JOSEPH E. ADDIEGO III (State Bar No. 169522)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111-6533
Telephone:    (415) 276-6500
Facsimile:    (415) 276-6599
joeaddiego@dwt.com

LEIV BLAD (State Bar No. 151353)
(APPLICATION FOR ADMISSION TO
THE NORTHERN DISTRICT PENDING)
CLIFFORD CHANCE US LLP
2001 K Street NW
Washington, D.C. 20006
Telephone:    (202) 912-5000
Facsimile:    (202) 912-6000
leiv.blad@cliffordchance.com

Attorneys for Defendants
BNP PARIBAS, and BNP PARIBAS
SECURITIES (ASIA) LIMITED

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THOMAS WEISEL PARTNERS LLC, a Delaware limited liability company, and THOMAS WEISEL INTERNATIONAL PRIVATE LIMITED, an Indian company,<br><br>                    Plaintiffs,<br><br>        v.<br><br>BNP PARIBAS, a French corporation, BNP PARTIBAS SECURITIES (ASIA) LIMITED, a Hong Kong company, and PRAVEEN CHAKRAVARTY, an individual,<br><br>                    Defendants. | Case No. CV-07-06198 MPH<br><br>**DECLARATION OF K.K. VENUGOPAL IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION AND FORUM NON CONVENIENS**<br><br>**Date: April 28, 2008**<br>**Time: 2:00 p.m.**<br>**Place: Courtroom 15**<br>**The Honorable Marilyn Hall Patel** |

DAVIS WRIGHT TREMAINE LLP

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| THOMAS WEISEL PARTNERS LLC, a Delaware limited liability company, and THOMAS WEISEL INTERNATIONAL PRIVATE LIMITED, an Indian company, | ) ) ) ) ) | No. C-07-06198 MHP |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| BNP PARIBAS, a French corporation, BNP PARIBAS SECURITIES (ASIA) LIMITED, a Hong Kong company, and PRAVEEN CHAKRAVARTY, an individual, | ) ) ) ) ) | |
| Defendants. | ) ) ) ) ) ) | |

### DECLARATION OF K.K. VENUGOPAL IN SUPPORT OF MOTION OF BNP PARIBAS, BNP PARIBAS SECURITIES (ASIA) LIMITED AND PRAVEEN CHAKRAVARTY TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION AND FORUM NON CONVENIENS

K.K. Venugopal makes the following declaration under 28 U.S.C. §1746:

1.      I have been retained by the firm of Clifford Chance, counsel for defendants BNP Paribas and BNP Paribas Securities (Asia) Limited in the above-captioned litigation, to provide my expert opinions on the matters set forth herein.

2.      I am a Senior Advocate of the Supreme Court of India, and have held this position since 1972. I have been practicing law in India since 1954. Through my 54 years of experience

WA413710.1

as an attorney in India, I am well-versed in Indian law.  A copy of my resume is attached hereto as Exhibit A.

3.    The Indian Contract Act, 1872 provides a cause of action for claims related to a breach of contract.  A copy of the relevant portion of the Indian code is attached hereto as Exhibit B.

4.    Indian law recognizes a cause of action to protect confidential information and trade secrets.  See *Pollock & Mulla's Indian Contract & Specific Relief Acts*, Manohar & Setalvad (Eds.), 12th edn., 2001, Volume 1, pp.819-823, attached hereto as Exhibit C.

5.    Indian law recognizes a cause of action related to intentional interference with employment relationships.  See *Ratanlal & Dhirajlal's The Law of Torts*, Singh (Ed.), 23rd edn., 1997, pp.329-331, attached hereto as Exhibit D. [See also Exhibit E]

6.    Indian law recognizes a cause of action related to intentional interference with contracts.  See *Ramaswamy Iyer's The Law of Torts*, 10th edn., 2007, pp.499-513, and *Ratanlal & Dhirajlal's The Law of Torts*, Singh (Ed.), 23rd edn., 1997, pp.319-323, attached hereto as Exhibit E.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 6, 2008.

K.K. Venugopal

2

WA413710.1

# Exhibit A

EXHIBIT 'A'

## K.K.VENUGOPAL

Born September 6, 1931;

Enrolled as an Advocate, January, 1954;

Designated Senior Advocate (The Indian equivalent of the Queen's Counsel in England) by the Supreme Court of India, March, 1972;

Was Additional Solicitor General of India, 1979-80;

Was conferred by the President of India the "Padma Bhushan" Award on the occasion of Republic Day, 2002;

President, Supreme Court Bar Association of India, 1990-91, 1994-95 and 1999-2000;

President, SAARCLAW (The International Association of Lawyers of the SAARC Countries), 1995-97;

President, Union Internationale des Avocats 1996-97 (The oldest among international associations of lawyers, with headquarters at Paris);

In 1997, received the "Grand Cross" award and medal from the Bar Association of Bagota, Columbia, as well as a medal and citation from the Bar Associations of Buenos Aires and Matanza, Argentina, in recognition of his achievement in human rights and legal multi-lingualism and multi-culturalism;

Vice-President, Bar Association of India;

Member, Executive Council & The General Council of the West Bengal National University of Juridical Sciences, Kolkata; Member, General Council of the National Academy of Legal Studies and Research University of Law (NALSAR University of Law), Hyderabad;

Member, Academic Council of the National Judicial Academy;

Member, National Legal Services Authority;

Honorary Member, American Bar Association;

Received the Global Award 2003 from the Chief Minister of Kerala, and the Eswara Iyer "Distinguished Lawyer Award" from the Kerala Bar Federation;

Editor-in-Chief of the Third and Fourth editions of the book "Justice Bachawat's: Law of Arbitration & Conciliation"

Delivered a number of lectures, including the following:

- 8th Dr. Zakir Husain Memorial Lecture, 2005;

- "Public Law Lectures 1997" at the Cochin University of Science & Technology (School of Legal Studies), 1998;

- The Third Delhi University Campus Law Centre Endowment Lecture, 1988;

- Justice V.R. Krishna Iyer Lecture 2003 at the National Law University, Jodhpur;

- A series of lectures on Constitutional Law at the John Marshall Law School, Chicago, USA, 1986

# Exhibit B

EXHIBIT 'B'

### THE INDIAN CONTRACT ACT, 1872
### ACT No. 9 OF 1872
### [25th April, 1872]

#### CHAPTER VI

OF THE CONSEQUENCES OF BREACH OF CONTRACT

73. **Compensation for loss or damage caused by breach of contract –**
When a contract has been broken, the party who suffers by such breach is
entitled to receive, from the party who has broken the contract,
compensation for any loss or damage caused to him thereby, which
naturally arose in the usual course of things from such breach, or which
the parties knew, when they made the contract, to be likely to result from
the breach of it.

Such compensation is not to be given for any remote and indirect loss or
damage sustained by reason of the breach.

Compensation for failure to discharge obligation resembling those created
by contract - When an obligation resembling those created by contract has
been incurred and has not been discharged, any person injured by the
failure to discharge it is entitled to receive the same compensation from
the party in default, as if such person had contracted to discharge it and
had broken his contract.

Explanation - In estimating the loss or damage arising from a breach
of contract, the means which existed of remedying the inconvenience
caused by the non-performance of the contract must be taken into
account.

**Illustrations**

a) A contracts to sell and deliver 50 maunds of saltpeter to B, at a certain
price to be paid on delivery. A breaks his promise. B is entitled to
receive from A, by way of compensation, the sum, if any, by which the
contract price falls short of the price for which B might have obtained
50 maunds of saltpeter of like quality at the time when the saltpeter
ought to have been delivered.

b) A hires B's ship to go to Bombay, and there take on board, on the first
of January, a cargo which A is to provide and to bring it to Calcutta, the
freight to be paid when earned. B's ship does not go to Bombay, but
A has opportunities of procuring suitable conveyance for the cargo
upon terms as advantageous as those on which he had chartered
the ship. A avails himself of those opportunities, but is put to trouble
and expense in doing so. A is entitled to receive compensation from B
in respect of such trouble and expense.

c) A contracts to buy of B, at a stated price, 50 maunds of rice, no time
being fixed for delivery. A afterwards informs B that he will not accept
the rice if tendered to him. B is entitled to receive from A, by way of
compensation, he amount, if any, by which the contract price exceeds ·

that which B can obtain for the rice at the time when A informs B that he will not accept it.

d) A contracts to buy B's ship for 60,000 rupees, but breaks his promise. A must pay to B, by way of compensation, the excess, if any, of the contract price over the price which B can obtain for the ship at the time of the breach of promise.

e) A, the owner of a boat, contracts with B to take a cargo of jute to Mirzapur, for sale at that place, starting on a specified day. The boat, owing to some avoidable cause, does not start at the time appointed, whereby the arrival of the cargo at Mirzapur is delayed beyond the time when it would have arrived if the boat had sailed according to the contract. After that date, and before the arrival of the cargo, the price of jute falls. The measure of the compensation payable to B by A is the difference between the price which B could have obtained for the cargo at Mirzapur at the time when it would have arrived if forwarded in due course, and its market price at the time when it actually arrived.

f) A contracts to repair B's house in a certain manner, and receives payment in advance. A repairs the house, but not according to contract. B is entitled to recover from A the cost of making the repairs conform to the contract.

g) A contracts to let his ship to B for a year, from the first of January, for a certain price. Freights rise, and, on the first of January, the hire obtainable for the ship is higher than the contract price. A breaks his promise. He must pay to B, by way of compensation, a sum equal to the difference between the contract price and the price for which B could hire a similar ship for a year on and from the first of January.

h) A contracts to supply B with a certain quantity of iron at a fixed price, being a higher price than that for which A could procure and deliver the iron. B wrongfully refuses to receive the iron. B must pay to A, by way of compensation, the difference between the contract price of the iron and the sum for which A could have obtained and delivered it.

i) A delivers to B, a common carrier, a machine, to be conveyed, without delay, to A's mill informing B that his mill is stopped for want of the machine. B unreasonably delays the delivery of the machine, and A, in consequence, loses a profitable contract with the Government. A is entitled to receive from B, by way of compensation, the average amount of profit which would have been made by the working of the Mill during the time that delivery of it was delayed, but not the loss sustained through the loss of the Government contract.

j) A, having contracted with B to supply B with 1,000 tons of iron at 100 rupees a ton, to be delivered at a stated time, contracts with C for the purchase of 1,000 tons of iron at 180 rupees a ton, telling C that he does so for the purpose of performing his contract with B. C fails to perform his contract with A, who cannot procure other iron, and B, in consequence, rescinds the contract. C must pay to A 20,000 rupees, being the profit which A would have made by the performance of his contract with B.

k) A contracts with B to make and deliver to B, by a fixed day, for a specified price, a certain piece of machinery. A does not deliver the piece of machinery at the time specified, and in consequence of this,

B is obliged to procure another at a higher price than that which he was to have paid to A, and is prevented from performing a contract which B had made with a third person at the time of his contract with A but which had not been then communicated to A, and is compelled to make compensation for breach of that contract. A must pay to B, by way of compensation, the difference between the contract price of the piece of machinery and the sum paid by B for another, but not the sum paid by B to the third person by way of compensation.

l) A, a builder, contracts to erect and finish a house by the first of January, in order that B may give possession of it at that time to C, to whom B has contracted to let it. A is informed of the contract between B and C. A builds the house so badly that, before the first of January, it falls down and has to be re-built by B, who, in consequence, loses the rent which he was to have received from C, and is obliged to make compensation to C for the breach of his contract. A must make compensation to B for the cost of rebuilding the house, for the rent lost, and for the compensation made to C.

m) A sells certain merchandise to B, warranting it to be of a particular quality, and B, in reliance upon this warranty, sells it to C with a similar warranty. The goods prove to be not according to the warranty, and B becomes liable to pay C a sum of money by way of compensation. B is entitled to be reimbursed this sum by A.

n) A contracts to pay a sum of money to B on a day specified. A does not pay the money on that day; B, in consequence of not receiving the money on that day, is unable to pay his debts, and is totally ruined. A is not liable to make good to B anything except the principal sum he contracted to pay, together with interest up to the day of payment.

o) A contracts to deliver 50 maunds of saltpeter to B on the first of January, at a certain price. B afterwards, before the first of January, contracts to sell the saltpeter to C at a price higher than the market price of the first of January. A breaks his promise. In estimating the compensation payable by A to B, the market price of the first of January, and not the profit which would have arisen to B from the sale to C, is to be taken into account.

p) A contracts to sell and deliver 500 bales of cotton to B on a fixed day. A knows nothing of B's mode of conducting his business. A breaks his promise, and B, having no cotton, is obliged to close his mill. A is not responsible to B for the loss caused to B by the closing of the mill.

q) A contracts to sell and deliver to B, on the first of January, certain cloth which B intends to manufacture into caps of a particular kind, for which there is no demand, except at that season. The cloth is not delivered till after the appointed time, and too late to be used that year in making caps. B is entitled to receive from A, by way of compensation, the difference between the contract price of the cloth and its market price at the time of delivery, but not the profits which he expected to obtain by making caps, nor the expenses which he has been put to in making preparation for the manufacture.

r) A, a ship-owner, Contracts with B to convey him from Calcutta to Sydney in A's ship, sailing on the first of January, and B pays to A, by way of deposit, one-half of his passage-money. The ship does not

sail on the first of January, and B, after being in consequence detained in Calcutta for some time and thereby put to some expense, proceeds to Sydney in another vessel, and, in consequence, arriving too late in Sydney, loses a sum of money. A is liable to repay to B his deposit with interest, and the expense to which he is put by his detention in Calcutta, and the excess, if any, of the passage-money paid for the second ship over that agreed upon for the first, but not the sum of money which B lost by arriving in Sydney too late.

74. **Compensation for breach of contract where penalty stipulated for-**
[When a contract has been broken, if a sum is named in the contract as the amount to be paid in case of such breach, or if the contract contains any other stipulation by way of penalty, the party complaining of the breach is entitled, whether or not actual damage or loss is proved to have been caused thereby, to receive from the party who has broken the contract reasonable compensation not exceeding the amount so named or, as the case may be, the penalty stipulated for.
Explanation.- A stipulation for increased interest from the date of default may be a stipulation by way of penalty.]
Exception.- When any person enters into any bail-bond, recognizance or other instrument of the same nature, or, under the provisions of any law, or under the orders of the 1*[Central Government] or of any State Government, gives any bond for the performance of any public duty or act in which the public are interested, he shall be liable, upon breach of the condition of any such instrument, to pay the whole sum mentioned therein.
Explanation.- A person who enters into a contract with Government does not necessarily thereby undertake any public duty, or promise to do an act in which the public are interested.

**Illustrations**
a) A contracts with B to pay B Rs. 1,000, if he fails to pay B Rs. 500 on a given day. A fails to pay B Rs. 500 on that day. B is entitled to recover from A such compensation, not exceeding Rs. 1,000, as the Court considers reasonable.
b) A contracts with B that, if A practices as a surgeon within Calcutta, he will pay B Rs. 5,000. A practice as a surgeon in Calcutta. B is entitled to such compensation, not exceeding Rs. 5,000, as the Court considers reasonable.
c) A gives a recognizance binding him in a penalty of Rs. 500 to appear in Court on a certain day. He forfeits his recognizance. He is liable to pay the whole penalty.
d) A gives B a bond for the repayment of Rs. 1,000 with interest at 12 per cent at the end of six months, with a stipulation that, in case of default, interest shall be payable at the rate of 75 per cent from the date of default. This is a stipulation by way of penalty, and B is only entitled to recover from A such compensation as the Court considers reasonable.
e) A, who owes money to B a money-lender, undertakes to repay him by delivering to him 10 maunds of grain on a certain date, and stipulates that, in the event of his not delivering the stipulated amount by the stipulated date, he shall be liable to deliver 20 maunds. This is a stipulation by way of penalty, and B is only entitled to reasonable compensation in case of breach.
f) A undertakes to repay B a loan of Rs.1,000 by five equal monthly

installments, with a stipulation that" in default of payment of any installment, the whole shall become due. This stipulation is not by way of penalty, and the contract may be enforced according to its terms.

g)  A borrows Rs. 100 from B and gives him a bond for Rs. 200 payable by five yearly installments of Rs. 40, with a stipulation that, in default of payment of any installment, the whole shall become due. This is a stipulation by way of penalty.

75.  **Party rightfully rescinding contract entitled to compensation –**
A person who rightfully rescinds a contract is entitled to compensation for any damage which he has sustained through the non-fulfilment of the contract.

**Illustration**
A, a singer, contracts with B, the manager of a theatre, to sing at his theatre for two nights in every week during the next two months, and B engages to pay her 100 rupees for each night's performance. On the sixth night, A willfully absents herself from the theatre, and B, in consequence, rescinds the contract. B is entitled to claim compensation for the damage which he has sustained through the non-fulfilment of the contract.

# Exhibit C

EXHIBIT 'C'

# Pollock & Mulla

## Indian Contract & Specific Relief Acts

Twelfth Edition

### Vol – I

**NILIMA BHADBHADE**
ILS Law College
Pune–411 004

General Editors

JUSTICE SUJATA MANOHAR
Member, National Human Rights Commission &
Former Judge, Supreme Court of India

ATUL SETALVAD
Senior Advocate



**Butterworths**
A Member of the LexisNexis Group

for a period of 12 months after termination of service was held unenforceable in Australia.[25] This was because of the notorious shortage of labour and economic situation and because of the shortage of houses,[26] and because it was not limited to the area where the workman was employed. A manager of a bookmaker's business had agreed to a covenant not to carry on business within 12 miles and for three years. He had the book containing the names and addresses of customers. Yet this agreement was held unenforceable as the nature of business was not such that the customers would seek out the defendant or he had acquired any personal goodwill, confidential information or knowledge to endanger the plaintiff's business. The agreement was against legitimate competition.[27] An agreement between an insurance company and one of its employees provided that the employee after ceasing to be an employee of the company will not solicit business from the company's clients, a term narrowly defined and the period of prohibition was five years. It was held that the clause prohibiting soliciting the customers of the company was not unreasonable but the term of five years was unreasonable, restraint making the agreement void.[28]

*Protection of trade secrets and confidential information*

In an employment contract, the employer has two interests worthy of protection: trade secrets and business connections. In case of restraints in contracts of employment, it is not enough that the employer's business will suffer from competition. It must be shown that the employee has entered into a contract with the customer or has trade secrets of the employer. In such cases the nature of the business and the nature of the employment are relevant factors; but although an employer can protect his trade secrets or other confidential information, he cannot prevent the use of the employee's own knowledge, skill or experience, even if this is acquired during the course of employment.[29]

An employee owes a duty of fidelity to his employer. He must not disclose to others or use to his own profit trade secrets or confidential information which he learns during the course of employment. Equity awards injunction against such ending servants[30] and common law awards damages.[31] An employee

25   *Lindner v Murdock's Garage* (1950) 83 CLR 628.
26   Ibid at 641.
27   *SW Strange Ltd v Mann* [1965] 1 All ER 1069, [1965] 1 WLR 629.
28   *Stenhouse Australia Ltd v Phillips* [1974] AC 391, [1974] 1 All ER 117 at 123–24 (PC).
29   *Herbert Morris Ltd v Saxelby* [1916] 1 AC 688 at 710, [1916–17] All ER Rep 305; *Faccenda Chicken Ltd v Fowler* [1987] Ch 117, [1986] 1 All ER 617; *Commercial Plastics Ltd v Vincent* [1965] 1 QB 623, [1964] 3 All ER 546 (CA); *Lansing Linde Lts v Kerr* [1991] 1 All ER 418, [1991] 1 WLR 251; *Universal Thermosensors Ltd v Hibben* [1992] 3 All ER 257, [1992] 1 WLR 840.
30   *Lamb v Evans* [1893] 1 Ch 218; *Amber Size and Chemical Co v Menzel* [1913] 2 Ch 239 (secret process); *Forster and Sons Ltd v Suggett* (1918) 35 TLR 87 (mixture of gas and air for glass making; knowledge gained of); *Fitch v Dewes* [1920] 2 Ch 159 at 181–82 (Customers being enticed away); on appeal [1921] 2 AC 158, [1921] All ER Rep 13 (solicitor's managing clerk).
31   *Robb v Green* [1895] 2 QB 315, [1895–99] All ER Rep 1053.

may not divulge 'trade secrets' acquired during his employment, even in the absence of an express contractual prohibition. But an employer cannot protect himself against the use of confidential information acquired during employment, unless it amounts to a 'trade secret'.[32] An employer is entitled to protect confidential information which amounts to a 'trade secret' or which prevents 'some personal influence over customers being abused in order to entice them away'.[33] Lord Parker in *Herbert Morris Ltd v Saxelby*,[34] emphasised that for the restraint to be justifiable, the servant must be one of who has acquired not merely knowledge of customers, but in addition influence over them.

An employer can prohibit lawfully his employee from accepting, after determination of his employment, such a position where he is likely to utilise the information of secret processes and trade secrets acquired by him during the course of employment. He may also covenant to prohibit his employee from setting up on his own or accepting employment with the employer's competitors likely to destroy the employer's trade connections by a misuse of acquaintance with the employers' clients. The employee may also be prevented by covenant from soliciting the former employer's customers or clients.

Confidential information must be highly confidential before it could be classed as trade secret. In deciding whether information amounted to a trade secret, the following factors are relevant: (a) the status of the employee and the nature of his work; (b) the nature of the information itself; (c) whether the employer impressed the confidentiality of the information on his employees; (d) whether the information could easily be isolated from other information which the employee was free to use. A good practical working rule is that information normally carried in the employee's head may be used, but if the employee takes or copies or even memorises lists of customers or similar information, this may well be a breach of the employee's duties even in the absence of an express covenant.[35] ... ... ... ... .

The classic explanation of this duty has been that of implied term in the contract of employment.[36] But this has ceased to be the view and now it is said to be based on duty of confidence.[37] Where it is proved that the employer is justified in apprehending that the employee may, on joining the service of the competitor, divulge the special knowledge and secrets in business gained by him while in the employer's service, after receiving special training, injunction to enforce negative contract which is restricted as to time, nature of employment

32. *Faccenda Chicken Ltd v Fowler* [1987] Ch 117, [1986] 1 All ER 617.
33. *ibid* at 139, [1986] 1 All ER 617, but see *Balston v Headline Filters Ltd* [1987] 13 FSR 330.
34. [1916] 1 AC 688, [1916–17] All ER Rep 305 at 317.
35. *Universal Thermosensors Ltd v Hibben* [1992] 3 All ER 257, [1992] 1 WLR 840; Atiyah, *Introduction to the Law of Contract*, 5th edn, p 329.
36. *Lamb v Evans* [1893] 1 Ch 218.
37. *Cranleigh Precision Engineering Ltd v Bryant* [1964] 3 All ER 289, [1965] 1 WLR 1293; *Saltman Engg Co v Campbell Engg Co* [1963] 3 All ER 413.

and area, can be issued in order to protect the employer's interest.[38]

In *Cranleigh's case*[39] an injunction was given against a servant who as a servant acquired confidential information and sought to take advantage of it after leaving the service of the master. This would be so even where the servant's conduct is not dishonest, but inconsistent with his duty towards the master who would be entitled to dismiss the servant summarily.[40] The principle was extended to licencees of a patent, who used for their own benefit, further ideas communicated and information given before negotiations, to them by the patentees for the purpose of manufacturing their machines[41] which proved abortive. The court awarded damages as compensation even though the use by the defendant was honestly done and the breach was innocent.[42]

### Restraint must be Reasonable

The restraint in order to prevent misuse of trade secrets or business connections has to be reasonable in the interest of the parties affording no more than adequate protection to the covenantee which will depend upon two factors of time and space. As the time of restriction lengthens or the space of its operation grows, the weight of the onus on the covenantee to justify it grows too;[43] but a restraint for life was held valid in *Fitch v Dewes*,[44] a case of a solicitor's clerk. An ex-servant confidentially employed in the manufacture of an article under a secret process is under an implied obligation to his late master not to disclose any knowledge or information as to that secret process acquired during his employment.[45] This applies to information retained in servant's memory as well as to information committed to writing and existing in a tangible form.[46] An injunction will be granted where the court is satisfied as to the existence of a secret process the servant has learnt during his service and of its misuse by the servant, even without the disclosure of the secret process to the court.[47] A restraint against competition is justifiable if its object is to prevent the exploitation of trade secrets learned by the servant, in the course of his

---

38  *Niranjan Shankar Golikari v Century Spg and Mfg Co Ltd* [1967] 2 SCR 367, AIR 1967 SC 1098;  *Sandhya Organic Chemicals Pvt Ltd v United Phosphorus Ltd* AIR 1997 Guj 177 (In the circumstances, injunction not granted).

39  *Cranleigh Precision Engineering Ltd v Bryant* [1964] 3 All ER 289, [1965] 1 WLR 1293 at 1311.

40  *Sinclair v Neighbour* [1966] 3 All ER 988.

41  *National Broach and Machine Co v Churchill Gear Machines Ltd* [1965] 2 All ER 961.

42  *Seager v Copydex* [1967] 2 All ER 415.

43  *Attwood v Lamont* [1920] 3 KB 571 per Younger LJ, at 589, [1920] All ER Rep 55; *Fitch v Dewes* [1920] 2 AC 158, [1921] All ER Rep 13;  *Halsbury's Laws of England*, fourth edn, Vol 47, para 40.

44  [1921] 2 AC 158, [1921] All ER Rep 13.

45  *Amber Size and Chemical Co v Menzel* [1913] 2 Ch 239.

46  Ibid.

47  Ibid.

821

S 27          *Indian Contract and Specific Relief Acts*

employment, viz in *Forster & Sons Ltd v Suggett*,[48] where a works manager had knowledge of certain confidential methods concerning to correct mixture of gas and air furnaces for making glass and glass bottles. An employer is also entitled to protect his trade connection, that is to prevent his customers from being enticed away by a servant formerly in his employment;[49] but if the so-called secrets is nothing more than a special method of organisation adopted in the business or if only part of the secret is known to the servant so that its successful exploitation by him is impossible, there can be no valid restraint.[50]

A contract not to divulge a trade secret may be reasonable though unlimited as to space or time and a restraint imposed in order to give effect to such a contract would apparently be treated in the same way.[51] But a covenant reasonably necessary to protect an employer against the betrayal of trade secrets or confidential information is not void merely because it unavoidably protects the employer against competition.[52]

### Breach of Confidence

No one can divulge to the world information received in confidence without just cause or excuse; even if he acquires it innocently. But the complaining party must be entitled to have the confidence respected and be one to whom duty of good faith is owed.[53] But there is an exception, eg to the disclosure of iniquity.[54] Commenting on the word 'iniquity' Denning MR has observed that this is not a principle but merely a just cause or excuse for breaking confidence. There may be cases of breach of confidence which are defamatory where the courts may intervene even though justification is pleaded.[55] The confidence can be enforced by injunction as well as damages.[56]

The duty to observe confidence is based on broad principle of equity that he who has received information in confidence shall not take unfair advantage

48  (1918) 35 TLR 87
49  *Fitch v Dewes* [1920] 2 Ch 159 at 181–82; affirmed in [1921] 2 AC 158, [1921] All ER Rep 13.
50  *Herbert Morris Ltd v Saxelby* [1916] 1 AC 688, [1916–17] All ER Rep 305.
51  *Halsbury's Laws of England*, fourth edn, Vol 47, para 40.
52  Ibid para 42; *Herbert Morris Ltd v Saxelby* [1916] 1 AC 688 at 710, [1916–17] All ER Rep 305; *Attwood v Lamont* [1920] 3 KB 571 at 597, [1920] All ER Rep 55; *Forster & Sons Ltd v Suggett* (1918) 35 TLR 87; *Gopal Paper Mills v Surendra Kumar Ganesh Das Malhotra*, AIR 1962 Cal 61 at 66.
53  *Fraser v Evans* [1969] 1 All ER 8 at 11; *Albert (Prince) v Strange* (1949) 1 Mac & G 25; *Duchess of Argyll v Duke of Argyll* [1967] Ch 302, [1965] 1 All ER 611 referred to.
54  *Gartside v Outram* (1857) 26 LJ Ch 113 at 1124; *Initial Services Ltd v Putterill* [1968] 1 QB 396, [1967] 3 All ER 145.
55  *Fraser v Evans* [1969] 1 All ER 8 at 11; distinguishing *Sim v Heinz & Co Ltd* [1959] 1 All ER 547.
56  *National Broach and Machine Co v Churchill Gear Machines Ltd* [1965] 2 All ER 961; *Saltman Engg Co v Campbell Engg Co* [1963] 3 All ER 413.

of it.[57] But when the information is mixed, partly private and partly public, then the recipient must take special care to use only the material which is in the public domain.[58] An injunction can also be given against an innocent third party to whom the information is passed on.[59]

### Sale of Goodwill

Although a restraint seeking to protect the covenantee against competition per se is not upheld in the case of other contracts,[60] a purchaser of a business is entitled to protect himself against competition *per se* on the part of the vendor.[61]

This exception deals with a class of cases which had a leading part in causing the old rule against agreements in restraint of trade to be relaxed in England. The rule arose apparently from a popular dislike of all combinations tending to raise prices, which may be compared with the agitation in America against the modern system of 'trusts'. It has been laid down in quite modern cases, as the governing principle, that 'no power short of the general law,' not even the party's own bargain, should be allowed to restrain a man's discretion as to the manner in which he shall carry on his business,[62] and originally the rule was without exceptions. 'In time, however, it was found that a rule so rigid and far-reaching must seriously interfere with transactions of everyday occurrence',[63] and from the early 16th Century onwards restrictions 'for a time certain,' to prevent the seller of a business from competing with the buyer, were allowed. In the 19th Century it was settled that a limit of time was not necessary, and contracts for the preservation of trade secrets were held to be outside the rule, altogether, and finally, the House of Lords declared that there was no hard and fast rule as such at all. The question is always whether the

57   *Seager v Copydex* [1967] 2 All ER 415 per Lord Denning at 417.
58   Ibid.
59   *Printers and Publishers Ltd v Holloway* [1964] 3 All ER 731 per Cross J, at 739, [1965] 1 WLR 1; *Albert (Prince) v Strange* [1949] 1 Mac and G 25.
60   *Herbert Morris Ltd v Saxelby* [1916] 1 AC 688, [1916–17] All ER Rep 305; applied in *Kores Mfg Co Ltd v Kolok Mfg Co Ltd* [1959] Ch 108, [1958] 2 All ER 65; *Atwood v Lamont* [1920] 3 KB 571, [1920] All ER Rep 55; *McEllistrim v Ballymacelligott Co-op Agriculture and Dairy Society Ltd* [1919] AC 548 at 562–63; *Vancouver Malt and Sake Brewing Co Ltd v Vancouver Breweries Ltd* AIR 1934 (PC) 101, [1934] AC 181 at 191, [1934] All ER Rep 38 at 41 (PC); not applying *Stewart v Stewart* (1899) 1 F (Ct of Sess) 1158.
61   *Herbert Morris Ltd v Saxelby supra*; Halsbury's Laws of England, fourth edn, Vol 47, para 27; *Atwood v Lamont* [1920] 3 KB 571 at 589, [1920] All ER Rep 55; *Vancouver Malt and Sake Brewing Co Ltd v Vancouver Breweries Ltd* AIR 1934 PC 101, [1934] AC 181, [1934] All ER Rep 38 at 41 (PC).
62   *Hilton v Eckersley* (1856) 6 E & B 47 at 74, 106 R & R 507 at 522, 25 LJQB 199.
63   Lord Macnaghten in *Nordenfelt v Maxim Nordenfelt Guns and Ammunition Co Ltd* [1894] AC 535 at 564, [1891–94] All ER Rep 1.

# Exhibit D

EXHIBIT 'D'

RATANLAL & DHIRAJLAL'S

# The
# Law of
# Torts

With exhaustive notes, comments, case-law references, also containing commentary on Bhopal Gas Leak Disaster (Processing of Claims) Act, 1985 and Bhopal Gas Leak Disaster (Registration and Processing of Claims) Scheme, 1985.

by

## RATANLAL RANCHHODDAS, B.A., LL.B.,
Advocate (O.S.), Bombay High Court

AND

## DHIRAJLAL KESHAVLAL THAKORE, B.A.,
Of Lincoln's Inn, Barrister-at-Law

*Authors of "The Indian Penal Code", "The Law of Evidence",*
*"The Criminal Procedure Code" etc.*

### Twenty-third Edition 1997
### (Thoroughly Revised & Revitalised)
by

## Guru Prasanna Singh,
M.Sc., LL.B., LL.D.(Hon.), Lokayukt Madhya Pradesh, Former Chief Justice of Madhya Pradesh High Court, Former Chairman MP Law Commission, Author of 'Principles of Statutory Interpretation'.

it was held that there was a distinction between an honest combination among intending purchasers and a dishonest concert for the suppression of all competition. MOOKERJEE, J., in an earlier decision,[23] had observed: "The test, in each case, is what was the object of the agreement among the bidders; it is the end to be accomplished which determines whether a combination is lawful or otherwise. If the object be to obtain the property at a sacrifice by artifice, the combination is fraudulent; if the object be to make a fair bargain or even to divide the property for the accommodation of the purchasers, the combination cannot be said to be fraudulent."

The Supreme Court of India in *Rohtas Industries Ltd. v. Rohtas Industries Staff Union*,[24] held that if the object of a strike by workmen belonging to a Union is to bring the employer to terms with the employees or to bully the rival Trade Union into submission, there cannot be an actionable combination in tort although the strike is illegal under the Industrial law.

The cases discussed above illustrate and bring out that what is required is that the combiners should have acted *in order that* (not with the result that, *even the foreseeable result*) the plaintiff should suffer damage. If they did not act in order that the plaintiff should suffer damage, they are not liable, however selfish their attitude and however inevitable the plaintiff's damage may have been.[25]

As the tort of conspiracy to injure by unlawful means is not complete without pecuniary loss, any damages at large had to be referrable to the act causing the pecuniary loss which constituted the tort.[1] Damages for injury to reputation or business reputation or injury to feelings can only be recovered in action for defamation and not in an action for conspiracy to injure by lawful means.[2]

#### 4(C) Unlawful means conspiracy

If a combination of persons uses unlawful means to achieve their object and damage results to the plaintiff, he will be no doubt entitled to sue the persons combining for conspiracy if their predominant purpose was to injure the plaintiff. Further, if the unlawful means employed by the combiners are themselves actionable by the plaintiff, even without the combination, the plaintiff will be entitled to sue the persons combining as joint tort-feasors for the damage caused to him without taking the aid of the tort of conspiracy. But what happens when the means employed are not actionable though they are unlawful? The answer given to this question by the Supreme Court of India,[3] and the House of Lords,[4] is that persons combining to use such unlawful means cannot be sued for conspiracy by the plaintiff suffering damage unless the purpose of the combination was to injure him. But the purpose to injure the plaintiff need not be the predominant purpose if unlawful means are used; it is sufficient if it is one of the purposes.[5]

In *Rohtas Industries v. Rohtas Industries Staff Union*,[6] the facts were that the

23. *Anibika Prasad Singh v. R.H. Whitewell and Sitaram Singh*, (1907) 6 CLJ 111, 115. See *Mahomed v. Savvasi*, (1900) 2 Bom LR 640 (643)=27 I.A 17=ILR 23 Mad 227 (PC); *Maung Sein Htin v. Chee Pan Ngaw*, ILR (1925) 3 Ran 275.
24. (1976) 2 SCC 82 (95).
25. WINFIELD & JOLOWICZ, Tort, 12th edition, p. 528.

1. *Lonrho plc. v. Fayed*, (1994) 1 All ER 188 (CA).
2. *Ibid.*
3. *Rohtas Industries Ltd. v. Rohtas Industries Staff Union*, (1976) 2 SCC 82.
4. *Lonrho Ltd. v. Shell Petroleum Co. Ltd.*, (1981) 2 All ER 456 (HL.).
5. *Lonrho PLC v. Fayed*, (1991) 3 WLR 188 (HL.).
6. (1976) 2 SCC 82.

workmen of two industrial establishments (appellants before the Supreme Court) went on strike. The strike was illegal under section 23 read with section 24 of the Industrial Disputes Act, as conciliation proceedings were pending. Section 26 of the Act provides for prosecution for starting and continuing an illegal strike. The question before the Supreme Court was whether the workmen were liable to pay compensation to the management for the loss caused during the period of strike. The Supreme Court held that illegal strike is a creation of the Act and prosecution under section 26 of the Act is the only remedy which can be availed of and no relief of compensation can be claimed.[7] It was further held that as the object of the strike was not the infliction of damage or destruction on the management, but to bring the employer to terms with the employees or to bully the rival trade union into submission it was not actionable as a conspiracy even though it was illegal.[8] It may be noted that here the strike was the means adopted by the workmen for achieving their object. The strike was illegal, though not actionable; so it can be said that the means adopted was unlawful. Yet, it was held that the tort of conspiracy was not made out for the object of the combiners was not to harm the management but to benefit themselves.

In *Lonrho Ltd. v. Shell Petroleum Co. Ltd.*[9] the House of Lords had to consider a claim for damages for breach of statutory sanctions to stop supply and delivery of oil to Southern Rhodesia which was punishable as a criminal offence. It was held, that the sanctions could not be said to be imposed for the benefit or the protection of any particular class of persons or to create a public right to be enjoyed by the subjects of the Crown, and therefore, the violation of the sanctions could not give rise to any claim for damages. As regards the tort of conspiracy, it was held that the purpose of the respondents in entering into any agreement to contravene the sanctions was to further their own commercial interests rather than to injure the appellants and there could be, therefore, no claim against the respondents in conspiracy. In this case again, the means adopted by the combiners was unlawful, though not actionable, yet the claim in conspiracy failed as the dominant purpose of the combiners was not to harm the appellants but to benefit themselves.

The House of Lords recently clearly held that when conspirators intentionally injure the plaintiff and use unlawful means to do so, it is no defence for them to show that their primary or predominant purpose was to further or protect their own interests; it is sufficient to make their action tortious that the means used were unlawful and their was intent to injure the plaintiff.[10]

## 5. INTERFERENCE WITH TRADE, BUSINESS OR OCCUPATION BY UNLAWFUL MEANS

The English law does not recognise an innominate tort of the nature of an "action for damages upon the case" available to "a person who suffers harm or loss as the inevitable consequence of the unlawful, intentional and positive acts of

7. *Ibid.* pp 96, 97.
8. *Ibid.*, p 95.
9. (1981) 2 All ER 456 (HL).

10. *Lonrho PLC v. Fayed,* (1991) 3 WLR 188 (HL).

WRONGS RELATING TO DOMESTIC RELATION

another."[11] But it does recognise a tort of "interfering with the trade or business of another person by doing unlawful acts."[12] Indeed, the tort of procuring of another person to break a subsisting contract is but one species of the wider tort of interfering with trade or business.[13] The tort may also cover occupations in addition to trade or business. An action will thus lie if a man threatens the tenants of another, whereby they depart from their tenures or if he threatens the workmen or customers who come to his stone-pit.[14] Similarly, an action lay when the defendant fired guns near a decoy for catching wild fowls owned by the plaintiff to frighten wild fowls away from it.[15] The ambit of this tort is yet not clear.[16] It seems that it is necessary to prove that the unlawful act was directed against the plaintiff or was intended to harm him.[17] Some uncertainty in the application of this tort is likely to result because of ambiguity of 'unlawful' acts. It appears that the violation of a statutory prohibition will not in this context be construed as unlawful if the statute creating the prohibition provides for a remedy, e.g. prosecution for an offence and intends that the remedy so provided should be treated as exclusive.[18]

11. *Lonrho Ltd. v. Shell Petroleum Ltd.*, (1981) 2 All ER 456 (HL) p. 463. See further Chapter 7, title 3, text and notes 9 to 13, p. 22, *ante*.

12. *Merkur Island Shipping Corpn. v. Laughton*, (1983) 2 All ER 189 (HL) (196); *J.T. Stratford & Son Ltd. v. Lindley*, (1965) AC 169 (HL) pp. 324, 329.

13. *Merkur Island Shipping Corpn. v. Laughton*, *supra* pp. 196, 197.

14. Com Dig A 6; *Bell v. The Midland Ry. Co.*, 2 Ld Raym 938; *Tarleson v. M. Gawley*, 170 ER

153; *Garret v. Taylor*, 79 ER 485.

15. *Carrington v. Taylor*, 103 ER 1126; *Keeble v. Hickeringill*, 103 ER 1127.

16. *Lonrho Plc v. Fayed*, (1989) 2 All ER 65 (CA).

17. *Ibid.*

18. *Rohtas Industries v. Rohtas Industries Staff Union*, (1976) 2 SCC 82; *Lonrho Ltd. v. Shell Petroleum Co. Ltd.*, (1981) 2 All ER 456 (HL). These cases have been discussed earlier in this Chapter under title 4 (C).

# Exhibit E

EXHIBIT 'E'

Ramaswamy Iyer's
# The Law of Torts

### Tenth Edition

**A Lakshminath**

*Vice-Chancellor, Chanakya National Law University, Patna*
*Former Professor-Registrar, NALSAR University of Law, Hyderabad*

and

**M Sridhar**

*Professor, NALSAR University of Law, Hyderabad*



wrongdoing without just cause or excuse.[54] Besides the provisions of the Trade Disputes Act 1906, and the Indian Trade Unions Act 1926, assume that interference with a person's trade, business or employment is actionable in the absence of a just cause like a trade dispute. In *Conway v Wade*,[55] the defendant, a district delegate of a trade union, procured the plaintiff's discharge by his employers by telling them that if they did not discharge the plaintiff there will be trouble with other union men employed by them. In doing this, he acted only as a mischief maker and without any authority of his union. The fact that the plaintiff had failed to pay a fine levied by the union nearly ten years ago, was alleged as a reason but, was simply a cloak for the defendant's improper action. The House of Lords held that there was no trade dispute under the Act of 1906, and that he was liable. However, as against these authorities, the rule propounded by the House of Lords in *Allen v Flood*,[56] is regarded as settling the law in the opposite direction.

### 15.1.3.1.2.1 The Rule In *Allen v Flood*

The rule is that 'an act lawful in itself is not converted by a malicious or bad motive into an unlawful act so to make the doer of it liable to a civil action'. From the application of this rule, conspiracy was excepted.[57] In that case the plaintiffs were two shipwrights or workers on the woodwork of a ship. They had been engaged on repairs of a ship while some iron-workers were also engaged in the iron part of it. The iron-workers came to know that the plaintiffs had been previously employed for doing the iron-work in another ship and thereupon resolved in a meeting of their union not to work with the plaintiffs, employers who thereupon discharged the plaintiffs. In doing so, the employers did not commit a breach of contract as the plaintiffs had been engaged from day to day. The House of Lords, by a majority held that the defendant was not liable on two grounds; first, he did nothing wrong in communicating to the plaintiff's employers, the decision of his men which had been arrived at without his intervention, and indeed, he was within his rights in trying to settle the matter which he could only be telling the employers about the position. Second, even if he acted maliciously in procuring the dismissal of the plaintiffs, his act was not wrongful. The first ground would have sufficed for the decision but

---

54  *Mogul Steamship Co v McGregor* (1888) 23 QBD 613, per Bowen LJ; *Skinner & Co v Shew & Co* (1893) 1 Ch 413, p 422; Pollock, *Torts*, p 421.
55  [1909] AC 506.
56  [1898] AC 1.
57  [1898] AC 124, per Lord Herschell.

the second one on which there was a large volume of dissent was propounded in the form of a general rule above set out. We have to revert to the rule again when we discuss motive as an element of liability for a tort, but here it is necessary to make the following comments on it. First, interference with another's business or trade by inducing others not to deal with him cannot be described as an act lawful in itself. It falls rather within the category of acts which are lawful only if they have a just cause or excuse. Therefore, it has been suggested in later cases[59] that the rule is applicable only to acts which are absolutely lawful, such as user of property by digging a well in it. So regarded, the rule becomes innocuous. However it was intended to have a wider operation and has had it. Second, the decision in *Allen v Flood* creates an anomaly in the law for which there is no reason or need. While one or more persons who combine to cause damage to another are liable to him if their object was to cause damage, a single individual acting similarly, is not. So a trade union can be held liable for such conduct but not one of its officers who abuses his position and influences and brings about a strike for personal reasons of his own. No more adequate explanation for the anomaly could be given, except that law is not logical.[60]

In *Crofter Handwoven Harris Tweed Co v Veitch*,[61] Lord Wright observed that 'the distinction between conduct by one man and conduct between two or more, might be difficult to justify' and that 'the rule in regard to the former though well established in English law, has been strongly criticized by some high legal authorities who would solve the apparent antinomy by holding that deliberate action causing injury is actionable whether done by one or several.' Before passing, it may be mentioned that the decision in *Allen v Flood* and the rather sweeping observations in it about motive being irrelevant in the law had, as we shall see later, unfortunate results on the development of the law of actionable conspiracy. The *American Restatement* departs from it and propounds the following rule:[62] one who without a privilege to do so procures a third person not to perform a contract with another or not to enter into or continue a business relation with another is liable to that other for the harm caused thereby. Therefore,

---

58  While in the House, the decision was by a majority of six to three, the judges in the courts below and six out of the eight judges who consulted, took the opposite view.

59  *Quinn v Leathem* [1901] AC 495, p 524, per Lord Brampton.

60  [1901] AC 506, per Lord Halsbury whose observation is oft-quoted; *Crofter Handwoven Harris Tweed Co v Veitch* [1942] AC 467, per Lord Wright.

61  [1942] AC 435; [1901] AC 535, per Lord Lindley who opined that *Allen v Flood* did not preclude a single individual's liability. But see *Thomson v Deakin* (1952) Ch 646 (CA).

62  Vol IV, para 766. However this rule does not apply to inducement to break a contract or to refuse a contract of marriage; para 698. This may be controversial.

*Interference with Commercial and Business Relations*

procuring a breach of contract and procuring a person to make a contract are treated alike as wrongful. However the privilege or lawful justification is not identical and is narrower in the former than in the latter. For instance *A* may be justified in inducing *B* to enter into a contract with him instead of with *C*. but his self interest will not excuse him in inducing *B* to break an existing contract with *C*.

### 15.1.4 Abuse of the Right of Trade Competition

It is the right of every person to engage in a trade or occupation available to him under the law. It may happen that his doing so and competing with another, causes loss to the latter but he is not liable for such damage. This has been the rule in England for a long time, and an old illustration of it was the *Gloucester Grammar Schoolmaster's* case.[63] In this respect, the law gives effect to the economic theory that free competition is worth more to society than it costs.[64] The doctrine of free competition does not however now prevail in the absolute form in which it did in the last two centuries which were noted for the policy of *laissez faire* preached by Adam Smith and Mill in England. Freedom of trade is now subject to serious restrictions under modern enactments and it is a criminal offence to pursue a trade which is not permitted at all eg, to manufacture or sell liquor in several parts of India or permitted only with a licence issued by the appropriate government authority eg, to sell a controlled article. In the absence of any such prohibition, the rule stated above will prevail. However a question which requires answering is whether it protects a person whose object is not to engage in trade but only to injure another? In England, no such case has been decided but the decision in *Allen v Flood* would appear to save him from liability. It is submitted that the rule is intended to allow competition and not conduct which is not competition at all but a pretence adopted to injure another. The *American Restatement*[65] is in favour of this view and propounds the following rule: a person who engages in business primarily for the purpose of causing loss of business to another with the intention of terminating the business when that purpose is accomplished, is liable to the other for the loss so caused. It is illustrated thus: *A*, a banker, has quarrelled with *B*, a barber, and threatened to drive him out of business in the neighbourhood. Accordingly, *A* opens a barber's shop next door to *B*'s shop and employs and finances *C* to operate it. *A* is liable to *B*

---

63  *Purushottamdas v Bai Dhai* (1940) ILR Bom 339, AIR 1940 Bom 205.

64  *Vegelahn v Guntner* (1896) 167 Mass 92, per Holmes J; Wigmore, *Cases on Torts*, vol II, p 373.

65  Vol III, para 709.

to the loss thereby caused to B. A contrary answer . . . be repugnant to our social sense, and there is no reason why it should be acceptable to a court of law. It would, however, be observed that a person will not become liable merely because he knew that if he engaged in a trade he would cause loss to another. Nor would he be liable if his primary object was to make a profit or to serve some trade interest of his, though accompanied by the knowledge or desire that another should suffer. The right to compete in trade would of course not justify the use of improper methods of competition, eg, infringement of trademark. Underselling is not illegal though it may cause harm to another. However, a conspiracy to undersell in order to injure another would stand on a different footing. Underselling may also be illegal where it is prohibited by law as where prices are fixed for controlled articles.

### 15.1.5  Improper Refusal to do Business with Another

A person's refusal to deal with another is not ordinarily improper, because it is his right to select the person from whom he buys or to whom he sells, and whom he serves or employs. There are however, exceptions to this rule. Two exceptions under the common law are the cases of a common carrier who cannot refuse to carry the goods offered for carriage and an innkeeper who cannot refuse to receive a guest in his inn. Enactments may impose a duty of the above kind and a breach of such duty resulting in damage will be actionable. Some instances of such breach are where a ration shopkeeper refusing to sell goods to a customer allotted to his shop, or a public utility service like a railway or motor transport authority refusing to accept a passenger or a hotel-keeper refusing to supply food to a Harijan, or an employer declaring an illegal lockout or a workman taking part in an illegal strike. When a person's refusal is not unlawful per se as it is in the above cases, he is not liable to a civil action. The fact that he had an improper motive would be immaterial and would not render him liable except in cases of conspiracy or concerted refusal by a combination of persons.[66] It should be noted that while A may not be liable to B for refusal to deal with B, A may be liable to C if A, by his refusal, produced B to break a contact or to avoid making a contact with C. In one case he only exercises his right; in the other he interferes with the business relations between two others and he can do so only with a just cause.

---

66 *Restatement*, vol IV, para 762. Another exception is when the refusal is a means of accomplishing an illegal monopoly; *Restatement*, vol IV, para 764.