1   GILBERT R. SEROTA (No. 75305)
    Email: gserota@howardrice.com
2   MARK A. SHEFT (No. 183732)
    Email: msheft@howardrice.com
3   MICHAEL L. GALLO (No. 220552)
    Email: mgallo@howardrice.com
4   HOWARD RICE NEMEROVSKI CANADY
         FALK & RABKIN
5   A Professional Corporation
    Three Embarcadero Center, 7th Floor
6   San Francisco, California 94111-4024
    Telephone:   415/434-1600
7   Facsimile:   415/217-5910

8   Attorneys for Plaintiffs
    THOMAS WEISEL PARTNERS LLC and
9   THOMAS WEISEL INTERNATIONAL
    PRIVATE LIMITED

10

11              UNITED STATES DISTRICT COURT

12           NORTHERN DISTRICT OF CALIFORNIA

13               SAN FRANCISCO DIVISION

14

15  THOMAS WEISEL PARTNERS LLC, a        No. C-07-6198 MHP
    Delaware limited liability company, and
16  THOMAS WEISEL INTERNATIONAL          Action Filed:  December 6, 2007
    PRIVATE LIMITED, an Indian company,
17                                        PLAINTIFFS' CONSOLIDATED
                  Plaintiffs,             OPPOSITION TO DEFENDANTS'
18                                        MOTIONS TO DISMISS PLAINTIFFS'
         v.                               FIRST AMENDED COMPLAINT
19
    BNP PARIBAS, a French corporation, BNP   Date:   August 18, 2008
20  PARIBAS SECURITIES (ASIA) LIMITED,      Time:   2:00 p.m.
    a Hong Kong company, and PRAVEEN        Place:  Courtroom 15
21  CHAKRAVARTY, an individual,            Judge:  Hon. Marilyn Hall Patel

22                Defendants.

23

24

25                        **REDACTED**

26

27

28

1

# TABLE OF CONTENTS

2

**Page(s)**

3    INTRODUCTION                                                                1

4         A.    The Illegal Raid.                                                1

5         B.    Summary Of Argument.                                            2

6    STATEMENT OF FACTS                                                          3

7         A.    TWP LLC Is A Multinational Investment Bank Headquartered
               In California.                                                   3
8
          B.    TWIPL Is An Indian Subsidiary And Branch Office Of TWP
9              LLC Created To Facilitate TWP Group's India Initiatives,
               Including Discovery Research.                                    4
10
          C.    Discovery Research Was Part Of TWP LLC's Integrated
11             Research Business Operated Out Of San Francisco,
               California.                                                      4
12
          D.    Defendant Chakravarty Was At All Times A TWP LLC
13             Employee And The Director Of Discovery Research.                 8

14        E.    Defendant BNPP Asia Is Part Of The BNP Paribas Global
               Banking And Securities Trading Network And, As Such,
15             Does Substantial Business With California Investors.             9

16             1.    BNP Paribas's Global Network Of Companies Operates
                    As A Seamless Integrated System.                           9
17
               2.    BNPP Asia Operates As An Integral Part Of The BNP
18                  Paribas Group By Executing Trades On Asian Markets
                    For BNP Paribas Customers Worldwide.                        11
19
               3.    BNPP Asia Serves BNP Paribas Clients In California By
20                  Executing Trades Worth Well More Than $100 Million.        12

21        F.    BNPP Asia And Chakravarty's Illegal Raid On Discovery
               Research Destroyed That Business And Harmed TWP LLC.            13
22
     ARGUMENT                                                                  16
23
          I.    THE COURT HAS JURISDICTION OVER THIS DISPUTE.                  16
24
          A.    BNPP Asia Purposefully Availed Itself Of This Court's
25             Specific Jurisdiction By Conspiring With Chakravarty To
               Commit Wrongful Acts Against TWP LLC, A Known
26             California Resident.                                            16

27             1.    Legal Standard.                                           16

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

1

**TABLE OF CONTENTS**

2

Page(s)

3        2.    BNPP Asia's Raid On Discovery Research Was
              Expressly Aimed At TWP LLC.                          17

4

     B.   General Jurisdiction Exists Over BNPP Asia Which Provides
5         Substantial, Continuous And Systematic Services To
          California Investors Through Other BNP Paribas Affiliates
6         That Have Substantial California Contacts.                18

7        1.    A Foreign Defendant With Minimal Direct Contact With
              A Forum Nonetheless May Be Subject To General
8              Jurisdiction If It Uses A General Agent For Business
              Within That Forum.                                   18

9
         2.    BNP Paribas Affiliate BNPP Securities Corp. Serves As
10             BNPP Asia's California Agent Because It Performs
              Functions In California That BNPP Asia Otherwise
11             Would Have To Perform For Itself.                    21

12       3.    General Jurisdiction Exists Because The California
              Contacts That Can be Imputed To BNPP Asia Are
13             Substantial, Continuous, And Systematic.            22

14   C.   This Court Has Specific Jurisdiction Over Chakravarty
          Because He Was A TWP LLC Employee At The Time Of The
15        Conspiracy And Knew That Raiding Discovery Research
          Would Injure TWP LLC In California.                      23

16

17   D.   Jurisdiction Over BNPP Asia And Chakravarty Is Reasonable
          And Necessary For The Furtherance Of Justice.            23

18       1.    The Purposeful Injection Factor Weighs Strongly In
              Favor Of Jurisdiction Because BNPP Asia And
19             Chakravarty Expressly Aimed Wrongful Conduct At
              TWP LLC.                                              24

20
         2.    Defendants Have Not Shown That Defending This
21             Lawsuit In California Would Be Unduly Burdensome.    24

22       3.    There Is No Evidence That Hearing This Dispute In
              California Will Conflict With Indian Sovereignty.     25

23
         4.    California Has A Strong Interest In Hearing This
24             Dispute.                                             25

25       5.    A California Forum Will Allow Efficient Resolution Of
              This Lawsuit And Is Critical To Plaintiffs' Ability To
26             Obtain Convenient And Effective Relief.              26

27   E.   TWP LLC Has Standing Because It Suffered Direct Injuries
          From Defendants' Wrongful Conduct.                       26

28

HOWARD
RICE
EMEROVSKI
CANADY
FALK
& RABKIN
Professional Corporation


# TABLE OF CONTENTS

**Page(s)**

II.   PUBLIC AND PRIVATE INTERESTS REQUIRE THIS COURT
      TO REJECT DEFENDANTS' FORUM NON CONVENIENS
      MOTION AND REFUSE TO RELEGATE THIS CASE TO THE
      INADEQUATE ALTERNATIVE FORUM OF MUMBAI, INDIA.      28

      A.   Legal Standard.                                28

      B.   Extraordinary Court Congestion And Delays Make The
           Mumbai, India Court System An Inadequate Forum For This
           Lawsuit.                                       29

      C.   The Balance Of Both Private And Public Factors Dictates
           That This Court Retain Jurisdiction.           32

           1.   The Balance Of Private Factors Does Not Favor
                Dismissal.                                33

           2.   The Balance Of Public Factors Does Not Favor
                Dismissal.                                36

CONCLUSION                                                37

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ballard v. Savage*, 65 F.3d 1495 (9th Cir. 1995) .......... 24, 25

*Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082 (9th Cir. 2000) .......... 16

*Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220 (3d Cir. 1995) .......... 28, 29, 31

*Brunswick Corp. v. Suzuki Motor Co. Ltd.*, 575 F. Supp. 1412 (E.D. Wis. 1983) .......... 19

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) .......... 23, 24

*Calder v. Jones*, 465 U.S. 783 (1984) .......... 18

*CE Distribution, LLC v. New Sensor Corp.*, 380 F.3d 1107 (9th Cir. 2004) .......... 16

*Ceramic Corp. of Am. v. Inka Maritime Co.*, 1 F.3d 947 (9th Cir. 1993) .......... 28

*Chhawchharia v. Boeing Co.*, 657 F. Supp. 1157 (S.D. N.Y. 1987) .......... 31

*Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.*, 142 F.3d 1266 (Fed. Cir. 1998) .......... 19, 20

*Dole Food Co., Inc. v. Watts*, 303 F.3d 1104 (9th Cir. 2002) .......... 23, 24, 25

*Energy Reserves Group, Inc. v. Superior Oil Co.*, 460 F. Supp. 483 (C.D. Kan. 1978) .......... 20

*Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331 (1990) .......... 26

*Freeman v. Gordon & Breach, Sci. Publishers*, 398 F. Supp. 519 (S.D.N.Y. 1975) .......... 20

*Gates Learjet Corp. v. Jensen*, 743 F.2d 1325 (9th Cir. 1984) .......... 29, 32

*Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122 (9th Cir. 2003) .......... 16, 18, 19

*In re Union Carbide Corp. Gas Plant Disaster*, 809 F.2d 195 (2d. Cir. 1987) .......... 31, 36

*Integral Development Corp. v. Weissenbach*, 99 Cal. App. 4th 576 (2002) .......... 25

*Jayne v. Royal Jordanian Airlines Corp.*, 502 F. Supp. 848 (C.D. N.Y. 1980) .......... 20

*Mangual v. Gen. Battery Corp.*, 710 F.2d 15 (1st Cir. 1983) .......... 19

*Neo Sack, Ltd. v. Vinmar Impex, Inc.*, 810 F. Supp. 829 (S.D. Tex. 1993) .......... 31

*Orefice v. Laurelview Convalescent Ctr., Inc.*, 66 F.R.D. 136 (E.D. Pa. 1975) .......... 19, 20



HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

# TABLE OF AUTHORITIES

**Page(s)**

*Pacific Atlantic Trading Co., Inc. v. M/V Main Exp.*, 758 F.2d 1325 (9th Cir. 1985) ............ 25

*Palmieri v. Estefan*, 793 F. Supp. 1182 (S.D. N.Y. 1992) ............ 19, 20

*Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998) ............ 16

*PLM Int'l, Inc. v. Nath*, 1998 WL 514045 (N.D. Cal. 1998) ............ 31

*Ravelo Monegra v. Rosa*, 211 F.3d 509 (9th Cir. 2000) ............ 28, 29

*Roth v. Garcia Marquez*, 942 F.2d 617 (9th Cir. 1991) ............ 24

*Shanks v. Westland Equip. & Parts Co.*, 668 F.2d 1165 (10th Cir. 1982) ............ 19, 20

*Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191 (9th Cir. 1988) ............ 26

*Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002) ............ 27

*Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163 (9th Cir. 2006) ............ 18

*Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006) ............ 16



# INTRODUCTION

## A.    The Illegal Raid.

Plaintiff Thomas Weisel Partners LLC ("TWP LLC") is an investment bank and broker-dealer headquartered in California.    Until the events described below, it provided securities research on thinly-covered U.S. stocks through its Mumbai-based subsidiary, Thomas Weisel International Private Limited ("TWIPL").    This product was called Discovery Research.

In late October and early November 2007, Defendants BNP Paribas and BNP Paribas Securities (Asia) Limited ("BNPP Asia"; collectively the "BNP Paribas Defendants") raided TWP LLC's Mumbai office.    The raid was swift and effective.    The BNP Paribas Defendants lured away ten of Discovery Research's fourteen NASD- (now FINRA-[1]) licensed professionals and at least seven support staff, representing nearly a third of Discovery Research's personnel.

The swiftness and effectiveness of the raid was only possible because the BNP Paribas Defendants conspired with a TWP LLC employee and fiduciary—Defendant Praveen Chakravarty.    Chakravarty, who was the Director of Discovery Research, arranged for TWIPL's employees to meet secretly with the BNP Paribas Defendants' senior executives; provided BNP Paribas executives with highly confidential information about the employees' salaries and bonuses; and encouraged the targeted employees to leave en masse.

A BNPP Asia executive, Jonathan Harris, outlined the scheme in an October 14, 2007 email to Chakravarty:

> Pierre [Rousseau][2] and I enjoyed meeting with you and your team on our recent trip.    Of course we missed our flight by 10 minutes after leaving you at the Oberoi, but made it back to Hong Kong eventually.
>
> Pierre and I both came away feeling we had some good discussions and that there

---

[1]The result of the merger of the self-regulatory divisions of the National Association of Securities Dealers and the New York Stock Exchange, FINRA is now the chief self-regulatory agency in the United States for broker-dealers and investment banks.

[2]Pierre Rousseau is the Chief Executive Officer of BNPP Asia *and* the Global Head of Equity Brokerage for BNP Paribas.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

is a lot of complementary interest. As we discussed, the way we'd like to take this forward is to first identify the core group of your team. I think you said about 20-25 individuals. We'd like to then work on preparing employment documents for all of them. *Once you have them and all is satisfactory, we'd look to you to resign from Thomas Weisel enmass. If their reaction is that they'd move to shut down the remainder of the office, we can step in and offer to take over the remainder as a gesture to save them the office shutdown costs.*

First step would be to get from you a list of all employees, their current comp and job descriptions. Next I'd like you to highlight the 20 or 25 key individuals, and a bit more info on their job descriptions and background. For this group, please include an indication of what comp levels you would think about for their move to BNP Paribas. Once I get this from you, you and I can arrange for a call to talk through the info. (Declaration Of Karanveer Dhillon In Support Of Plaintiffs' Consolidated Opposition To Defendants' Motions To Dismiss The First Amended Complaint ("Dhillon Decl.") ¶17 & Ex. E (emphasis added))

Chakravarty soon provided the confidential compensation and skills information that the BNP Paribas Defendants needed. Within just three weeks of the secret meeting, seventeen core members of the Discovery Research team resigned.

Crippled by the raid, Discovery Research shut down a month later. Almost simultaneously, the BNP Paribas Defendants launched their own research business in Mumbai. *Every single member of the research staff of BNP Paribas's Mumbai research venture is a former member of Plaintiffs' Discovery Research team.*

**B.     Summary Of Argument.**

The BNP Paribas Defendants and Chakravarty have brought nearly identical motions to dismiss, arguing this Court (1) lacks personal jurisdiction over BNPP Asia and Chakravarty and (2) is an inconvenient forum in which to litigate Plaintiffs' claims. Chakravarty also argues that TWP LLC lacks standing. Both motions should be denied.

*Jurisdiction.* This Court may exercise specific jurisdiction over BNPP Asia and Chakravarty because they intentionally disrupted the Discovery Research business and knew that TWP LLC, a California company, would bear the brunt of that disruption. *See* Sections I(A)(2) & I(C), *infra.* Such "express aiming" constitutes the "purposeful availment" required for specific jurisdiction. *See* Sections I(A) & I(C), *infra.*

The Court also may exercise general jurisdiction over BNPP Asia, which does substantial business with California investors—business solicited for it by at least one other

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

BNP Paribas affiliate acting as BNPP Asia's general agent. *See* Section I(B), *infra*. Defendants also have failed to demonstrate "compellingly" that the exercise of personal jurisdiction—specific or general—would be unreasonable. *See* Section I(D), *infra*. Chakravarty's "standing" argument misses the mark as well: TWP LLC has standing to pursue its claims because it was directly injured by the destruction of Discovery Research. *See* Section I(E), *infra*.

*Forum Non Conveniens.* Defendants' forum non conveniens arguments are equally flawed. The Bombay High Court, where this case would be tried if litigated in India, is so understaffed and plagued by delays that it does not constitute an adequate alternative forum. *See* Section II(E), *infra*. Nor have Defendants carried their heavy burden of showing that the balance of private and public convenience factors so favors dismissal as to outweigh Plaintiffs' traditional right to choose the forum in which to litigate. *See* Section II(C), *infra*.

For all these reasons, Defendants must answer in this Court for their brazen theft of Plaintiffs' trade secrets, and their destruction of the innovative research business it took Plaintiffs several years and millions of dollars to build.

## STATEMENT OF FACTS

### A.    TWP LLC Is A Multinational Investment Bank Headquartered In California.

Plaintiff TWP LLC is an investment bank and broker-dealer organized under the laws of Delaware and headquartered in San Francisco, California. Dhillon Decl. ¶2; *see also* Declaration of Michael L. Gallo In Support Of Plaintiffs' Consolidated Opposition To Defendants' Motions To Dismiss The First Amended Complaint ("Gallo Decl.") Ex. A. TWP LLC is a wholly-owned subsidiary of Thomas Weisel Partners Group, Inc. ("TWP Group"), a publicly-traded investment bank holding company also organized under the laws of Delaware and headquartered in San Francisco. Dhillon Decl. ¶2; Gallo Decl. Ex. A at F-7. TWP LLC is the largest of several TWP Group subsidiaries, and is TWP Group's main broker-dealer. Dhillon Decl. ¶2. TWP LLC provides strategic advisory and corporate finance services to U.S. and international emerging growth companies, and equity research,

HOWARD
RICE
EMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

1  trade execution and asset management services to wealthy individuals and institutional

2  investors. *Id.* TWP LLC has offices in many cities around the globe, including the branch

3  office in Mumbai, India that was devastated by Defendants' tortious conduct. *Id.*

**B.    TWIPL Is An Indian Subsidiary And Branch Office Of TWP LLC Created To Facilitate TWP Group's India Initiatives, Including Discovery Research.**

6      Plaintiff TWIPL, incorporated under the laws of India in August 2005, is wholly

7  owned by TWP LLC, either directly or indirectly through a Mauritius holding company.

8  Dhillon Decl. ¶¶3, 4 & Ex. A; *see also* Gallo Decl. Ex. A.  TWIPL provided services to

9  TWP LLC pursuant to an Intercompany Services Agreement ("ISA")  Dhillon Decl. ¶6 &

10  Ex. C.[3]

11      TWIPL leased office space in Mumbai, India, and employed Indian nationals who

12  worked on several different initiatives, one of which (Discovery Research) produced

13  research reports on under-covered companies whose stocks traded on U.S. exchanges. *Id.*

14  ¶5. In October 2005, the New York Stock Exchange ("NYSE") approved TWIPL's Mumbai

15  office as a branch of TWP LLC. *Id.* ¶5 & Ex. B; *see also* Gallo Decl. Ex. A at F-7.  Until

16  Defendants' tortious acts forced TWP Group to close it, Discovery Research was by far the

17  largest component of TWIPL, employing more than 50 people, including 14 U.S.-licensed

18  analysts who published research on approximately 150 different companies.[4]  Dhillon Decl.

19  ¶5 & Ex. B.

**C.    Discovery Research Was Part Of TWP LLC's Integrated Research Business Operated Out Of San Francisco, California.**

22      The purpose of the Discovery Research business was to allow TWP LLC to distribute

---

24  [3]The ISA provided that

**REDACTED**

27  [4]Discovery Research was shut down in December 2007 in response to Defendants'
raid.  In May 2008, a second TWIPL initiative was closed down, but TWIPL continues to
operate on a limited basis. Dhillon Decl. ¶¶20-21.

HOWARD
RICE
JEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

research reports on a broader range of United States companies than TWP LLC previously had been able to provide. *Id.* ¶7. By using Discovery Research analysts based in India to analyze the companies and write research reports, TWP LLC extended coverage to smaller companies that were not cost-effective for U.S.-based analysts to cover. *Id.*

Discovery Research operated for the benefit of TWP LLC. Pursuant to the ISA, TWIPL was paid its operating costs for Discovery Research, plus 12 percent. *Id.* ¶9. TWP LLC earned revenues by selling subscriptions to Discovery Research reports. *Id.* TWP LLC also benefited from Discovery Research's ability to broaden TWP LLC's coverage universe in other ways. *Id.* TWP LLC made a market in the stocks of many of the companies covered by Discovery Research, and derived revenue when its customers traded in those stocks. *Id.*

Defendant Praveen Chakravarty, a Director of TWIPL and the head of Discovery Research's Mumbai operation, was employed by TWP LLC and registered with U.S. regulatory authorities (FINRA, the New York Stock Exchange and the State of California, for example) as an associated person of TWP LLC. Declaration of Lisa Sorani In Support Of Plaintiffs' Consolidated Opposition To Defendants' Motions To Dismiss The First Amended Complaint ("Sorani Decl.") ¶5 & Ex. D; Declaration of Karen Santos In Support Of Plaintiffs' Consolidated Opposition To Defendants' Motions To Dismiss The First Amended Complaint ("Santos Decl.") ¶2 & Ex. A.

The Discovery Research analysts—who researched and authored the research reports that were Discovery Research's principal product—worked in Mumbai, but were functionally integrated into TWP LLC's larger research operations and subject to the same regulation and oversight as San Francisco-based TWP LLC research analysts. Dhillon Decl. ¶8; Sorani Decl. ¶7 & Exs. F, G. The Discovery Research analysts were, like Chakravarty, registered with U.S. regulatory authorities as associated persons of TWP LLC. Dhillon Decl. ¶5; *see also* Santos Decl. ¶3 & Ex. B.

TWP LLC's compliance department, headquartered in San Francisco, oversaw Discovery Research employees' compliance with applicable regulations and TWP LLC

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

1   policies.  Dhillon Decl. ¶10.  San Francisco-based TWP LLC employees monitored and

2   archived Discovery Research employees' emails, conducted compliance training for

3   Discovery Research employees (via video conference or periodic visits to India), and

4   periodically inspected TWIPL's Mumbai office.  *Id.*  TWP LLC personnel based in San

5   Francisco also monitored Discovery Research employees' trades to ensure they complied

6   with TWP LLC policies and regulatory rules.  *Id.*  One London-based TWP LLC compliance

7   officer, whose work was overseen by management in San Francisco, assisted with some of

8   these tasks.  *Id.*

9        TWP LLC was closely involved in Discovery Research coverage and ratings decisions,

10  as well as in producing the research reports themselves.  *Id.* ¶11.  TWP LLC research

11  managers based in San Francisco oversaw the strategic positioning of Discovery Research's

12  product within the larger scheme of TWP LLC's research business.  *Id.*  Decisions about

13  coverage by Discovery Research analysts, as well as ratings or price target changes, were

14  made by a seven-person Research Review and Oversight Committee ("RROC") chaired by

15  Keith Gay, the San Francisco-based Head of Research for TWP LLC.  *Id.*  Except for the

16  membership of the committee, the RROC followed the exact same procedures as TWP

17  LLC's research review and oversight committee for U.S.-based analysts.  *Id.*  The majority

18  of the RROC were U.S.-based TWP LLC employees, three of whom were based in San

19  Francisco.  *Id.*  Before publication of Discovery Research reports, the reports had to be

20  approved by a Supervisory Analyst employed by TWP LLC in San Francisco to ensure

21  compliance with regulatory requirements.  *Id.* ¶12.  Additional support was provided by

22  Supervisory Analysts located in Baltimore and London.  *Id.*  All formal research reports

23  written by Discovery Research analysts were edited, first in Mumbai and then by TWP LLC

24  personnel in San Francisco or London, to ensure that the content and format met TWP LLC

25  standards.  *Id.*

26       The Discovery Research analysts' reports show that Discovery Research was an arm of

27  TWP LLC's research operation.  The research reports were copyrighted by TWP LLC, used

28  a TWP LLC stock rating system and, in many cases, stated that TWP LLC made a market in

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

1    the subject security. *See, e.g.*, Dhillon Decl. ¶13 & Ex. D. Each Discovery Research report

2    listed its author's name and contact information, including a phone number in the San

3    Francisco area code and an @tweisel.com email address. *Id.*

4                                          **REDACTED**

5

6         TWP LLC sold and distributed the research reports authored by Discovery Research

7    analysts. Declaration of Michi Sethavarangura In Support Of Plaintiffs' Consolidated

8    Opposition To Defendants' Motions To Dismiss The First Amended Complaint

9    ("Sethavarangura Decl.") ¶2. TWP LLC's Institutional Sales department—based in San

10   Francisco—sold access to Discovery Research reports on a subscription basis to institutional

11   investors located solely in the United States. *Id.* The subscription contracts were between

12   TWP LLC and its customers; TWIPL did not sell any Discovery Research research and was

13   not a party to any subscription agreements. *Id.* & Ex. A. TWP LLC distributed the

14   Discovery Research reports through a secure website that resided on servers in San

15   Francisco and could only be accessed by subscribers. *Id.* ¶3. TWP LLC's Marketing

16   department in San Francisco oversaw the website's design and processed all proposed

17   changes. *Id.*

18        Discovery Research's operations were intertwined with, and overlapped, those of TWP

19   LLC in numerous other ways. TWP LLC's legal department, based in San Francisco and

20   New York, handled TWIPL's legal affairs, including those related to Discovery research.

21   Dhillon Decl. ¶14. TWP LLC personnel in San Francisco also handled some or all of

22   TWIPL's human resources, accounting, and facilities management functions. *Id.*

23        Substantial overlap likewise exists between TWP LLC and TWIPL's IT systems.

24   TWIPL has no separate IT department; TWIPL's one resident IT person in Mumbai reports

25   to TWP LLC personnel in San Francisco. Declaration Of Dheeraj Soni In Support Of

26

27

28                                          **REDACTED**

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Plaintiffs' Consolidated Opposition To Defendants' Motions To Dismiss The First Amended Complaint ("Soni Decl.") ¶2. The Discovery Research website was maintained and hosted by TWP LLC in San Francisco. *Id.* Although a significant portion of information pertaining to Discovery Research resided in the first instance on laptops and a server in Mumbai— which TWP LLC purchased for TWIPL's use—that information, and additional information, was also kept in San Francisco. *Id.* The Mumbai server was networked into the TWP LLC system and was backed up daily to TWP LLC servers in San Francisco and/or New York. *Id.* Emails and internet messages generated by Discovery Research personnel in Mumbai were captured and archived by TWP LLC compliance software in San Francisco. *Id.* Discovery Research employees also had access through the TWP LLC network to a drive on TWP LLC's San Francisco server with confidential information about both TWIPL and Discovery Research. *Id.*

### D. Defendant Chakravarty Was At All Times A TWP LLC Employee And The Director Of Discovery Research.

On August 7, 2003, TWP LLC offered Defendant Praveen Chakravarty a position as an Equity Research Associate in its San Francisco office. Sorani Decl. ¶2 & Ex. A. Chakravarty accepted that offer. *Id.* Chakravarty is an Indian citizen and was employed in San Francisco until early October 2005. *Id.* ¶3. As a condition of his employment, Chakravarty agreed to protect TWP LLC's confidential information, to not solicit its employees, and to not use his position or TWP LLC's confidential information for his personal gain or to compete with TWP LLC. *Id.* ¶4 & Exs. B, C.

In October 2005, TWP LLC assigned Chakravarty to TWIPL in Mumbai to take the lead management role in building up and running the research side of Discovery Research. Dhillon Decl. ¶15; Sorani Decl. ¶5 & Ex. D. Until his termination on November 7, 2007, Chakravarty remained an employee of TWP LLC, whose employment terms he and TWP LLC agreed would be governed by "the laws of the US and [TWP LLC rules and regulations]." *Id.* In Mumbai, Chakravarty reported to Karanveer ("KV") Dhillon, the Managing Director of TWIPL (but not a TWIPL employee). *Id.* ¶5. As part of his

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

international assignment, Chakravarty was named "Director of Discovery Research" and received a raise and significant benefits, including a guaranteed bonus, an equity award and a substantial housing allowance. Sorani Decl. ¶5 & Ex. D.

As Director of Discovery Research, Chakravarty had access to most if not all confidential information about Discovery Research. Dhillon Decl. ¶16. Using the shared TWP LLC/TWIPL computer system, Chakravarty received and/or reviewed documents showing employee compensation levels, current and projected profit and loss statements, and other financial planning documents. *Id.* Chakravarty also was involved intimately with the research at the core of the Discovery Research business and, as a result, had access to research reports, information about coverage decisions, contact information for the companies the Discovery Research team covered, training materials, and knowledge about the research analysts and associates themselves. *Id.* Chakravarty also had access to confidential customer information about Discovery Research subscribers. *Id.*

### E. Defendant BNPP Asia Is Part Of The BNP Paribas Global Banking And Securities Trading Network And, As Such, Does Substantial Business With California Investors.

#### 1. BNP Paribas's Global Network Of Companies Operates As A Seamless Integrated System.

BNPP Asia is part of the BNP Paribas Group, a network of interrelated companies centered on BNP Paribas, parent of BNPP Asia and a codefendant in this lawsuit. BNP Paribas is an international retail and investment bank headquartered in France with a presence in more than 85 countries and close to 140,000 employees worldwide. Gallo Decl. Ex. B at 2. BNP Paribas has substantial operations in the United States, including a regional office in San Francisco, and has a designated officer for service of process in California. *Id.*, Ex. C.

**REDACTED**

.            BNP Paribas does not dispute that it is subject to jurisdiction in the Northern District of California.

BNP Paribas markets itself as an "international banking network," with regional

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

subsidiaries and affiliates in 85 countries that can offer customers investment opportunities around the globe. *Id.*, Ex. E. This network is promoted as an integrated system, providing customers a seamless international banking experience.

For clients who need international securities services, BNP Paribas's website touts its ability to provide "global execution services" to investors and describes global execution as "the answer" for financial institutions easily to carry out complicated international securities transactions:

> We provide clients with a fully-integrated solution covering both the execution of a trade order and the associated clearing, settlement and custody-related tasks. Our market coverage includes easy access to dozens of exchanges worldwide, so clients just send us their initial trade instructions—and we handle the rest. (*Id.*, Ex. F)

Acting through its network of regional offices and subsidiaries, BNP Paribas thus offers customers direct access to securities markets—including the ability to order trades of equities and structured derivatives—on more than 50 exchanges around the world. *Id.*

BNP Paribas also uses its network of regional offices and subsidiaries to conduct research into securities traded on exchanges throughout the world. This research is then sold or distributed to BNP Paribas Group's customers around the world. Most research operations are managed through a network of subsidiaries operating under the BNP Paribas Personal Investors business line, which is "dedicated to providing financial advice to a mass-affluent clientele in Europe and several emerging countries. . . . " *Id.*, Ex. G at 2.

In India, BNP Paribas, acting through BNPP Asia, created a Mumbai-based research team, comprised primarily, if not entirely, of former Discovery Research employees, to investigate and analyze the stocks of Indian public companies. Dhillon Decl. ¶22. The India team's research reports are branded and marketed abroad as a product of "a member company of the BNP Paribas Group." *See, e.g.*, *id.*, Ex. G at 27.[6]

**REDACTED**

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

**2.     BNPP Asia Operates As An Integral Part Of The BNP Paribas Group By Executing Trades On Asian Markets For BNP Paribas Customers Worldwide.**

Based in Hong Kong, Defendant BNPP Asia is an integral part of BNP Paribas's global system of investment services for customers of the BNP Paribas Group, including investors located in California.   BNP Paribas's 2006 annual report describes Defendant BNPP Asia's "integrated Asian equity brokerage solution":

> Since its recent integration into Equities and Derivatives, BNP Paribas Securities Asia has offered its institutional clients a comprehensive range of research, execution, and distribution services in Asian equity products and their derivatives.  Based in Hong Kong, the BNP Paribas Securities Asia teams are present on all Asian markets, particularly in China, Japan, India, Korea, Taiwan and South-East Asia (Singapore, Indonesia, Malaysia and Thailand).   In total, over 250 professionals are active on the secondary markets as well as in providing a distribution platform for the primary market and equity derivatives. *BNP Paribas Securities Asia also has sales teams in the United States (New York and San Francisco)* and Europe (London, Paris and Milan).  (Gallo Decl. Ex. H at 29-30 (emphasis added))[7]

The BNP Paribas website describes BNPP Asia as a "pioneer in Asian equities brokerage" that is tied to BNP Paribas and "part of the Group's Equity Derivatives division." *Id.*, Ex. I. The website touts BNPP Asia's "comprehensive" range of equities trading solutions for institutional investors, its equity research capacities in "nine of Asia's most active economies . . . [including] India," its advanced trading and execution platform and its "exclusive franchise" with BNP Paribas's Corporate Finance Asia Pacific division. *Id.* The website refers investors to their BNP Paribas Group sales representatives, or to the BNP Paribas website, for further information on BNPP Asia's offerings. *Id.* Thus, as the BNP Paribas Defendants' own materials show, BNPP Asia offers a wide range of services related to Asian markets to clients of the BNP Paribas Group throughout the world, including California, where those customers have been serviced by a sales team located in San Francisco.[8]

---

[7] BNPP Asia has been "part of the [BNP Paribas] Group's Equity Derivatives division" since September 2006. *Id.*

**REDACTED**

HOWARD
RICE
EMEROWSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

1    The management structure of BNPP Asia further reveals the depth of its integration

2    into the larger BNP Paribas Group.  Pierre Rousseau, one of the principal architects of the

3    raid on Discovery Research, is both the Chief Executive Officer of BNPP Asia *and* the

4    Global Head of Equity Brokerage for BNP Paribas, and reports directly to Yann Gerardin,

5    Global Head of Equities and Derivatives for BNP Paribas.  *Id.*, Exs. A, J at 2.

6        **3.    BNPP Asia Serves BNP Paribas Clients In California By Executing
         Trades Worth Well More Than $100 Million.**

7

8

9

10

11

12

13

14                              **REDACTED**

15

16

17

18

19

20

21

22

23                              **REDACTED**

24

25                                              *Id.*  Since providing BNPP
26  Asia's interrogatory responses, the BNP Paribas Defendants have claimed that the
    information provided in BNPP Asia's responses overstates the commissions received for
27  transactions executed for California investors.  Gallo Decl. Ex. O.  However, the BNP
    Paribas Defendants have not provided Plaintiffs with a revised number or any estimate of the
28  amount by which their original number is off.  *Id.*

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

1
2
3
4
5
6
7
8
9
10
11
12

**REDACTED**

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

---

[11]NASD rules provide for a maximum commission rate of 5%, absent special circumstances. Mahon Decl. ¶3. In practice, commissions are rarely if ever that high. *Id.* ¶3-4.

1
2
3
4
5 **REDACTED**
6
7
8
9

10  F.    **BNPP Asia And Chakravarty's Illegal Raid On Discovery Research**
11         **Destroyed That Business And Harmed TWP LLC.**

12      In mid-October 2007, Chakravarty, acting without TWP LLC and TWIPL's authority,

13  met in Mumbai with Pierre Rousseau (BNP Paribas' Global Head of Equity Brokerage and a

14  Director and Chief Executive Officer of BNPP Asia) and Jonathan Harris (BNPP Asia's

15  Regional Head of Company Research).   Gallo Decl. Ex. J at 2, 3.   As Harris's October 15

16  email summary of the meeting attests, Rousseau, Harris and Chakravarty planned to solicit

17  Discovery Research employees to "resign from Thomas Weisel enmass (sic)."  Dhillon Decl.

18  Ex. E.

19      In furtherance of their scheme, the BNP Paribas Defendants asked Chakravarty to

20  provide confidential information about the qualifications, expertise and compensation of a

21  targeted group of more that twenty Discovery Research professionals. *See, e.g., id.* (asking

22  Chakravarty to provide "current comp," "job descriptions," "background," and "an

23  indication of what comp levels you would think about for their move to BNP Paribas" for

24  "the core group of your team . . . about 20-25 individuals").

25  _____

26
27  **REDACTED**
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

A password-encrypted spreadsheet discovered on Chakravarty's TWP-issued laptop contains precisely the information Harris requested—Discovery Research employees' (1) 2007 base and bonus compensation, (2) 2008 expected TWP base compensation, (3) sector coverage, (4) years of experience, (5) educational background and (6) 2008 "proposed" base and bonus compensation, including a signing bonus. Dhillon Decl. ¶18 & Ex. F; *see also* Declaration of Laurel Sutcliffe In Support Of Plaintiffs' Consolidated Opposition To Defendants' Motions To Dismiss The First Amended Complaint Sutcliffe ("Sutcliffe Decl.") ¶¶7-10 & Exs. A & B (discussing password protection). The spreadsheet also contains salary and bonus information for Chakravarty and a "purchase price" analysis. *Id*. Another worksheet in that same encrypted document contains a schedule for interviews with individual Discovery Research analysts on October 25 and 26, 2007, approximately ten days after Harris's email and just a few days before the analysts began to give notice. *Id*. A third worksheet contains a timeline for the defection of Discovery Research analysts. *Id*.

These documents show that Chakravarty and the BNP Paribas Defendants used TWP LLC's confidential information actively to solicit TWIPL employees to quit en masse and jump ship to BNPP Asia's India business.[13] And the employees responded. Between October 31 and November 6, 2007, seventeen Discovery Research employees gave notice— including ten of Discovery Research's fourteen FINRA-licensed research analysts and seven research associates. Dhillon Decl. ¶19.[14] Of the four remaining research analysts, three had only been licensed for a few months. *Id*. Chakravarty would also have resigned if he had not first been terminated for cause on November 7, 2008, after TWP LLC discovered his

---

[13]Plaintiffs are informed and believe that Chakravarty provided, or instructed others to provide, other confidential information to the BNP Paribas Defendants—including business plans and lists of customer contacts. Because merits discovery has not yet commenced, Plaintiffs have not yet been able to confirm this. Plaintiffs also know Chakravarty traveled to Hong Kong during the time the analysts were resigning, and believe he did so specifically to deliver to the BNP Paribas Defendants confidential information related to Discovery Research and to plot and scheme to destroy Discovery Research.

[14]In addition to the seventeen research professionals who resigned, TWIPL's human resources generalist, who was later discovered to be materially assisting Chakravarty, quit on November 7. Dhillon Decl. ¶19.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    conspiracy with the BNP Paribas Defendants. *Id.*

2        Defendants' orchestration of the mass defection of key employees destroyed the

3    Discovery Research business.  Due to the simultaneous departure of most of its licensed

4    analysts, Discovery Research could not produce timely research reports on many of the

5    stocks it covered. *Id.* ¶20.  Despite intensive efforts over several weeks to salvage the

6    damaged business—including exploring efforts to quickly recruit, hire, train and license new

7    research analysts—TWP LLC management concluded reluctantly that the loss of talent

8    rendered Discovery Research unable to provide research coverage of a quality and scope that

9    TWP LLC's subscribers demanded (and had paid for). *Id.*  As a result, on December 6,

10   2007, TWP Group announced that Defendants' actions had forced the shutdown of

11   Discovery Research. *Id.*; *see also* Gallo Decl. Ex. K.  The closure of Discovery Research

12   deprived TWP LLC of current and future revenue from the sale of subscriptions and from

13   trading in stocks covered by Discovery Research. Dhillon Decl. ¶20.

14       The BNP Paribas Defendants contemplated, and indeed hoped for, this sequence of

15   events.  Harris's October 15 email to Chakravarty describes BNP Paribas's willingness to

16   take over TWP LLC's Mumbai office if the mass resignations led to a decision to shut down

17   operations:

18       Once you have [formal offers for the research team] . . . we'd look to you to
         resign from Thomas Weisel enmass. *If their reaction is that they'd move to shut*
19       *down the remainder of the office, we can step in and offer to take over the*
         *remainder as a gesture to save them the office shutdown costs.* (*Id.*, Ex. E)
20

21   Chakravarty's timetable for the team's defection to BNP Paribas includes a date (after the

22   dates on which team members were expected to resign) for "TWP's decision on real estate"

23   (*id.*, Ex. F)—an apparent acknowledgement that TWP LLC would have little reason to keep

24   Discovery Research open once virtually all its qualified analysts were gone.

25       The BNP Paribas Defendants have created their own venture with the research team

26   poached from Discovery Research.  A December 4, 2007 BNP Paribas press release entitled

27   "BNP Paribas Securities Asia Launches Onshore Research Platform in India" describes the

28   creation of a 27-person securities research team in India under the leadership of Chakravarty.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

Gallo Decl. Ex. L.  According to the release, the new India research team will "complete BNP Paribas Securities Asia's regional research footprint," and "with the new setup boasting 10 writing analysts and 13 research associates by the end of year, BNP Paribas Securities Asia will see its India securities capabilities significantly boosted." This "boost" comes at Plaintiffs' expense.  Indeed, *all* the people who comprise BNPP Asia's new India research venture are former Discovery Research professionals.[15]  *Id.*

## ARGUMENT

## I.    THE COURT HAS JURISDICTION OVER THIS DISPUTE.

Defendant BNP Paribas does not contest this Court's jurisdiction.  Defendants BNPP Asia and Chakravarty oppose jurisdiction primarily on the ground that they have no physical presences in California.  As we show below, these arguments are insufficient.  The facts in this case establish that these defendants are subject to jurisdiction (1) under the "express aiming theory" and (2) because BNPP Asia provides, on a continuous basis, execution services to California investors on trades worth hundreds of millions of dollars annually.

### A.    BNPP Asia Purposefully Availed Itself Of This Court's Specific Jurisdiction By Conspiring With Chakravarty To Commit Wrongful Acts Against TWP LLC, A Known California Resident.

#### 1.    Legal Standard.

A defendant without a physical presence in a state can subject itself to specific jurisdiction in that state through "express aiming"—the "purposeful direction of a foreign act having an effect in the forum state." *CE Distribution, LLC v. New Sensor Corp.*, 380 F.3d 1107, 1111 (9th Cir. 2004) (quoting citation omitted).  The "express aiming" requirement is met "when the defendant is alleged to have engaged in wrongful conduct targeted at a

---

[15] Plaintiffs have obtained a March 13, 2008 research report authored by one of the former Discovery Research analysts, Vijay Sarathi.  Dhillon Decl. ¶22 & Ex. G.  The report lists Sarathi's employer as "BNP Paribas India Solutions Pvt Ltd" ("BNPP India"), which is described as a "member company of the BNP Paribas Group." *Id.* at 1, 27.  The report lists twenty-one members of BNPP India's "India Research Team"—*every single one of whom is a former Discovery Research employee*. *Id.* ¶22.  BNPP India's research team is headed by Chakravarty, and comprised of the seventeen research analysts and associates who left Discovery Research en masse between October 31 and November 6, plus three other Discovery Research research associates who left subsequently. *Id.* ¶22 & Ex. G at 24.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

1  plaintiff whom the defendant knows to be a resident of the forum state." *Bancroft &*
2  *Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000); *Panavision Int'l,*
3  *L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998).

4      Under the Ninth Circuit's express aiming test, a plaintiff need not allege that the harm
5  was directed at the forum *state* itself.  The harm is jurisdictionally sufficient if aimed at a
6  *resident* of the forum state, even when the actions causing the harm occurred outside the
7  forum.  *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122 (9th
8  Cir. 2003) (personal jurisdiction existed over British company that allegedly interfered with
9  a California company's business operations in Europe).  The harm need not be felt only in
10  the forum state.  A majority of the harm may be felt elsewhere, so long as the defendant
11  knows the plaintiff will suffer *some* harm in the forum state.  *Yahoo! Inc. v. La Ligue Contre*
12  *Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006) (en banc) ("[T]he
13  'brunt' of the harm need not be suffered in the forum state.  If a jurisdictionally sufficient
14  amount of harm is suffered in the forum state, it does not matter that even more harm might
15  have been suffered in another state.").

### 2. BNPP Asia's Raid On Discovery Research Was Expressly Aimed At TWP LLC.

18      By wrongfully acquiring confidential information about Discovery Research and its
19  professionals and using that information to lure away Discovery Research's trained analysts,
20  BNPP Asia disrupted the flow of research reports from Mumbai to TWP LLC in
21  California—ultimately causing the destruction of TWP LLC's entire Discovery Research
22  initiative.  In so doing, BNPP Asia deliberately harmed a known California resident and
23  purposefully availed itself of this Court's jurisdiction.

24      TWIPL and Discovery Research's close ties to TWP LLC were readily apparent to
25  BNPP Asia.  TWP Group's *public* filings state that TWIPL was both a subsidiary and
26  NYSE-approved branch of TWP LLC.  *See, e.g.*, Gallo Decl. Ex A.  The Discovery
27  Research analysts, including Chakravarty, were registered as associated persons of TWP
28  LLC with FINRA and other U.S. regulatory authorities.  This information, too, was *publicly*

HOWARD
RICE
JEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

1   available at the FINRA website.  Chakravarty, BNPP Asia's "inside man," was a TWP LLC

2   employee throughout his tenure at Discovery Research.

3       BNPP Asia officials, including Rousseau and Harris, undoubtedly knew of the

4   connection between Discovery Research and TWP LLC, as did their co-conspirator

5   Chakravarty.  Their recognition of the connection is on display in Harris's October 15 email

6   to Chakravarty, which envisions that Discovery Research personnel will "resign from

7   *Thomas Weisel* enmass."  Dhillon Decl. Ex. E (emphasis added).  Harris makes no

8   distinction between the Indian subsidiary and the California-based parent company.

9       That the harm has befallen a California plaintiff is equally clear.  As set forth in the

10  Statement of Facts, Section C, *supra*, Discovery Research's operations were intertwined

11  inextricably with TWP LLC in San Francisco and were operated for TWP LLC's benefit.

12  Discovery Research served as an offshore manufacturing facility whose "product"—research

13  reports on under-covered U.S. companies—was supplied to TWP LLC according to its

14  specifications so that TWP LLC could package, market and sell it.  TWP LLC personnel

15  based primarily in San Francisco decided which companies to research, supervised the

16  analysis, and sold and distributed the reports on a subscription basis.  Investors' subscription

17  agreements and payment arrangements were with TWP LLC, not TWIPL; TWP LLC stood

18  to receive any revenue and profit from the subscription agreements over and above TWIPL's

19  operating costs plus twelve percent.[16]

20      Having targeted a California company, it is legally beside the point that BNPP Asia's

21  wrongful acts occurred in Asia.  *Harris Rutsky*, 328 F.3d at 1131 (personal jurisdiction

22  upheld based on express aiming into California when defendant targeted resident corporation

23  with wrongful acts performed in London); *see also, e.g., Integral Development Corp. v.*

---

25  [16]The BNP Paribas Defendants mischaracterize this lawsuit as "essentially an
26  employment dispute involving Indian employees who are employed in India" (BNP Paribas
    and BNP Paribas Securities Mot. to Dismiss First Am. Compl. ("BNPP Mot") at 13)—an
27  argument that glosses over BNPP Asia's own Hong Kong citizenship and connection to a
    worldwide bank, and ignores altogether the California citizenship of the principal plaintiff,
28  TWP LLC.

HOWARD
RICE
JEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

*Weissenbach*, 99 Cal. App. 4th 576, 587 (2002) (misappropriation of trade secrets by German national managing German subsidiary of California company and use of that information to injure California company supported exercise of personal jurisdiction under express aiming theory). A primary justification for the "express aiming" doctrine is to prevent a state's residents from having to travel to sue out-of-state wrongdoers who target those residents from afar. *Calder v. Jones*, 465 U.S. 783, 790 (1984) ("An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California"). The knowing targeting and the harm are the keys—and both are present here.

**B.    General Jurisdiction Exists Over BNPP Asia Which Provides Substantial, Continuous And Systematic Services To California Investors Through Other BNP Paribas Affiliates That Have Substantial California Contacts.**

**1.    A Foreign Defendant With Minimal Direct Contact With A Forum Nonetheless May Be Subject To General Jurisdiction If It Uses A General Agent For Business Within That Forum.**

A court may exercise general jurisdiction over a non-resident defendant with substantial, continuous and systematic contacts with the forum. BNPP Asia unquestionably conducts substantial business that originates in California.

**REDACTED**

These contacts alone are substantial enough to warrant general jurisdiction. *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163 (general jurisdiction existed over company doing hundreds of millions of dollars of business in state).

**REDACTED**

An out-of-state entity may be subject to general jurisdiction through the conduct of a

HOWARD
RICE
IEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

"general agent" used to conduct business within the forum. *Harris Rutsky*, 328 F.3d at 1134-35. An in-forum entity serves as a foreign defendant's "general agent" by performing services in the forum that it "would have to undertake" itself if the foreign defendant "did not have a representative to perform them." *Id.* at 1135 (internal citation omitted). The general agent's contacts with the forum are imputed to the foreign defendant, so that jurisdiction over the agent also creates jurisdiction—either specific or general, depending on the nature of the contacts—over the foreign defendant. *Id.*[17]

Affiliates operate as each other's agents in different states or countries if they depend on each other's foreign operations to produce a single integrated product. In such situations, the out-of-state entity, but for the existence of the in-forum affiliate acting as its general agent, either would have to forego operating in the forum or create its own contacts with the forum. In *Palmieri v. Estefan*, 793 F. Supp. 1182 (S.D. N.Y. 1992), for example, the court held that general jurisdiction existed in New York over a network of thirty-three foreign subsidiaries of New York-based Sony Music. *Id.* at 1187-94. The subsidiaries used their New York parent as a conduit for new products (music recordings made in New York) and as a central clearing house to swap recording rights. *Id.* at 1185-86. The subsidiaries were subject to jurisdiction based on the New York contacts of Sony Music because "when two corporations have common ownership and their activities are interrelated as here, they may

---

[17]Other jurisdictions have also adopted the general agency theory of jurisdiction. *See, e.g., Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.*, 142 F.3d 1266, 1270-71 (Fed. Cir. 1998) (upholding jurisdiction over foreign subsidiary company based on parent's contacts in forum); *Mangual v. Gen. Battery Corp.*, 710 F.2d 15, 20-21 (1st Cir. 1983) (upholding jurisdiction over foreign parent corporation based both on individual agent's tortious conduct in forum and fact that parent shared office space with in-forum subsidiary); *Shanks v. Westland Equip. & Parts Co.*, 668 F.2d 1165, 1166-68 (10th Cir. 1982) (upholding jurisdiction over foreign trailer manufacturer based on in-state affiliate's frequent use of foreign manufacturer's trailers in the state); *Palmieri v. Estefan*, 793 F. Supp. 1182, 1187-94 (S.D.N.Y. 1992) (upholding general jurisdiction over foreign subsidiary when in-state parent acted as agent); *Brunswick Corp. v. Suzuki Motor Co. Ltd.*, 575 F. Supp. 1412, 1421-23 (E.D. Wis. 1983) (holding that Wisconsin agent's contacts could subject foreign corporate affiliates to general jurisdiction when the foreign affiliates had "systematically injected themselves into the Wisconsin market place" through the acts of their Wisconsin agents); *Orefice v. Laurelview Convalescent Ctr., Inc.*, 66 F.R.D. 136, 139-42 (E.D. Pa. 1975) (jurisdiction over foreign subsidiary appropriate when parent acted as in-forum agent, even where parent's forum contacts had nothing to do with subject matter of suit).

have an agency relationship for jurisdictional purposes, even if the resident corporation is not controlled by the nonresident entity." *Id.* at 1194. In *Freeman v. Gordon & Breach, Sci. Publishers*, 398 F. Supp. 519, 520-522 (S.D.N.Y. 1975), a New York district court asserted jurisdiction over a foreign company based on the contacts of its New York affiliate. The two commonly owned corporate affiliates, although distinct corporate entities, acted as "one commonly owned enterprise . . . which, in order to function, must rely upon the joint endeavors of each constituent part." *Id.*

As these cases indicate, the agent need not be a subsidiary of the foreign business entity. It can be above the foreign entity on the corporate ladder. Thus, a resident parent can be a foreign subsidiary's local agent even though the subsidiary is often the smaller entity and lacks "control" over the parent's acts. *Dainippon Screen Mfg. Co. v. CFMT, Inc.*, 142 F.3d 1266, 1271 (Fed. Cir. 1998) (parent could be in-forum agent of subsidiary); *Shanks*, 668 F.2d at 1166-68 (sister company as agent); *Palmieri*, 793 F. Supp. at 1187-94 (parent as agent); *Jayne v. Royal Jordanian Airlines Corp.*, 502 F. Supp. 848, 856-60 (C.D. N.Y. 1980) (same); *Energy Reserves Group, Inc. v. Superior Oil Co.*, 460 F. Supp. 483, 513-15 (C.D. Kan. 1978) (same); *Orefice*, 66 F.R.D. at 141 (same); *Freeman*, 398 F. Supp. at 520-22 (S.D.N.Y. 1975) (same).

> **2.    BNP Paribas Affiliate BNPP Securities Corp. Serves As BNPP Asia's California Agent Because It Performs Functions In California That BNPP Asia Otherwise Would Have To Perform For Itself.**

**REDACTED**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

**REDACTED**

1

**REDACTED**

2

3    **3.    General Jurisdiction Exists Because The California Contacts That Can**
        **Be Imputed To BNPP Asia Are Substantial, Continuous, And**
4        **Systematic.**

5

6

7

8

9

10

11

12                                    **REDACTED**

HOWARD
RICE    13
NEMEROVSKI
CANADY
FALK    14
& RABKIN
*A Professional Corporation*    15

16

17

18

19

20

21         Such substantial contact with California is more than enough to invest this court with

22    general jurisdiction over BNPP Asia.

23    **C.    This Court Has Specific Jurisdiction Over Chakravarty Because He Was A**
            **TWP LLC Employee At The Time Of The Conspiracy And Knew That**
24          **Raiding Discovery Research Would Injure TWP LLC In California.**

25         Chakravarty is subject to this Court's specific jurisdiction for the same reasons

26    described above.  As a Director of Discovery Research with intimate understanding of its

27    business model, Chakravarty facilitated the BNP Paribas Defendants' raid on Discovery

28    Research and understood that gutting Discovery Research would injure TWP LLC in San

1  Francisco.  When he conspired with the BNP Paribas Defendants, Chakravarty remained an

2  employee of TWP LLC and knew his own departure would harm TWP LLC.  He, like his

3  co-conspirators, "expressly aimed" his wrongful conduct at his California-based employer.

4       By virtue of his employment agreements with TWP LLC—including his agreements

5  not to disclose confidential information and not to use company resources to his own

6  advantage—Chakravarty also remained in contractual privity with TWP LLC, a California

7  company, until he was terminated for his part in the raid.  *Burger King Corp. v. Rudzewicz*,

8  471 U.S. 462, 479-80 (1985) (minimum contacts existed over party that entered into contract

9  with substantial connections with forum state).  *See also, e.g., Integral Development Corp.*,

10  99 Cal. App. 4th at 589-90 (2002) (minimum contacts existed over a German national who

11  entered into an employment agreement with a California company to manage its German

12  subsidiary).

13      **D.    Jurisdiction Over BNPP Asia And Chakravarty Is Reasonable And**
              **Necessary For The Furtherance Of Justice.**

14

15      Reasonableness and justice require that this Court exercise jurisdiction over BNPP

16  Asia and Chakravarty for two independent reasons: (1) BNPP Asia and Chakravarty

17  knowingly caused the destruction of San Francisco-based TWP LLC's Discovery Research

18  initiative; and (2) BNPP Asia maintained substantial contacts with California through its

19  general agent.

20      The Ninth Circuit balances seven factors to decide whether jurisdiction is reasonable:

21      (1) the extent of the defendants' purposeful injection into the forum state's
        affairs; (2) the burden on the defendant of defending in the forum; (3) the extent
22      of conflict with the sovereignty of the defendant's state; (4) the forum state's
        interest in adjudicating the dispute; (5) the most efficient judicial resolution of the
23      controversy; (6) the importance of the forum to the plaintiff's interest in
        convenient and effective relief; and (7) the existence of an alternative forum.
24      (*Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1114 (9th Cir. 2002))

25  The burden is on Defendants to demonstrate in "compelling" fashion that the seven factors

26  weigh heavily against the exercise of jurisdiction here.  *Burger King*, 471 U.S. at 477.  If the

27  question is close, a court cannot decline to exercise jurisdiction for lack of reasonableness.

28  *See Roth v. Garcia Marquez*, 942 F.2d 617, 625 (9th Cir. 1991) (exercise of personal

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

jurisdiction was reasonable even though only two of seven reasonableness factors favored plaintiff while three favored defendants; even though the defendants may have been "able to show that the exercise of jurisdiction might be unreasonable," the "closeness of the question manifests that they cannot do so in a compelling fashion").

The present case is not close; the reasonableness factors weigh heavily in favor of jurisdiction in California.

### 1. The Purposeful Injection Factor Weighs Strongly In Favor Of Jurisdiction Because BNPP Asia And Chakravarty Expressly Aimed Wrongful Conduct At TWP LLC.

BNPP Asia deliberately injected itself into this forum by establishing substantial contacts with California through its corporate affiliates. More importantly, both BNPP Asia and Chakravarty expressly aimed their wrongful conduct into California. The fact that BNPP Asia and Chakravarty aimed wrongful conduct at TWP LLC "knowing that [this conduct] would likely injure [TWP LLC] in California" is sufficient to tip the purposeful injection factor "strongly in plaintiff's favor." *Dole*, 303 F.3d at 1115 (internal citation and quotation marks omitted). *See also, e.g., Integral Development Corp.*, 99 Cal. App. 4th at 588 (German national's alleged misappropriation of trade secrets from California company and alleged use of that information to injure California company constituted tortious conduct aimed at a California plaintiff and provided a reasonable basis for the assertion of jurisdiction).

### 2. Defendants Have Not Shown That Defending This Lawsuit In California Would Be Unduly Burdensome.

The burden on Defendants is not a significant factor. Unless inconvenience to the defendant "is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction." *Roth*, 942 F.2d at 623 (internal quotation marks omitted). While litigating in California will be somewhat inconvenient for Defendants, "the advent of 'modern transportation' certainly has made the burden of defending in a foreign forum more palatable." *Ballard v. Savage*, 65 F.3d 1495, 1501 (9th Cir. 1995) (internal quotation marks omitted). Defendants have not presented any concrete

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1  evidence of hardship or pointed to any special burden that litigating in California would
2  impose on them, especially relative to the burden Plaintiffs would experience if they were
3  forced to litigate in India.[18]

### 3. There Is No Evidence That Hearing This Dispute In California Will Conflict With Indian Sovereignty.

6  Defendants argue that India's sovereignty interest is implicated (BNPP Mot. at 11; Def.
7  Praveen Chakravarty's Mot. to Dismiss First Am. Compl. ("Chakravarty Mot.") at 11) but
8  nowhere explain how TWP LLC's petition for redress *conflicts with* India's sovereignty
9  interest. Moreover, every lawsuit in a U.S. court against a foreign defendant tangentially
10 implicates a foreign nation's sovereignty interest. But, that sovereignty interest "is by no
11 means controlling." *Ballard*, 65 F.3d at 1501; *see also id.* (if a foreign nation's sovereignty
12 interest were "given controlling weight, it would always prevent suit against a foreign
13 national in a United States court") (internal quotation marks omitted). In fact, since a Hong
14 Kong corporate defendant conspired here with an Indian individual to harm a corporation
15 headquartered in California, India's sovereignty interest is arguably third in line behind
16 California and Hong Kong.

### 4. California Has A Strong Interest In Hearing This Dispute.

18 California "has a strong interest in providing a forum for its residents and citizens who
19 are tortiously injured." *Dole*, 303 F.3d at 1115-16. TWP LLC's California citizenship alone
20 tilts this factor in favor of jurisdiction. *See id.*; *see also Ballard*, 65 F.3d at 1501.[19]

---

[18]This point in discussed further in our response to Defendants' forum non conveniens argument. *See* Section II, *infra*.

[19] The BNP Paribas Defendants cite the admiralty case *Pacific Atlantic Trading Co., Inc. v. M/V Main Exp.*, 758 F.2d 1325, 1330 (9th Cir. 1985) for the proposition that California's interest in protecting its residents does not extend "to conduct that occurred outside California." BNPP Mot. at 11. *Pacific Atlantic* asserts no such broad proposition, which would eviscerate the express aiming doctrine (a standard built, after all, on the principle that foreign defendants *should* be subject to jurisdiction for wrongful conduct that occurs outside the state but is aimed into it). Instead, *Pacific Atlantic* merely expresses concern about harm to commerce "when the forum activities of the nonresident are not substantial." *Pac. Atl.*, 758 F.2d at 1330. In that case, the nonresident's forum activities were *de minimis*, and the subject of litigation was an indemnification contract "executed abroad between Malaysian and West German citizens." *Id.* Even though the plaintiff was a
(continued . . . )

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

**5.    A California Forum Will Allow Efficient Resolution Of This Lawsuit And Is Critical To Plaintiffs' Ability To Obtain Convenient And Effective Relief.**

A California forum is critical to TWP LLC and TWIPL's ability to obtain "convenient and effective relief."  Defendants' preferred forum, India, is a country notorious for its understaffed judiciary and decades-long docket backlogs.[20]  As discussed at greater length in our response to Defendants' forum non conveniens argument (*see* Section II(C), *infra*), the balance of private and public convenience factors that courts consider is compellingly in favor of Plaintiffs.[21]

Since several factors heavily favor jurisdiction, and no important factors tilt the other way, this court can reasonably exercise jurisdiction.  Indeed, declining jurisdiction would be unreasonable as it would permit Defendants to sling arrows at a California resident without having to answer for their deeds in a California court.

**E.    TWP LLC Has Standing Because It Suffered Direct Injuries From Defendants' Wrongful Conduct.**

Defendant Chakravarty's shareholder standing argument (Chakravarty Mot. at 6-7) is misplaced because TWP LLC has alleged direct injuries in connection with each of its claims.  A shareholder "with a direct, personal interest in a cause of action [may] bring suit even if the corporation's rights are also implicated." *Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990).  A shareholder has standing if the defendant

---

( . . . continued)
California citizen, the court found California's interest in that particular controversy was "weak." *Id.*   *Pacific Atlantic* is distinguishable from the present case, in which the defendants expressly aimed their tortious conduct into California.

[20] *See* Section II(B), *infra*, for further discussion of India's inadequacy as a forum for this lawsuit.

[21]The seventh and final Ninth Circuit reasonableness factor—the existence of an alternative forum—is irrelevant.  "[W]hether another reasonable forum exists becomes an issue only when the forum state is shown to be unreasonable." *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1201 (9th Cir. 1988) (quoting citation omitted) (finding that the exercise of jurisdiction was reasonable even though plaintiff had "not met his burden to show that another forum is unavailable").  Since Defendants have failed to make a compelling case that jurisdiction is unreasonable, the Court need not consider whether an alternative forum exists.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    breaches either a contract made directly with the shareholder, or a fiduciary duty owed

2    independently to the shareholder. *See, e.g., Strougo v. Bassini*, 282 F.3d 162, 172-76 (2d

3    Cir. 2002) (class of mutual fund investors had standing to sue directors, officers, and

4    investment advisor of fund because plaintiffs suffered direct injuries when defendants, in

5    breach of fiduciary duty, pressured plaintiffs to buy more shares).

6        TWP LLC has standing to assert all its claims because it has suffered the following

7    direct injuries:

8    • **Theft of trade secrets.**  Under the Intercompany Services Agreement between TWP

9        LLC and TWIPL,

10

11

12                                **REDACTED**

13

14

15    • **Unauthorized access to computers in violation of the Computer Fraud and Abuse**

16        **Act.**

17

18                                **REDACTED**

19

20

21        These direct injuries give TWP LLC standing to pursue its claim under the Computer

22    Fraud and Abuse Act, 18 U.S.C. §1030.

23    • **Injuries resulting from Chakravarty's breaches of contract and the implied**

24        **covenant of good faith and fair dealing.**  Chakravarty directly injured TWP LLC

25        when he breached agreements between TWP LLC and himself.

26    • **Injuries resulting from Defendants' intentional interference with employment**

27        **relationships, with contracts, and with prospective economic advantage.**  By

28        interfering with the employment relationships between Discovery Research employees

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

and TWIPL, Chakravarty and BNPP Asia directly injured TWP LLC because the resulting destruction of Discovery Research eliminated TWP LLC's ability to sell Discovery Research reports. This interfered with TWP LLC's existing subscription agreements with its customers as well as its ability to sell future subscriptions.

- **Injuries resulting from Chakravarty's breach of fiduciary duty and BNPP Asia's aiding and abetting that breach.**

REDACTED

Chakravarty had a fiduciary duty not to disclose TWP LLC's confidential information or to use his position to seek advantage for himself to TWP LLC's detriment. Chakravarty's participation in the raid on Discovery Research breached these duties and directly harmed TWP LLC. Likewise, BNPP Asia directly injured TWP LLC by aiding and abetting Chakravarty in the theft of these trade secrets.

- **Injuries resulting from Defendants' civil conspiracy to commit these tortious acts.** Defendants' conspiracy directly injured TWP because it resulted in all the wrongful conduct described above that harmed TWP LLC.

In short, since each of its claims arises from a direct injury, TWP LLC has standing to pursue them.

## II. PUBLIC AND PRIVATE INTERESTS REQUIRE THIS COURT TO REJECT DEFENDANTS' FORUM NON CONVENIENS MOTION AND REFUSE TO RELEGATE THIS CASE TO THE INADEQUATE ALTERNATIVE FORUM OF MUMBAI, INDIA.

### A. Legal Standard.

Forum non conveniens is an "exceptional tool to be employed sparingly." *Ravelo Monegra v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000). A defendant moving to dismiss a complaint based on forum non conveniens must make a threshold showing that an adequate alternative forum exists for the plaintiff to pursue its remedy. *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1227-79 (3d Cir. 1995) (litigation backlog rendered India an inadequate forum because of severe delays in disposing of cases); *Ceramic Corp. of Am. v. Inka Maritime Co.*, 1 F.3d 947, 949 (9th Cir. 1993) (Japan was an inadequate forum because

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

its courts would not hear plaintiffs' claim). The defendant must also demonstrate that the balance of private and public interests *strongly* favors dismissal. *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1335 (9th Cir. 1984) (district court abused discretion in dismissing case on forum non conveniens grounds because "[t]he balance of the public and private interest factors is not strongly in favor of the defendants").

There must be a "clear showing of facts which establish such oppression and vexation of a defendant as to be out of proportion" to the convenience of the principal plaintiff, TWP LLC[22]—an American citizen entitled to a strong presumption that its "home forum," San Francisco, is reasonable and convenient. *Ravelo Monegra*, 211 F.3d at 514 (overturning forum non conveniens dismissal due to lack of proper showing); *Gates Learjet*, 743 F.3d at 1335 (plaintiff's choice of home forum entitled to deference).

**B.    Extraordinary Court Congestion And Delays Make The Mumbai, India Court System An Inadequate Forum For This Lawsuit.**

Were this case sent to India, TWP LLC would be forced to seek relief in a legal system infamous for delays so egregious that knowledgeable lawyers sometimes warn plaintiffs not to expect a remedy in their lifetimes. Declaration of Justice (Ret.) S. K. Desai In Support Of Plaintiffs' Opposition To Motion To Dismiss ("Desai Decl.") ¶7. Such extreme delay renders the Mumbai Bench of the Bombay High Court, where this case would be litigated, an inadequate forum for this lawsuit. *Id.* ¶6; *see also Bhatnagar*, 52 F.3d at 1227-29 (Calcutta High Court was an inadequate forum when cases routinely took 15 to 20 years to resolve).

Civil cases in the Bombay High Court often take *twenty to twenty-five years* to bring to resolution. According to Justice S. K. Desai, a distinguished Mumbai jurist and former High Court acting chief justice with more than 50 years of litigation experience in Mumbai, the present case would likely take 15 to 20 years, *not* including appeals, to reach final resolution.

---

[22] TWIPL is a secondary plaintiff in this case because, as explained *supra*, the majority of damage was to TWP LLC, the owner of the trade secrets and most of the contractual rights and economic advantages that Defendants either interfered with or stole.

HOWARD
RICE
EMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

*Id.* ¶¶7, 8, 32. This grim prognosis is not surprising, given that:

- There is only one High Court judge for every 1.8 million people in the Bombay High Court's area of jurisdiction, and the average caseload per judge exceeds 6,200. *Id.* ¶¶12, 18. This is almost *ten times* the average caseload per judge of the Northern District of California, itself a busy court with more than 640 cases per judge. Gallo Decl. Ex. M. Only 59 judges are assigned to the Bombay High Court, which has jurisdiction over civil, criminal, and appellate cases worth more than 50,000 rupees (about $1,200) in the states of Maharashtra and Goa, and the territories of Dadra & Nagar Haveli and Daman & Diu—an area with 110 million people. Desai Decl. ¶¶5, 9, 18 & Ex. A. And only *six or seven* judges are assigned on any given day to hear *all* civil litigation before the largest division of the Bombay High Court: the Mumbai Bench, which covers not only the massive city of Mumbai (population 16.4 million) but also surrounding communities with millions more people. *Id.* ¶¶11, 13.

- Nearly 368,000 cases of all sorts were pending before the Bombay High Court as of September 30, 2007. *Id.* ¶17 & Exs. G, H. The backlog of pending civil cases increased by 400 over the year ending September 30, 2007, and the backlog of pending appeals rose by 3,000 over the same time. *Id.* ¶19 & Exs. G, I, J, K.

- As a result of this congestion, more than 41 percent of the civil cases pending in the Bombay High Court are more than 10 years old. *Id.* ¶23 & Ex. L. More than half the civil cases are more than eight years old and two-thirds are more than six years old. *Id.* Among these thousands of cases are many that have been pending before the High Court since the 1960s and before, including some from the late 1940s, when the British still ruled India and Harry Truman was President. *Id.* ¶25. In addition, 14 percent of all *appeals* before the High Court—which has jurisdiction over civil, criminal and appellate matters of all sorts—are themselves more than 10 years old, and more than one-third of all appeals have been pending for more than five years. *Id.* ¶24.

The Bombay High Court is afflicted with congestion and delays so "extreme" that "the prospect of judicial remedy becomes so temporally remote that it is no remedy at all."

1    *Bhatnagar*, 52 F.3d at 1227-28.    Confronted in *Bhatnagar* with a similarly compelling

2    statistical record of delay, the Third Circuit affirmed the trial court's holding that the

3    Calcutta High Court (where the average case took between 15 and 20 years) was an

4    inadequate alternative forum.  This level of delay, the Third Circuit found, was "much more

5    than the mere minor delay of the sort long tolerated, albeit ruefully, in courts of justice. . . .

6    Wherever the line might be drawn separating tolerable delay from intolerable—that is, delay

7    that does not vitiate a remedy from that which does—delays of up to a quarter of a century

8    fall on the intolerable side of that line."    *Id.* at 1228.    Delays of such "egregious

9    magnitude . . . render a remedy clearly inadequate."  *Id.* (internal quotation marks omitted).

10    Defendants have cited cases where other courts have declared India an adequate forum

11    for particular litigation.  But, each of those cases involved either special circumstances or

12    decidedly weaker evidence of delay than that presented either here or in *Bhatnagar*.  In

13    *Chhawchharia v. Boeing Co.*, 657 F. Supp. 1157, 1160 (S.D. N.Y. 1987), plaintiff submitted

14    only "one newspaper article, which includes anecdotal references to congestion in Indian

15    courts" as evidence of delay. In *Neo Sack, Ltd. v. Vinmar Impex, Inc.*, 810 F. Supp. 829, 834

16    (S.D. Tex. 1993), plaintiffs' only evidence of delay in Bombay courts was an affidavit

17    asserting delays in the court system of Indore, not Bombay.  *PLM Int'l, Inc. v. Nath*, 1998

18    WL 514045 (N.D. Cal. 1998), held that a plaintiff that had previously filed lawsuits in India

19    could not now argue India was an inadequate forum.

20    *In re Union Carbide Corp. Gas Plant Disaster*, 809 F.2d 195 (2d. Cir. 1987), was a

21    unique case: through special legislation, the Indian legislature explicitly fast-tracked tort

22    claims arising from the Bhopal gas leak in order to free them from the usual procedural

23    constraints of the court system, which even in the mid-1980s was already notoriously

24    congested.  *Id.* at 199 (noting that the "Bhopal Act" provided that the Bhopal cases be

25    treated "speedily, effectively and to the best advantage of the claimants").    The Second

26    Circuit upheld the lower court's finding that India was an adequate forum for *those*

27    *particular lawsuits* in large part because India had created this procedural shortcut for those

28    "extraordinary cases."  *Id.*

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1  Plaintiffs here would receive no such special treatment in Mumbai. As Justice Desai

2  says, they would be "last in a line 368,000 cases long." Desai Decl. ¶32. Given the

3  complexities of the case and the BNP Paribas Defendants' considerable financial resources,

4  it would likely take decades to reach the front of that line. *Id.* For this reason, the Bombay

5  High Court is an inadequate forum for this lawsuit.

6  **C.    The Balance Of Both Private And Public Factors Dictates That This Court**
   **Retain Jurisdiction.**

7

8  The court is well aware of the private and public factors it must balance.[23] What must

9  be emphasized is that a heavy weight is already on the scale: San Francisco is TWP LLC's

10  home forum and it is Defendants' burden to show that other private and public factors

11  strongly tilt in their direction. *See, e.g., Gates Learjet*, 743 F.2d at 1335 (noting that a "real

12  showing of convenience by a plaintiff who has sued in [its] home forum will normally

13  outweigh" any inconvenience to the defendant and holding that district court abused

14  discretion in dismissing case on forum non conveniens grounds because "[t]he balance of the

15  public and private interest factors is not strongly in favor of the defendants").

16  **1.    The Balance Of Private Factors Does Not Favor Dismissal.**

17  Defendants argue that private factors weigh heavily in favor of dismissal because the

18  conduct at issue occurred mostly in India, only one of the parties in the case is a California

19  citizen, and many of the witnesses and documents in the case are located in India or Hong

20  Kong. BNPP Mot. at 15-16. These factors do not outweigh Plaintiffs' choice of forum, or

21  show that India is a markedly more efficient forum than this Court.

22

23  _____

[23] "The private interest factors include the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. The public interest factors include the administrative difficulties flowing from court congestion; the local interest in having localized controversies resolved at home; the interest in having the trial of a diversity case in a forum that is familiar with the law that must govern the action; the avoidance of unnecessary problems in conflicts of law, or in application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Gates Learjet Corp.*, 743 F.2d at 1334 (quoting citation and internal quotations omitted).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

*First*, while the tortious conduct at issue may have occurred in India, it was directed at a research operation that was controlled by, and operated for the benefit of, TWP LLC, a California citizen. TWP LLC's operation of, and expectations for, Discovery Research play an important role in this case, as evidenced by the fact that Defendant Chakravarty was at all times a TWP LLC employee.

*Second*, TWP LLC is a California citizen and the principal plaintiff damaged by Defendants' conduct. India is not a clear "center of gravity" for the parties—Chakravarty and TWIPL are Indian citizens, but BNPP Asia is a Hong Kong citizen and BNP Paribas is a French citizen with substantial operations in California and elsewhere in the United States.

*Third*, while a number of likely witnesses in this case are located in India, those witnesses are all (or almost all) employees of either BNP Paribas Group companies or TWIPL. For example, the majority of the witnesses named in Chakravarty's responses to jurisdictional discovery as having "direct knowledge of … facts relevant to this case," (Gallo Decl. Ex. N at 3-4 (Chakravarty's Response to Interrogatory 2)), are former Discovery Research research analysts and associates who now work for BNP Paribas Group's new Indian venture (headed by Chakravarty).[24] The BNP Paribas Defendants can see that these employees—including Chakravarty—appear, and will not be any more inconvenienced by the cost of bringing them to California than Plaintiffs would be inconvenienced by bringing their U.S.-based witnesses, described below, to India.[25] Furthermore, there will be no need

---

[24] *See, e.g.*, Dhillon Decl. ¶22 & Ex. G (March 13, 2008 research report authored by Vijay Sarathi listing members of BNPP India's "India Research Team"—Shashank Abhisheik, Abhishek Bhattacharya, Alok Deshpande, Karan Gupta, Manish Gupta, Avinash Singh, Joseph George, Preeti Dubey, Abhiram Eleswarapu, Laksminarayana Ganti, Sandeep Thomas Matthew, Girish Nair, Sameer Naringrekar, N. Vijay Sarathi, Amit Shah, Vishal Sharma, Sriram Somayajula, Kunal Vora, and Charanjit Singh—all of whom are former Discovery Research research analysts or associates). Plaintiffs are informed and believe that three former Discovery Research administrative employees also named by Chakravarty as potential witnesses—Bijal Thakkar, Neelima Mane and Roshan Shetty—have also moved to BNPP Asia's new venture. *Id.* ¶23. A final witness named by Chakravarty, Angelo Pinto, is a BNP Asia employee in India. Gallo Decl. Ex. N at 3-4 (Chakravarty's Response to Interrogatory 2).

[25] Plaintiffs expect that a few remaining TWIPL employees based in India might serve as witnesses in the case. Plaintiffs will make these witnesses available in the United States as necessary.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    for all, or even most, of these witnesses to provide testimony.  The analysts and research

2    associates, for example, would provide largely identical testimony about being recruited and

3    interviewed by BNPP Asia and resigning from Discovery Research.  This cumulative

4    testimony will be unnecessary.

5        The key witnesses affiliated with BNPP Asia are in Hong Kong.  *See* Gallo Decl.

6    Ex. N at 3-4 (Chakravarty's Response to Interrogatory 2, listing Pierre Rousseau, Jonathan

7    Harris and Hugo Leung as BNPP Asia employees based in Hong Kong who played a role "in

8    the recruiting, hiring, decision to hire, interviewing or interrogation [of Chakravarty and the

9    TWIPL employees who left Discovery Research]").[26]  Defendants appear to argue that India

10   is substantially more convenient for these witnesses because Hong Kong and Mumbai are

11   both in Asia, but this argument is specious—it is a relatively long plane flight from Hong

12   Kong to either Mumbai or San Francisco, and it will be more or less equally inconvenient

13   for these witnesses to appear in either forum.

14       Despite Defendants' assertions to the contrary, there are a substantial number of

15   witnesses whose testimony will be required for this case who are located in the United

16   States, and in California in particular.  These witnesses will testify to, among other things:

17   Chakravarty's role at, and duties to, TWP LLC and TWIPL; the creation of—and business

18   model for—Discovery Research, as well as its day-to-day operations; and the harm that

19   Defendants' actions have caused TWP LLC and TWIPL.[27]  Additional California witnesses

20   will likely include forensic experts who will testify to Chakravarty's use of Plaintiffs'

21   computer system and experts who will testify as to the nature and amount of Plaintiffs'

22

23   [26]Another potential BNPP Asia witness, Theresa Ho, is based in Singapore.  *See* Gallo
     Decl. Ex. N at 3.

24   [27]Plaintiffs have not yet made their initial disclosures under Federal Rule of Civil
     Procedure 26 but would likely call at least the following San Francisco-based witnesses if
25   this matter went to trial:  Mark Fisher (legal), Keith Gay (research), Steve Buell (research),
     Austin Hamilton (compliance), Karen Santos (compliance), Daniel Widener (compliance),
26   Paul Slivon (institutional sales), Michi Sethavarangura (marketing), Ryan Straub
     (accounting), Dheeraj Soni (IT), and Lisa Sorani (human resources).  Plaintiffs would also
27   call the following witness located outside California and India:  John Columbo (legal—New
     York), and Sian Savage (compliance/editorial—London).  KV Dhillon travels frequently
28   between Mumbai and San Francisco and would be equally available in either forum.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   damages.  If this action were litigated in India, Plaintiffs would bear the expense and

2   inconvenience of those witnesses' travel there.

3       *Fourth*, while Defendants make conclusory statements that India provides the most

4   convenient access to physical evidence and documents in the case, they have not shown this

5   to be the case.  Most of the documents related to the planning and operational details of

6   Discovery Research are located in San Francisco, not India.  The same is true of the

7   personnel files of Chakravarty and the departed Discovery Research employees.  The BNPP

8   Defendants' claim with regard to relevant documents is not that they are in India, but that

9   they are in *Asia* (*see* BNPP Mot. at 16 ("All of the relevant documents related to the hiring

10  and employment of the former TW India employees are in Asia")).  This suggests, consistent

11  with the email sent by Jonathan Harris, that the efforts to recruit Chakravarty and the others

12  were run out of Hong Kong and that the documents related to those efforts are located there.

13  In our electronic age, it is no more difficult to move documents from Hong Kong to San

14  Francisco than from Hong Kong to Mumbai.

15      *Fifth*, the factor relating to "other practical problems that make trial of a case easy,

16  expeditious and inexpensive" favors Plaintiffs because, as discussed above, the Mumbai

17  High Court routinely takes fifteen years or more to decide cases.

18      In short, Defendants have not made, as is their burden, a clear showing of facts

19  supporting their assertion that private factors weigh heavily in their favor.

### 2.    The Balance Of Public Factors Does Not Favor Dismissal.

21      Defendants argue that public factors weigh heavily in favor of dismissal because

22  California has little interest in what Defendants characterize as "an employment dispute

23  involving two Indian research operations and Indian employees," because California has

24  little expertise with Indian law, and because a trial in California would impose a burden on

25  this Court and local juries.  None of these arguments holds water.

26      *First*, far from being a local dispute between two Indian companies, the raid on

27  Discovery Research was conducted by the Hong Kong affiliate of an international banking

28  conglomerate and was directed at a business that, although partially located in India, was

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

OPP. TO DEFS.' MOT. TO DISMISS FIRST AM. COMPL. C-07-6198 MHP

-37-

1    controlled by and operated for the benefit of TWP LLC, a company headquartered in

2    California. California has a strong interest in preventing its corporate citizens from being

3    stripped on their assets, even if the immediate conduct that harms the California company

4    takes place outside the state.

5        *Second*, Plaintiffs have alleged their claims under federal and California law and

6    Defendants have made no showing, beyond conclusory statements, that Indian law would

7    apply in this case, or would materially differ from California law. Thus, this Court's

8    expertise, or lack thereof, in Indian law is irrelevant.

9        *Third*, Defendants incorrectly argue that the burden on this Court and a California jury

10   of litigating this case in California outweighs California's "comparatively low" interest in

11   this lawsuit. As described above, California has a strong interest in seeing that the business

12   operations and revenues of its corporate citizens are not damaged by rogue employees

13   conspiring with foreign corporations to raid valuable assets. Unlike the *In re Union Carbide*

14   case cited by Defendants, here the principal entity that has suffered harm is not an Indian

15   citizen, but rather TWP LLC, a California citizen. Defendants have made no showing that

16   this case will be particularly burdensome to this Court, and the congestion in this Court,

17   while significant, pales in comparison to that of the Bombay High Court.

18       In short, a review of the public and private factors shows that they do not weigh

19   heavily, if at all, in favor of dismissal of this case for forum non conveniens.

20

21

22

23

24

25

26

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1

**CONCLUSION**

For the reasons described above, the Court should deny the BNP Paribas Defendants'
and Chakravarty's motions to dismiss.

DATED:  July 10, 2008.

Respectfully,

GILBERT R. SEROTA
MARK A. SHEFT
MICHAEL L. GALLO
HOWARD RICE NEMEROVSKI CANADY
     FALK & RABKIN
A Professional Corporation


By: _____
            /s/
           GILBERT R. SEROTA

Attorneys for Plaintiffs THOMAS WEISEL
PARTNERS LLC and THOMAS WEISEL
INTERNATIONAL PRIVATE LIMITED

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation