# EXHIBIT R-1



# LAW COMMISSION OF INDIA

# SEVENTY-NINTH REPORT

# ON

## DELAY AND ARREARS IN HIGH COURTS AND OTHER APPELLATE COURTS

# SEVENTY-NINTH REPORT ON DELAY AND ARREARS IN HIGH COURTS AND OTHER APPELLATE COURTS

MAY 10, 1979

<p style="text-align:center">
CHAIRMAN<br>
LAW COMMISSION<br>
GOVERNMENT OF INDIA<br>
<em>May,</em> 10, 1979.
</p>

D.O. NO. F. 2(8)/,77-L.C.

*My dear Minister,*

 *I send herewith the Seventy-ninth Report of the Law Commission relating to delay and arrears in High Courts and other appellate courts.*

 *The subject was taken up for consideration pursuant to the terms of reference of the Law Commission, according to which the Commission should,* inter alia, *keep under review the system of judicial administration to secure elimination of delays and speedy clearance of arrears. I may mention that the Commission has already forwarded its Report on delay and arrears in trial courts, being its 77th Report.*

 *I must place on record my appreciation of the assistance rendered by Shri P. M. Bakshi, Member-Secretary, in the preparation of this Report.*

 *With kind regards,*

<p style="text-align:right"><em>Yours sincerely,</em></p>

<p style="text-align:right"><em>Sd/.-</em><br>
<em>(H. R. Khanna)</em></p>

*Shri Shanti Bhushan,*
*Minister of Law, Justice*
*& Company Affairs,*
*New Delhi.*

<p style="text-align:center">(i)</p>

# CONTENTS

| Chapter | Topic | Page |
|---|---|---|
| 1. | Introductory ... ... ... ... ... ... ... ... ... | 1 |
| 2. | Jurisdiction of High Courts and City Civil Courts . . ... ... ... | 13 |
| 3. | Strength of High Courts: numerical and qualitative aspects ... ... | 17 |
| 4. | Appellate jurisdiction ... ... ... ... ... ... ... | 23 |
| 5. | Procedure in appeals: general ... ... ... ... ... ... ... | 27 |
| 6. | Arguments and judgment in appeals ... ... ... ... ... ... | 34 |
| 7. | Grouping and listing of appeals ... ... ... ... ... ... | 42 |
| 8. | First appeals. (including appeals from City Civil Courts) to High Courts | 46 |
| 9. | Appeals under special Acts ... ... ... ... ... ... ... | 49 |
| 10. | Second appeals ... ... ... ... ... ... ... ... | 51 |
| 11. | Appeals against judgments of single judges ... ... ... ... ... | 53 |
| 12. | Civil revisions ... ... ... ... ... ... ... ... | 55 |
| 13. | Certificate for appeal to Supreme Court under article 133 ... ... | 56 |
| 14. | Criminal appeals, revisions and references ... ... ... ... ... | 57 |
| 15. | Ordinary original civil jurisdiction of High Courts ... ... ... ... | 59 |
| 16. | Extraordinary original civil jurisdiction of High Courts: writs ... ... | 61 |
| 17. | Jurisdiction under Special Acts: Tax cases ... ... ... ... | 65 |
| 18. | Appeals to Courts subordinate to the High Court ... ... ... ... | 70 |
| 19. | High Court for Goa, Daman & Diu ... ... ... ... ... ... | 75 |
| 20. | Conclusion ... ... ... ... ... ... ... ... | 76 |
| 21. | Summary of matters dealt with ... ... ... ... ... ... | 78 |

## APPENDICES

| Appendix | Topic | |
|---|---|---|
| 1. | Appellate jurisdiction of District Judges in various States ... ... | 91 |
| 2. | List of sections of the Indian Succession Act, 1925, under which the High Courts have testamentary jurisdiction ... ... ... ... ... | 92 |
| 3. | Appeals to High Courts under Special Acts besides those mentioned in the body of the Report ... ... ... ... ... ... ... | 93 |
| 4. | Jurisdiction of the High Court under Guardians & Wards Act, 1890 ... | 94 |
| 5. | Oral arguments in France ... ... ... ... ... ... ... | 95 |
| 6. | U.P. High Court Abolition of Letters Patent Appeals Act, 1962 ... ... | 96 |
| 7. | Pendency of cases in High Courts during 1976 to 1978 ... ... ... | 97 |

## CHAPTER 1

### INTRODUCTORY

### I. GENESIS AND SCHEME

**1.1.** According to the terms of reference of the Law Commission, the Commission is expected, *inter alia*, to keep under review the system of judicial administration, to secure elimination of delay and speedy clearance of arrears in courts. The Commission has already forwarded to Government[1] its Report on delay and arrears in trial courts. The present Report deals with delay and arrears in the High Courts and other appellate courts.

We shall deal first with the magnitude of the problem and the efforts so far made to solve it. After stating in brief the various types of jurisdiction exercised by High Courts, we shall proceed to a consideration of proceedings falling within particular species of such jurisdiction—appellate, original, special and so on. Measures for expediting disposal in respect of each type of proceeding will naturally find mention in the Chapter devoted to that particular type of proceeding, but we also propose to make certain suggestions of a general character which would apply to the entire judicial work of High Courts.

### II. ARREARS

**1.2.** As will be evident from a later Chapter[2] of this Report, the jurisdiction of High Courts in India is of an infinite variety. The remedies available to an aggrieved person and the proceedings that he can institute for seeking relief depend on the nature of his legal grievance and the stage at which the matter stands. These remedies—inclusive of remedies by way of first appeals, second appeals, revision and writ petitions in the High Court—are, to our mind, necessary for the proper administration of justice, for the satisfaction of legal conscience and for the proper enforcement of legal rights.

However, various proceedings filed and pending in the High Courts have, in course of time, piled up to a disquieting figure and at present, the situation in regard to arrears is so grave that it needs to be tackled without any delay.[3] The problem is not new: and several efforts have been made in the past to solve it,[4] but there has not been any abiding solution,—as, indeed, there cannot be,—because of expanding society, continuously changing social values and, above all, the ever-increasing and diversifying functions of the State, both in the public and in the private sector and the passing of new legislation, which adds to the burden and responsibilities of the courts.

**1.3.** To deal with the present situation rationally, it will be necessary to see which type of the pending cases can be said to be old so as to constitute arrears. We shall deal with this point in due course.[5]

**1.4.** While fall in disposal might, to some extent, have contributed to increase in the arrears of the High Courts, it cannot be denied that, as we have stated earlier,[6] there has been substantial increase in the fresh institutions in the High Courts. In particular, this increase is due to the expansion of its special jurisdiction under the various Acts and the coming into force of the Constitution, with Articles 226 and 227 providing efficacious remedies to aggrieved citizens who, by now, have become more conscious of their rights—though perhaps a little oblivious to their duties and obligations. The delays in the making of proper appointment of judges of the High Court when vacancies arise, and the comparative indifference in regard to the strength of the judges in the High Court inspite of increase in institutions and the heavy backlogs, have also very appreciably added to the gravity of the situation.

*Marginal notes:*
Genesis and scheme of discussion.

Accumulation of cases.

Arrears.

Increase in institution.

---

[1] 77th Report, Delay and Arrears in Trial Courts (December, 1978).
[2] Chapter 2, *infra*.
[3] Para 1.31 to 1.36, *infra*.
[4] Para 1.23 and 1.24, *infra*.
[5] Para 1.29, *infra*.
[6] Para 1.2, *supra*.

2

**Speed and justice —Need for harmony.**

**1.5.** Speedy justice is of the essence of an organised society and it is in the interest of both the State and the citizen that disputes which go to the law courts for adjudication are decided as early as possible. Justice delayed is, in most cases, justice denied. At the same time, it is obvious that in order to speed up the decision of cases, the basic norms that are necessary for ensuring justice should not be dispensed with. This is the great problem facing any person or group of persons entrusted with the task of devising measures to secure elimination of delay and speedy clearance of arrears in courts. How does one balance the consideration of speed and the demands of justice? In making our recommendations, we have tried to keep in the forefront the need to maintain a reasonable amount of harmony between these two considerations.

**Need to cry halt to Litigation.**

**1.5A.** Delay in the disposal of cases apart from causing hardship to the parties has a human aspect and has the effect of embroiling succeeding generations in litigation started by the ancestors. Some of these aspects were brought out in a judgment[1] of the Supreme Court in 1976 wherein the Court observed:

"Apart from that we find that the suit out of which the present appeal has arisen was filed as long ago as January 1950. From the title of the appeal we find that many of the original plaintiffs and defendants have during this period of more than a quarter of century departed and are no more in the land of the living, having bowed as it were to the inexorable law of nature. They are now represented by their legal representatives. To remand the suit to the trial Court would necessarily have the effect of keeping alive the strife between the parties and prolonging this longdrawn litigation by another round of legal battle in the trial Court and thereafter in appeal. It is time, in our opinion, that we draw the final curtain and put an end to this long meandering course of litigation between the parties. If the passage of time and the laws of nature bring to an end the lives of men and women, it would perhaps be the demand of reason "and dictate of prudence not to keep alive after so many years the strife and conflict started by the dead. To do so would in effect be defying the laws of nature and offering a futile resistance to the ravage of time. If human life has a short span, it would be irrational to entertain a taller claim for disputes and conflicts which are a manifestation of human frailty. The courts should be loth to entertain a plea in a case like the present which would have the effect of condemning succeeding generation of families to spend major part of their lives in protracted litigation. It may be appropriate in the above context to reproduce what was said in the case of *Sant Narain Mathur* v. *Rama Krishna Mission* :[2]

'It is time, in our opinion, that we draw the final curtain on this long drawn litigation and not allow its members to smoulder for a further length of time, more so when the principal contestants have all departed bowing as it were to the inexorable law of nature. One is tempted in this context to refer to the observations of Chief Justice Crewe in a case concerning peerage claim made after the death without issue of the 'Earl of Oxford. Said the learned Chief Justice :

"Time hath its revolutions; there must be a period and an end to all temporal things—an end of names, and dignities and whatsoever is terrene, and why not of De Vere? For where is Bohun? Where is Mowbray? Where is Mortimer? Why, which is more and most of all, where is Plantagenet? They are all entombed in the urns and sepulchres of mortality."

'What was said about the inevitable end of all mortal beings, however eminent they may be, is equally true of the affairs of mortal beings, their disputes and conflicts, their ventures in the field of love and sport, their achievements and failures for essentially they all have a stamp of mortality on them.'

One feels tempted to add that if life like a dome of many-coloured glass stains the white radiance of eternity, so do the doings and conflicts of mortal beings till death tramples them down."

---

[1]*Bechan Pandey* v. *Dulhin Janki*, (1976) 2 S.C.C. 286, 290, 291.

[2]*Sant Narain Mathur* v. *Rama Krishna Mission*, (1974) 2 S.C.C. 730, 737, para 15.

3

**1.5B.** With these preliminary observations, we proceed to a consideration of the subject.

## III. THE COURTS

**1.6.** The judicial power of the Union and the States is exercised through the courts established by or under the Constitution. The Constitution of India, apart from creating a Supreme Court for the Union of India, has provided for a High Court for each State. It has also empowered every State to establish for its territory appropriate judicial machinery, with such judicial powers as are necessary, subject to constitutional limitations. This accounts for some difference in the functioning and exercise of jurisdiction by various courts, including, in certain respects, the High Courts, in each State. There are, however, certain features which are common to most High Courts. *Courts under Constitution.*

**1.7.** The utility of the Supreme Court and the High Courts was well brought out in the 58th Report of the Law Commission[1] which dealt with the structure and jurisdiction of the higher judiciary: *Role of Courts.*

"Ever since our Constitution was adopted and the Supreme Court was established, the Supreme Court has, by its verdicts rendered during the last twenty-two years, made the concept of the Rule of Law relevant, coherent and stable in this country. It has consistently protected the Fundamental Rights of the citizens against unconstitutional encroachment, examined the validity of legislative and executive actions fairly, impartially and fearlessly, and introduced an element of certainty and uniformity in the interpretation of laws. The service thus rendered by the Supreme Court is of a very significant character and its importance cannot be exaggerated in the context of the federal set-up of the Indian Republic.

"During the same period, High Courts in our States also have done valuable work in exercising their ordinary civil and criminal jurisdiction and their constitutional jurisdiction under Articles 226 and 227 of the Constitution. Broadly stated, it can be legitimately claimed that the operation of judicial process in our country during the last twenty-two years has, on the whole, fostered and strengthened the best judicial traditions and thereby deserved and commanded confidence from the Indian community in general and the litigating public in particular."

## IV. PAST REPORTS

**1.8.** To maintain this confidence, it is necessary that arrears be brought down. The problem of arrears in High Courts is of long standing and has been inquired into more than once. A brief review of the efforts made in the past may be of use. *Past efforts.*

**1.9.** To deal with the question of delay in the disposal of civil cases both in the High Courts and in the subordinate courts, a Committee was appointed in 1924 under the Chairmanship of Mr. Justice Rankin of the Calcutta High Court.[2] The task of the Committee was "to enquire into the operation and effects of the substantive and adjective law, whether enacted or otherwise, followed by the courts in India in the disposal of civil suits, appeals, applications for revision and other civil litigation (including the execution of decrees and orders), with a view to ascertaining and reporting whether any and what changes and improvements should be made so as to provide for the more speedy, economical and satisfactory despatch of the business transacted in the courts and for the more speedy, economical and satisfactory execution of the process issued by the Courts". The Committee, after a thorough and careful enquiry into the various aspects, forwarded an exhaustive report in 1925. *Rankin Committee.*

**1.10.** In 1949, a High Courts Arrears Committee was set up by the Government of India under the Chairmanship of Mr. Justice S. R. Das, for enquiring and reporting as to the advisability of curtailing the right of appeal and revision, the extent of such curtailment, the method by which such curtailment should be *Committee of 1949.*

[1]Law Commission of India, 58th Report (Structure and Jurisdiction of the Higher Judiciary), Questionnaire and the preamble thereto, quoted at page 1, para 1.1 and 1.2.

[2]Rankin Committee.

4

effected, and other measures, if any, which should be adopted to reduce the accumulation of arrears. A number of recommendations were then made by this Committee.[1]

**Review by Government and Committee of 1969-1972.** 1.11. In 1967, the Government of India, greatly concerned at the problem of accumulation of arrears in various High Courts,[2] conducted a review of the state of work in each High Court and found that inadequacy of judges was the main cause of the accumulation of arrears.[3] Government increased the strength of judges in some of the High Courts, taking into account the arrears of cases then pending, fresh institutions and disposals. Though this had some effect, no appreciable result was produced.

At the end of the year 1969, the Government of India constituted a Committee presided over by Mr. Justice Hidayatullah, the then Chief Justice of India, to suggest ways and means for reducing arrears of cases pending in the High Courts. Upon the retirement of Mr. Justice Hidayatullah, Mr. Justice Shah was appointed the Chairman of the Committee.[4] When Mr. Justice Shah retired as the Chief Justice of India, Government requested him to continue as Chairman of the Committee. The Report of the Committee will be referred to in due course.

**Committees appointed in various States.** 1.12. Apart from the above three Committees which worked at all-India level, some Committees were appointed in different States to look into the problem of delay and other matters concerning judicial administration.

One such Committee was in West Bengal. This Committee was constituted in 1949 under the Chairmanship of Sir Trevor Harries, the then Chief Justice of the Calcutta High Court. Another Committee was constituted in 1950 in Uttar Pradesh under the Chairmanship of Mr. Justice K. N. Wanchoo.

**Law Commission's Reports.** 1.13. The Law Commission of India, in its 14th Report made in 1958, went into all aspects relating to the Reform of Judicial Administration, including the question of delay in the disposal of cases in High Courts.

The 27th and 54th Reports of the Law Commission dealing with the Code of Civil Procedure, and the 41st Report dealing with the Code of Criminal Procedure, when making recommendations for revision of the procedural codes, were addressed, *inter alia,* to the need for reducing delay at various stages of the trial, including appeals and revisions to High Courts.

It may be mentioned that it was as a result of the recommendations in the 54th Report that the scope of the right of second appeal came to be somewhat circumscribed. Also, it was as a result of the 41st Report that appeals to High Courts from Presidency Magistrates (who are now designated as Metropolitan Magistrates) came to be abolished. Such appeals now lie to the Court of Session.[5]

**58th Report.** 1.14. In 1974, when the Law Commission reviewed the structure and jurisdiction of the higher judiciary[6] (58th Report), it focussed its special attention on the imperative need to reduce arrears in the higher courts, and dealt with a number of questions, including writ petitions, taxation, industrial disputes, matters relating to conditions of service of the judges. The Report also deals at length with appeals to the Supreme Court—both civil and criminal,—including appeals with special leave.

---

[1]These are summarised by the later Committee Report, 1972, pages 9-10, paragraphs 32 to 36.

[2]*See* High Courts Arrears Committee Report (1972), page 1, Chapter 1, para 4.

[3]The other contributing factors were—

    (a) delay in filling up vacancies;

    (b) lack of court accommodation;

    (c) diversion of serving judges to other duties, such as Commission of Inquiry etc., without providing replacement in the High Court.

[4]High Courts Arrears Committee Report (1972), page 2, paragraphs 6 and 7.

[5]Code of Criminal Procedure, 1973, section 374(3).

[6]Law Commission of India, 58th Report (Structure and Jurisdiction of the Higher Judiciary).

5

## V. LEGAL AND EXTRA-LEGAL FACTORS

**1.15.** The very fact that the problem of arrears has received attention for such a long time, and has been considered by so many high powered committees, and yet continues to vex all concerned, is enough to indicate that the problem, by its nature, is not easy of solution. Being very conscious of this fact, we have not, in preparing this Report, been unmindful of the complicated nature of the subject and of the numerous issues involved. The institution of cases and increase therein is not a matter which can be adequately dealt with merely by legal amendments, though certain aspects thereof could be so attended to. Improvement in the rate of disposal of cases cannot also, in its totality, be achieved by mere statutory reforms, since the human factor cannot be overlooked. This human factor comprises so many elements—the judges, the ministerial staff of the courts, the members of the bar, the parties and the witnesses.

*Complicated nature of the problem.*

**1.16.** It should also be remembered that the judicial system and the legal machinery do not work in isolation from society. They are parts of the entire social and political system and their efficient working must, to a large extent, depend on the co-operation of other elements of the system. Take a familiar but important example. The service of summonses, notices and other documents issued by the courts—that is to say, prompt and efficient service—pre-supposes the promptness and efficiency of the serving establishment. Where postal service is introduced, it pre-supposes the efficiency and promptness of the postal authorities. Where service is effected through the Government—as for example, in the case of Government servants,—co-operation of the head of the office is needed. Delay in these fields—fields which are, in a sense, outside the legal system—necessarily causes delay in the disposal of cases. In this sense, the role of improvements that are operative only within the judicial system is obviously a limited one in dealing with the problem.

*Judicial system not working in isolation.*

**1.17.** We are mentioning this consideration, elementary though it may be, in order to indicate that without the active co-operation of other agencies, too much should not be expected of the steps that may be taken to implement the recommendations made in this Report or, for that matter, of any other Report on the subject that might have been given in the past.

*Limitations of reforms in the system and need to look to the future as well as to the past.*

**1.18.** We would also like to make it clear that it is simple arithmetic that arrears arise when—taking one calendar year—the rate of disposal in that year is less than the rate of institution. If disposal maintains a percentage equivalent to that of institution, then certainly no further arrears would accumulate and the problem would remain only of dealing with the past arrears. It is therefore of importance that any steps that may be taken in the matter should look not only to the past, but also to the future. This is not to say that the backlog must not be attended to. It must also be cleared,[1] and, in making our recommendations, we have tried to pay heed to that aspect also.[2]

*Rate of disposal and rate of institution.*

**1.19.** It cannot be denied that the problem of arrears in High Courts is not only serious in its magnitude, but also complex in its character. In order to elicit opinion on the complex issues involved, we invited views through a Questionnaire,[3] copies of which were sent to various interested persons and bodies. The Chairman of the Commission also visited several places for holding oral discussions on the subject with the Bench and the Bar. The Commission is grateful for the co-operation of all concerned who were kind enough to spare their valuable time and expressed their views.

*Complexity of the problem.*

**1.20.** With a view to solving the problem of arrears in courts, suggestions have been made for the appointment of more judges, changes in the distribution of business, amendments in the rules of procedure, the elimination of delaying tactics and the like. The problem, however, has persisted, requiring again a review of the position. It is no exaggeration to speak of an impending crisis in judicial administration. To understand how this crisis has come about, it is necessary to inquire into the factors leading to work-loads, and the procedure adopted for the disposal of that load.

*Efforts in the past.*

---

[1]Para 1.27 and 1.28, *infra.*

[2]*See* Chapter 3, *infra.*

[3]The Questionnaire is printed as an Appendix to the 77th Report.

6

**Extra-legal and legal factors leading to workload.** 1.21. The factors leading to judicial work-loads may be broadly classified as extra-legal and legal. For example, with the increase in population, there is naturally an increase in the work of the courts. In addition, our society is with the passage of time getting more complex. These are illustrations of extra-legal factors.

**New rights.** 1.22. New rights have been brought into being, and older rights (such as contract and property) have been subjected to Governmental regulation and legal control. New social interests are also pressing for recognition in the courts. In part, the increase is contributed by legislation and by broadened governmental programmes of all kinds, since issues arising out of these ultimately reach the courts for resolution. These factors may be described as legal.

All these developments have increased the demands on the law and its institutions, and it is desirable to keep in mind factors leading to increase in judicial business.

**Law Commission —14th Report.** 1.23. We have referred above[1] to the various Reports concerned with the subject of arrears. Some of them have examined the causes of arrears at length. The Law Commission of India, in its 14th Report,[2] while pointing out that the problem of arrears in the High Courts has to be viewed against the very large increase in the institution of cases in the High Courts, particularly during the post-Constitution period, summarised the reasons for the accumulation of work in the High Courts in the following manner:

"(1) The arrears can be partly attributed to the increase in both the normal work of the High Court and also the expansion of its special jurisdiction under various Acts.

(2) The coming into force of the Constitution has also greatly added to the work of the High Courts.

(3) The strength of the High Courts was not increased in time to prevent the arrears from accumulating.

(4) There has been large increase of arrears in the High Courts and disposals have fallen short of what they should be in a properly regulated court.

(5) Many unsatisfactory appointments have been made to the High Courts on political, regional and communal or other grounds with the result that the fittest men have not been appointed. This has resulted in a diminution in the outturn of work of the judges.

(6) These unsatisfactory appointments have been made notwithstanding the fact that in the vast majority of cases appointments have been concurred in by the Chief Justice of the High Court and by the Chief Justice of India."

The Commission also recommended certain remedial measures.

**View of High Courts Arrears Committee.** 1.24. The High Courts Arrears Committee presided over by Mr. Justice Shah, after stating as many as fourteen causes which, in its view, were responsible for the accumulation of cases[3] in the High Courts, recommended certain measures for their clearance. The Report of that Committee concluded thus:

"In the last analysis it is obvious that it will depend entirely on the calibre and willing effort of individual judges in the country not only to clear the back-log but keep down the file without unduly affecting the quality of justice. It is our firm belief that if proper care is taken in manning the superior judiciary in the best possible way with men of ability and character, that will be the surest guarantee for achieving prompt and efficient administration of justice in our land."[4]

**Backlog** 1.25. We may mention that most of the High Courts are not able to deal with old cases along with the current files, with the result that there continues to be a heavy backlog of arrears on their file. In some High Courts, the disposals

[1]Paragraphs 1.8 and 1.9, *supra.*
[2]14th Report.
[3]High Courts Arrears Committee Report (1972), pages 36-48.
[4]High Courts Arrears Committee Report (1972), pages 91-92.

7

are not keeping pace even with the institution.[1]  The courts and their staff have begun to feel oppressed and suffocated on account of the heavy work-load in courts.

**1.26.**  Every one is familiar with the arrears in law courts, especially in the High Courts in most of the States.  The hard fact of delayed justice has driven not only many Judges and lawyers, but also members of the public, to re-thinking about the court procedures and to search for better ways of getting justice.  That congestion of cases in the High Courts is chronic and has been allowed to run for some time is clear from various Reports on the subject from 1924 to-date. Law's delays is not something peculiar to India, but it should be borne in mind that delay is curable if the Government, the members of the bar and the judiciary set their hearts at it.  If the right remedies are applied at the appropriate time, the problem is not beyond solution.  The need, therefore, at present is to find out the correctives; the causes are, by and large, well known.

*Arrears and remedies.*

**1.27.**  The recommendations already made by us in a separate Report[2] for the disposal of suits and other original proceedings in the trial courts will be helpful in expediting the disposal of cases in these courts.  Here we are concerned with the measures needed for the disposal of arrears and the prompt disposal of current files by the High Courts and other appellate courts.  In doing this, we have to keep two objectives in the forefront—as indeed our terms of reference emphasise—namely, inexpensive justice and obtaining of speedy justice. At the same time, it is necessary to ensure that judicial decisions should not be hasty and made to depend merely on calculation of time.

*Disposal of arrears and prompt disposal of current files.*

**1.28.**  In order that the respect which the judiciary has earned may be maintained, it is necessary—apart from any other considerations—to examine the problem of delay and its causes.  The elimination of congestion in courts will certainly enhance the public respect for the law and the judges to a very considerable extent where it can be achieved without affecting the quality of justice.

*Question of balancing justice and speed.*

This, then, has been the great question that has faced all Committees and Commissions investigating judicial delay—how to reconcile justice with speed, and what kinds of measures to suggest for expediting disposal while maintaining the quality of justice.

One could conceive of a variety of measures: reform in the court structures; improvement in the rules of procedure; augmentation of numbers in the judiciary and in the auxiliary staff; improvement in the conditions of service; and many other reforms.

**1.29.**  As to the structure of courts, by and large, the appellate courts in India are streamlined and the causes of delay cannot be sought in their structure. The structure, no doubt, visualises a hierarchy of courts and a procedure of appeals from one court to the other—but that is inevitable in any modern system.  No organised system of administration of justice permits the findings of the trial court to carry a stamp of finality.  The fact that the findings are liable to be assailed in appeal, constitutes in a large number of cases a guarantee against arbitrariness, and by itself produces judicial constraint.  It is also essential that, so far as questions of law are concerned, there should be a uniformity of decisions.[3]  Our system, therefore, by and large, contemplates that there should be one right of appeal on questions of law and facts and a second appeal on a substantial question of law to a court whose decisions are binding upon all the courts in the State.[4]

*Structure of appellate courts—Hierarchy of courts inevitable in modern system.*

**1.30.**  The system, which is in force in many other countries like the United Kingdom, Canada, Australia and the United States of America, has won the support of most of those who have been dealing with law, and, in our opinion, it would not be proper to condemn it as a legacy of the colonial days.  No doubt, every system has to meet the needs of national and local requirements, and whenever we feel the necessity of making changes for that reason, we should not be averse to making such changes as may be called for.  But, as already

*System not alien to Indian genius.*

[1] *See* Appendix.
[2] 77th Report.
[3] See Chapter 4, *infra.*
[4] See Chapter 4, *infra.*

8

mentioned,[1] by and large, the system cannot be decried as alien to the genius of India. In this connection, we would repeat what was said by us in the 77th Report,[2] where we observed:

> "No judicial system in any country is wholly immune from, and un-affected by, outside influences, nor can such outside influence be always looked upon as a bane. The laws of a country do not reside in a sealed book; they grow and develop. The winds of change, and the free flow of ideals, do not pass the laws idly by. The present day complications and delays in disposal of cases are not so much on account of the technical and cumbersome nature of our legal system as they are due to other facrots operating in and outside the courts. In spite of the fact that we are still heavily dependent on agriculture, we can no longer be regarded as an underdeveloped peasant society, in view of the great strides that have been made in the direction of industrialisation and urbanisation of population, besides expansion of trade and commerce. It will be a reirograde step to revert to the primitive method of administration of justice by taking our disputes to group of ordinary laymen ignorant of the modern complexities of life and not conversant with legal concepts and procedures. The real need appears to be to further improve the existing system to meet modern requirements in the context of our national ethos and not to replace it by an inadequate system which was left behind long ago."

**Observations in earlier Report of the Law Commission.** **1.31.** The Law Commission presided over by Dr. P. B. Gajendragadkar made the following observations in its 58th Report:[3]

> "We have sound judicial traditions; a coherent pattern developed for the organisation of the judiciary; and a rational and systematic judicial process. There is no doubt that these factors have conferred great advantages on the country. An independent and efficient judiciary, a unified judicial system and a modernised procedure—though legacies of the pre-independence era—have been cherished by us. The judicial system has earned the respect of the people, and the respect so earned is well deserved."

**Compulsions of modern society as necessitating elaborate legal rules —Example of Soviet legal system.** **1.32.** We may mention that even in some of the countries which started with simple legal rules, the compulsions of modern society have led to a situation wherein they could not avoid having elaborate and cumbersome legal rules. We may in this context refer to a recent study[4] about the Soviet legal system, wherein it is said:

> "During the period immediately following the Bolshevik Revolution of 1917 there were devout Communists who believed that their new polity would offer the world a model of a different kind of judicial system. They intended to do away with complex legislation and procedures, to eliminate the roles of lawyers and even prosecutors, and to substitute for professionally trained judges wise laymen who would hear disputes presented by the parties themselves and then make their decisions according to the principles of socialist morality as much as formal norms. Justice was to be simple, quick and inexpensive and would not require an elaborate system of appellate review, judicial precedents, legal education, or legal scholarship."

> "Within five years this aspiration was shattered. A frenzy of experimentation had produced not the simple, locally oriented judicial system that had been anticipated, but a rather complex and centralised one with institutions that bore embarrassing resemblances to those of imperial Russia and the West European tradition from which the last three Tsars had borrowed. Judges found it too inconvenient to try cases without the assistance of a public prosecutor, defence counsel, and carefully prescribed procedures, and the courts of the nation were being subjected to

---

[1]Para 1.29, *supra*.

[2]77th Report, para 3.1.

[3]Law Commission of India, 58th Report (Structure and Jurisdiction of the Higher Judiciary), page 14, para 2.10A.

[4]Jerome Alan Cohen, "Will China Have a Formal Legal System?" (1968) Vol. 64, American Bar Association Journal, pages 1510-1511

ever greater uniformity of decision through the revival of appellate review and the issuance of statutes, decrees, and texts designed to guide the judiciary. 'The primitive concept of judicial procedure had collapsed under the burden of practice', as Professor John N. Hazard concluded. 'The formative years had proved to men who expected to avoid complexity and formality that there was no alternative'."

**1.33.** In the context of the judicial system in ancient India, we had occasion, in the 77th Report,[1] to point out that with the grown of society, the function of administration of justice was transferred to the King, who came to be regarded as the fountainhead of justice, and that a regular hierarchy was set up which gradually developed into a sophisticated system. *Ancient Indian system also one of regular hierarchy with sophisticated system.*

**1.34.** Reverting to delay, it may be said that it is sometimes due to dilatory tactics adopted by one party who attempts to protract the proceedings of the court. The courts must be in a position to control such acts and to see that the case proceeds in conformity with the rules and according to Schedule. *Dilatory tactics.*

**1.35.** The rules of procedure, on the whole, are simple and devoid of unnecessary technicalities, so that it cannot be said that these rules are responsible for holding up the hearing of cases. Improvements in procedure and administration may, no doubt, be desirable, and will be suggested in due course, but they will not, by themselves, alone solve the problem. *Rules of procedure not responsible.*

**1.36.** Moreover, the best of rules and the best of judges may be helpless in the face of sheer volume of work. This aspect would suggest that attention will have to be paid to the strength of judges also. Again, it is desirable that the number and quality of judicial personnel is put to the optimum use by proper distribution of business. *Volume of work.*

Thus, the solution lies not in this or that measure, but in a number of measures taken together. Finally, these measures, once adopted, will not solve the problem for all times to come. Periodical review of the impact of measures taken will be needed—an aspect to which we shall revert at the end.[2]

## VI. NORMS

**1.37.** Since this Report is concerned with "arrears" and "delay" — two concepts vitally linked up with the time element—it is necessary to indicate certain norms to determine what cases can be treated as old at a given time. The Law Commission in its 14th Report[3] suggested that cases which were pending for periods of time longer than those mentioned in that Report should be treated as arrears. The periods suggested were as follows: *Norms for arrears*

(Periods suggested in 14h Report)

| | |
|---|---|
| (a) Second appeals and Letters Patent Appeals | One year. |
| (b) First appeals | Two years. |
| (c) Criminal matters, writs and civil revision petitions. | Six months. |

The period for treating cases as arrears was to be counted from the date of institution.

The High Courts Arrears Committee presided over by Mr. Justice Shah,[4] considered that it was difficult to adhere to any time schedule for the disposal of a given cause, because the time for each individual cause would be determined by many factors. While we agree with the comment made by the High Courts Arrears Committee, we think that it may be necessary to fix certain periods beyond which a case should be regarded as "old" whose clearance assumes importance.

As regards the actual periods, we largely agree with those suggested in the 14th Report, but have a few modifications and additions to suggest—

(a) The period for second appeals and appeals against judgments of single judges in writ petitions should be one year.

---

[1] 77th Report, paragraphs 3.2 and 3.3.

[2] Chapter 19, *infra*.

[3] 14th Report, Vol. I, page 91, para 55.

[4] High Courts Arrears Committee Report (1972), page 33, para 21 and page 34, para 24.

(b) The period for regular first appeals should be two years.

(c) The period for criminal matters and civil revisions should be six months.

(d) So far, however, as petitions under article 226 (other than those for a *habeas corpus*) are concerned, the more realistic period in our opinion should be one year. The period for a writ petition for *habeas corpus* should not normally exceed two months.

(e) Cases submitted to the High Courts for confirmation of the sentence of death pronounced by a court of Session[1] should be disposed of within three months from the date of submission.

(f) As regards original suits being tried in High Courts, the period should be two years.

(g) Income-tax references and proceedings under the General Sales Tax Acts, should be disposed of within one year.

(h) Original petitions or appeals or revision petitions under the Land Reforms Act or Tenancy Legislation and Rent Control Acts should be decided within six months.

## VII. LITIGATION TO WHICH GOVERNMENT IS A PARTY

Government as a party.

1.38. No proposal for judicial reform can achieve success without the co-operation of the parties to the litigation. This is particularly so where the Government is a party. At this stage, therefore, we would like to emphasise that the Government is one of the main parties in the bulk of cases before the High Courts. In all criminal cases the main party, apart from the accused, is the State. As to civil cases, the Government is generally one of the parties in most writ petitions. As to other civil proceedings, Government constitutes one of the parties in quite a number of cases. For the quick disposal of cases, it therefore becomes essential that the various departments of the Government should afford all reasonable co-operation to the judicial process and attend to court cases with diligence and promptness. Apart from that, a good bit of litigation can be avoided if the departments concerned pay proper attention to the notices issued to the Government prior to the initiation of proceedings. Likewise, much time of the court can be saved if frivolous objections are avoided in pleadings and written statements filed on behalf of the Government. The position of the Government, it needs to be stressed, is not the same as that of a private litigant. The Government has to project an image of being reasonable in all cases to which it is a party. Its conduct in litigation should, in the very nature of things, inspire a feeling of fairness.

## VIII. NATURE AND MAGNITUDE — STATISTICS

Comparison of pendency at the end of 1977 with pendency at the end of 1972.

1.39. The nature and magnitude of the problem will be further appreciated if the position regarding arrears in the High Courts in 1977 is noted. It would appear that in the country as a whole,[2] the pendency of cases in the High Courts at the end of 1977 was much higher than the pendency at the end of 1972. High Court-wise also, when one contrasts the pendency at the end of 1977 with pendency at the end of 1972, the trend is found to be upward excepting in four High Courts, namely, Andhra Pradesh (18.6% decline), Gujarat (6.7% decline), Calcutta (8.10% decline) and Orissa (6.6% decline). The percentage mentioned for these four High Courts represents a decline, and not an increase.

Quantum of increase in pendency.

1.40. The increase of pendency at the end of 1977 over the pendency at the end of 1972 is—

(a) more than 50% in the case of nine High Courts and

(b) less than 50% but more than 20% in the case of three High Courts. The exact percentages are given below alphabetically:[3-4]

---

[1]Section 366(1), Code of Criminal Procedure, 1973.

[2]Department of Justice figures.

[3]Figures for Sikkim High Court are not given in this case.

[4]Based on figures given in Department of Justice letter No. 36/1/78-Jus(M), dated 2-6-78, Table XII.

11

*Comparison of pending cases in the High Courts on 31-12-77 with those pending on 31-12-72*

| S.No. | Name of the High Court | Pending on 31-12-1972 | Pending on 31-12-1977 | Percentage of increase or decrease |
|---|---|---|---|---|
| 1. | Allahabad . . . . | 78,617 | 1,32,749 | +68.9 |
| 2. | Andhra Pradesh . . . | 19,527 | 15,887 | —18.6 |
| 3. | Bombay . . . . | 41,442 | 52,592 | +26.9 |
| 4. | Calcutta . . . . | 78,820 | 72,448 | —8.1 |
| 5. | Delhi . . . . | 16,561 | 26,587 | +60.5 |
| 6. | Gauhati . . . . | 5,796 | 6,548 | +12.9 |
| 7. | Gujarat . . . . | 12,560 | 11,722 | —6.7 |
| 8. | Himachal Pradesh . . | 1,564 | 5,019 | +220.9 |
| 9. | Jammu & Kashmir . . | 1,726 | 4,677 | +171.0 |
| 10. | Kerala . . . . | 29,353 | 42,739 | +45.6 |
| 11. | Karnataka . . . | 10,727 | 36,449 | +229.7 |
| 12. | Madhya Pradesh . . | 20,653 | 46,613 | +225.7 |
| 13. | Madras . . . . | 32,678 | 51,763 | +58.4 |
| 14. | Orissa . . . . | 6,470 | 6,042 | —6.6 |
| 15. | Patna . . . . | 23,704 | 29,435 | +24.2 |
| 16. | Punjab & Haryana . . | 25,150 | 46,069 | +83.2 |
| 17. | Rajasthan . . . | 13,359 | 10,558 | +53.9 |
| 18. | Sikkim . . . . | .. | 21 | .. |
| | Total in the country . . | 4,10,707 | 6,07,918 | +48.0 |

**1.41.** Taking the actual percentage of increase every year, during the five-year period—1973 to 1977—it would appear that the percentage has been fluctuating. High Court-wise, the percentage change in pendency at the end of the year over the pendency of the previous year is as follows.[1]

*Actual percentage of increase during all the five years.*

*Pendency at the end of each year from 1973 to 1977 and percentage change in pendency over the previous year in the High Courts in India*

| Sl. No. | Name of the High Court | Percentage change in pendency over the pendency of previous year | | | | |
|---|---|---|---|---|---|---|
| | | 31-12-73 | 31-12-74 | 31-12-75 | 31-12-76 | 31-12-77 |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 1. | Allahabad . . . | +13.9 | +6.9 | +13.8 | +10.2 | +10.6 |
| 2. | Andhra Pradesh . . | +7.7 | +12.3 | —16.4 | —27.2 | +10.4 |
| 3. | Bombay . . . | +8.9 | +1.9 | +4.3 | +4.4 | +5.0 |
| 4. | Calcutta . . . | —6.0 | +3.5 | +8.9 | +2.4 | —5.7 |
| 5. | Delhi . . . | +19.1 | +3.9 | +8.3 | +3.2 | +14.4 |
| 6. | Gauhati . . . | —9.2 | +0.5 | +18.9 | —1.6 | +5.8 |
| 7. | Gujarat . . . | —3.5 | +2.0 | +2.6 | —3.1 | —4.6 |
| 8. | Himachal Pradesh . | +20.4 | +29.6 | +33.5 | +35.6 | +13.7 |
| 9. | Jammu & Kashmir . | +33.7 | +14.9 | +9.5 | +32.4 | +21.6 |
| 10. | Kerala . . . | +4.3 | —5.5 | +16.9 | +27.5 | —10.9 |
| 11. | Karnataka . . . | —1.1 | +17.1 | +32.6 | +48.2 | +49.2 |
| 12. | Madhya Pradesh . | +37.6 | +24.1 | +10.7 | +9.4 | +9.1 |
| 13. | Madras. . . . | +5.1 | —0.9 | +12.9 | +9.5 | +23.0 |
| 14. | Orissa . . . | —9.3 | +3.2 | —0.1 | —0.5 | +1.3 |
| 15. | Patna . . . | +6.2 | +3.9 | —2.1 | +20.4 | +7.5 |
| 16. | Punjab and Haryana . | +0.7 | +14.2 | +12.0 | +34.4 | +5.8 |
| 17. | Rajasthan . . . | +16.3 | +4.3 | +21.1 | +3.2 | +1.5 |
| 18. | Sikkim . . . | .. | .. | .. | +100.0 | —40.0 |
| | Total in the country . | +7.0 | +5.9 | +9.7 | +10.5 | +8.4 |

[1]Department of Justice letter No. 36/1/78-Jus(M), dated 2-6-78, Table II.

3—253 LAD/ND/79

12

**Percentage of increase from 1973 to 1977.**

**1.42.** It would appear[1] that for the years 1973 to 1977, the increase in the whole country of arrears in the High Courts in terms of percentage is as follows:

| | |
|---|---|
| 1973 . . . (increase in pendency at the end of 1973 over pendency at the end of 1972). | 7.0% |
| 1974 | 5.9% |
| 1975 | 9.7% |
| 1976 | 10.5% |
| 1977 | 8.4% |

**Sample figures.**

**1.43.** It would be tedious to give the figures of such increase during the five year period (1973 to 1977) for every —High Court.

**Actual pendency**

**1.44.** One may also obtain a rough picture of the state of arrears[2] by mentioning that at the end of the year 1977, the total pendency of cases in the High Courts was 6,07,918 (comprising 4,97,172 main cases and 1,10,746 miscellaneous cases). In contrast with the figures of cases pending at the beginning of the year 1977, this increase represents an increase in pendency of 7.7 per cent in the case of main cases and 11.7 per cent in the case of miscellaneous proceedings.

The highest number of cases pending as at the end of 1977, was in Allahabad (1,32,749), followed by Calcutta (72,448), Bombay (52,592), Madras (51,763), Madhya Pradesh (46,613), Punjab and Haryana (46,069) and Kerala (42,739).[3]

**Three principal characteristics of arrears.**

**1.45.** From the above sample figures about arrears, three characteristics of arrears stand out. In the first place, speaking chronologically, arrears, in the sense of increased pendency at the end of the year, has been continuous for the years represented by 1973-1977.[4]

In the second place, speaking numerically, the rate of arrears itself[5] has varied from year to year.

Lastly, speaking territorially,[6] the arrears are of an all-India extent, in the sense that they are not confined to only a few High Courts. With a few exceptions, arrears are found in all High Courts, though the rate of increase and the magnitude may vary from State to State.

---

[1]Department of Justice letter No. 36/1/77-Jus(M), dated 12th July, 1977, Table IX and Department of Justice letter No. 36/1/78-Jus(M), dated 2-6-78, Table II.

[2]For discussion of recent figures, see para 3.2 and 3.3

[3]Department of Justice letter No. 36/1/78-Jus(M), dated 2nd June, 1978, paragraph 1.(ii), page 3.

[4]Para 1.42, *supra.*

[5]Para 1.42, *supra.*

[6]Para 1.40 and 1.42, *supra.*

CHAPTER 2

## JURISDICTION OF HIGH COURTS AND CITY CIVIL COURTS

**2.1.** The jurisdiction of High Courts in India presents an infinite variety. The jurisdiction is original as well as appellate; civil as well as criminal; ordinary as well as extra-ordinary; general as well as special; derived from the Constitution of the country and the statute law, as well as from the Letters Patent or other instrument constituting the High Court and other sources.
*Variety of juris-dictions and history.*

This jurisdiction has a long history. The oldest High Courts in India—the High Courts of Calcutta, Madras and Bombay—exercise ordinary original civil jurisdiction within the respective limits of the three presidency towns.[1] The source of their original jurisdiction is to be found in the Indian High Courts Act[2] and in the Letters Patent issued thereunder. But it may be noted that some of the provisions of the Letters Patent refer back to earlier Charters of the Supreme Courts for the three presidency towns.

**2.2.** In addition to their ordinary original civil jurisdiction, these High Courts also exercise original jurisdiction in admiralty[3] and insolvency,[4] testamentary,[5] matrimonial and guardianship matters.[6] The jurisdiction of High Courts in regard to admiralty is, incidentally, distinct from their ordinary original jurisdiction.[7] While many of these matters are now regulated by Central Acts, some of them—e.g. admiralty jurisdiction—still have their source in the Letters Patent[8] or in other instruments.[9]

**2.3.** All High Courts have extraordinary original jurisdiction.[10]
*Extraordinary ori-ginal jurisdiction.*

**2.4.** All High Courts have original jurisdiction in election petitions under the Representation of the People Act.[11] Further, they have original jurisdiction under the Companies Act, the Banking Companies Act and certain other special Acts.
*Special original jurisdiction.*

As Courts of Record, High Courts have also power to punish contempt of Court.[12] It would be of interest to note that the Mayor's Courts (which were the predecessors of the Supreme Courts)[13] were Courts of Records.[14]

**2.5.** All High Courts exercise appellate and revisional jurisdiction under the two procedural codes, and under certain other laws,—those laws themselves dealing with matters of a diverse character. The High Courts have also supervisory jurisdiction under Article 227 of the Constitution.
*Appellate and revisional jurisdiction upon the Codes and other laws.*

**2.6.** High Courts also hear references under the laws relating to direct taxes, made by the Income-tax Appellate Tribunal and under the laws relating to certain other taxes made by the competent authority. They are also vested with jurisdiction to hear references for the confirmation of death sentence under the Code of Criminal Procedure.[15] Under the same Code,[16] High Courts (and other
*References.*

---

[1]Certain other High Courts are at present vested with ordinary original civil jurisdiction. *See* Chapter 16, *infra*.

[2]The Indian High Courts Act, 1861.

[3]*Kamalakar* v. *Scindia Steam Navigation Co.,* A.I.R. 1961, Bom. 186, 189.

[4]Section 3, Presidency Towns Insolvency Act, 1909.

[5]Indian Succession Act, 1925. *See* Appendix 2 for a list of relevant sections.

[6]*See* Appendix 6.

[7]See also *Hamid Hasan* v. *Banwari Lal*, A.I.R. 1947, P.C. 90, 93.

[8]*Kamalakar* v. *Scindia Steam Navigation Co.,* A.I.R. 1961, Bom. 186, 189.

[9]E.g. certain British statutes. See para 2.10, *infra*.

[10]See Chapter 16, *infra.*

[11]Section 80A, Representation of the People Act, 1951.

[13]Article 215 of the Constitution.

[13]Mayor's Courts were first established in 1726 and re-established in 1753.

[14]Cowell, Courts and legislative authorities in India (1905), page 13, citing Statute of 1726 (13 Geo. I)

[15]Sections 366 to 368, Code of Criminal Procedure, 1973.

[16]Section 432, Code of Criminal Procedure, 1973.

13

14

Courts also) can be consulted by the Government in certain matters concerned with exercise of the prerogative of mercy (application for suspension or remission of sentence).

Then, there are civil references heard under statutory provisions. Some examples of such provisions are given below:

1. Section 113, Code of Civil Procedure, 1908.
2. Order 46, Rule 1, Code of Civil Procedure, 1908.
3. Section 69, Presidency Small Cause Courts Act, 1882.
4. Sections 11 and 17, Provincial Small Cause Courts Act, 1887.

Under the Contempt of Courts Act, [1,2] a subordinate court can make a reference to the High Court in regard to contempt of court.

**Confirmation procedure under the Divorce Act.** **2.7.** Under the Indian Divorce Act, which applies to Christians, every decree for the dissolution of marriage made by a District Court, is subject to confirmation[3] by the High Court, and section 17 of the Act requires such cases for confirmation to be heard by a bench of three judges, where the number of judges of the High Court is three or more, or by a bench of two judges where the number of judges of the High Court is two.

Matrimonial jurisdiction in regard to Parsis is of a special category.[4] A judge of the High Court presides over the Chief Parsi Matrimonial Court constituted under the Act in Presidency towns.

**Revisions.** **2.8.** Civil revisional[5] and supervisory jurisdiction of the High Court is derived from several constitutional and statutory provisions, chief amongst these being article 227 of the Constitution; section 115 of the Code of Civil Procedure, 1908; section 25 of the Provincial Small Cause Courts Act, 1887 (or corresponding law) and section 75(1), proviso, of the Provincial Insolvency Act, 1920. Against the decision of a High Court Judge in revision, there is no Letters Patent Appeal—a feature which under the existing law distinguishes revisional jurisdiction from decisions of a High Court Judge on first appeal.[6]

Criminal revisional jurisdiction is principally governed by the Code of Criminal Procedure.

**Varied sources of jurisdiction.** **2.9.** The sources of jurisdiction of High Courts are as varied as the jurisdiction itself. The jurisdiction is derived from the Constitution, the Letters Patent, the two procedural Codes, certain other Central Acts and, in some cases, from State Acts.

**British statutes on Admiralty.** **2.10.** Certain British statutes which are still in force[7] also contribute their share to the judicial business of High Courts in regard to admiralty jurisdiction.[8]

**File in High Courts.** **2.11.** The jurisdiction of High Courts being, as stated above[9] wide and of infinite variety, judicial business in the High Courts also presents considerable variety. The files in the High Courts include, in the main, (a) first appeals, (b) appeals, commonly known as Letters Patent Appeals, by whatever name they are known in some High Courts, (c) second appeals, (d) civil revision petitions, (e) criminal appeals, (f) criminal revision petitions and references, (g) petitions under Articles 226 and 227 of the Constitution, (h) writ appeals, (i) references under the Income Tax Act, and other laws relating to direct taxes, (j) matters arising under the Sales Tax Act, (k) election petitions, (l) petitions under the Companies Act, Banking Companies Act, and other special Acts already mentioned.[10]

---

[1]Section 15, Contempt of Courts Act, 1971.

[2]See *in the matter of D. B. Vora*, (1974), Criminal Law Journal 899 (Delhi).

[3]Section 17, Indian Divorce Act, 1869.

[4]Sections 18 and 19, Parsi Marriage and Divorce Act, 1936

[5]For history, see para 2.12, *infra.*

[6]Chapter 11, *infra.*

[7]Cf. the Colonial Courts of Admiralty Act, 1890 (53-54 Vic. c. 27) read with the Colonial Courts of Admiralty Act (Central Act 16 of 1891).

[8]Para 2.1, *supra.*

[9]Para 2.1 to 2.8, *supra.*

[10]Para 2.4. *supra.*

15

Apart from the above, there is, as mentioned above,[1] the ordinary original civil jurisdiction in the matter of suits, exercisable by the High Courts of Bombay, Calcutta and Madras[2] under their Letters Patent. The High Courts of Delhi and Himachal Pradesh have ordinary original civil jurisdiction under a Central Act, to be discussed in due course.[3] The High Court[4] of Jammu & Kashmir has also ordinary civil jurisdiction.

**2.12.** The emergence of the various species of jurisdiction of the High Courts is integrally connected with important events in Indian legal history. Thus, the three High Courts in the Presidency towns have succeeded[5] to the jurisdiction previously exercised by at least three different courts—the Supreme Court (principally a court of original jurisdiction),[6] the Saddar Divani Adalat and the Saddar Nizamat Adalat (which heard appeals from civil and criminal courts respectively).[7] Revisional jurisdiction can also be traced to the Saddar Divani Adalat. *(margin: Plenitude of jurisdiction and its roots in history.)*

This fusion of jurisdiction by the Indian High Courts Act, 1861 is an interesting epoch of Indian legal history. Introducing the Bill, Sir Charles Wood[8] made an interesting speech, pointing out that "the administration of justice in the minor courts depends on the mode in which the appeals sent up from them are treated (by the superior courts)".

**2.13.** Another epoch-making change took place with the coming into force of the Indian Constitution.[9] Not only were High Courts created or continued for all States, but also all the High Courts came to be vested with writ jurisdiction— a jurisdiction which has played a notable part in the development of the constitutional and administrative jurisprudence of the country. It has been stated[10] that presumably the object of giving this power was to put the High Courts substantially in the same position as the Court of the Queen's Bench in England. The basic principle of constitutionalism is that the Government itself must be subject to rules. In Aristotle's phrase, "Government must be of laws, not of men". Article 226 of the Constitution is intended to provide a machinery to implement this principle. *(margin: The Indian Constitution.)*

**2.14.** This is a brief sketch of the jurisdiction of the High Courts. A full statement of the various species of jurisdiction exercisable by them would require a conspectus of almost the entire statute law of India. Hardly any superior court in any other country exercises jurisdiction of such plenitude and variety. *(margin: No other court vested with such wide jurisdiction.)*

**2.15.** Before closing this Chapter, we may state that the burden of High Courts in the Presidency towns in respect of ordinary original civil jurisdiction has been somewhat lessened by the establishment of city civil courts.[11] Such a court was established for the city of Madras in 1892, for Greater Bombay by the Bombay City Civil Court Act, 1948 and for Calcutta in 1957 under the Calcutta City Civil Court Act, 1953. Their pecuniary limits have been revised from time to time. The City Civil Courts of Bombay, Calcutta and Madras have now jurisdiction to try suits of a civil nature not exceeding Rs. 50,000/- in value, except *(margin: City Civil Courts in the three Presidency towns.)*

---

[1] Para 2.1. *supra.*

[2] Chapter 15, *infra.*

[3] Chapter 15, *infra.*

[4] Chapter 15, *infra.*

[5] (a) Cowell, Courts and Legislative Authorities in India (1905), pages 13, 15. 79, 90, 107, 109, 113, 114, 128 and 131.

   (b) *Kamalakar v. Scindia Steam Navigation Co. Ltd.*, A.I.R. 1961, Bom. 186, 189.

[6] Section 17, Act of Settlement (21 Geo. 2 c. 70).

[7] For history of appellate jurisdiction of High Courts, see *India Electric Works* v. *Registrar, Trade Marks,* A.I.R. 1947, Cal. 49, 52, 61.

[8] Hansard (1861), page 647; Cowell, Courts and Legislative Authorities in India (1905), pages 161-162.

[9] See para 1.7 and 1.21, *supra.*

[10] *Election Commissioner* v. *Saka Venkata Suba Rao,* (1952) S.C.R. 1144, 1150.

[11] See also para 2.9, *supra.*

16

those specifically excluded from their cognizance, with the result that the ordinary original civil jurisdiction of those three High Courts is now confined to suits or proceedings exceeding Rs. 50,000/- in value, apart from the original jurisdiction which they are exercising under some special statutes.

**Delhi and Himachal Pradesh.** **2.16.** As already stated,[1] High Courts of Delhi and Himachal Pradesh also exercise original civil jurisdiction in suits exceeding Rs. 50,000/- in value.[2] There are, however, no City Civil Courts in Delhi and Himachal Pradesh.

**City Civil Courts in Ahmedabad and Hyderabad.** **2.17.** It may be mentioned that in Ahmedabad and Hyderabad, there are City Civil Courts, constituted under State legislation.

[1]Para 2.11, *supra.*

[2]See Chapter 15, *infra.*

CHAPTER 3

## STRENGTH OF THE HIGH COURTS : NUMERICAL AND QUALITATIVE ASPECTS

### I. STATISTICS

**3.1.**    We propose to deal in this Chapter with the strength of High Courts and other connected matters,—matters which we regard as of primary importance in solving the problem of arrears and preventing the further accumulation of arrears.    Since this question requires consideration of figures of institution, disposal and pendency of cases in High Courts, we first refer to such figures for recent years. *Scope of Chapter.*

**3.2.**    According to the statistics issued by the Ministry of Law, Justice and Company Affairs[1] (Department of Justice), on June 2, 1978, the total number of cases pending in the High Courts on 1-1-77 and 31-12-77, as also the percentage of increase in pendency, was as under[2]: *Increase in pendency.*

|  | 1-1-1977 | 31-12-1977 | Percentage increase in pendency |
|---|---|---|---|
| Main Cases  .  .  .  .  .  .  . | 4,61,720 | 4,97,172 | +7.7 |
| Miscellaneous Cases .  .  .  .  . | 99,161 | 1,10,746 | +11.7 |
| Total  .  .  .  .  .  .  . | 5,60,881 | 6,07,918 | +8.4 |

The position in the High Courts with heavy pendency was as under:

|  | 1-1-1977 | 31-12-1977 | Percentage increase or decrease in pendency |
|---|---|---|---|
| Allahabad  .  .  .  .  .  .  . | 1,20,022 | 1,32,749 | +10.6 |
| Calcutta  .  .  .  .  .  .  . | 76,866 | 72,448 | —5.7 |
| Bombay  .  .  .  .  .  .  . | 50,099 | 52,592 | +5.0 |
| Madras  .  .  .  .  .  .  . | 42,078 | 51,763 | +23.0 |
| Madhya Pradesh .  .  .  .  .  . | 42,723 | 46,613 | +9.1 |
| Punjab & Haryana  .  .  .  .  . | 43,542 | 46,069 | +5.8 |
| Kerala  .  .  .  .  .  .  . | 43,130 | 42,739 | —0.9 |
| Karnataka  .  .  .  .  .  .  . | 24,427 | 36,449 | +49.2 |
| Patna .  .  .  .  .  .  .  . | 27,375 | 29,435 | +7.5 |

**3.3.**    Institution and disposal during the year 1977 in the country as a whole and percentage of disposal qua institution in each of the High Courts were as under: *Institution and disposal.*

(i) *In the country (1977)*

|  | Institution | Disposal | Percentage of disposal qua institution |
|---|---|---|---|
| Main Cases  .  .  .  .  .  . | 2,39,796 | 2,04,331 | 85.2 |
| Miscellaneous Cases  .  .  .  .  . | 2,14,937 | 1,96,373 | 91.4 |
| Total  .  .  .  .  .  .  . | 4,54,733 | 4,00,704 | 88.1 |

[1]See Department of Justice figures (Appendix).

[2]For figures of five years, see para 1.32 to 1.36, *supra*.

17

18

*(ii) Percentage of disposal qua institution in the High Courts (1977)*

| | |
|---|---|
| Sikkim | 128.6 |
| Calcutta | 110.2 |
| Gujarat | 104.1 |
| Kerala | 101.1 |
| Orissa | 98.4 |
| Rajasthan | 96.8 |
| Andhra Pradesh | 96.6 |
| Bombay | 93.6 |
| Punjab & Haryana | 92.1 |
| Patna | 87.6 |
| Madhya Pradesh | 86.6 |
| Delhi | 84.5 |
| Himachal Pradesh | 83.2 |
| Madras | 82.2 |
| Gauhati | 81.8 |
| Allahabad | 77.9 |
| Jammu ; Kashmir | 70.1 |
| Karnataka | 67.5 |

The average disposal per judge during the years 1976 and 1977 in the country as a whole and the various High Courts was as under:—

| | 1976 | 1977 |
|---|---|---|
| (i) *In the country* | 688.2 | 729.2 |
| (ii) *In the High Courts* | | |
| Punjab & Haryana | 917.4 | 1216.3 |
| Kerala | 844.3 | 1063.4 |
| Madras | 1001.2 | 1031.6 |
| Calcutta | 1078.1 | 1006.9 |
| Gujarat | 884.3 | 840.5 |
| Andhra Pradesh | 992.0 | 826.1 |
| Karnataka | 952.9 | 807.7 |
| Allahabad | 590.0 | 648.3 |
| Bombay | 931.5 | 627.3 |
| Madhya Pradesh | 805.2 | 590.8 |
| Patna | 718.5 | 580.4 |
| Orissa | 608.1 | 571.2 |
| Rajasthan | 606.4 | 444.9 |
| Delhi | 525.2 | 350.3 |
| Himachal Pradesh | 225.0 | 349.3 |
| Jammu & Kashmir | 280.0 | 320.2 |
| Guahati | 385.5 | 210.5 |
| Sikkim | 22.0 | 30.7 |

**Main cases at the end of 1977.**   **3.4.**   Total number of main cases in High Courts at the end of 1977 was 4,97,172. Taking 650 main cases as the average disposal per judge per year, and taking 352 as the total number of judges[1] during 1977, this number of cases would take 2 years, 2 months and 2 days for disposal, even if the full strength of judges is available.

The statistics mentioned above point to the need for examining at some length the question of strength of the High Courts.

**Sanctioned strength.**   **3.5.**   The sanctioned strength[2] of Judges during the year 1977 was 352, as against the sanctioned strength of 351 in the previous year. One post was kept in abeyance during the two years. Out of the sanctioned strength of 352 in

[1]Department of Justice figures.
[2]Department of Justice figures.

19

1977, only 287 Judges on an average were in position.  The number of such judges during the year 1976 was 292.   Out of the actual strength, seven judges on an average were entrusted with work outside their normal duties during the year 1977 and 14 judges during the year 1976.   The effective strength for the purpose of court work in 1977 was 280 and in 1976 it was 278.   The position as on 31st March, 1979 was as follows for the entire country:—

*Strength of High Court Judges—Position as on 31st March, 1979*
(All India)

| | | | |
|---|---|---|---|
| 1. *Sanctioned strength.*  .   .   .   .   .   . | . | (a) Permanent | 292 |
| (31st March, 1979)   .   .   .   .   . | . | (b) Additional | 79 |
| | | Total        . | 371 |
| 2. *Actual strength*  .   .   .   .   . | . | (a) Permanent | 280 |
| (31st March, 1979)   .   .   .   .   . | . | (b) Additional | 65 |
| | | Total | 345 |
| 3. *Vacancies.*  .   .   .   .   .   . | . | (a) Permanent | 12 |
| (31st March, 1979)   .   .   .   .   . | . | (b) Additional | 14 |
| | | Total | 26 |

## II.  INCREASE IN JUDGE STRENGTH

**3.6.**   A close scrutiny of the figures reproduced above would show that the number of cases disposed of by the High Courts in the country as a whole was less than the number of cases instituted during the year 1977.  This resulted—as it must—in further piling up of the huge backlog of arrears.  Any scheme which aims at clearing of the backlog of arrears and eliminating delay in the disposal of cases must take into account the imperative need to achieve two objectives, namely: (i) the disposal of cases in the High Courts in the country must not be less than the institution during the year, and (ii) effective steps must be taken to reduce and lighten the heavy backlog of arrears.  *(margin: Disposal less than institution.)*

To attain the above  objectives, increase in the judge strength of the High Courts cannot be avoided.  It has to be borne in mind that the disposal of cases, whether pending in the High Court or in any other court, needs the observance of certain procedural requirements.  In the absence of such observance, any attempt to accelerate the disposal of cases would be only at the cost of rules of fair play and natural justice.  Such an attempt would thus be substituting a much worse evil, compared with the evil manifested by delay in the disposal of cases.  We are, therefore, opposed to attempts at expediting the disposal of cases at the cost of the requirements of fair play and substantial justice.

**3.7.**   Stress has also been laid quite often on the personality of judges.  Although we agree that the personality of judges can make a substantial difference in the quality and quantum of disposal, we must not lose sight of the fact that there is a limit up to which this factor can affect the totality of disposal.  By and large, the solution for increasing disposal of cases, eliminating delays and clearing arrears lies in raising the judge strength of the High Courts.  With this end in view, we recommend that the judge strength of the High Courts should be kept at that level as ensures—  *(margin: Recommendation as to Judge strength.)*

(a) that the disposal in the year is not less than the institution,[1] and

(b) also that one-quarter of the backlog of old cases may be cleared[2] in a period of one year.

**3.8.**   So far as the permanent strength of each High Court is concerned, we are of the opinion that it should be fixed keeping in view the average institution during the preceding three years.  As and when necessary, the permanent strength  *(margin: Fixation of permanent strength.)*

[1]See para 3.8. *Infra.*
[2]See para 3.9. *Infra.*

4 — 253 LAD (ND)/79

<div style="float:left">Additional and ad hoc judges.</div>

may be reviewed. The permanent strength would thus be in a position to cope with the fresh institution[1] and prevent any further accumulation in the heavy backlog of cases

3.9.    As regards[2] the clearance of arrears of old cases, it would plainly be not necessary to increase the permanent strength of the judges in a High Court on that account. For this purpose, we would necessarily have to take recourse to appointing additional judges and ad hoc judges.[3]

We have considered the alternative of appointing *only* additional judges for clearing the arrears but, on further reflection, we have arrived at the conclusion that it would not be advisable to have *only* additional judges for this purpose. The reason which has prevailed with us in arriving at this conclusion is the necessity of adhering to a rule that ordinarily, and, in the absence of any special reason, persons appointed additional judges from amongst the members of the Bar practising in court and the District Judges should not be sent back to the profession to practise in that court or reverted to their substantive post. So far as the members of the Bar are concerned, it is, in our view, extremely undesirable to appoint them additional judges unless there is certainty of their being ultimately absorbed as permanent judges. Instances—though, fortunately, very few—have not been lacking of members of the Bar being appointed as additional judges and, after a spell of a year or two on the Bench, going back to the profession and practising in that very court. Such a practice is most undesirable. It is fraught with grave abuse and should not be countenanced. As regards the District Judges also, it seems desirable that the eventuality of their reversion to their substantive post should, as far as possible, be avoided. Reversion to the post of district judge after a person has been a High Court judge is bound to create within him a feeling of discontent and frustration. The prospect of reversion is also likely to affect the approach and independence of such a judge when sitting in Division Bench with a senior judge.

It is also plain that during the time a person functions as additional judge of the High Court, vacancies are bound to arise from time to time for the office of permanent judges, consequent upon the retirement of some of those judges. As and when such vacancies occur, additional judges can, in accordance with their seniority, be made to fill in the vacancies.

<div style="float:left">Filling of vacancies.</div>

3.10.    As mentioned earlier,[4] though the sanctioned judge strength of the High Courts in the country during the year 1977 was 352, only 287 judges on an average were in position. Like wise, in the year 1976, even though the sanctioned strength was 351, only 292 judges were in position. Leaving aside the judges who were entrusted with work outside their normal duties, the fact remains that the number of judges in position in both the years was less than the sanctioned strength. This disparity between the sanctioned strength and the number of judges in position was apparently due to the fact that vacancies in the posts were not filled in as soon as they occurred. It is our considered opinion that delay in filling in the vacancies is one of the major contributing factors responsible for the piling accumulation of arrears. In our opinion, when a vacancy is expected to arise out of the retirement of a judge, steps for filling in the vacancy should be initiated six months in advance. The date on which such a vacancy will normally arise is always known to the Chief Justice of the High Court and also to others concerned. It should be ensured that necessary formalities for the appointment of a Judge to fill the vacancy are completed by the date on which the vacancy occurs.

As already mentioned,[5] the total number of judges in position has, as a result of certain step, increased to 345 as on 31st March, 1979, as against the sanctioned strength of 371.

## III. RECOMMENDATIONS OF CHIEF JUSTICE TO BE PROMPTLY ATTENDED TO

<div style="float:left">Recommendations of Chief Justice to be attended to without delay.</div>

3.11.    Complaints have been heard that sometimes a Chief Minister sits tight over the recommendation made by the Chief Justice for the appointment of judges, and this fact results in delaying the appointment. In this regard, it would,

---

[1]Para 3.7(a), *supra.*
[2]Para 3.7(b), *supra.*
[3]Para 3.13, *infra.*
[4]Para 3.5, *supra.*
[5]Para 3.5, *supra.*

21

in our opinion, be necessary to ensure that whatever may be the view of the Chief Minister about the particular recommendation of the Chief Justice, the recommendation of the Chief Justice should engage the prompt attention of the Chief Minister and should not be kept pending for more than a month. Sometimes the recommendation of the Chief Justice necessitates the exchange of correspondence between the Chief Minister and the Chief Justice. In such an event, efforts should be made to see that because of such exchange of correspondence the matter does not get stuck up. It would perhaps be appropriate that necessary reply to a letter received be sent within a week of its receipt. We feel that the outside limit of six months which we have indicated above[1] should be sufficient to take into account the various bottlenecks and delays which take place at different stages.

## IV.  AD HOC JUDGES UNDER ARTICLE 224A

**3.12.**  It has been stated above[2] that the number of additional judges in each High Court should be such as takes into account the prospects of their absorption as permanent judges. Apart from such additional judges, more judges would also be needed to cope with the arrears. The only suitable alternative that we can think of for this purpose is the appointment of ad hoc judges. For this purpose, we may have to avail of the provisions of article 224A of the Constitution, according to which the Chief Justice of a High Court for any State may, at any time, with the previous consent of the President, request any person who has held the office of a judge of that court or of any other High Court to sit and act as a Judge of the High Court for that State and every such person so requested shall, while so sitting and acting, be entitled to such allowance as the President may, by order determine and have all the jurisdictions, powers and privileges but shall not otherwise be deemed to be a judge of that High Court. *Judges appointed under article 224A of the Constitution.*

**3.13.**  We would like to stress that in taking recourse[3] to article 224A, only those retired judges may be appointed under that article as are known for efficiency and quickness in disposal. It is also, in our view, necessary to ensure that only those persons may be appointed under that article who retired within a period of three years of their appointment. This would prevent persons who have got out of touch with the court work being appointed. *Field of choice and duration.*

The choice in making an appointment under article 224A to a particular High Court should not be confined to the persons who have retired as judges from that very court. For this purpose, the Chief Justice can look also to persons who have retired as judges from other High Courts. Such a course is permissible under article 224A. Initially, the appointment should normally be for a period of one year, to be extended by further periods of one year each, upto total three years. In making the recommendation for extension, the performance of the retired judge appointed under article 224A during the preceding year can be taken into account.

## V.  ASSIGNMENT OF WORK

**3.14.**  As mentioned elsewhere also,[4] the Chief Justice of the High Court can play a pivotal role in securing the optimum disposal out of the Judge strength of his court. The Chief Justice is presumed to know the aptitude of his colleagues, and in the formation of Benches and assigning the type of work to each Bench, he should keep in view the aptitude, grounding and familiarity with any particular branch of law of each judge. We shall have occasion to revert to this topic and deal with it at greater length subsequently.[5] *Role of Chief Justice.*

## VI.  QUALITY

**3.15.**  We are also of the opinion that every effort should be made to see that the best persons available can be appointed to serve on the High Court Bench. The overriding consideration for this purpose should be the merit of the individual. All other considerations must be subordinated to the paramount necessity of having the best available person for the post. Experience tells us that wrong appointments not only affect the image of the courts, they also undermine the *Judges on the Bench best persons to be appointed.*

---

[1] Para 3.10, *supra.*
[2] Para 3.8 and 3.9, *supra.*
[3] Para 3.12, *supra.*
[4] See Chapter 7, *infra.*
[5] Chapter 7, *infra.*

confidence in, and respect for, the High Court amongst the litigants, the members of the Bar and the general public. A wrong appointment also affects the quantum of output and the quality of disposal. Cases have also not been unknown when one wrong appointment has deterred competent persons from joining the Bench subsequently despite the entreaties of the Chief Justice.

**3.16.** Also, with a view to attracting persons of the right calibre to the Bench, something may have to be done to improve the service conditions. This might also take into account the benefits, including pension, to which they would be entitled after retirement. While it is true that the pay-scales of the judges cannot be wholly divorced from the general pattern of pay structure of the country at the higher levels, it has also to be borne in mind that bright and capable members of the Bar by sticking to the profession can earn much more. In the eyes of some there may be a halo around the office of judgeship. The halo has, however, been getting dimmer and dimmer with the efflux of time, the rising spiral of prices and the disparity between the professional income and the salary of judges. We must take note of the fact that some measures have recently been adopted to improve the service conditions of the High Court Judges by providing them rent-free house and giving them a conveyance allowance. However, having regard to the existing tax laws, the steps taken in this respect may perhaps not provide adequate relief. *Conditions of service.*

## VII. INCREASE IN ADMINISTRATIVE FACILITIES

**3.17.** Increase in the number of judges must also take into account the need for more court rooms and chambers, larger staff of the High Court and the necessity of adequate number of law books for each court. *Court rooms, staff and library—consequential increase needed*

It may also be ensured that judges are provided with suitable residences and have not to wait long for the purpose. A number of suitable government houses commensurate with the judge strength of the courts should be earmarked for the judges and be placed at the disposal of the Chief Justice for being allotted.

## VIII. PUNCTUALITY

**3.18.** We are happy to find that by and large the judges in the High Courts are punctual and observe court timings. This, however, does not mean that no complaints have been heard about the lack of punctuality or non-observance of the court timings in some individual cases. It would essentially be for the Chief Justice of each High Court to ensure that no deviations in the matter of punctuality and the observance of court timings are countenanced. It is also plain that failure to adhere to court timings by a judge would result in less time being given by him for court sittings and thus affect quantum of his disposal. The Chief Justice would normally be able to secure adherence to court timings by the judges only if he himself sets an example and abides by the court timings. Instances have sometimes been known when a Chief Justice, as a matter of routine, does administrative work during court time. This causes dislocation of the court work and, as such, results in considerable inconvenience to the members of the bar and the litigant public. *Punctuality.*

CHAPTER 4

APPELLATE JURISDICTION UNDER THE CODE OF CIVIL PROCEDURE

I. PRESENT SCHEME AND HISTORY

**4.1.** A major part of the judicial business of the High Courts is constituted by the appellate and revisional work. This work is of various types—first appeals (civil), second appeals (civil), appeals under special Acts, civil revisions and references, criminal appeals and revisions and the like. In this Chapter, we are concerned[1] with appellate jurisdiction under the Code of Civil Procedure, 1908.

*Scope of the Chapter.*

**4.2.** The cost of litigation could very well be reduced and justice made speedier if the remedy of appeal were to be dispensed with altogether, but it is generally agreed that this is not possible. Giving a stamp of finality to the decisions of the trial court may seem to some to be an easy solution to the problem of congestion in courts, but it should not be overlooked that to every litigant his case is very important. There is, therefore, nothing surprising in the attempts made by many of them to exhaust all their remedies in the various courts in the judicial hierarchy before calling a halt to the course of litigation.

*Remedy of appeal.*

**4.3.** The rationale of the system of civil appeals in Indian law has been considered at length in two Reports of the Law Commission[2], where the history of the relevant statutory provisions has also been dealt with. A brief description of the present scheme would be useful.

*Rationale of the system.*

**4.4.** The Indian procedural law has provided for appeals in civil suits according to a pattern now well known. The Code of Civil Procedure, 1908, provides for first appeal[3] against the decree of the trial court, for second appeal on specified grounds against the decree of the first appellate court,[4] for appeal against certain orders passed under the Code,[5] and for revision[6] on specified grounds. The court in which first appeals have to be filed depends on the provisions of the civil courts Act in force in each State,[7] including (as regards decrees passed by a City Civil Court), the City Civil Court Act in force in some areas.[8] Second appeals, and petitions for revision under the Code of Civil Procedure, are to be filed only in the High Court. In addition, appeals and petitions for revision to the High Court are provided for by some special Acts[9] while certain local Acts vest revisional powers in the District Court.

*Scheme of civil appeals.*

**4.5.** As has been pointed out in the Law Commission's 54th Report on the Code of Civil Procedure,[10] the scheme of the Code, ever since 1859, has been to give a party to suit at least two opportunities of hearing on facts—one by the trial court and another by the appellate court. The right of a litigant to take his cause before a second appellate court on a question of law has also been recognised in our country.

*Two opportunities on facts.*

**4.6.** Against certain decisions of the High Courts there is a right of appeal to the Supreme Court.[11] By a constitutional amendment,[12] certain limitations have been introduced on this right. These limitations had their genesis in two Reports

*Appeals to Supreme Court in civil cases.*

---

[1] For Letters Patent Appeals, see Chapter 11, *infra.*

[2] Law Commission of India, 54th Report (Code of Civil Procedure) and 58th Report (Structure and Jurisdiction of the Higher Judiciary).

[3] Section 96, Code of Civil Procedure, 1908.

[4] Section 100, Code of Civil Procedure, 1908.

[5] Order 43, Code of Civil Procedure, 1908.

[6] Section 115, Code of Civil Procedure, 1908.

[7] See para 8.2, *infra.*

[8] See para 8.11, *infra.*

[9] Section 25, Provincial Small Causes Courts Act, 1887; Section 75(1), proviso, Provincial Insolvency Act, 1920. See Chapter 2, *supra.*

[10] 54th Report, page 74, para 1-3.16A.

[11] For history of appeal to the Supreme Court, see 44th and 45th Reports of the Law Commission.

[12] Constitution (30th Amendment) Act, 1972.

of the Law Commission, forwarded on a reference made by the Government of India. [1-3]

The position now is that apart from an appeal with special leave under article 136 of the Constitution, and apart from the right of appeal in a case involving questions of interpretation of the Constitution, a litigant in a civil proceeding can appeal to the Supreme Court against any final decision of the High Court only if the High Court certifies that "the case involves a substantial question of law of general importance which in the opinion of the High Court needs to be decided by the Supreme Court".[3]

## II. NEED FOR RIGHT OF APPEAL

**Appeal on facts.**  **4.7.**    This, then, is a brief description of the existing scheme of civil appeals. There is, no doubt, a school of thought, according to which there should be finality of the decisions of the trial court in regard to findings of fact. According to this school, appeals on question of fact serve no useful purpose, nor do they justify the expense, delay, anxiety and inconvenience which the right of such appeal involves. We do not, however, consider it advisable to do away completely with the right of one appeal on questions of fact.

We have already pointed out[4] that the appellate courts in India are streamlined and the causes of delay cannot be sought in their structure. A hierarchy of courts and a procedure of appeals from one court to the other is inevitable in any modern system.  No organised system of administration of justice permits the findings of the trial court to carry a stamp of finality.  The fact that the findings are liable to be assailed in appeal, constitutes in a large number of cases a guarantee against arbitrariness, and by itself produces judicial constraint.  It is also essential that so far as questions of law are concerned, there should be a uniformity of decision in a State.

The procedural law in this respect, in our view, has considerable merit and, in our opinion, it would be inadvisable to deprive a litigant of the right of first appeal on questions of fact,—a right which has been enjoyed by him for a long time.  The fact that we have not so far been able to devise effective means for prompt and efficient disposal of appeals is, in our opinion, no reason for short-circuiting the procedure on a cardinal aspect.

**Evershed Committee's view.**  **4.8.**    We may also note that in England, the Committee on Supreme Court Practice and Procedure expressed itself thus on this subject[5] :

> "The legal system of every civilised country recognises that judges are fallible and provides machinery for appeal in some form or another.  The right of appeal is too ingrained in our legal system to be capable of being uprooted *in toto*.  The problem must be approached on the basis that it would be palpably wrong to leave the defeated litigant entirely without remedy even in those cases where the judgment against him is demonstrably wrong or to deny him altogether the chance of appeal from a decision which leaves him smarting under a sense of injustice."

We are in substantial agreement with the above observations. Appeal is an essential part of the gamut of our judicial system and should continue to be so.

**Need to retain right of appeal.**  **4.9.**    Although we are against conferring a right of multiple appeals at various stages of the same litigation, we are also, as already mentioned,[6] of the opinion that the right of appeal cannot be dispensed with altogether.  The present scheme of conferring one right of appeal against the judgment of the trial court on questions of fact and law, and a right of second appeal on a substantial question of law (in those cases where the judgment on first appeal was of a court subordinate to the High Court) meets the requirements of the situation.  So far as appeals to the Supreme Court are concerned, the matter is governed by the provisions of the Constitution[7] and calls for no comment.

---

[1]Law Commission of India, 44th Report (Appellate Jurisdiction of the Supreme Court in Civil matters) (August 31, 1971).

[2]Law Commission of India, 45th Report (Civil appeals to the Supreme Court on a certificate of fitness) (October, 1971).

[3]Article 133 of the Constitution ; cf. section 109, Code of Civil Procedure.

[4]Para 1.29, *supra*.

[5]Committee on Supreme Court Practice and Procedure in England (1953), page 153, para 473.

[6]Para 4.8, *supra*.

[7]Para 4.5 and 4.6, *supra*.

25

### III. SECOND APPEALS

**4.10.** We are also not in favour of doing away altogether with the right of second appeal in civil cases on a substantial question of law, as provided by section 100 of the Code of Civil Procedure. The reason for that is that, in our view, there should be uniformity of decisions on questions of law in a State.[1] If the findings of the courts subordinate to the High Court when deciding a first appeal were to have a finality on a question of law, the inevitable effect of that would be that we shall be confronted with situation wherein, on identical questions of law, the different courts in the State would be taking different—and sometimes diametrically opposite—views. This, in our opinion, is wholly undesirable and should not be countenanced. To have uniformity of decisions on a question of law in the same State, we consider it proper that for questions of law the final court of appeal within the State should be the highest court of the State. *[side note: Rationale of second appeal.]*

It also needs to be emphasised that a finding of fact is of importance only to the parties to the case, as it is those parties who are affected by that finding. As against that, a finding on a question of law is of importance not only to the parties to the case but also to a large number of other persons in whose cases that question of law would arise. A finding on a question of law is, therefore, of general importance and it is for that reason also that it becomes imperative to ensure that the approaches to the highest court in the State to secure authoritative pronouncements on questions of law should not be barred. We shall have occasion to refer to this aspect later.[2]

**4.11.** At the same time, it was realised that allowing appeal on a simple question of law had given rise to some loopholes for filing all kinds of appeals by stretching the connotation of the words "question of law" in section 100. It was, therefore, thought proper to restrict the right of second appeal under section 100 of the Code of Civil Procedure to an appeal on a substantial question of law. We find no compelling ground to make any further curtailment of the right of second appeal as contemplated by section 100. *[side note: Appeal limited to substantial question of law.]*

**4.12.** It would be useful in this context to refer to what was said by the Law Commission in its 54th Report.[3] The Commission observed : *[side note: 54th Report.]*

> "**1-J.74.** Since we are retaining the right of second appeal with the above modification, the query may be raised why the litigant who, before coming to the High Court, has had one right of an appeal before a subordinate court, should have the right of two appeals on questions of law. In other words, why a multiplicity of appeals should be allowed. Now, it is to be remembered that in any legal system which recognises the binding force of precedent, the status and calibre of the final appellate court on questions of law is vital. This consideration over-balances the consideration of multiplicity of appeals.
>
> It is obvious that the numerous subordinate courts in the districts cannot be final arbiters on questions of law. If the law is to be uniformly interpreted and applied, questions of law must be decided by the highest court in the State whose decisions are binding on all subordinate courts.
>
> If the right of second appeal is so abridged as to remove questions of law from the High Court, it would create a situation wherein a number of subordinate courts will decide differently questions of law, and their decisions will stand. Such a situation would be unsatisfactory.
>
> **1-J.75.** The subordinate appellate courts functioning in the districts are not superior courts of record, and their interpretations of law are not binding on other courts. In fact, ordinarily, subordinate courts in one district are not even aware of the pronouncements of other courts in other districts (except when a point of law is declared by the High Court in appeal). It is section 100 which enables the High Court to function as the author, distributor and clearing house of pronouncements of law for the benefit of all subordinate courts.

---

[1] See also para 10.2 and 10.3, *infra.*

[2] Para 10.6. *Infra.*

[3] Law Commission of India, 54th Report, pages 87-88, paragraphs 1-J-74 and 1-J-75.

26

"The interpretation of the law by the High Court is (subject to the law declared by the Supreme Court) binding on all subordinate courts. It is, therefore, essential for uniformity that every error of law, raising a substantial question is promptly rectified by the High Court by a correct pronouncement of the law."

Letters Patent Appeals.    **4.13.** We may also make it clear that our observations regarding right of second appeal on a substantial question of law[1] relate only to those cases where first appeals are decided by courts subordinate to the High Courts. So far as first appeals decided by the High Courts are concerned, even when those decisions are given by single judges, we are not, as would be indicated elsewhere,[2] in favour of grant of a right of second appeal to a Division Bench of the High Court. The reason for that is that the decision of the court of first appeal in such cases would be given by the High Court itself.

Measures to expedite hearing.    **4.14.** We now proceed to consider to what extent improvements in the process of decision of the appeal are possible in order to achieve expedition in hearing without impairing the essence of the remedy or principles of fair play and natural justice.

---

[1]Para 4.12, *supra.*

[2]Chapter 11. *infra.*

CHAPTER 5

PROCEDURE IN APPEALS—GENERAL

I. STAGES OF DELAY

**5.1.**    We propose to discuss in this Chapter certain matters concerning appel- Scope of Chapter.
late procedure in regard to which there is need for improvement.  We shall con-
centrate only on those matters that need attention, but it will be convenient to
mention the chronological stages of the process of appeals,  and to refer to the
causes of delay at every stage.

**5.2.**    An appeal must be made ready for hearing before it can be heard.  Delay Delay in making
in making an appeal ready for hearing, and in the hearing, can be dealt with in appeals ready for
this order, with reference to the various stages of the process—                      hearing.

(1)  delay in making available certified copies of the judgments and decrees
    of the Subordinate Courts so as to enable the aggrieved party to file
    an appeal, or (though the copies are ready), delay in presenting the
    appeal.[1]

(2)  delay in the scrutiny and registration of the appeal,[2]

(3)  delay by way of the requirement of preliminary hearing,[3]

(4)  delay in the preparation of notice of appeal and its service,[4]

(5)  delay in the preparation of the paper books for the use of the court
    for hearing the appeal,[5]

(6)  delay in final hearing.[6]

Certain special issues relevant to appeals from interlocutory orders could
be separately dealt with.[7]

Before an appeal can be filed in the appellate court, there are certain pre-
requisites that have to be complied with.  After the appeal is presented, it has
to be scrutinised.  After scrutiny, there is a preliminary hearing for admission.
If it is admitted, notice has to be served on the respondent and (in the High
Courts) a paper book has to be prepared, as required by rules made by the High
Court for regulating its appellate procedure.

## II. PRE-REQUISITES FOR APPEAL : COPY OF THE DECISION

**5.3.**    The first pre-requisite for an appeal is the statutory requirement to file Scope of delay.
a copy of the decision sought to be appealed from.[8]  Delay may result from the
time that elapses between the pronouncement of the judgment and the preparation
of a copy thereof.   The filing of the appeal, either in a subordinate court having
appellate jurisdiction or in the High  Court, may then be  delayed.  This has
been sought to be remedied by amendment  of Order 20  of the Code of Civil
Procedure,[9]  by the insertion of certain new provisions, referred to in the next
paragraph.[10]

**5.4.**    By the amendment of 1976,  there was inserted a new rule to which we Filing of appeal.
made a reference in our Report on arrears in trial courts,[11] namely, Order 20,
Rule 6A, Code of Civil Procedure, which deals with judgment and decree.  Sub-
rule (1) of this rule provides that the last paragraph of the judgment shall state
in precise terms the relief which has been granted by such judgment.  Sub-rule

---

[1]Para 5.3, 5.4 and 5.5, *infra*.

[2]Para 5.6 and 5.7, *infra*.

[3]Para 5.8, *infra*.

[4]Para 5.10, to 5.16, *infra*.

[5]Para 5.17 to 5.28, *infra*.

[6]Chapter 6, *infra*.

[7]Para 5.27 to 5.30, *infra*.

[8]O.41, R. 1(1), Code of Civil Procedure.

[9]O.20, Rules 6A and 6B, Code of Civil Procedure.

[10]Para 5.4, *infra*.

[11]77th Report, para 7.8.

27

28

(2), clause (a) then provides that an appeal may be preferred against the decree without filing a copy of the decree and, in such a case, the last paragraph of the judgment shall, for purposes of Order 41, rule 1, be treated as the decree. This amendment will, to some extent, ameliorate the difficulty which was faced in the past about having to wait for a long time to get certified copy[1] of the decree with a view to filing the appeal.

Despite the above provision, we cannot under-estimate the importance of the prompt supply of the copies of the judgment soon after its pronouncement to the parties. Long delays have in the past occurred in the supply of such copies by the copying agency. Such delays have now been sought to be minimised by Order 20, rule 6B of the Code of Civil Procedure which was added by Act 104 of 1976. According to this provision, where the judgment is type-written, copies of the type-written judgment shall, where it is practicable so to do, be made available to the parties immediately after the pronouncement of the judgment, on payment, by the party applying for such copy, of such charges as may be specified in the rules made by the High Court. Apart from that, such delays, as pointed out by us in the 77th Report,[2] can be avoided or cut short if, instead of typing out the copies, the whole thing is done by mechanical or electronic process.

**Application for extension of limitation to be heard first.** 5.5. An appeal is normally filed within the time prescribed therefor by the Limitation Act, 1963. But if, for any reason,[3] it is filed beyond the prescribed time, the memorandum of appeal has to be accompanied by an application under section 5 of the Act. In such case, the Code[4] of Civil Procedure requires that the application should be finally decided before the court proceeds to deal with the appeal under Order 41, Rule 11 or Order 41, Rule 13.

## III. SCRUTINY AND REGISTRATION

**Delay in registration of appeal.** 5.6. After an appeal is presented,[5] it has to be scrutinised and registered.[6] Delay in this process is sometimes appreciable, and could be avoided by adopting certain measures.

There is a practice in almost all the courts of noting the defects in the memorandum[7] of appeal and returning the same to the parties for re-presentation after curing the defects within a certain time. But the parties or their counsel take their own time in re-presenting the memorandum of appeal with the application to excuse delay which is automatically granted, and the office is obliged to register the appeal at that time. There is also a complaint among the bar in some States that all the defects found in the appeal are not noted at the same time, but that the defects are being pointed out in instalments and at different times,—a practice which, apart from causing inconvenience to the members of the bar and the litigant public, is responsible for further delay.

To remedy the above difficulty, we suggest that the court should register the memorandum of appeal within seven days of its presentation, and the office should, within that period, note all the defects to be cured. Registration, however, need not be postponed until rectification of defects. A time limit should then be stipulated within which such defects will have to be cured. This time limit should not exceed fifteen days, and a notice of the same should either be published on a notice board of the court, or given to counsel or the appellant. If the defects are not cured within that time limit, the Registrar of the High Court should have power, under rules to be framed by the High Court, to extend the time for a period not exceeding 15 days for proper reasons, on an application to be filed by counsel or by the appellant. If the defects are not cured even within the extended time, or if no application is filed for extension of time, the appeal should, without further delay, be listed before the court for necessary orders. Modifications of the rules, if necessary, may be made to give effect to the above suggestion[8].

---

[1] Para 5.2(1), *supra*.
[2] 77th Report, para 13.10.
[3] Section 5, Limitation Act, 1963.
[4] Order 41, Rule 3A, Code of Civil Procedure, 1908.
[5] Order 41, Rule 1(1), Code of Civil Procedure, 1908.
[6] Order 41, Rule 3(1) Code of Civil Procedure, 1908.
[7] Order 41, Rule 9(1), Code of Civil Procedure, 1908.
[8] For action in connection with rules.

20

**5.7.** In this connection, reference[1] should be made to Order 41, Rule 11A, Code of Civil Procedure, 1908, which provides that every appeal should be heard under Order 41, Rule 11, as expeditiously as possible and endeavour shall be made to conclude such hearing within 60 days from the date on which the memorandum of appeal is filed. In view of this provision, it is necessary to tone up the administrative machinery of High Courts for scrutiny of the memorandum of appeal, so that there is adequate staff and not much time is spent in bringing to light deficiencies in the memorandum of appeal.

<div style="text-align:right">Order 41, Rule 11A, Code of Civil Procedure— expeditious hearing of appeal.</div>

## IV. PRELIMINARY HEARING

**5.8.** We now turn to the procedure for appeal. Support has been canvassed for the view that we[2] should do away with the preliminary hearing of the appeal as contemplated by Order 41, Rule 11 of the Code of Civil Procedure and that the only hearing of the appeal should be in the presence of counsel for the respondent after service of notice upon the latter. The reason given in support of the above view is that very few appeals are dismissed under Order 41, Rule 11 and that in most of the appeals the hearing under Order 41, Rule 11 results in the duplication of labour and serves no useful purpose. We have given the matter our consideration and are unable to subscribe to the view that the hearing of the appeal under Order 41, Rule 11 is without utility. Experience tells us that quite a number of appeals are dismissed under Order 41, Rule 11.

<div style="text-align:right">Suggestion to dispense with preliminary hearing not favoured.</div>

In any case, this provision results in the dismissal, in limini, of a number of frivolous appeals. To keep such appeals pending and to dispose them of only after service of the notice upon the respondent and after elaborate hearing would, in our opinion, not only add to the workload of the courts, but would also be subjecting the respondent to needless expense. The fact that in the event of dismissal of the appeal, the appellant can be burdened with costs is not enough to compensate the respondent for the labour, time and money spent by him.

**5.9.** The matter can also be looked at from another angle. Most memoranda of appeal are also accompanied by applications asking for interim relief. Quite often, the fact that the appeal is admitted operates as a factor with the courts in the matter of grant of interim relief. To have a general provision making it imperative that all appeals which are filed should be disposed of only after notice to the respondent would necessarily act as a temptation for the parties to file appeals, however frivolous, just with a view to seeking an order for interim relief. As the position stands at present, the preliminary hearing of the appeal under Order 41, Rule 11, not only results in the dismissal of frivolous appeals, but also results in the dismissal of applications asking for interim relief sought in such appeals.

<div style="text-align:right">Interim relief an important factor in connection with preliminary hearing.</div>

## V. SERVICE OF NOTICE

**5.10.** Registration of the appeal is followed by the service of notices on the respondents to the appeal. It cannot be gainsaid that there is some amount of delay in the service of such notices by the appellate court, for two reasons—

<div style="text-align:right">Summons to be filled up by parties</div>

    (a) the first being the delay caused in the office of the High Court[3] in the preparation of the notices,[4] and

    (b) the second being the time taken for actual service of notices on the respondents.[5]

**5.11.** Delay in the office in preparing the notice[6] can be avoided by requiring the parties or their counsel to follow the same procedure as we have, in our Report on delay and arrears in trial courts, recommended for the preparation of summonses to be issued in suits to be served on the defendants.[7] The parties should be required to produce, along with the memorandum of appeal, printed forms of the process in duplicate, duly filled up, for each respondent, leaving the date for appearance and the date of the issue of process blank for being filled in by the concerned officer of the court. Such printed forms should be made available to members of the bar and litigants at nominal cost by the

<div style="text-align:right">Parties to file printed forms of process.</div>

---

[1]Order 41, Rule 11A, Code of Civil Procedure, 1908.

[2]Suggestion of a High Court Judge, forwarded to the Law Commission.

[3]This applies also to appeals heard by the District Courts.

[4]Para 5.11, infra.

[5]Para 5.12, infra.

[6]Para 5.10(a), supra.

[7]77th Report, para 4.2.

High Courts. It should also be provided that the appellant should along with the memorandum of appeal file, as many copies of the memorandum as there are respondents, and additional number of copies for the use of the Court. This is necessary in view of Order 41, Rule 14(3) of the Code of Civil Procedure as amended.[1]

**Payment of charges or process fees and issue of notice.**  5.12. The necessary charges or the process fee for the service of notices on the respondents should also be paid at the time of presentation of the appeal or within a week of admission of the appeal under order 41, rule 12(1) of the Code of Civil Procedure. Order 41, rule 14(1) and (2) of the Code[2] makes the provisions of Order 5 relating to service of summons applicable to the court of appeal, and Order 5 now provides for simultaneous issue of summons by registered post and in the ordinary way. Where there is no dismissal of appeal under Order 41, rule 11 of the Code, the notice of appeal can be issued by the Court to the respondents by registered post acknowledgement due and in the ordinary way at the addresses given in the memorandum of appeal. This should be done within a time to be fixed by the rules of the High Court for the purpose, the time being computed from the date of registration of the appeal or from the date of admission of the appeal under Order 41, rule 12(1) of the Code.[3]

**Service of notice.**  5.13. After a notice of appeal is prepared and ready for service, actual service[4] on the respondent, according to the present system in vogue, takes quite a long time and is one of the major factors contributing to the over-all delay in the disposal of appeals.

**Advantage of early service.**  5.14. It is true that even if the notice of appeal is served, say, within a month or so, the appeal, having regard to the present state of arrears, will be no nearer hearing and decision in the High Court till after the lapse of two further years,—or even more. But that is due to the heavy backlog that has accumulated, for the disposal of which we have elsewhere in this Report made our recommendations,[5] including, in particular, the appointment of additional and ad hoc judges. If proper care is taken, then, as and when this backlog is eliminated, early service of the notice of appeal will undoubtedly ensure quick disposal of the appeal.

## VI. PAPER BOOKS

**Paper books.**  5.15. We now come to the stage of preparation of paper books. Experience has shown that much time is taken in the High Court in the preparation of paper books of appeal, but the system of preparing paper books has proved helpful and of use in an expeditious decision of the appeal. Hearing of appeal by a Bench consisting of more than one Judge is not possible without a separate paper book for each one of the Judges constituting the Bench. Besides this, the paper book also facilitates the hearing. The paging of the original record in the trial courts, it has been seen, is often confusing and not very systematic. Paper books prepared in accordance with the rules of the High Court eliminate that difficulty and save the time of the court when arguments are heard.

There is, however, scope for improvement in certain matters of detail, to which we address ourselves.

**Sending for records.**  5.16. While dealing with the question of paper books, we should advert to the necessity of sending for the records of the courts below as contemplated by Order 41, rule 13(2) of the Code of Civil Procedure. We feel that except for appeals against interlocutory orders[6] and except in cases wherein those records have already been sent for under Order 41, rule 11 of the Code of Civil Procedure, the High Court should, immediately after an order for the admission of appeal has been made, send for the records of the courts below. Much delay in the preparation of paper books can be eliminated by sending promptly for the records of the courts below. As would appear from what follows subsequently,[7] we are fastening responsibility upon the appellant to file paper

[1] Order 41, Rule 14(3), Code of Civil Procedure, 1908.
[2] Order 41, Rule 14, Code of Civil Procedure, 1908.
[3] For implementation by rules.
[4] Para 5.10(b), supra.
[5] See Chapter 3, supra.
[6] Para 5.28, infra.
[7] See discussion as to copies, para 5.20, infra.

31

books containing certain copies. This can be done only if the records are promptly sent for by the High Court. In a large number of cases the counsel for the appellant would not be able to furnish the requisite copies unless the records of the courts below are in the High Courts.

**5.17.** So far as appeals against interlocutory orders are concerned, we are of the view that the records of the courts below should be sent for only as and when a specific order is made by High Court for that purpose. Our experience tells us that many cases in the trial courts remain stayed because of transmission of records to High Courts, even though no stay order has been made by the High Court.

<div style="float:right">Records in appeal against interlocutory orders</div>

**5.18.** Another question in the context of preparation of paper books relates to translation of documents and depositions, where such translation is necessary under the rules of the High Court. In our opinion, it should be the duty of the party who has to file the requisite copy to also get the deposition or document translated. The translation should be done by a counsel, who would normally be a junior counsel, and should bear his certificate about its correctness. The translated copy, along with other necessary copies, should be filed in the High Court within the time suggested hereafter.[1] In case the opposite party questions the correctness of the translation, the deposition or document in question should be translated by the official translator of the High Court.

<div style="float:right">Translation.</div>

**5.19.** According to the prevalent practice, the paper books are printed either in the Government printing press or in private printing presses selected by the High Court for that purpose under the supervision and on the direction of the High Court. This process involves a lot of delay and entails expense which it is possible to curtail. As compared with printing, the cyclostyling or typing of records is not only cheaper, but also more expeditious. We therefore recommend that except in cases where the court otherwise directs, the printing of paper books may be dispensed with, and liberty may be allowed to the parties to have the records typed or cyclostyled in accordance with the Rules of the High Court.

<div style="float:right">Recommendation for typing.</div>

**5.20.** After the records of the trial court are sent for, the next step would be the preparation of the paper book. For this purpose, we are of the view that as soon as the records are received in the High Court, intimation about that fact should be sent to the counsel for the appellant and also to the counsel for the respondent, or the respondent in case no lawyer has put in appearance on his behalf. It shall be the responsibility of the appellant in all regular first appeals in civil matters to file within four months, or such further time as may for sufficient cause be allowed by the court, of the date of intimation of the receipt of the records of the trial court in the High Court, properly bound paper books containing copies of the following documents :

<div style="float:right">Paper books—copies to be filed by appellant.</div>

    (a)  plaint ;

    (b)  written statement ;

    (c)  issues ;

    (d)  judgment ;

    (e)  decree sheet ;

    (f)  memorandum of appeal ;

    (g)  admission order ;

    (h)  documents, depositions, applications, replies thereto, and interlocutory orders upon which the appellant wants to rely at the time of arugments ; and

    (i)  documents, depositions, applications, replies thereto and interlocutory orders referred to by the trial court in its judgment while dealing with issues, findings on which are sought to be challenged by the appellant.

The copies to be included in the paper books, should, as already mentioned,[2] be either cyclostyled or typed. The number of paper books should be sufficient for the purpose of supply to the respondents and for the use of the court.

---

[1]Para 5.20, *infra.*

[2]*Cf.* para 5.19, *supra.*

**Paper books to be supplied to respondents.** 5.21. Within two weeks of the filing of the abovementioned paper books, one or more such paper books, as may be necessary, should be supplied to the counsel for the respondents.

**Respondents' paper books.** 5.22. It would be necessary for the respondents to file in court within two months, or such further time as may, for sufficient cause, be allowed by the court, of the receipt of the above, properly bound paper books containing copies of depositions, documents, applications, replies thereto and interlocutory orders, upon which they wish to rely and which have not been filed by the appellant. The number of these paper books would be the same as that of the paper books filed on behalf of the appellant.

One or more paper books, as may be necessary, filed by the respondents shall be supplied to the counsel for the appellant and counsel for other respondents within a period of one week of the filing of the same in court.

**Translation and exempted documents.** 5.23. Reference to "copies" in the above paragraphs[1] would include reference to the translation of the plaint, written statement, issues, depositions, documents, applications and replies thereto, when translated copies of the same are required according to the rules of the High Court. Nothing in the above paragraphs should make it necessary to include in the paper book copies of documents in respect of which exemption has been granted for the purpose of printing by the High Court rules.

**Existing rules.** 5.24. We are aware of the fact that rules have already been framed by the various High Courts regarding most of the matters referred to above. We have made the above suggestion just with a view to introducing uniformity in the practice prevailing in the different High Courts and also with a view to accelerating the process of preparation of paper books. The above procedure, if accepted by the High Courts, will not cause any delay in making a case ready for hearing, and will also save the parties from a certain amount of the expenses of litigation.

**Delegation to Registrar of powers in connection with paper books.** 5.25. For the completion of the record of appeal and preparation of the paper books, power may be delegated by the court to the Registrar or any other officer of the court specially empowered in this behalf, with the proviso that in case the order passed by the Registrar or such officer is not complied with, the appeal shall be placed before the court for appropriate orders or directions. If the court finds that the omission to comply with the order was wilful or without sufficient cause, it may dismiss the appeal for non-prosecution, or award conditional costs against the defaulting party, or may unconditionally give such further time as it may consider proper to do the needful. It should also be open to the court, in appropriate cases, if it thinks it just and proper, to direct that the appeal shall be heard without any further documents or papers being filed, and in such an event such documents and papers will not be allowed to be referred to at the time of hearing.

**Paper book not to be burdened with unnecessary documents.** 5.26. It is important from the point of view of saving both cost and time in the hearing of the appeal that the paper books should not be burdened with unnecessary and irrelevant documents. If in a given case, this is not done and the court, at the time of hearing of the appeal, finds that irrelevant documents have been included in the paper book, the court may, irrespective of the decision of the appeal, order that the cost occasioned by inclusion of those documents should be paid by the party at whose instance they were typed or cyclostyled. The preparation of paper book and the order in which the papers are to be arranged in it should be left to conform to the rules that may be framed by the High Courts for the purpose.

## VII. INTERLOCUTORY ORDERS

**Appeals and revisions against interlocutory orders.** 5.27. The filing of appeals or applications for revision sometimes creates problems where the appeal or revision is against an interlocutory order, as the grant by the court of appeal or revision of stay of proceedings holds up the progress of the case in the lower court.

**Records not to be sent for unless express orders made.** 5.28. We recommend that in revisions against interlocutory orders, records of the court below should not be sent for,[2] unless an express order is made for the purpose by the High Court. It shall be the responsibility of the petitioner

[1] Para 5.20 to 5.22, *supra.*

[2] See also para 5.17, *supra.*

33

in such a case to file, copies of pleadings, documents, depositions, applications and replies thereto or orders as are sought to be relied upon at the time of the hearing of the revision. The copies shall be accompanied by an affidavit about their correctness. The same should be the procedure in appeals against interlocutory orders, as already indicated.[1]

**5.29.** We are also of the view that in order to obviate any delay in getting service effected upon the respondents in appeals or petitions for revision against interlocutory orders, service may be effected upon the counsel representing the respondents in trial court. An amendment in the law appears to be needed in the interests of expeditious justice.

*Service on pleader —Amendment of Order 3, Rule 4(3) C.P.C. recommended.*

We are, however, of the opinion that so far as service of injunctions is concerned, the same should be effected upon the party itself, and not upon the counsel.

**5.30.** We, therefore, recommend that the following proviso should be[2] added to Order 3, Rule 4, sub-rule (3) of the Code of Civil Procedure, 1908 :

*Recommendation to amend Order 3, Rule 4(3), C.P.C.*

*To be added to Order 3, Rule 4(3), C. P. C.*

> "Provided that in regard to an appeal or petition for revision against an interlocutory order passed in the course of a suit or other proceeding, pending on the date of filing of such appeal or petition, service of any notice or document issued by the court hearing the appeal or petition on the pleader representing any party in the suit or other proceedings in the trial court shall, unless the court otherwise directs, be as effectual as service upon the party represented by the pleader, but nothing in this proviso shall authorise service on the pleader of any injunction issued by the court of appeal or revision."

---

[1]Para 5.17, *supra*.

[2]For amendment of Code.

CHAPTER 6

ARGUMENTS AND JUDGMENT IN APPEALS

## I. SCOPE OF CHAPTER

Scope of Chapter. **6.1.**   Once an appeal is ready for hearing,[1] the next stage is the addressing of arguments and judgment.   We propose to deal in this Chapter with these two stages of the appellate process.

## II. ARGUMENTS : WRITTEN AND ORAL

Importance of arguments. **6.2.**   In contrast with an original trial, the duration of, hearing before an appellate court depends almost entirely on the time taken up by the counsel for the parties in presenting their case before the court.   No doubt, the questions which the appellant proposes to raise can sometimes be properly answered from an examination of the record ; but usually it becomes necessary to allow the parties to present before the appellate court at some length their points of view in regard to the verdict of the lower court.   The appellate court, therefore, needs statements of the contentions advanced by the respective parties to challange or support the verdict.   Such statements could be written—these are known usually as "briefs" : but in India, the practice is to hear the counsel for the parties orally.   This renders it desirable that some attention should be paid to the time taken in an appellate court in the oral presentation of the arguments.   The question whether some saving of time could be effected in his regard without prejudice to the interests of justice should therefore be examined.

Two methods of arguments. **6.3.**   One of the most important questions which needs attention when dealing with the hearing of appeals is about the method of arguments to be adopted.   There are, at present, two main schools of thought in this regard.   One school pleads for substituting written briefs for oral arguments, or for reducing oral arguments to the minimum extent.   The opposite school stresses the need for oral arguments and is averse to introducing the system of written "briefs" in arguments.   In U.S.A. the arguments addressed to the appellate courts are in the form of written "briefs", supplemented by oral arguments lasting normally not more than an hour for each case.[2]   In many countries on the European continent also.[3] the system adopted in appeals is that of written arguments.   As against that, the system prevalent in England.[4] India[5] and a number of Commonwealth countries[6] is of oral arguments.

The two procedures. **6.4.**   We propose to consider at some length the English and American appellate procedure, since they represent two diametrically opposite systems in regard to oral and written arguments.   The salient features of the two systems and the contrast between the two have been given in an article,[7] to which we shall make a reference.

Papers on appeals in U.S.A. and England. **6.5.**   An outstanding difference between the two nations is the fact that 'briefs' are required in the United States, whereas in England they are not.   The 'brief' is a full-dress argument in writing, often running into fifty or more printed or mimeographed pages in length.   It states the facts, outlines the claimed errors in the proceedings below, and cites and discusses the authorities claimed to justify reversal or affirmance.   The appellant serves his brief on the other side well in advance of the time for oral argument, and the respondent then serves his answering brief on the appellant, again well in advance of oral argument.   Sometimes the appellant serves a reply brief.

---

[1]Chapter 5. *supra.*

[2]Para 6.8. *infra.*

[3]E.g. France. see Appendix 7.

[4]See para 6.4 and 6.5, infra.

[5]Order 41, Rules 9, 10, 11(1) and 16, Code of Civil Procedure, 1908.

[6]For Canada. see para 6.11. *infra*

[7]Delmar Karlen. "Appeals in England and the United States" (1962) 78 L.Q.R. 371. 375-382.

6.6.  In England, a brief is virtually unknown.  The closest approach to it is the 'case' normally required from both sides in the House of Lords and Privy Council.  This however, is a very abbreviated paper, seldom running into more than six or seven pages in length, and is intended only as a preliminary out-line of the extended oral argument to be made later.  It does not discuss authorities in detail, or argue the propositions of law to be relied upon.  Relatively few cases are cited.[1]

Case in House of Lords.

In the House of Lords,[2] prior to the hearing,  the  parties provide  the Court and  each other with only a very short out-line of the line of argument they intend to adopt and the legal authorities they will rely on.  The judges do not usually analyse this document in any detail before-hand, apparently on the assumption that this would detract from the right of counsel to make his case before judges who do not have any preconceptions.  Oral argument is not limited in time, lasts an average of  three days and occasionally up to twenty days, and is the primary external influence on the Court's conclusion.

6.7.  The record of appeal in the United States consists of the notices of ap-peal, pleadings and other formal documents, the judgment below and so much of the evidence as may be relevant as to the questions raised on appeal.[3]

Record in U.S.A.

6.8.  Oral arguments in U.S.A.[4] are secondary in  importance to the 'briefs'. and are rigidly limited in duration.  In the United States Supreme Court, half an hour is usually allowed to each side.[5]  In many appellate courts, frequently no more than fifteen minutes or a half-hour for each side is permitted for oral arguments.[6]  Reading by counsel is frowned upon.[7]  The judges do not wish to hear what they can read for themselves.  They expect to get all the information they need about the judgment below,  the  evidence, and  the authorities relied upon, from studying the briefs and record on appeal.  They do not even encourage counsel to discuss  in  detail the precedents claimed to govern the decision, preferring to do that job by themselves in the relative privacy of their chambers, with or without the assistance of law clerks.

Oral arguments in U.S.A.

The relevant rule, so far as is material reads[8]

"1. Oral argument should undertake to emphasize  and clarify the written argument appearing in the briefs theretofore filed.  The court looks with disfavour on any oral argument that is read from a prepared text.

2. The appellant or petitioner shall be entitled to open and conclude argument.  But when there are cross-appeals or cross-writs of certiorari they shall be argued together as one case and in the time of one case, and the court will, by order reasonably made, advise the parties which one is to open and close.

3. Unless otherwise directed,  one half hour  on each side will be allowed for argument.  Any request for additional time shall be presented not later than fifteen days after service of the petitioner's, or appellant's, brief on the merits by letter addressed to the clerk (copy to be sent opposing counsel), and shall set forth with specificity and conciseness why the case cannot be presented within half hour limitation.

4. Unless additional time has been granted one counsel only will be heard for each side, except by special permission when there are several parties on the same side.  Divided arguments  are not favoured by the court.

[1]Delmar Karlen, "Appeals in England and the United States" (1962) 78 L.Q.R. 371, 378-382.

[2]Weiler, In the Last Resort (1978), page 24.

[3]Delmar Karlen, "Appeals in England and the United States" (1962) 78 L.Q.R. 371, 378-382.

[4]Delmar Karlen, "Appeals in England and the United States" (1962) 78 L.Q.R. 371, 378-382.

[5]See Rule 44, quoted infra.

[6]This was the position in 1962.

[7]Delmar Karlen, "Appeals in England and the United States" (1962) 78 L.Q.R. 371 378-382.

[8]Title 28. U.S. Code (1970). Ed. Rule 44 (Oral Argument).

36

> 5. In any case, and regardless of the number of counsel participating, a fair opening of the case shall be made by the party having the opening and closing.
>
> 6. Oral argument will not be heard on behalf of any party for whom no brief has been filed."

**Oral arguments in England.** **6.9.**    In contrast, in England, where there are no written briefs, oral arguments are all-important.  They are never arbitrarily limited in duration.  While some last for only a few minutes, others go on for many days, even weeks.  The position in England has been thus stated[1] : —

> "The only controls ordinarily exercised over the time of oral argument are informal, *ad hoc* suggestions from the judges.  Thus when counsel wishes to cite a case as authority, the presiding judge may ask him : for what proposition ?  If the judges indicated that they "accept the proposition as stated, there is no need to read the case.  Similarly, if counsel has persuaded the judges on a certain point, they may indicate that it is unnecessary for him to pursue it further.  If counsel for the appellant, by the time he finishes his argument, has failed to persuade the court that the decision below should be reversed or modified, the court informs counsel for the respondent that it does not wish to hear from him at all, and proceeds forthwith to deliver judgment.  Despite such controls as these, the time spent in England in oral argument tends to be very much greater than that spent in the United States.
>
> "In recent years, the average duration of argument in the court of Appeals has been about a day and a quarter per case, and in the House of Lords and the Privy Council, about three days per case.  Much of the time, perhaps half, has been spent by counsel reading aloud to the court.  It is in this way that the judges have learned what transpired in the court below (by listening to a reading of the judgment and such parts of the evidence as may be relevant), what errors are complained of by "counsel (by listening to a reading of the notice of appeal, which is required to specify the errors), and the authorities relied on by counsel (by listening to a reading of statutes and cases, either in their entirely or in large part)."

**No 'brief' in England.** **6.10.**    Very rarely does one come across a written 'brief' in England.  In *Rondel v. Worsely*,[2] a 'brief' (written statement prepared by counsel and handed in to an appellate court to show the contentions put forward) was received and read by the Court of Appeal, but it was described as "wholly irregular and contrary to the practice of the Court and should not be allowed as a precedent for future proceedings".

**Appellate procedure in Supreme Court of Canada.** **6.11.**    It may be of interest to note that the procedure in Canada in the hearing of appeals before the Supreme Court is half-way between that adopted in England and in U.S.A.  A fairly recent study,[3] after stating that in the House of Lords, the parties provide the court with only a short cut-line of arguments they intend to adopt and the legal authorities they will rely on, tells us as follows about Canada[4] :

> "In the Supreme Court factums are much larger—often over 100 pages— and make a much more sustained argument in their own right. The Judges are assisted by a clerk who can make some analysis of the issues in the case and critical points in contending positions and provide this for the Judges before the hearing................  At the hearing, oral argument is again unlimited, lawyers on each side spend a great deal of time reading from the record of the case or from prior judicial authorities, and a typical hearing will last upto two days."

**View of the Evershed Committee.** **6.12.**    In England, the adoption of the American method of disposing of appeals was considered by the Evershed Committee,[5] which carefully examined the arguments in favour of and against the method.  The Committee reached the

---

[1]Delmar Karlen, "Appeals in England and the United States" (1962) 78 L.Q.R. 371.
[2]*Rondel v. Worsley*, (1967) 1 Q.B. 443.
[3]Paul Weiler, In the Last Resort (1974), page 25.
[4]For criminal cases in Canada, see para 6.15, *infra*.
[5]Committee on Supreme Court Practice and Procedure Report (1953), pages 191-193, para. 573, 574.

conclusion "that the American system would provide in this country a less satisfactory system for conducting appeals than that now prevailing. Furthermore, we are satisfied that the American system would be quite unsuitable for adoption in this country in view of the different conditions prevailing here and would not be likely to lead to any marked reduction in the costs of appeals".

**6.13.** The Evershed Committee further stated[1] that "Whatever may be thought to be the advantage of the American system of 'briefs'................ we found singularly little enthusiasm for it amongst the witnesses whose opinions we sought. The members of the Court of Appeal whom we consulted were emphatically opposed to the adoption of such a system in this country as also were the representatives of the Bar Council and Law Society".

**6.14.** It would be of interest to refer to the views expressed before the Evershed Committee by certain distinguished judges and lawyers. The Committee stated : *Views expressed by Mr. Justice Frankfurter and Mr. John Davis.*

"We also had the advantage of hearing evidence from Mr. Justice Frankfurter, of the United States Supreme Court, as well as from Mr. John W. Davis, who was able to speak with a wealth of experience of appellate work in "the United States Courts. We gained the impression from these witnesses that they were by no means whole-heartedly in favour of the American system of conducting appeals, but that they rather envied the system prevailing here of unrestricted oral argument. They appeared to regard the American 'brief' system, with its strict limitation of the time for oral argument, as a necessary evil forced upon them by the pressure of appellate work, the volume of which is so great that it would be simply impossible to get through it if unrestricted oral argument were permitted."

**6.15.** It would seem that the idea of dispensing with oral arguments has not, as a rule, found favour with Commonwealth countries.[2] *Position in Commonwealth.*

## III. MODIFICATIONS CONSIDERED

**6.16.** As already mentioned[3] the members both of the Bench and the Bar in India have so far been accustomed to the system of oral arguments. After giving the matter our earnest consideration, we are of the opinion that it would not be desirable to give up the system of oral arguments. What modifications, if any, are needed, in this system would be discussed by us later,[4] but by and large we feel that we shall not be justified in dislocating the existing appellate system by giving up the method of oral arguments and replacing it by that of written briefs. There are some practical difficulties and weighty considerations which should not be lost sight of while taking a decision in this matter. Unlike in India, judges in the United States have law clerks who are generally brilliant law graduates from universities like Harvard or Yale. These clerks study the whole brief and render assistance to the judges in knowing about the different aspects of fact and law in each case. The judges in the United States Supreme Court sit in open court for not more than 8 or 10 days in a month. The rest of the days are spent by them in studying briefs and preparing judgments. *System of oral arguments to be retained.*

The United States Supreme Court normally is in session from the first Monday in October until the end of June the following year. Generally the first two weeks of each month are set apart for hearing cases argued orally, and the last two weeks are spent discussing the cases and writing opinions[5].

**6.17.** No oral submissions are made in the United States Supreme Court at the time of admission of appeals—a stage broadly corresponding to what constitutes in India a preliminary hearing. It is obvious that if judges have to spend considerable time in studying lengthy and elaborate written briefs, there would have to be a curtailment of the number of days on which the court holds public sittings. Looking to the conditions which are prevalent in India, we are of the opinion that such a course would be wholly undesirable.

[1]Committee on Supreme Court Practice and Procedure Report (1953), pages 191-193, para. 574.

[2]For Canada, see para, 6.11, *supra*.

[3]Para 6.2 and 6.3, *supra*.

[4]Para 6.18, *infra*.

[5]Lewis and Others, Introduction to the Courts and Judicial Process (Prentice—Hall) (1978), page 91.

38

**View taken in the 14th Report.** 6.18. We may mention at this stage that the Law Commission presided over by Shri Setalvad did not favour the adoption of the American system. It was observed by that Commission in the 14th Report[1]—

"8. ..........................it will be realised that the system operating in the United States proceeds on three fundamental hypotheses. It postulates :

"(i) A competent Bar which should be able to prepare and submit an exhaustive and fully documented brief ;

(ii) Judges who would be able to comprehend the full hearings of the points involved in an appeal by a mere perusal of the briefs ;

(iii) Expert qualified assistants to the Judges who would make research into the questions arising so as to assist the Judges to get thoroughly seized of the briefs filed.

9. We may, perhaps, with some hesitation accept that the first requisite would be available at the Bar of the Supreme Court and the High Courts. It would be difficult to say the same with regard to the second. Our Judges are trained to gather facts and perceive the relevant points of law from fairly full oral arguments. Indeed, they, from time to time, resolve doubts both as to inferences of facts and validity of legal contentions by questions put to counsel. As to the third, its introduction into the working of the judicial system in our country will be an entirely novel feature. It involves the question whether we "would not be in many cases substituting the efficient Legal Assistants for the Judges. Lawyers in the United States have not infrequently a feeling that cases are disposed of by the Legal Assistants and not by the Judges..............................

..............    ..................    .................

10. What is more, the United States system involves the practice of granting what is called free time to the Judges to peruse the briefs, the Judges working in Court half the time, remaining half being devoted to study and disposal of briefs. It also means the increased cost of the employment of a number of very capable well paid legal assistants.

Having regard to the essential difference in the jurisdiction and powers of our Courts and the entirely different conditions in which they function, is the adoption of the American system by us at all practicable?"

The Commission ultimately rejected the suggestion for adoption of the American system.

**Concise note of arguments to be filed and read— Recommendation.** 6.19. At the same time, we are not unmindful of the fact that oral arguments quite often take much more time than is warranted by the facts of the case. In our opinion, considerable saving in the time taken can be effected if we have a system of a concise note of arguments to be presented in advance before the commencement of oral arguments. This would also bring about a certain amount of precision and orderliness, and eliminate desultory submissions.

In our opinion, it will be of assistance to the court and a matter of satisfaction to the counsel and the litigants if, in every first civil appeal before the High Court and writ petition other than petition for *habeas corpus*, a concise note of arguments is filed in court by the parties, and read and studied by the judge, before the commencement of the hearing of the case. The note should contain, in separately numbered paragraphs, the material facts and all propositions of fact and law that are sought to be raised by the parties before the court, with specific authorities in support thereof noted separately under each head. In order that the note may be of real assistance to the litigants and the court, it should be drawn up with care and exactitude. Oral arguments should, unless otherwise permitted by the court, be confined to the propositions that are set out in the note. These notes should be exchanged by opposing counsel at least one week before the commencement of the oral arguments.

So far as writ petitions are concerned, we shall deal with the matter subsequently also.[2]

---

[1] 14th Report, Vol. 1, pages 468-469, para. 8-10.
[2] Para 16.15, *infra*.

39

**6.20.** We may note that the matter was discussed in the 14th Report of the Law Commission[1], which did not favour either the introduction of written arguments[2] or the filing of a statement of cases in appeals. View in 14th Report.

It appears to us, however, that so far as the need for filing a statement of case is concerned having regard to the magnitude of arrears, which, since then, have piled up and call for clearance, a somewhat different approach to the matter is desirable. That is why we are recommending[3] a modification in that regard.

**6.21.** Looking to the magnitude of the problem, we are inclined to agree, in principle, with the conclusion reached by the High Courts Arrears Committee presided over by Mr. Justice Shah.[4] The Committee, while arriving at its conclusion, said:— Shah Committee.

> "97. It is uniformly complained that lengthy arguments are addressed in many cases on matters which are only of incidental importance and there is no attempt to concentrate upon the essentials of the dispute between the parties to the litigation. Sometimes passages from evidence are read out in extenso, and decisions are read verbatim from the commencement to the final order. Citation of decision from obscure sources is also a common occurrence. To obviate all this and to compel the counsel of both sides to concentrate upon the essentials of the dispute, we recommend that unless otherwise ordered by the court, in every appeal or petition to be heard before the High Court, the Advocates for the parties would draw up a concise statement setting out briefly the facts giving rise to the dispute, the points at issue, the propositions of law or fact to be canvassed and the authorities relied upon for each proposition, and the relief claimed. These statements should be exchanged between the advocates and filed in court well in advance of the hearing and the judges should not ordinarily permit the advocate to travel outside such a statement or to cite authorities, not included herein. It may be noted that the High Courts Arrears Committee of 1949 observed that a full statement of the case on law and fact should be filed by the appellant along with the Memorandum of appeal, in all second appeals and in all civil appeals to the High Court a concise statement of the case with relevant law and authority which will in all essential features be presented to the court at the time of the final arguments should be exchanged between the parties and filed in Court, a short time before the hearing actually begins on the lines of the statement of the case in the Privy Council. The Law Commission did not recommend acceptance of that suggestion but merely recommended the exchange between counsel of lists of authorities they propose to cite in order to prevent surprise and to ensure speedy assistance to the court. In our view, if the statements "are properly drawn up and the Advocates are not permitted to travel outside except for compelling reasons, the length of arguments would be considerably reduced".

**6.22.** We may observe that the filing of concise note[5] of arguments would prove helpful and result in curtailing the time of the court hearing, only if the judge concerned reads beforehand the said concise note of arguments. Otherwise, the preparation of a note would prove a mere exercise in futility. There is, in the words of an American jurst,[6] nothing in the whole field of procedure as futile as an appellate court solemnly listening to the arguments of counsel without having read and analysed the briefs that counsel have gone—or should have gone—to great pains to prepare. Reading in advance.

**6.23.** To avoid any possible misconceptions, we would make it clear that it is not suggested that we should, in this country, adopt the American system of "written briefs". But it would be worth while making an experiment aimed at a real reduction in the time taken in the appellate court and therefore a real reduction in costs, without at all fettering the right of counsel to full oral Oral arguments not to be dispensed with.

---

[1] 14th Report (Reform of Judicial Administration) Vol. 1, pages 465-474.
[2] Para 6.18, supra.
[3] Para 6.19, supra.
[4] High Courts Arrears Committee Report (1972), pages 72-73, para 97.
[5] Para 6.19, supra.
[6] Vanderbilt, Challenge of Law Reform (1955), page 71.

argument of their cases on propositions set out in a concise note. We do not contemplate doing away with oral arguments. What we contemplate is a method whereby the time taken in oral arguments may, to a certain extent, be reduced and oral arguments could be made more purposeful. A concise note of the arguments filed in the court and received in advance by the counsel would, in our view, go a long way towards achieving this object.

**No time limit on arguments.** **6.24.** We are also averse to putting a time limit on arguments. The time required for oral argument in each case would depend upon the nature of the case, the questions of fact and law involved in it, the volume of evidence and the number of legal propositions advanced. To prescribe a time limit on arguments would not only cause discontent, but might also result in miscarriage of justice in some cases. Every case is unique and is entitled to the time and individual attention necessary for a fair hearing, considering all the circumstances of the case.

If the presiding judge has read the judgment of the trial court and perused the concise note of arguments in advance, he would be able to regulate the arguments and avoid any desultoriness therein.

In this context, we may refer to the observations of the High Courts Arrears Committee presided over by Mr. Justice Shah : [1]

"98. We are averse to the suggestion made by some Judges and the Members of the bar that a time limit should be set for arguments before the High Court, as is the practice in the Supreme Court of the United States of America. The Law Commission has in its Report elaborately examined the system in vogue in the Supreme Court of the United States of America and has shown how it is unsuitable to the conditions here.

"99. The procedure prevailing in the Supreme Court of the United States of America is entirely different from that in vogue in our High Courts. The practice adopted in the Supreme Court of the United States of America cannot be transplanted here. At the same time we are conscious of the fact that lengthy arguments waste a good deal of time of the Court."

**Scheme to be tried in the High Courts in certain proceedings in the first instance.** **6.25.** For the present the scheme recommended by us[2] regarding concise note of arguments may be tried in the High Courts in regard to regular first appeals and petitions under article 226 of the Constitution other than those seeking *habeas corpus.* If this scheme is found successful, it can be extended to second appeals and revisions in the High Courts and also to the Lower Civil Appellate Courts.[3]

**Need for working the scheme in proper spirit.** **6.26.** We may finally state that the scheme recommended by us will be successful only if the bar and the bench work it in its true spirit.

## IV. JUDGMENTS

**Judgments to be pronounced within reasonable time.** **6.27.** We now deal more specifically with judgments. It has been observed that judgments are generally reserved and, in some cases, pronounced a long time after the arguments have been heard. Long delay in the pronouncement of judgment is an unhealthy practice. The Law Commission of India, in its Report on the Reform of Judicial Administration,[4] expressed the view that though ordinarily the most convenient course for the judges would be to deliver the judgment straightaway at the close of the hearing, there could be certain cases in which judgments would need to be reserved. The Commission observed that in such cases the reserved judgments should be pronounced within a reasonable time. We fully agree that judgments should be pronounced within a reasonable time.

**Statement to be circulated.** **6.28.** Normally, it should be possible to pronounce a judgment, if not done immediately, within a week of the conclusion of arguments. Care may be taken to ensure that the time lag between the conclusion of arguments and the pronouncement of the judgment does not exceed one month, except in some special

---

[1] High Courts Arrears Committee Report (1972) pages 72-73, para 98-99.
[2] Para 6.19, *supra.*
[3] See also para 18.15, *infra.*
[4] 14th Report, Vol. 1, page 360, para. 102.

41

matters. We are, however, not unmindful of the fact that judgments are, on occasions, not pronounced for a number of months after conclusion of arguments. This is an undesirable practice and affects the image of the courts. It would perhaps administratively help if in each High Court a statement is circulated amongst the judges every month, giving a list of cases in which judgments have not been pronounced within two months of the conclusion of arguments.

**6.29.** It has been brought to our notice that sometimes the judges have to spend considerable time in dictating judgments in regular second appeals and civil revisions, even though those appeals and revisions are devoid of any merit. We suggest that it would be permissible for a judge, when dismissing a regular second appeal or a civil revision, to give a short statement of facts, the main contentions advanced and brief reasons for repelling those contentions. This would eliminate the necessity of writing long and elaborate judgment in such cases. *[margin:* Judgment of dismissal.*]*

**6.30.** We may also draw attention to the observations made by us in the context of judgments of the trial courts in our 77th Report[1]. We feel that though some of those observations may not be apt for the judgments of High Courts, by and large they underline the importance of some wider aspects which can prove helpful. It was said in that Report— *[margin:* Observations in earlier Report on the subject of judgment.*]*

"7.4. One general tendency is to cite a very large number of authorities and to read lengthy passages from those judgments. Experience tells us that the fate of most cases depends upon facts. The law bearing on the cases is well settled by statute or the pronouncements of the highest court. It would be much better if the judgments of the trial deal with questions of fact by appraising the evidence, refer to the relevant statutory provisions applicable to the matter and cite such of those authorities as have a direct bearing. Burdening of the judgments with too many authorities mostly with a view to distinguish them has invariably the effect of making judgments unduly lengthy. It has to be borne in mind that the primary function of the judge is to decide the case before him. A judgment should set out the salient facts of the case, deal with the points of controversy, appraise the relevant evidence, discuss the questions of law which arise and incorporate the findings of the court on the various issues. The judgment should conclude by stating in precise language the actual relief, if any, granted to the plaintiff.

"7.5. A judgment, it needs to be emphasised is not a medium to display the learning of the judge, on points which have only incidental bearing. The function of a judge while deciding a case is not the same as that of a research scholar writing a thesis on a particular branch of law. The art of writing not very long judgment while at the same time dealing with all material points of controversy can be acquired only slowly and gradually. It is indeed learning the art of condensing the maximum of ideas into the minimum of words.

"7.6. There is, however, one danger which we have to guard against. Brevity in the matter of judgments should not be used as a justification for not dealing with inconvenient contentions and not facing the crux of the argument of a counsel against whom the judge decides the matter. The stress on brief judgments should certainly not provide a cover for mental lethargy nor an alibi for intellectual dishonesty. A balance has, therefore, to be kept in the matter."

---

[1]77th Report, Delay and Arrears in Trial Courts para. 7.4 to 7.6.

CHAPTER 7

GROUPING AND LISTING OF APPEALS

## I. IMPORTANCE

Need for proper listing. **7.1.** In order that an appellate court — or, for that matter, any court — may function with the maximum efficiency, it is necessary that the business before that court is so arranged that matters which require prompt attention get such attention and also that the situation of old cases getting older and of new cases receiving priority should, as far as possible, be avoided. It is not enough to ensure the good quality and adequate strength of the judges; it is also necessary that the same be utilised in the best manner in attending to judicial business, so that arrears do not accumulate.

Cause of arrears. **7.2.** It has not been disputed[1] that lack of proper listing and proper notice of ready cases, and not giving priority to old cases, is a factor which contributes to the accumulation of arrears. Similarly, failure to group cases involving the determination of common questions of law may contribute to the piling up of arrears.[2] Accordingly, we propose[3] to devote a few paragraphs to that aspect.

## II. GROUPING

Listing of appeals and grouping. **7.3.** In the matter of listing of appeals, it has frequently been noticed that adequate care is not taken by the Registry. Very often, there are appeals involving determination of common questions of law, but due notice is not taken of this important aspect and such appeals are posted separately before different benches. Instructions should be issued to the staff concerned for (i) the grouping of cases involving determination of common question of law; and (ii) posting them together for hearing before the same bench.

Observations by earlier Committee. **7.4.** The High Courts Arrears Committee presided over by Mr. Justice Shah in its Report[4] made the following pertinent recommendation relating to the grouping and classification of cases:

"We recommend that there should be grouping and classification of cases, so that cases raising similar disputes or cases under "specialised branches such as tax cases, cases under the Industrial Disputes Act, cases under the Land Acquisition Act, petitions for writs dealing with special statutes may be brought together. This would not only expedite disposal of cases but would also conduce to a uniformity of approach and decisions, with a progressive development of the law. The method of clubbing together and posting before the same Judge or Bench of Judges cases of the same nature, has in our opinion much to commend. This method need not be confind to petitions for writs alone, but may be adopted for all cases including first appeals".

Appeals under Land Acquisition Act. **7.5.** It will be useful to refer here, in particular, to appeals under the Land Acquisition Act[5,6] Very often, when large parcels of lands situated in, the same locally or in similarly placed localities are acquired, separate awards are made at different times in respect of the parcels of land comprised in the locality. References from the awards of Land Acquisition Collectors are heard by the District Judge, from whose decisions appeals lie to the High Court. These appeals relating to different parcels of land in the same locality most usually involve common questions of law or fact, but are not filed at the same time nor put up together in the High Court. This leads not only to want of uniformity, but also to the unnecessary accumulation of cases—unnecessary, because matters involving common questions of fact or law should preferably be put up together, thereby effecting saving of time.

---

[1]Para 7.4, infra.
[2]High Courts Arrears Committee Report (1972), page 49, para 33, 34
[3]Para 7.3 and 7.4, infra.
[4]High Courts Arrears Committee Report (1972), page 72, para 94.
[5]As to general discussion of appeals under special Acts, see Chapter 9, infra.
[6]As to priortiy, see para 7.9 and 7.10, infra.

42

There is a remedy which could remove the defect. Officials of the Revenue Department generally are in the full know of the particulars of all such proceedings and of the various awards made by the Land Acquisition Collectors and by the Land Acquisition Courts in references made to them in such cases. When the matters come up before the High Court in separate appeals from the awards of the Land Acquisition Courts, the counsel in charge of conducting the appeals in the High Court on behalf of the State has ample means and facilities for collecting the relevant data in this regard from the Departments concerned. The Registry of the High Court can make necessary enquiries from the counsel who, after contacting the concerned officials of the Revenue Department should give necessary information about appeals relating to the same area. All such pending appeals can then be listed in one batch and posted together for hearing. This will not only facilitate a correct assessment of compensation by the High Court, but will also, at the same time, bring about speedy disposal of the appeals.

**7.6.** Likewise, there are appeals involving points which, since the filing of the memorandum of appeal, have been settled by authoritative decisions. If proper care is taken, it should not be difficult for the Registry to pick out those appeals and list them in one batch before the High Court for disposal. *(Appeals involving same points settled after filing of appeal.)*

### III. LISTING

**7.7.** Another cause of delay in the disposal of appeals is the defect in the system of listing with reference to dates. Fixing of actual dates in all appeals is not possible in the High Court. The time taken in each appeal is uncertain and cannot be estimated. An appeal fixed for a particular actual date, if not reached on that date, has necessarily to be adjourned to another date which may well be after several months, because of the intervening actual date appeals already fixed. This may result in the old appeals becoming older and the newer appeals being taken up and disposed of earlier. It will be conceded that this is not desirable. In our view, the system best suited to the High Court is normally that of a continuous list. *(System of listing —continuous list recommended.)*

**7.8.** For the system of continuous list[1] to work effectively, meticulous care should be taken in its preparation. We recommend (as, in fact, is the practice already being followed in most of the High Courts) that there should be a ready list containing particulars of cases ready for hearing in chronological order according to the dates of their institution. From this ready list, a daily list should be drawn up in the same manner and with reference to the dates of institution. The cases should be taken up by the court *seriatim* from this daily list from day to day, strictly in the order in which they appear in the list. No deviation should normally be made save in exceptional circumstances.[2] Adjournment of cases reached for hearing according to the daily list should be an exception, and not a matter of course. *(Continuous list— ready list to be prepared.)*

**7.9.** We may add that there are certain types of cases which, on account of their very nature, call for early disposal. It is plain that great injustice would be done and hardship caused if these cases have to take their turn in the queue. Justice demands that priority should be given to their disposal. *(Cases requiring early disposal.)*

**7.10.** Certain cases require urgent attention as having effect upon the pendency of other proceedings. Certain cases require urgent attention as affecting life or liberty. Certain other cases require urgent attention because of the peculiar nature of their subject matter. *(List.)*

The following list enumerates the categories of cases calling for priority:

I. *Cases Requiring Urgent Attention as having effect upon pendency of other Proceedings*

    (a) Cases in which orders have been passed whereby other proceedings have been stayed.

    (b) Appeals against orders of remand.

II. *Cases Requiring Urgent Attention as affecting Life or Liberty.*

    (a) Cases involving death sentence.

    (b) Habeas Corpus petitions.

---

[1] Para 7.7, *supra.*

[2] See also Chapter 20, *infra.*

7—253 LAD/ND/79

44

III.  *Cases Requiring Urgent Attention because of their Peculiar Nature*

    (a)  Appeals in matrimonial cases, and cases involving custody of children.

    (b)  Appeals under the Motor Vehicles Act, 1939 in claim cases.

    (c)  Appeals under the Indian Succession Act, 1925.

    (d)  Cases arising out of statutes dealing with agrarian reform.

    (e)  Cases between the landlords and tenants where eviction is claimed on the ground of *bona fide* personal need of the landlord.

    (f)  Cases where the relief sought is a declaration that suspension or termination of service of an employee, including employees in industrial undertakings, is illegal and not warranted, with or without a prayer for consequential relief.

    (g)  Election matters.

    (h)  Such other cases as may, in the opinion of the High Court, call for early disposal.

**Criminal appeals.**  7.11.  We may add that criminal appeals and revisions also need early disposal. One or more separate Benches should normally deal with these appeals and revisions, so that they do not remain pending for a long time. It hardly needs to be emphasised, so far as criminal cases are concerned, that it is essential that as they relate to the liberty of the subject and impinge upon the maintenance of law and order in the society, they be disposed of as early as possible. The criminal cases on that account would have to be treated as a class by themselves, and for that reason it becomes imperative to have separate Benches to deal with them.

So far as tax cases are concerned, the matter is being dealt with in a subsequent chapter.[1]

## IV. BENCHES

**Benches.**  7.12.  Relevant at this stage is also the question of constitution and disbanding of Benches. It is undoubtedly a matter which falls within the domain of the discretion of the Chief Justice of the High Court, and we are averse to prescribing fetters on the general exercise of that discretion. It is because of the complaints that have sometimes been made on this score that we have considered it proper to suggest some guidelines, not with a view to fettering the exercise of that discretion as with a view to bringing about better functioning of the High Court in order to attain the objective of securing optimum output. Experience has shown that a Bench constituted of judges having a particular aptitude for a certain branch of law is best suited to handle cases pertaining to that branch with ease, grace and speed, and its overall performance is generally very satisfactory, both from the point of view of quality and from the point of view of speedy and larger disposal.

**Assignment of cases to Judges with experience.**  7.13.  Complaints are not uncommon that some of the judges to whom certain types of cases are assigned have no experience of that branch of law. The result is that a case which, before a judge having experience, of that branch of law, might take, say, one hour would take before the judges before whom it is posted four or six hours if they have no aptitude for that branch of law. This results in unnecessary wastage of the time of the court. Such wastage can be avoided if the Chief Justice takes into account the aptitude of different judges while constituting Benches. A person holding the office of the Chief Justice should acquaint himself, as he normally does, with the aptitude of his colleagues. It is necessary that he should take that fact into account when constituting different Benches. It hardly needs to be emphasised that the Benches of the High Court cannot be used virtually as training ground for judges in branches of law new to them.

**Observations in Report of earlier Committee.**  7.14.  In this context, we may refer to the observations made by the High Courts Arrears Committee presided over by Mr. Justice Shah[2] which we quote below:

"There is occasionally failure to make optimum utilisation of the judge strength. One factor which undoubtedly affects the turnover in some High Courts, is the non-utilisation of judges having special aptitude and

---

[1]Chapter 17. *infra.*

[2]High Courts Arrears Committee Report (1972), page 83, para 135.

talent for a particular class of causes. It should not be difficult for the Chief Justice of the High Court to assess the special aptitude and talent of the judges in his court and to allocate as far as possible judicial work in such a manner that judges are called upon to attend to causes for which they have special experience, aptitude or talent. It need hardly be emphasised that if judges with special acquaintance or competence or who have specialised in certain branches of the law are allotted causes under that particular branch of the law, the time taken to decide those causes would be much shorter than the time taken by judges not familiar with the branch, especially a specialised branch."

**7.15.** Arthur T. Vanderbilt, Chief Justice, Supreme Court of New Jersey, on this aspect said :[1]    *Vanderbilt's view.*

"Judicial work is of various kinds; appellate, criminal, civil, equity, probate and matrimonial. A Judge who is equally interested or equally proficient in all of them is indeed a rarity. Every judge, if he is to do his work best, should be assigned, wherever possible, to the kind of judicial business in which he excels..................... Because this power of assignment is a delicate one, to be exercised only on mature reflection in the interest of the judicial establishment as a whole, it should be committed to the Chief Judicial Officer of the state, and he, in turn would do well to seek the advice of his colleagues, even though the ultimate responsibility must be solely his."

Experience has shown that the observance of this rule has yielded good results.

**7.16.** We may also advert to the question of duration of benches. Principally, the object of constituting a Bench is disposal of a particular type or category of work, such as first appeals, second appeals, land acquisition appeals or writ petitions. To relieve monotony, work of a different nature is also included at times in the list of cases posted before a Bench. But the principal object is what we have just now stated. This system has worked well, and has yielded good result. It is, however, desirable that the Benches so constituted should be allowed to function for a reasonable length of time and the Judges constituting the Bench should know well in advance when the Bench is to break, so that there may be no part heard cases left by the Bench after it is disbanded.    *Duration of Benches.*

**7.17.** Another aspect that results in delay and also dis-satisfaction amongst the lawyers and the litigants is that the bench so constituted for hearing a particular type of appeal is discontinued abruptly without making arrangement for the hearing of cases (of the same type) already on the daily list in the order of their dates of institution. What happens in such cases is that when the bench is disbanded, those cases are taken out of the daily list altogether and very often it is after months, if not years, that they suddenly appear again in the daily list either at the bottom or at the top. In either event, apart from causing inconvenience to the counsel, this results in the old matters becoming older and the newer institutions gaining preference.    *Disbanding of benches.*

To obviate this difficulty, it is necessary that cases not disposed of by the disbanded bench should be posted for hearing before the successor bench. In case that is, for some reason, not immediately possible, steps should be taken to post them for hearing without delay.

---

[1]Vanderbilt, Challenge of Law Reform (1955), page 87.