# EXHIBIT S

# LAW COMMISSION OF INDIA

## ONE HUNDRED TWENTY-FOURTH REPORT

### ON

### THE HIGH COURT ARREARS—A FRESH LOOK

1988

## CONTENTS

|  |  |  | PAGE |
|---|---|---|---|
| CHAPTER I | Introduction | | 1 |
| CHAPTER II | Principal causes contributing to delay in courts noticed earlier | | 8 |
| CHAPTER III | Remedial measures for the principal infirmities | | 10 |
| CHAPTER IV | Suggestions in unexplored region | | 20 |
| CHAPTER V | Computer Technology | | 25 |
| CHAPTER VI | Conclusion | | 26 |
| REFERENCES | | | 27 |
| APPENDIX I | Summary of recommendations made by the committees/Commission in the past to tackle the problem of exploding court dockets in the High Courts (See para 1.6, 4.1 & 6.1) | | 29 |
| APPENDIX II | Letter to Chief Justice of India (See para 3.6 & 3.24) | | 31 |
| APPENDIX III | Letter to Chief Justice of each High Court (See para 3.6 & 3.24) | | 35 |

CHAPTER I

INTRODUCTION

1.1 The Law Commission, in pursuance of the task assigned to it to study justice delivery system in order to find out what ails it and, after the diagnostic exercise is over, to recommend remedies so as to fundamentally reform the system to make it operational with a view to promoting, on a basis of equal opportunity, so as to ensure that opportunities for securing justice are not denied to any citizen by reason of economic or other disabilities, focussed its attention to the foundation of the pyramidic structure of the system at present in vogue. Major part of the litigation which reaches the upper echelons of judicial hierarchy emanates from rural areas. Accordingly, the Law Commission examined the structure of the court system in rural and semi-urban areas and recommended its re-structuring to povide a new model or mechanism for resolving disputes. The principle of participatory justice was the essential feature of the new model.[1] This approach also necessitated the need for decentralisation of the system of administration of justice by establishing other tiers or systems within the judicial hierarchy to reduce the volume of work in the Supreme Court and the High Courts. The relevant terms of reference in this behalf read as under :—

"1. The need for decentralisation of the system of administration of jusice by :—

  (i)  .......................................;

  (ii) .......................................;

  (iii) establishing other tiers or systems within the judicial hierarchy to reduce the volume of work in the Supreme Court and the High Courts.

2. The matters for which Tribunals (excluding service Tribunals) as envisaged in Part XIVA of the Constitution need to be established expeditiously and various aspects related to their establishment and working.'.

1.2 A superficial view of the aforequoted terms of reference may indicate that the Law Commission is merely concerned with finding out the inlets through which work flows into the High Courts and the Supreme Court and think of diversification as envisaged by Part XIVA of the Constitution with a view to providing a bottleneck in the inflow of work so that the court dockets evidencing litigation explosion may become manageable. This view may exclude from the purview of examination a radical re-scructuring of the High Courts and even of the Supreme Court.

1.3 Even with trenchant criticism of the justice delivery system in general and of the failure of the High Courts to dispose of matters coming before it expeditiously in particular, it cannot be gainsaid that the High Courts and the Supreme Court still enjoy considerable respect and affinity amongst the litigants and the intelligentsia. A suggestion for a radical re-structuring of the High Courts and the Supreme Court is likely to meet with sustained and vehement opposition. It would be unwise to ignore the sustained opposition to a proposal for Constitutional Division within the Supreme Court.[2] Therefore, attempts should first be made to have a view of the plenitude of the jurisdiction of the High Court and recall the recommendations made for improving the working in the High Courts and ascertain whether the drastic remedy of curtailing the jurisdiction of the High Court is unavoidable.

1.4 At the outset, an overview of the present jurisdiction enjoyed by the High Courts will permit an assessment of the enormity of the task assigned to the High Court. The High Courts enjoy civil as well as criminal, ordinary as well as extraordinary, and general as well as special jurisdiction. The source of the jurisdiction is the Constitution and the various statutes as well as letters patent and other instruments constituting the High Courts. The High Courts in the country enjoy an original jurisdiction in respect of testamentary, matrimonial and guardianship matters. Original jurisdiction is conferred on the High Court under the Representation of the People Act, 1951, Companies Act, 1956, and several other special statutes. The High Courts, being courts of record, have the power to punish for its contempt as well as contempt of its subordinate courts.[3] The High Courts enjoy extraordinary jurisdiciton under articles 226 and 227 of the Constitution enabling it to issue prerogative writs, such as, the one in the nature of *habeas corpus, mandamus,* prohibition, *quo warranto and certiorari.* Over and above this, the High Courts of Bombay, Calcutta, Delhi, Himachal Pradesh, Jammu and Kashmir and Madras also exercise ordinary original civil jurisdiction. The High Courts also enjoy advisory jurisdiction, as evidenced by section 256 of the Indian Companies Act, 1956, section 27 of the Wealth Tax Act, 1957, section 26 of Gift Tax Act, 1958, and section 18 of Companies (Profits) Surtax Act, 1964. Similarly, there are parallel provisions conferring advisory jurisdiction on the High Courts, such as, section 130 of Customs Act, 1962, and section 354 of Central Excises and Salt Act, 1944. The High Courts have also enjoyed jurisdiction under the Indian Divorce Act, 1869, and the

1

2

Parsi Marriage and Divorce Act, 1936. Different types of litigation coming before the High Court in exercise of its wide jurisdiction bear different names. The vast area of jurisdiction can be appreciated by reference to those names, viz., (a) first appeals; (b) appeals under the letters patent; (c) second appeals; (d) revision petitions; (e) criminal appeals; (f) criminal revisions; (g) civil and criminal references; (h) writ petitions; (i) writ appeals; (j) references under direct and indirect tax laws; (k) matters arising under the Sales Tax Act; (l) election petitions under the Representation of the People Act; (M) petitions under the Companies Act, Banking Companies Act and other special Acts and (n) wherever the High Court has original jurisdiction, suits and other proceedings in exercise of that jurisdiction. This varied jurisdiction has to some extent been responsible for a very heavy institution of matters in the High Courts. The Table hereunder will explain the rising crescendo of institutions, disposals and pendency in the High Courts :—

| Year | Institutions | Disposals | Pending |
|------|-------------|-----------|---------|
| 1982 | 6,63,183 | 5,51,785 | 9,76,781 |
| 1983 | 6,71,195 | 5,40,357 | 11,09,188 |
| 1984 | 7,07,91 | 5,75,451 | 12,51,915 |
| 1985 | 7,31,543 | 6,05,698 | 13,77,790 |

The upward swing in pendency has become relentless as would become evident from the latest figures available in this respect

Please see Table below :—

| S. No. | High Court | Pendency | As on |
|--------|-----------|----------|-------|
| (A) 1. | Patna | 56,904 | 31-12-1985 |
| 2. | Rajasthan | 48,921 | 31-12-1985 |
| | Total | 1,05,825 | |
| (B) 1. | Allahabad | 2,88,060 | 30-6-1986 |
| 2. | Kerala | 1,20,890 | 30-6-1986 |
| | Total | 4,08,950 | |
| (C) 1. | Madras | 1,87,250 | 31-12-1986 |
| 2. | Calcutta | 1,56,447 | 31-12-1986 |
| 3. | Karnataka | 66,741 | 31-12-1986 |
| 4. | Madhya Pradesh | 53,888 | 31-12-1986 |
| 5. | Gauhati | 17,880 | 31-12-1986 |
| 6. | Himachal Pradesh | 8,820 | 31-12-1986 |
| | Total | 4,91,026 | |
| (D) 1. | Bombay | 1,33,245 | 30-6-1987 |
| 2. | Andhra Pradesh | 86,137 | 30-6-1987 |
| 3. | Delhi | 77,191 | 30-6-1987 |
| 4. | Punjab & Haryana | 53,568 | 30-6-1987 |
| 5. | Gujarat | 52,623 | 30-6-1987 |
| 6. | Orissa | 37,854 | 30-6-1987 |
| 7. | Jammu & Kashmir | 35,945 | 30-6-1987 |
| 8. | Sikkim | 36 | 30-6-1987 |
| | Total | 4,76,599 | |
| | GRAND TOTAL (A+B+C+D) | 14,82,400 | |

1.5 The grim situation is further compounded by the fact that there is inordinate delay in filling in the existing vacancies in the High Courts. The Estimates Committee of the Parliament, focusing the attention on the pendency of cases in the Supreme Court and High Courts, noticed that there were 69 vacancies (as on 3-2-1986) of Judges in various High Courts lying unfilled and expressed an opinion that if the situation is not considerably improved or allowed to continue, the same could be interpreted as deliberate denial of speedy and less costly justice to the litigants. The Committee also expressed an opinion that ways and means have to be found out to replace the present procedure for appointment of Judges if it results in inordinate delay in their selection and appointment.[6]

1.6 As many as ten[7] attempts have been made in the past by Commissions and Committees to tackle the problem of exploding court dockets in the High Courts. Numerous suggestions for improving the situation by amending substantive and procedural laws were made. Few have been implemented but majority put in deep freeze. Over a period, these recommendations are likely to be forgotten with an inevitable fall out of the new Committees|Commissions traversing the beaten track and largely reiterating or repeating the previous recommendations, the fresh ones meeting the same fate as the earlier ones. In this background, it is not possible to effectively evaluate whether these recommendations, if implemented in entirety, would have solved the problem or at least made it manageable. The Commission would like to avoid the exercise of repeat performance. It was honestly and sincerely assumed that implementation of the previous recommendations would save the system and restore its dwindling dignity. Therefore, a summary of all relevant recommendations is set out in Appendix I.

1.7 Another view is that it is necessary simultaneously to have a comprehensive view of the vast jurisdiction of the High Court and examine whether any worthwhile curtailment can be made so as to assist the High Courts in discharge of their constitutional functions.

1.8 It must at once be conceded that when an attempt is being made to have a fresh look at the jurisdiction enjoyed by the High Court, the Law Commission is not writing on a clean slate. Numerous attempts have been made in the past to examine the structure of the High Court, its expansive jurisdiction, its inability to deal with matters coming before it expeditiously, the cost benefit structure and people's estimate of the working of the High Courts. Numerous recommendations have been made so as to rejuvenate and revitalise the High Courts. To repeat those recommendations as part of this report would be idle parade of familiar knowledge. The Law Commission would certainly avoid any such repetitive effort which is generally considered platitudinous. As pointed out in the just preceding paragraph, recommendations collated from all past reports are set out in the Appendix I, not as forming part of the recommendations of the present report but merely to

enliven the memory of the Government about those recommendations, and to come to a conclusion whether it is going to implement them or not. Subject to those recommendations, the Law Commission would make a few recommendations for further strengthening the High Courts with a view to make them people and justice-oriented.

1.9 A brief review of the exercise till now undertaken by various bodies to make an indepth study in the working of the High Courts, its structural format, its expansive jurisdiction and its worsening position year after year may be referred to here.

1.10 The earliest to which reference may be made is the High Court Arrears Committee, 1949. It is unnecessary to go into the recommendations made by it because the Law Commission extensively examined the recommendations of that body in its Fourteenth Report.

1.11 The next in point of time and first in its maximum importance is the report of the Law Commission of India in 1958.[8] In Chapters VI and VII, working of the High Courts, its structure, format, procedure followed by it, its original and appellate and constitutional jurisdiction, the increase in the volume of its work, the expansion of its jurisdiction under various special statutes was examined in depth. The two principal conclusions it reached were that neither any change is necessary in the structure of the High Court nor any reduction or curtailment in its vast jurisdiction. It took note of the fact that the Judge strength of the High Court has not been regularly reviewed keeping in view the ever-rising graph of institution. It was of the opinion that many unsatisfactory appointments have been made to the High Courts on political, regional and communal or other grounds with the result that the fittest men have not been appointed. This has resulted in diminution of the outturn of Judges. In its view, an upward revision of the Judge strength of the High Court coupled with the expeditious appointment of competent persons and reducing the holidays in the High Court would, all in their cumulative effect, help in reducing the backlog and making the High Court free from the stress and strain of mounting arrears. It recommended abolition of letters patent appeals. It was in favour of retaining the original side of the High Court wherever it existed.

1.12 The Law Commission, dealing with the Code of Civil Procedure,[9] opined against curtailment of the right of appeal but desired to put some restriction on the revisional jurisdiction of the High Court under section 115 of the Code of Civil Procedure. It did not feel that any curtailment of jurisdiction of the High Court was called for.

1.13 The Law Commission reverted to the Code of Civil Procedure in the circumstances mentioned in the report.[10] It took notice of the fact that appeals from appellate decrees (second appeals) are admitted too frequently, that there is some scope for circumscribing and thereby curtailing the right of second appeal by so amending section 100 of the

4

Code of Civil Procedure, that an appeal will lie only on substantial question of law and that substantial question of law so involved be formulated and specified at the time of admission of the appeal and the appeal will be heard on the questions of law so specified. Subsequent experience shows that the situation has hardly improved in the matter of admission of second appeals. Except this specific recommendation, certain peripheral changes were suggested in the procedure for hearing appeals. The question of effective curtailment of the appellate jurisdiction of the High Court was not tackled.

1.14 Being greatly concerned with the problem of accumulating arrears of cases in the various High Courts, the Government of India requested the then Chief Justice of India in April 1969 to consider the desirability of appointing a small Committee of Judges to go into the problem of arrears in all its aspects and to suggest remedial measures. This Committee, known as Shah Committee, as it was presided over by the then Chief Justice of India who continued to chair the Committee even after his retirement, has extensively gone into the jurisdiction of the High Court, the causes for accumulation of work, the manifest inability to tackle the problem of arrears and all allied aspects of the matter. Amongst the causes responsible for piling up of backlog of cases, the Committee noticed population explosion, extraordinary resort to writ Jurisdiction of the High Court, investment of special jurisdiction in the High Court, such as, trial of election petitions under the Representation of the People Act, 1951, with its concomitant that it should be disposed of within six months from the date of institution, et el. Government of India had conducted a review of the state of work in each High Court and found that inadequacy of Judges was the main cause for accumulation of arrears in some of the High Courts, further compounded by delay in filling in of vacancies, yet it again reviewed the Judge strength of each High Court and recommended an upward revision, simultaneously pointing out the pitfalls that the attempt must be made to avoid unsatisfactory appointments. It suggested certain procedural changes for reducing arrears. The Committee seriously considered curtailment of jurisdiction of the High Court and, noticing that the reference procedure under the tax laws is responsible for gross delay in disposal of cases in that branch of law, recommended substitution of that procedure by conferring a right of appeal against the decision of the Income Tax Appellate Tribunal to the High Court. It also recommmended that the original jurisdiction of the High Court under Patents and Designs Act, Succession Act and Divorce Act should be replaced by an appellate jurisdiction, the original jurisdiction being conferred on the District Court City Civil Court, as the case may be. It was in favour of setting up of Service Tribunals, which recommendation has now materialised by the enactment of Administrative Tribunals Act, 1985. However, in the absence of a recommendation for simultaneously eliminating the jurisdiction of the High Court. It was quite ligely that the decision of the Service Tribunal would be questioned before the High Court under article 226 of the Constitution, adding one more stage of litigation.[1]  The situation continued to deteriorate with an accelerated speed.

1.15 The judicial system continuously getting overburdened by the mounting arrears repeatedly attracted the attention of the Law Commission. In the year 1974, the Commission, after eulogizing the Supreme Court of India for making 'the concept of the Rule of Law relevant, coherent and staple in this country, could not shut its eyes to the problem of growing arrears in the administration of justice. It noticed that 'these arrears have now assumed a somewhat alarming dimension'.[1]  Accordingly, it undertook an exercise to revaluate the structure and jurisdiction of the higher judiciary which necessarily includes the institution of High Court. Leaving aside for the moment the recommendations relating to the Supreme Court of India, the Commission, while dealing with the High Court, reiterated the view with slight modification for substituting the procedure for reference under Indian Income-tax Act, 1961, by an appeal on a substantial question of law from the decision of the Income Tax Appellate Tribunal to the High Court, simultaneously rejecting the proposal for Central Tax Court. A further appeal to the Supreme Court would lie against the decision of the High Court if the High Court certifies that the case involves a substantial question of law of general importance which needs to be decided by the Supreme Court. This is in tune with the amended article 133 of the Constitution. A passing observation was also made that it would be worthwhile to create a machinery which would encourage and strengthen collective bargaining with a view to reducing the inflow of matters under the labour laws to the High Courts and the Supreme Court. It opined against setting up of Service Tribunals as well as against creation of Zonal Courts of Appeal. It is here a germ for the first time of creating specialist Tribunals as alternatives to the High Court with a view to curtailing the jurisdiction of the High Court to control the inflow of work which may indirectly help in tackling the problem of arrears and backlog of cases.

1.16 Within a period of five years since the submission of the last-mentioned report, the Law Commission of India, consistent with its policy decision to keep under review the system of judicial administration to secure elimination of delay and speedy clearance of arrears in courts, focused its attention on 'Delay and arrears in High Courts and other appellate courts'.[13]  After reviewing the past attempts at tackling the problem and the situation as it presented to the Commissions at the relevant time, it ther took notice of the litigation exposion in the High by the High Courts and its roots in history.  It further took notice of the litigation explosion in the High Courts since the advent of the Constitution. It then posed to itself the question which, according to it, had faced all Committees and Commissions investigating judicial delay : how to reconcile justice with speed, and what kind of measures to suggest for expediting disposal while maintaining the quality of justice. Almost having been convinced that High Courts enjoy unmanageable jurisdiction, it still opined

5

against curtailment of the right of appeal under the present scheme but suggested some peripheral changes in the procedure to be followed in the High Courts in hearing appeals. It reiterated the opposition against setting up of a Central Tax Court and did not express any opinion whether reference procedure under the Income-tax Act, 1961, should be replaced by an appeal over the decision of the Income-tax Appellate Tribunal to the High Court on a substantial question of law. The Commission reiterated the earlier view that the vacancies should be expeditiously filled in and that the Judge strength of the High Court should be reviewed periodically and attempt should also be made to appoint ad hoc Judges to tackle the problem of arrears.

1.17 As no perceptible change was visible in the situation, Government of India constituted an informal Committee consisting of three Chief Justices of *three different High Courts* to examine the problem of arrears and to suggest remedial measures. The Committee submitted its report specifically emphasizing the fact that the Judge strength in the High Court is inadequate, that there is inordinate delay in filling in vacancies and that these are the two principal causes which have contributed to the piling up of arrears in High Courts. It recommended certain peripheral changes in the matter of appointment to the *High Court.* It recommended abolition of second appeal where the subject matter of the original suit does not exceed Rs. 10,000. It recommended amendment of section 115 of the Code of Civil Procedure conferring revisional jurisdiction on the High Court in tune with section 3 of the Code of Civil Procedure (U.P. Amendment) Act, 1978. It recommended abolition of the letters patent appeal. It was of the view that ad hoc Judges be appointed to deal with election *petitions* under the Representation of the People Act, 1951. It was of the firm view that the ordinary original civil jurisdiction enjoyed by the High Courts of Delhi, Calcutta, Bombay, Madras, Himachal Pradesh and Jammu & Kashmir be abolished. There were certain other peripheral recommendations dealing with the jurisdiction of the High Courts. [14]

1.18 An incidental report made by the Law Commission in April 1984 may be briefly referred to.[15] It recommended that the parties must be called upon to file written briefs in the High Courts in relation to first appeals, capital cases and other complex cases coming before the High Courts and to curtail oral arguments to a minimum. According to the Commission, it would save time which would enable the Judges to deal with the arrears.

1.19 This is a brief review of the past efforts and attempts made by Committees and Commissions to tackle the rising crescendo of arrears in courts imposing an unbearable burden on the justice system consequently impairing the efficiency and diminishing the respect and credibility of the system in the minds of consumers of justice (litigants).

1.20 The present Law Commission, having been assigned the task to study judicial reforms, was specifically asked to draw up a **feasibility** report 'on est-

ablishing tiers or systems within the judicial hierarchy to reduce the volume of work in the Supreme Court and the High Courts'. The present Commission, having carefully studied all the past reports, analysed and evaluated the recommendations, made an enquiry about their implementation as best as one could make, looked at the present depressing and distressing situation of arrears and backlogs in High Courts and the Supreme Court and posed to itself the first question whether any cosmetic changes are at all likely to improve the situation. Having regard to the past attempts and consistent with its broadly stated approach as set out in its first report, it came to an affirmative conclusion that not only radical restructuring of the courts from the grassroot level is necessary which itself would provide a regulatory mechanism in the inflow of work to the High Courts and then reaching the Supreme Court, but also to have a close look at the vast jurisdiction enjoyed by the High Court and then to have a second look at the hitherto holistic view that the jurisdiction enjoyed by the High Court is a holy cow. Keeping in view the experience gained all over the world that the generalist courts have to some extent yield their place to specialist courts/tribunals, simultaneously effectively curtailing the jurisdiction of the generalist courts, that is, the High Courts. To take only one illustration : in Australia, 'New tribunals outside the established courts have been created to administer these areas. Administrative Appeal Tribunals, Arbitration Tribunals, Workers' Compensation Tribunals, Pension Tribunals, Planning Appeal Tribunal Equal Opportunity Tribunals', to name a few. This activity of creating tribunals is founded on a belief that : 'the established courts are too remote, too legalistic, too expensive and, above all too slow.[16] Unless, therefore, the jurisdiction of the High Court is substantially curtailed, simultaneously providing effective forum for juridical review enjoyed by the High Courts, the situation, by cosmetic peripheral changes, is not likely to improve and the situation which was once considered 'alarming'[17] can now be described as catastrophic, crisis ridden, almost unmanageable, imposing such an immeasurable burden on the system as led the former Chief Justice of India warning that 'the system is about to crash'.[18] An exercise that was always shunned was the trimming of the jurisdiction of the High Court due to a deeprooted regard for the High Courts till the dawn of independence because Privy Council was a distant dream situated at such a distance as almost to be inaccessible. But the visible deep malaise needs a drastic remedy for saving the system and to refurbish it with the dignity which it once enjoyed in the past.

1.21 The High Court is at the apex of the State Judicial apparatus. Each State will have a High Court.[19] Each High Court is invested with constitutional power to issue prerogative writs.[20] Each High Court shall have superintendence over all courts and tribunals throughout the territories in relation to which it exercises jurisdiction.[21] Every High Court is invested with control over all subordinate courts in the State and this control has become very pervasive and expansive by judicial decisions.[22]

The system of both civil and criminal justice provides for either an appeal or a revision to the High Court depending upon the nature of civil disputes, the jurisdiction of the trial court as well as the level of the court at which the criminal case is tried. Accordingly, unless the base level, where a litigation is initiated and vertically moves upward to the High Court by way of appeal or revision, is re-structured and this proliferating appellate jurisdiction is either controlled or curtailed, the inflow of work in the High Court would neither be regulated nor diminished. The Law Commission is of the firm view that, wherever possible, proliferating appellate and wide original jurisdiction should be controlled or curtailed without impairing the quality of justice.

1.22. Approaching the problem from this angle, the Law Commission recommended re-structuring of judiciary at grassroot level from where maximum litigation emanate, simultaneously recommending only one revision petition to the District Court and no appeal to the High Court in the matters conciliable by this re-structured grassroot judiciary, designated 'Gram Nyayalaya.[23] This recommendation when implemented would make a deep dent in the institution of second appeals and civil and criminal revision petitions in the High Courts.

1.23 The Commission next turned its attention to ever-expanding field of litigation under various direct and indirect tax laws. Delay in disposal of litigation under the tax laws has a debilitating effect on the State revenue and delayed disposal adversely affected even assessees. To cite one example, after the decision of the Supreme Court of India in Lohia Machines Ltd. vs. Union of India.[24] which upheld the view that while determining the capital employed in an industrial undertaking for the purposes of section 80J, there shall be deducted the aggregate amounts, as on the first day of the computation period, of borrowed moneys and debts owed by the assessee, numerous companies faced financial ruin in view of the fact that their accounts year to year were closed on a different view of the matter namely, that the borrowed moneys or debts were not to be excluded. The delay in this case adversely affected the assessees. On the other hand, the State was injuncted from recovering an amount of Rs. 3,800 crores of indirect taxes. It was succinctly brought to the notice of the Commission that the delay in disposal of tax litigation occurs at the High Court level because of a clumsy and dilatory reference procedure under section 256 of the Indian Income-tax Act, 1961, and ever widening conflict in the decisions of different High Courts. The alternative was to set up a Central Tax Court which will deal with references under the laws imposing direct taxes, indirect taxes and disputes arising under import and export legislation with an all-India perspective. This approach reflected a total departure from the hesitation felt by the earlier Commissions and Committees in recommending Central Tax Courts. A comprehensive report was submitted recommending setting up Central Tax Courts simultaneously eliminating the jurisdiction of the High Courts in the matters covered by the report.[25]

1.24 The Directive Principles of State Policy, as enunciated in Part IV of the Constitution, require the State to take concrete action for social and socio-economic justice. Accordingly, since the advent of the freedom, labour laws proliferated. 'Industrial and labour disputes', being a subject in the Concurrent List, both the Central Government and the State Governments enacted numerous labour laws and set up specialist machinery for resolving disputes arising under those laws, such as, the Labour Court, Industrial Tribunal|Court, Wage Board and National Tribunal. The decisions of these Tribunals, barring few exceptions in some States, did not provide for any appellate forum. Consequently, every decision of such Court|Tribunal was generally questioned before the High Court or the Supreme Court of India. The Commissions and the Committees dealing with the problem of arrears in the High Court did focus attention on this mounting litigation in the High Court under the labour laws. In the earlier attempts, no concrete suggestions emerged as to how to deal with this branch of litigation. The present Law Commission, toying with the idea of setting up tiers of specialist systems within judicial hierarchy, formulated an approach which, when applied, would indicate the areas where such intermediate tiers or systems could be established, simultaneously excluding the jurisdiction of the High Court. One such area was litigation under labour laws. It does not require multiple reasons to establish that handling litigation under labour laws requires a specialist knowledge, not merely of labour laws but of economic planning, monetary and fiscal policies, industrial expansion and budgetary formulations and above all peace and harmony in the industry to stimulate increased productivity. The very fact that since its inception, litigation under labour laws was excluded from the jurisdiction of civil courts, which are generalist courts, and was entrusted to specialist courts set up under those statutes provided proof, if any was needed, that it is an area of specialist jurisdiction. The Law Commission accordingly examined in depth the nature of litigation under labour laws, the equipment necessary for dealing with the same, the conflicting approach of the various High Courts and other incidental and ancillary aspects and recommended setting up Industrial Relations Commission at the State and Central level, simultaneously excluding the jurisdiction of the High Court under labour laws including elimination of jurisdiction under articles 226 and 227 of the Constitution.[26]

1.25 Continuing the search for matters better left to specialist court|tribunal, the Commission came across numerous disputes brought year after year before High Courts arising in the field of education. The Commission, being ill-equipped by itself to formulate the approach, participated in a well attended seminar and subsequent dialogue with a number of Vice-Chancellors from various universities and other experts in the field of education, and examined in depth the nature of litigation in the field of education and the High Court's responses to the same. The Commission, having been convinced that disputes arising in the field of education need the specialist approach, recommended setting up of Educational

Tribunal at the State and Central level excluding the jurisdiction of the High Court.[21]

1.26 While diagnosing what ails the High Courts, the Committees and Commissions in the past largely focussed their attention on inadequate Judge strength and inordinate delay in filling the vacancies. The major recommendations have all been in the direction of simplifying the procedure for appointment of Judges to the High Court, removing the roadblock at present experienced and periodical review and upward revision of the Judge strength of the High Court. Even apart from the Commissions and the Committees, the Estimates Committee of the Parliament strongly advocated repeal of the procedure for appointment of Judges to the High Courts and the Supreme Court as it felt that the present procedure was outmoded and cumbersome.[78] While asserting that the procedure prescribed in the Constitution for appointment of Judges to High Courts and the Supreme Court is cumbersome and dilatory, no alternative procedure was devised and recommended. Being in agreement with this diagnostic effort of ascertaining the specific ailments with which the High Courts suffer, namely, inordinate delay in filling in the vacancies, failure to review the Judge strength and sanction upward revision commensurate with the institution, the Commission examined in depth the present procedure prescribed in the Constitution for appointment of Judges to High Courts and the Supreme Court. It did appear that the procedure is cumbersome and dilatory and there was visible failure on this front which further accentuated the malaise of backlog. Accordingly, the Law Commission prepared and submitted a comprehensive report recommending radical reform in the procedure for appointment to High Court and Supreme Court and the method of review of the Judge strength at regular intervals.[29] The Law Commission thus took care not merely to specify the ailments but to suggest concrete remedial measures to retrieve the situation.

1.27 To sum up, the approach of the Commission is to reduce number of appeals, to set up specialist courts|tribunals, simultaneously eliminating the jurisdiction of the High Court which, when translated into action by implementing the reports submitted by the present Law Commission, would, on a very superficial assessment, reduce the inflow of work into the High Court by nearly 45 per cent of its present inflow. The Government of India, having very recently reviewed the Judge strength of each High Court, sanctioned 81 more posts of Judges in the High Court. If these newly created posts are filled in expeditiously and the existing vacancies are also filled in expeditiously, coupled with the setting up of specialist tribunals, all in their cumulative effect would enable the High Court to effectively and expeditiously deal with the current litigation and simultaneously reduce the backlog of cases.

1.28 The question, however, remains : Is something more required to be done ? That is the concern of the present report.

CHAPTER II

PRINCIPAL CAUSES CONTRIBUTING TO
DELAY IN COURTS NOTICED EARLIER

2.1 The genesis leading to the appointment of the first Law Commission lies in a non-official Resolution moved in the Lok Sabha on 19th November, 1954. It reads as under :—

> "This House resolves that a Law Commission be appointed to recommend revision and modernisation of laws, criminal, civil and revenue, substantive, procedural or otherwise and in particular, the Civil and Criminal Procedure Code and the Indian Penal Code, to reduce the quantum of case law and to resolve the conflicts in the decisions of the High Courts on many points with a view to realise that justice is simple, speedy, cheap, effective and substantial.".

Pursuant to this Resolution, in August 1955, the then Law Minister made a statement in the Lok Sabha announcing Government of India's decision to appoint a Law Commission. Its first term of reference was : 'To review the system of judicial administration in all its aspects and suggest ways and means for improving it and making it speedy and less expensive'. The Law Commission, with reference to its first term of reference, proceeded to inquire into the system of administration of justice, including in its scope the operation and effect of laws, substantive as well as procedural, with a view to eliminating unnecessary litigation, speeding up the disposal of cases and making justice less expensive. It comprehended within its scope of inquiry the procedure for recruitment to judiciary.[1]

2.2 It adopted a multi-dimensional approach while examining the question of delay and cost involved in litigative processes. Inter alia, it was of the opinion that it was possible to lay down limits of time within which judicial proceedings of various classes should be normally brought to a conclusion. As far as the munsif's court is concerned, it was of the opinion that a contested regular suit should be disposed of within a year and if the trial court happens to be the court of a subordinate judge, it must be disposed of within one and a half years. No attempt appears to have been made to determine what should be the average duration of different types of litigation coming up before the High Court. But if the trial of a suit in the trial court can be ideally completed within one and a half years, a second appeal ought to be disposed of within half that time. The situation today can be appreciated from the dismal fact that 5,461 second appeals over

ten years old were awaiting disposal on December 31, 1985. Similarly, 5,680 first appeals over ten years old were awaiting disposal on the same date. To be more precise, 30,183 matters over ten years old were pending in the High Courts on the same date.[2]

2.3 Even at the time when the situation was not so gloomy and when a concerted attempt by the appointment of Law Commission was made to tackle the problem in all its ramifications while dealing with the question of the delay and arrears in the High Court, the two most important recommendations made by the first Law Commission were : (1) the delay in filling vacancies in the High Court was found to be responsible in a considerable measure for the accumulation of arrears in the High Courts, and (2) inadequate Judge strength of each High Court not commensurate with the workload. Incidentally it was observed that High Court judgeship has ceased to be attractive to the senior members of the Bar and, therefore, their conditions of service, inclusive of pay, pension and perks and the age of retirement, should be suitably revised. It was also found that caste, communal and even occasionally political considerations have resulted in selection of unsatisfactory judicial personnel.[3]

2.4 This line of thinking has permeated through all subsequent recommendations dealing with the High Courts. Suggestions were made that convention should be established to reduce to a minimum the intervention of the Executive in the matter of appointment of Judges to the High Courts and the Supreme Court of India. Nearly three decades have elapsed since the first report of the Law Commission on Judicial Administration. During this journey through three decades, attempts have been made to improve the conditions of services of Judges of the High Courts and the Supreme Court as also to review and increase the strength of the Judges in the High Courts and the Supreme Court. Notice must be taken of some specific attempts very recently made. Parliament enacted the High Court and Supreme Court Judges (Conditions of Service) Amendment Act, 1986. It also amended, by the Constitution (Fifty-fourth Amendment) Act, 1986, Part D of the Second Schedule to the Constitution. By the constitutional amendment, the salaries of the Chief Justice of India, Judges of the Supreme Court and Chief Justice and Judges of the High Court were upward revised and more than doubled. By the Amendment Act of 1986, pension admissible to Judges of the High Court and the Supreme Court, including the Chief Justices, was substantially revised. Other conditions of service, such as, leave,

8

9

travelling allowance and gratuity were also suitably revised. The attempt was to make judgeship in the High Court and the Supreme Court more attractive than what it is today.

2.5. Dealing with the second most important cause commonly found responsible for arrears in the High Court was the failure to periodically revise the judge strength of each High Court as also of the Supreme Court commensurate with the increase in the workload. Article 124(1) of the Constitution provides that there shall be a Supreme Court of India consisting of the Chief Justice of India and, until Parliament by law prescribes larger number, of not more than seven other Judges. Parliament on four different occasions sanctioned upward revision of the Judge strength of the Supreme Court, to wit, in 1956, the strength was revised from seven to ten ; in 1960, from ten to thirteen ; in 1977, from thirteen to seventeen and in 1986, from seventeen to twenty-five excluding the Chief Justice of India. Similarly, very recently in March 1987, the Judge strength of High Courts was increased by sanctioning 81 posts comprising 25 of permanent Judges and 56 of Additional Judges. Therefore, it can be said that attempts have been made to remove one of the causes held responsible for accumulation of arrears. The sub-limb of the second cause found responsible for mounting backlog of cases is inordinate delay in filling in vacancies, coupled with unsatisfactory appointments. The Law Commission has exhaustively examined this aspect. Briefly, the recommendation is that a National Judicial Service Commission must be set up to expeditiously deal with the question of filling in the vacancies in the High Courts and the Supreme Court. Thus, a comprehensive methodology to remove the causes responsible for piling up of arrears has already been recommended and is awaiting implementation.

2.6. Therefore, it can be said that Law Commission has examined the problem of arrears from all possible angles and, while broadly retaining the structure of courts, has recommended comprehensive measures for tackling the problem of backlog of cases in High Courts and the Supreme Court. What remains now is the will to deal with the problem.

# CHAPTER III
## REMEDIAL MEASURES FOR THE PRINCIPAL INFIRMITIES

3.1. What paths are open to the judiciary during the interregnum till such time as the recommendations are implemented and its impact felt on the problem of backlog of cases in courts? A look at the mounting arrears is by itself frightening :

See Table in the adjoining pages.

Classification of Civil Cases pending in the High Courts as on 31-12-1985 in terms of period of pendency.

| Types or Cases. | Less than 1 year | 1 to 2 years | 2 to 3 years | 3 to 4 years | 4 to 5 years | 5 to 6 years | 6 to 7 years |
|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| **ORIGINAL SIDE** | | | | | | | |
| 1. Civil Suits . . . . | 6220 | 5158 | 4016 | 3433 | 2988 | 2398 | 2242 |
| 2. Testamentary & Intestate suits | 169 | 105 | 87 | 53 | 31 | 26 | 21 |
| 3. Insolvency cases . . | 231 | 106 | 61 | 48 | 14 | 15 | 1 |
| 4. Liquidation cases . . | 772 | 245 | 238 | 117 | 64 | 71 | 57 |
| 5. Chartered Accountant Act . | ... | ... | 3 | ... | ... | 2 | 3 |
| 6. Writ Petition | | | | | | | |
| (a) Service matters . . | 23235 | 17141 | 14262 | 10424 | 6473 | 4107 | 2218 |
| (b) Land Reforms including land ceilings | 8538 | 6280 | 6772 | 11797 | 4851 | 1690 | 1212 |
| (c) Labour laws . . | 4405 | 3829 | 3363 | 2037 | 1603 | 1770 | 330 |
| (d) Others . . . | 63642 | 44631 | 38801 | 32397 | 22667 | 15415 | 9035 |
| 6.(A) Banking Companies Act. . | 1 | ... | ... | ... | ... | ... | ... |
| 7. Company petitions and application | 3559 | 1431 | 2377 | 881 | 788 | 1262 | 363 |
| 8. Income-tax references and applications . | 5424 | 5068 | 3425 | 3984 | 3237 | 2658 | 2336 |
| 9. Sales-tax reference and applications | 1011 | 825 | 721 | 735 | 822 | 628 | 385 |
| 10. Other direct and indirect tax reference and applications | 1170 | 1045 | 949 | 709 | 323 | 392 | 352 |
| 11. Petition under Indian Arbitration Act. . | 1930 | 1041 | 668 | 440 | 564 | 278 | 373 |
| 12. Land Acquisition references . | 8 | 34 | 55 | 44 | 43 | 38 | 36 |
| 13. Matrimonial cases . . | 167 | 68 | 29 | 14 | 13 | 2 | 3 |
| 14. Election Petition . . | 296 | 61 | 33 | 3 | 1 | 18 | ... |
| 15. Other Petitions . . . | 39744 | 25651 | 13241 | 6671 | 3463 | 1695 | 899 |
| 16. TOTAL . . . . | 160012 | 112729 | 89101 | 73787 | 47952 | 31577 | 19993 |
| **APPELLATE SIDE** | | | | | | | |
| 17. Original side appeals . . | 1288 | 1198 | 1011 | 1028 | 670 | 456 | 340 |
| 18. Letter patent appeals . . | 2537 | 1309 | 1019 | 753 | 502 | 470 | 174 |
| 19. First appeals . . . | 14982 | 13292 | 11144 | 11217 | 8605 | 7913 | 5602 |
| 20. Second appeals . . . | 15456 | 12247 | 11075 | 11038 | 10294 | 8640 | 6492 |
| 21. Misc. First and Second appeals | 10702 | 8685 | 7005 | 5674 | 3973 | 2436 | 1653 |
| 22. Revision Petitions . . | 39632 | 32220 | 26065 | 18139 | 13252 | 10924 | 10372 |
| 23. Miscellaneous Petitions . | 73737 | 43016 | 27794 | 21467 | 9790 | 6096 | 2933 |
| 24. Others . . . . | 20561 | 12080 | 6157 | 4326 | 2390 | 1173 | 64 |
| 25. TOTAL . . . . | 178695 | 124047 | 91370 | 73542 | 49476 | 38108 | 28259 |
| 26. GRAND TOTAL (16+25) of Civil Cases . . . . | 335853 | 236776 | 180471 | 147329 | 97428 | 69685 | 48252 |

| Types of cases | 7 to 8 years | 8 to 9 years | 9 to 10 years | Over 10 years | Total |
|---|---|---|---|---|---|
| (1) | (9) | (10) | (11) | (12) | (13) |
| **ORIGINAL SIDE** | | | | | |
| 1. | 1524 | 1210 | 1034 | 4148 | 34371 |
| 2. | 9 | 5 | 3 | 3 | 512 |
| 3. | 3 | 6 | 2 | 15 | 502 |
| 4. | 75 | 1015 | 26 | 66 | 1746 |
| 5. | ... | 4 | 1 | 1 | 14 |
| 6. Writ Petition | | | | | |
| (a) | 850 | 425 | 249 | 177 | 79561 |
| (b) | 450 | 372 | 83 | 84 | 41732 |
| (c) | 180 | 179 | 82 | 78 | 16862 |
| (d) | 4605 | 2909 | 2706 | 4555 | 241363 |
| 6. (A) | ... | ... | ... | 3 | 4 |
| 7. | 174 | 81 | 62 | 115 | 11093 |
| 8. | 1495 | 1013 | 743 | 437 | 29847 |
| 9. | 115 | 54 | 72 | 31 | 5399 |
| 10. | 237 | 205 | 155 | 142 | 5681 |
| 11. | 321 | 295 | 292 | 317 | 6519 |
| 12. | 50 | 40 | 19 | 37 | 404 |
| 13. | 1 | 2 | ... | 5 | 304 |
| 14. | ... | ... | ... | ... | 412 |
| 15. Other Petitions | 532 | 464 | 414 | 441 | 90471 |
| 16. TOTAL | 10621 | 7279 | 5945 | 10655 | 569965[1] |
| **APPELLATE SIDE** | | | | | |
| 17. | 295 | 146 | 115 | 244 | 6791 |
| 18. | 122 | 81 | 51 | 166 | 7184 |
| 19. | 4543 | 3386 | 1964 | 5680 | 88418 |
| 20. | 5027 | 4188 | 3039 | 5461 | 92957 |
| 21. | 1368 | 696 | 457 | 1433 | 44082 |
| 22. | 2177 | 3036 | 2375 | 5173 | 163165 |
| 23. | 2131 | 1324 | 500 | 1113 | 189901 |
| 24. | 394 | 161 | 103 | 258 | 48206 |
| 25. TOTAL | 16057 | 13018 | 8604 | 19528 | 640704 |
| 26. GRAND TOTAL (16+25) of Civil Cases. | 26678 | 20297 | 14549 | 30183 | 1210355 |

SUPREME COURT OF INDIA

MONTHLY STATEMENT FOR THE MONTH OF SEPTEMBER, 1987

| Particulars | Pending last month | Instituted Rule granted during the month | Disposed of during the month | Pending at the end of the month |
|---|---|---|---|---|
| Regular Hearing matters . . . . | 37809 | 605 | 248 | 38166 |
| Admission & Misc. matters . . . | 126549 | 6180 | 3021 | 129708 |
| 'A' & 'B' Total . . . . . | 164358 | 6785 | 3269 | 167874 |

12

## SUPREME COURT OF INDIA

### MONTHLY STATEMENT FOR THE MONTH OF SEPTEMBER, 1987

For Ready 'R'  
For Not Ready 'NR'  
'G' For Granted.  
'D' For Dismissed.

| Particulars | Pending from Last month 'R'2 | 'NR' | Institut-ed Rule granted During the month 3 | G | D | Dispos-ed of during the month 4 | Pending CAVs at the end the month 'R'5 | 'NR' | 6 | Pending at the end 1982 (7) | 1983 (8) | 1984 (9) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **'A' REGULAR HEARING MATTERS:** | | | | | | | | | | | | |
| 1. Ordinary Civil Appeals | 5859 | 20441 | 481 | | | 141 | 5818 | 20822 | 246 | 12647 | 1565 | 18965 |
| 2. Constl. Civil Appeals | 340+447* | 303 | ... | | | ... | 340+447* | 303 | 239 | 427 | 46 | 549 |
| 3. Crl. Appeals | 2391 | 1736 | 75 | | | 11 | 2413 | 1778 | ... | 2021 | 251 | 2910 |
| 3. Art. 32 Petition Civil | 3606 | 2971 | 49 | | | 91 | 3640 | 2895 | 36 | 2050 | 413 | 5076 |
| 5. Art. 32 Petition Crl. | 95 | 67 | ... | | | 5 | 90 | 67 | 4 | 76 | 10 | 106 |
| **'A' TOTAL** | 12291 | 25518 | 605 | | | 248 | 12301 | 25865 | 525 | 17221 | 2286 | 27606 |
| **'B' ADMISSION MISC. MATTERS:** | | | | G | D | | | | | | | |
| 6. S.L.P. (Civil) | 33468 | 1070 | 1499 | 146 | 666 | 812 | 34132** | 1093 | ... | ... | ... | ... |
| 7. S.L.P. (Crl.) | 5349 | 550 | 303 | 53 | 142 | 195 | 5486 | 521 | ... | ... | ... | ... |
| 8. Art. 32 Petns. (Civil) | 4690 | 3047 | 151 | 49 | 139 | 188 | 4668 | 3032 | ... | ... | ... | ... |
| 9. Art. 32 Petns. Crl. | 664 | 20 | 99 | ... | 179 | 179 | 584 | 20 | ... | ... | ... | ... |
| 10. Civil Misc. Petns. | 73165 | ... | 3150 | ... | ... | 1357 | 74958 | ... | ... | ... | ... | ... |
| 11. Crl. Misc. Petns. | 4526 | ... | 978 | ... | ... | 290 | 5214 | ... | ... | ... | ... | ... |
| **'B' TOTAL** | 121862 | 4687 | 6180 | | | 3021 | 125042 | 4666 | ... | ... | ... | ... |
| **'A' & 'B'** | 134153 | 30205 | 6785 | | | 3269 | 137343 | 30531 | 525 | 17221 | 22868 | 27606 |

(*447 Appeals received on transfer from ordinary appeals side to be decided by Constitution Bench  
**Includes matters directed to be listed with some appeals or Writ Petitions or after their disposal and also includes matters wherein service of show-cause notice is not yet Complete).

13

STATEMENT AS ON 1ST OCTOBER, 1987
Non-Constitutional Matters (Consolidated Classified Statement)

| Year | Tax | | | Labour | | | Election | | | Others | | | Total | Criminal Appeals | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 1 | 2 | 3 | 1 | 2 | 3 | 1 | 2 | 3 | | 1 | 2 | 3 |
| 1969 | ... | ... | ... | ... | ... | ... | ... | ... | ... | 1 | ... | 1 | 1 | ... | ... | ... |
| 1970 | ... | ... | ... | ... | ... | ... | ... | ... | ... | 4 | 14 | 18 | 18 | ... | ... | ... |
| 1971 | ... | ... | ... | ... | ... | ... | ... | ... | ... | 15 | 18 | 33 | 33 | ... | ... | ... |
| 1972 | ... | ... | ... | ... | ... | ... | ... | ... | ... | 117 | 20 | 137 | 137 | ... | ... | ... |
| 1973 | 5 | 2 | 7 | 3 | 1 | 4 | ... | ... | ... | 143 | 79 | 222 | 233 | ... | ... | ... |
| 1974 | 25 | 9 | 34 | ... | 1 | 1 | ... | ... | ... | 358 | 86 | 444 | 479 | ... | ... | ... |
| 1975 | 215 | 59 | 274 | 2 | 4 | 6 | ... | ... | ... | 260 | 143 | 403 | 683 | 1 | 8 | 9 |
| 1976 | 209 | 74 | 283 | 5 | 1 | 6 | ... | ... | ... | 202 | 163 | 365 | 654 | 3 | 11 | 14 |
| 1977 | 109 | 379 | 488 | 24 | 8 | 32 | ... | ... | ... | 531 | 343 | 874 | 1394 | 8 | 11 | 19 |
| 1978 | 61 | 224 | 285 | 7 | 33 | 40 | ... | ... | ... | 225 | 346 | 571 | 896 | 96 | 12 | 103 |
| 1979 | 110 | 379 | 489 | 25 | 48 | 73 | ... | ... | ... | 367 | 748 | 1115 | 1677 | 411 | 21 | 432 |
| 1980 | 131 | 425 | 556 | 27 | 23 | 50 | ... | ... | ... | 453 | 845 | 1298 | 1904 | 474 | 36 | 510 |
| 1981 | 61 | 209 | 270 | 21 | 20 | 41 | ... | ... | ... | 500 | 1358 | 1858 | 2169 | 439 | 124 | 563 |
| 1982 | 21 | 420 | 441 | 41 | 23 | 64 | ... | ... | ... | 413 | 1451 | 1864 | 2369 | 271 | 95 | 366 |
| 1983 | 120 | 958 | 1078 | 4 | 80 | 84 | ... | 1 | 1 | 400 | 1448 | 1848 | 3011 | 331 | 158 | 489 |
| 1984 | 87 | 1249 | 1336 | 4 | 77 | 81 | 6 | 12 | 18 | 172 | 1700 | 1872 | 3307 | 220 | 180 | 400 |
| 1985 | 22 | 386 | 408 | 12 | 52 | 64 | 4 | 3 | 7 | 91 | 1794 | 1885 | 1364 | 84 | 485 | 569 |
| 1986 | 13 | 271 | 284 | 18 | 45 | 63 | 29 | 27 | 56 | 120 | 2536 | 2656 | 3059 | 68 | 315 | 383 |
| 1987 | ... | 128 | 128 | 5 | 76 | 81 | 2 | 24 | 26 | 18 | 1994 | 2017 | 2252 | 7 | 322 | 329 |
| TOTAL | 1189 | 5172 | 6361 | 198 | 492 | 690 | 41 | 67 | 108 | 4390 | 15091 | 19481 | 26640 | 2413 | 1778 | 41991 |
| C.A.V. | | 188 | | ... | 1 | ... | ... | ... | ... | ... | 57 | 246 | | ... | ... | ... |

14

CONSTITUTION MATTERS AS ON 1ST OCTOBER, 1987
(Consolidated classified Statement)

| Year | Tax | | | Service | | | Others | | | Total | Writ Petns(c) | | | @Writ Petns (Ctl.) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 1 | 2 | 3 | 1 | 2 | 3 | | 1 | 2 | 3 | 1 | 2 | 3 |
| 1968 | ... | ... | ... | ... | ... | ... | 2 | ... | 2 | 2 | ... | ... | ... | ... | ... | ... |
| 1969 | ... | ... | ... | ... | ... | ... | 1 | ... | 1 | 1+1 | ... | ... | ... | ... | ... | ... |
| 1970 | 2 | ... | 2 | ... | ... | ... | ... | ... | ... | 2+1 | ... | ... | ... | ... | ... | ... |
| 1971 | ... | ... | ... | 1 | ... | 1 | ... | ... | ... | 1+3 | 1 | 0 | 1 | ... | ... | ... |
| 1972 | 1 | ... | 1 | ... | ... | ... | ... | 1 | 1 | 2+8 | 20 | ... | 20 | ... | ... | ... |
| 1973 | 10 | ... | 10 | ... | ... | ... | 8 | ... | 8 | 18+3 | 16 | ... | 16 | ... | ... | ... |
| 1974 | 16 | ... | 16 | 2 | ... | 2 | 7 | ... | 7 | 25+1 | 16 | ... | 16 | ... | ... | ... |
| 1975 | 2 | ... | 2 | 3 | ... | 3 | 11 | 5 | 16 | 21+6 | 9 | ... | 9 | ... | ... | ... |
| 1976 | 2 | ... | 2 | ... | ... | ... | 8 | 3 | 11 | 13+1 | 2 | ... | 2 | ... | ... | ... |
| 1977 | ... | 1 | 1 | 3 | ... | 3 | 23 | 5 | 28 | 32+140 | 37 | 1 | 38 | ... | ... | ... |
| 1978 | ... | 1 | 1 | 3 | ... | 3 | 73 | 9 | 82 | 86 | 58 | 50 | 108 | ... | ... | ... |
| 1979 | ... | 24 | 24 | ... | 5 | 5 | 12 | 6 | 18 | 47+155 | 92 | 15 | 107 | ... | ... | ... |
| 1980 | 19 | 2 | 21 | ... | ... | ... | 40 | 30 | 70 | 91+71 | 179 | 151 | 330 | 2 | 1 | 3 |
| 1981 | 2 | 1 | 3 | 1 | 3 | 4 | 8 | 16 | 24 | 31+11 | 222 | 188 | 410 | 11 | 16 | 27 |
| 1982 | 6 | 17 | 23 | 1 | ... | 1 | 7 | 24 | 31 | 55+10 | 708 | 285 | 993 | 16 | 30 | 46 |
| 1983 | ... | 5 | 5 | ... | ... | ... | 6 | 24 | 30 | 35+1 | 1063 | 1025 | 2088 | 24 | ... | 24 |
| 1984 | ... | 1 | 1 | ... | ... | ... | 50 | 36 | 86 | 87+33 | 715 | 223 | 938 | 6 | 0 | 6 |
| 1985 | ... | ... | ... | ... | ... | ... | 2 | 11 | 13 | 13+1 | 389 | 690 | 1079 | 6 | 0 | 6 |
| 1986 | ... | ... | ... | ... | ... | ... | 8 | 4 | 12 | 12+1 | 83 | 109 | 197 | 25 | 20 | 45 |
| 1987 | ... | ... | ... | ... | ... | ... | ... | 69 | 69 | 69 | 25 | 158 | 183 | ... | ... | ... |
| TOTAL | 60 | 52 | 12 | 14 | 8 | 22 | 266 | 243 | 509 | 643+447* | 3640 | 2895 | 6535 | 90 | 67 | 151 |
| C.A.V. | ... | ... | ... | ... | ... | ... | ... | ... | ... | 239 | ... | ... | 36 | ... | ... | 4 |

(*447 Appeals rectified on transfer from ordinary appeal side to be decided by Constitution Bench which were not registered as Constitutional appeals, but were received on transfer as per such directions from time to time.)

15

The problem may appear insoluble. It would how- ever be an insult to human ingenuity to surrender to the problem. It must be tackled.

3.2. Recalling that the delay in filling in vacan- cies, both existing and those created by the upward revision of the strength, being largely responsible for piling up arrears, one specific suggestion can be made till such time as the National Judicial Service Com- mission is set up.

3.3. Vacancy occurs in a High Court on the eleva- tion of the High Court Judge to the Supreme Court or on retirement or death of a Judge in position. Death is such an uncertain event that one cannot foresee it and rationally deal with the situation on its occurrence. At any rate, the date of retirement of every Judge is presumably known from the day he takes oath of his office save and except in those rare cases where subsequent to the induction in the High Court the Judge raises a question about his birthday being recorded incorrectly. These are rarest of rare cases. Therefore, occurrence of a vacancy on account of retirement of a Judge of the High Court is known years in advance. It has been repeatedly re- commended that effective steps must be taken much in advance to fill in the incoming vacancies. The process of recommendation must start at least three to six months before the occurrence of the vacancy, which time will be spent in processing the proposal. Even if the schedule is adhered to, experience shows that rarely, if ever, a successor is appointed on the day on which a vacancy occurs. On an average, a period ranging from one to three years is spent in filling in the vacancies.[1] During this period, the Judge strength gets reduced, average disposal suffers and the arrears increase. To cite one case as of today, the High Court of Himachal Pradesh at Simla has a sanc- tioned strength of seven Judges and only three, includ- ing the Chief Justice, are in position. What sense it makes to sanction upward revision and not to fill in the vacancy? It becomes a paper exercise and the arrears merrily pile up. Tackling, therefore, the ques- tion of time spent in filling in the vacancies, it is now necessary to consider a radical suggestion.

3.4 Conceding that the Chief Justice of the High Court will start the process of recruitment by making necessary recommendation six months in advance of the occurrence of the vacancy, and yet if the vacancy is not filled in by the date on which it occurs, that is, the successor is not available to take oath on the day of retirement of the outgoing Judge, to retain the strength of the High Court at its sanctioned level, the retiring Judge shall continue to be in position till such time as the successor is appointed and is ready to be sworn in,

3.5. Can this be done without raising the retire- ment age of the retiring Judge? The answer is that it is possible to do so within the parameters of the Con- stitution without revising the age of retirement of High Court Judge. Article 224A of the Constitution provi- des that : 'Notwithstanding anything in this Chapter, the Chief Justice of a High Court for any State may

at any time, with the previous consent of the Presi- dent, request any person who has held the office of a Judge of that Court or of any other High Court to sit and act as a Judge of the High Court for that State, and every such person so requested shall, while so sitting and acting, be entitled to such allowances as the President may by order determine and have all the jurisdiction, powers and privileges of, but shall not otherwise be deemed to be, a Judge of that High Court'. Of course, this can only be done with his consent but ordinarily such consent will be forthcom- ing. The Judge concerned formally retires when he attains the age of 62 and without all the formality of going in for a fresh appointment, he may continue to be in position till his successor is appointed. Consent of the President in such a situation would be of a formal nature, especially because the Judge is a sitting Judge and is not subjected to a fresh selection. To put teeth into the recommended procedure, the Chief Justice shall move the concerned authority to obtain the consent of the President, six months before the date of the retirement of the Judge, which time would be more than sufficient to process the proposal and obtain the consent. President shall ordinarily grant the consent. The Judge strength would remain intact by this formula.

3.6. The Law Commission formulated a tentative proposal about the continuance of the retiring Judge in position as ad hoc Judge and requested the Chief Justice of India and the Chief Justice of each High Court to submit their critical response to the proposal after having deliberations with their colleagues.[2] The response has been highly encouraging. There is almost near unanimity amongst Chief Justices of various High Courts in support of this proposal.

3.7. It may be said that this is a very drastic, re- medy. The cancerous growth of arrears which has pro- ved intractable over years and has defied various peripheral suggestions has to be dealt with by a dras- tic remedy. But there is nothing to indicate that the remedy is drastic nor is it surgical in character. The remedy at best is a stop gap arrangement which would energise all concerned with appointments of High Court Judges' to expeditiously deal with the prob- lem. And after all, till the date of retirement, the Judge was certainly working as a Judge of the High Court and his continuance for a couple of months would not in any way diminish the value of High Court judge- ship or tarnish the image of the High Court.

3.8 A Chief Justice of a High Court had a reser- vation about this remedy. In his opinion, if the Judge is not physically fit, he should not be allowed to continue in position and that in this respect a fresh medical certificate be obtained about his health or a confidential opinion of the Chief Justice of the High Court concerned must be obtained before the Judge is allowed to continue in position. If the Judge is suf- fering from an impaired health, he himself would not like to continue because the High Court work is very burdensome and taxing. And he cannot be continued without his consent. Once the Chief Justice is allow- ed to interpose himself, even for this short continu- ance, all sorts of likes and dislikes will have a field

day and the remedy itself may become counter-productive. For every new suggestion, there will be an apprehension but the apprehension has to be curbed in the larger interest of making justice delivery system effective and result-oriented.

3.9. The second suggestion which also emanates from the indefensible failure on the appointment front may now be examined. Assuming that the first suggestion is literally carried out, its effect will be felt in future as the High Court in each State will ordinarily be working with its full sanctioned strength. Assuming that in the meantime all vacancies are filled in, the situation is so desperate that a justifiable apprehension is felt that even then, the improved situation may account for current institution and proportionate disposal so as not to permit further piling up of the arrears but it does not promise to reduce the existing arrears. And a delay of a day justifies that justice delayed is wholly denied. Therefore, an alternative has to be found to tackle the question of arrears without further augmenting the Judge strength.

3.10. Without meaning any disrespect, it can be said with confidence that even if the Judge strength is augmented in the High Court, the new inductee is bound to take some time to settle down to the rigors and routine of High Court work and to make his presence felt by expeditiously dealing with matters coming before him. One has, therefore, to think of utilising a pool of tried talent without exposing the depleted resources of State to further strain.

3.11. The principal Bench of the High Court is generally located in the capital city save and except cases like Rajasthan where the principal seat of High Court is at Jodhpur while Jaipur is the capital. There is still one more peculiar case where the capital does not have a Bench of the High Court to wit, Bhopal in Madhya Pradesh. But save these two exceptional cases, generally the principal seat of the High Court is located in the capital city. The seat of the Supreme Court is located in the Capital of India. The constitutional provision is that the Supreme Court shall sit in Delhi or in such other place or places, as the Chief Justice of India may, with the approval of the President, from time to time, appoint.¹ At present, the Supreme Court sits in Delhi and even though feelers were sent, no attempt is made to provide a Bench of the Supreme Court in any other part of the country.

3.12. The Judges of the High Court, save with rare exemption are recruited from the members of the Bar practising in the High Court or the subordinate judiciary of the High Court in each State. On retirement from the High Court, the Judges recruited from the members of the Bar ordinarily settle down in the city in which the principal seat of the High Court is located. Even those elevated to the Bench from the subordinate judiciary tend to settle down in the city in which the principal seat of the High Court is located. The retired Judges, who settle down in the city in which the High Court is having its principal seat, have made their own arrangements for their residence, and have generally also made their own arrangements

for transport and telephone. Undoubtedly, few High Court Judges, after retirement from the High Court, sent to Delhi to practice in the Supreme Court. But they form a small percentage of the Judges retired from the High Court year after year.

3.13. These retired Judges are experienced people, having spent a major part of their life in adjudication work. They have decided causes and controversies coming before them. They have collected a rich experience of decision-making process. They are well versed in the art of adjudication. They are fully conversant with court processes. They have acquired a certain expertise in dealing with matters, civil, criminal, tax, labour and constitutional coming before them. In short, they represent a rich pool of talent. On retirement by superannuation, while some of them may enter the field of private practice, such as, private arbitrator or giving opinions, most of them languish without work and their rich experience is lost to the society. A country like India can ill afford to waste its talent. How do we utilise the rich experience of these senior citizens ?

3.14. As stated earlier, in order to annihilate the monster of backlog, a multipronged attack is indispensable. Constitution makers had the vision to foresee that a situation may develop where the talent of retired Judges will have to be enlisted and, therfore, they had made ample provision in this behalf. Article 224A of the Constitution provides that notwithstanding anything in Chapter V, Part VI, of the Constitution, the Chief Justice of a High Court for any State may at any time, with the previous consent of the President, request any person who has held the office of a Judge of that High Court, to sit and act as a Judge of the High Court for that State, and every such person so requested shall, while so sitting and acting, be entitled to such allowances as the President may by order determine and have all the jurisdiction, powers and privileges of but shall not otherwise be deemed to be, a Judge of that High Court There is a proviso which says that this power could only be exercised with the consent of the person concerned. Rarely, if ever, this power is invoked.

3.15. Now in every High Court, as per the Table set out earlier there are numerous cases more than five years old. Some of them may have become obsolete; some of them may have become irrelevant; some may have as well abated and there may be some in which the parties have lost litigating interest sheer on account of delay in disposal of cases. Undoubtedly, there may be many in which the matter had to be adjudicated upon and judgment delivered.

3.16. Most of the High Courts have their own buildings, except a State like Gujarat where the High Court is located in children's hospital. But that again is an exception. The sitting time in the High Court varies from 10 A.M. to 4 P.M. such as in Himachal Pradesh to 11 A.M. to 4.45 P.M. In Gujarat and Maharashtra. Others have their local adjustments as per their requirements. High Court buildings are generally huge, well-furnished and having a modern

library The use of the High Court building say between 10 A.M. and 4.45 P.M., definitely reveals under-utilisation of space accommodation and facility. Now if we combine these two things, namely, non-utilisation of the pool of talent represented by retired Judges of the High Court and under-utilization of the capital equipment like buildings, furniture and library, the solution manifests by itself. A developing country like India must fully utilize its resources both as to capital expenditure and talent. The choice is accordingly dictated.

3.17 The High Courts generally work for five hours with lunch hour varying from 45 minutes to 1 hour. It is felt that this lunch hour is unusually long in duration. A break of 30 minutes would be sufficient for resuscitating the retired nerves. Again, the working hours from 11 to 5 with variations are inconvenient in the sense that neither much work can be done at home in the morning nor much work can be attended to in the evening for want of staffing facilities. It is not for a moment suggested that the shift system of the industry is being imported into the working of a dignified institution like the High Court Judges and lawyers enriched by professional expertise. However, under-utilization of capital assets, coupled with non-utilization of experienced talent pool, results in national wastage. Accordingly, it is time to have a second look at both the situations.

3.18 As pointed out a little while earlier, Judges retiring from the High Court generally settle down where the principal seat of the High Court is located or if recruited from the Bar attached to places where the Benches are set up, they settle down on retirement in the same place. It is, therefore, justifiable to assume that at every place where there is a seat of High Court, principal as well as seat for the Bench, there is available a pool of talent represented by retired Judges well-versed in the art of adjudication and conversant with justicing process. It is, therefore, depending upon the requirements, necessary to recall these retired Judges to offer their services to the society, which gave them the status, position and dignity in life, as High Court Judges. Depending upon the availability of retired Judges who settled down where the High Court has its principal seat or where its Bench is functioning, the Chief Justice should enlist the services of retired Judges for setting up Benches composed of two Judges to do civil, criminal and miscellaneous work in the morning. The Benches of retired Judges may start functioning at about 8.30 A.M. and work up to 12 or 12.30 noon. The High Court Judges will assemble from 12 or 12.30 noon, as the case may be, and work up to 5.30, claiming their half an hour lunch hour. This will have a double advantage, firstly, of utilising the unutilized capacity of the buildings, centralised offices, and facilities, including library, as also utilizing the rich talent pool represented by retired Judges. Its second advantage would be that these retired Judges would be quick in disposal of the work on account of the rich experience and expertise in justicing processes. Simultaneously, they would not be burdened with any administrative or admission work which would permit them to devote their full-time to the hearing of old matters. No doubt staff strength will have to be augmented proportionate to the number of

Judges who would work as ad hoc Judges, such as, court masters, stenographers, clerks and class IV staff.

3.19. The Chief Justice, depending upon the pendency of old matters, should draw a line of the base year and then direct that all matters pending up to the base year and admitted before the base year should be exclusively assigned to the retired Judges. Where the Bench is of two Judges, the burden of writing judgements will be equitably distributed. These retired Judges will have whole of afternoon to their credit so that they do not suffer any excessive load. Correspondingly, the sitting Judges will have the whole of morning to their credit to write their judgements, to dispose of their administrative work and even to read the matters in the evening after returning home. The Law Commission is confident that this recommendation, if carried out, would make a deep dent into the arrears because 3 to 4 Benches will simultaneously deal with old matters only.

3.20. Whenever a suggestion is made that Judge strength should be revised upward and more Judges should be appointed, simultaneously the question of capital expenditure arises. A point would be made that existing building facility is insufficient, house accommodation for Judges is not available in big cities like Bombay, Calcutta, Madras, Hyderabad, Ahmedabad and such other places. New cars have to be bought by the High Court to provide transport facilities. New furniture, furnishings, typewriters and other things will have to be purchased and the cost of capital expenditure would outweigh the benefits flowing from the suggestion. The approach herein indicated and the recommendation made in the preceding paragraph takes care of saving on capital expenditure. The same building will be utilized in which the High Court at present sits. Judges who have retired have made their own transport arrangements. So no new cars will be required to be purchased for them. They have their houses, their telephones and such other things which they need for the purpose of working as Judges. The library facilities will be available to them. So, there will be a negligible increase in capital expenditure.

3.21. It is, however, a moot question whether the present approach, both of the Government of India and the State Governments, in the matter of re-employment of anyone who has retired works as a disincentive. All such re-employed persons will be offered last pay minus pension, even deducting unjustly, unfairly and illegally, the pension equivalent to gratuity which they had already earned by rendering service for such long period as entitled them to their retiral benefit. Therefore, a review of the conditions on re-employment is of urgent necessity. Article 224A itself provides a further disincentive. It says that a retired Judge, when recalled to act as a Judge, would be entitled to such allowances as the President may by order determine. Translated into action, this power is utilised to make payment as if he is a daily wages, meaning thereby that he does not get, unlike an industrial worker, paid holiday. Apart from being a disincentive, the Law Commission thinks that the approach is insulting. How then do we go about it ?

19

3.22. The first suggestion in this behalf is that the retired Judges should be paid the salary drawn by sitting Judges without deducting pension or gratuity, miscalled equivalent of pension. By salary is meant pay and dearness allowance, if any, but would not include car allowance, sumptuary allowance, *et el.* The approach of the retiree, which this Law Commission has come across, revealed that the retiree has earned his pension. If he has to work during the fall of his life, there must be some incentive. This reservation can be removed by paying him full salary without deducting pension or pension equivalent to gratuity.

3.23. Let it not be said that something very revolutionary is suggested by recommending payment of full salary to a retired Judge without deducting pension or pension equivalent to gratuity. In the State of Gujarat, there are a number of posts manned by retired Judges, *to wit,* the Courts of Industrial Arbitration, Arbitrators and Registrar's nominees under the local Cooperative Societies' Act and other comparable posts. Usually, the retired Judges are appointed to man these posts. Retired Judges are also appointed to various tribunals, such as, Sales Tax Tribunal, Revenue Tribunal, State Service Tribunal and other such comparable posts. They are all paid the last salary without deducting pension. Therefore, the Law Commission is of the opinion that the retired Judges who are called upon to render duty in public and national interest should be paid the salary drawn by sitting Judge as explained herein without deducting pension or pension equivalent to gratuity.

3.24. In order to elicit the reaction of the Chief Justices to the tentative thinking of the Law Commission, a letter was addressed to Chief Justice of each High Court and to the Chief Justice of India (*See Appendix II and III*) inviting them to critically respond to the tentative thinking of the High Court comprising the recommendations herein made after consulting their colleagues.

3.25. One of the Chief Justices, subject to his reservation, was in favour of this tentative thinking of the Law Commission. He said that it must be left to the Chief Justice of the High Court to decide who amongst the retired Judges should be recalled and which Judge should be allowed to continue in the absence of his successor being appointed beyond his date of retirement. Undoubtedly, article 224A confers power on the Chief Justice of the High Court, with the previous consent of the President, to request a retired Judge to act as a Judge of the High Court. Therefore, the intervention of the Chief Justice in selecting a retired Judge, to be recalled with a request to work as a Judge, is implicit in article 224A. However, in the matter of continuance beyond the date of retirement till the incumbent steps in, the Law Commission is of the opinion that the Chief Justice should ordinarily consent to his continuance. Once a provision is made that a retiring Judge will continue till his successor is appointed, it is hoped that, by itself would be an incentive to fill in the vacancies expeditiously and if simultaneously the new forum for recruiting Judges of the High Court and the Supreme Court, as recommended by the Law Commission, is set up, it can be legitimately hoped that the stopgap arrangement would be of a shorter duration and, therefore, the Chief Justice should not come in the way of the continuance of a retiring Judge till the successor is appointed. He may process the proposal expeditiously so that the continuance may not be for a long period.

3.26. Some of the Chief Justices who have responded to the letter dated January 20, 1988 (Appendix III) have by and large supported the thinking of the Law Commission. Others, it can be safely assumed that if they believed that the proposal is neither feasible nor workable nor in the interest of Judiciary, would have certainly responded setting out their views. In the absence of any specific response, it is safe to conclude that by and large their thinking is in accord with the proposal of the Law Commission.

# CHAPTER IV

## SUGGESTIONS IN UNEXPLORED REGION

4.1. Numerous suggestions in the past have been made by Commission and Committees to tackle the problem of arrears in the High Courts. They have been tabulated as set out in Appendix I. Unless departed from by the suggestion running counter to the one already made or where the suggestion herein made and one on the same subject in the past cannot coexist, all the earlier suggestions are not departed from in this report. They may be dealt with with a view to exploring the possibility of remedying the situation as it existed till 1979. However, where the recommendations|suggestions made in this report run counter to the one already made, the Commission suggests that the recommendation herein made should be implemented as the earlier ones have hardly helped in solving the problem. The Law Commission when it submitted its report in 1979, itself was sceptic of the outcome if the recommendations made were implemented for solving the problem of arrears for all times to come. The Commission frankly stated that it has no illusion and would prefer to be little sceptic till the implementation of the recommendations. According to it, 'The search for a permanent solution to the problem would be futile. In human history, in the long run, there are no solutions—only problems. The search for a solution must, therefore, be a continuous process. It is a quest, not a discovery'.[1] The present report is one more dip in the bottomless pit of arrears.

4.2. Conceding that numerous suggestions have been made in the past, there is hardly an area where a fresh approach can be introduced. However, the experience of the working of the High Courts reveals grey areas where a fresh approach may be effective. These may be said to be unexplored areas which may now be explored.

4.3. One of the fundamental assumptions on which the internal management of the High Courts rests is that the court management is the exclusive responsibility of the Judges and the focal point of power is the Chief Justice.[2] He fixes Benches, appoints staff, regulates the assignment of work, deals with seniority and promotion of the staff of the High Court and corresponds on behalf of the High Court with other governmental agencies. In short, he is the centre of power on the managerial side of the High Court. Undoubtedly, every Chief Justice requests some Judges to help him in administration while dealing with the subordinate courts. But that is a matter of his discretion. If he finds time and has energy enough to deal with the problem, he is not under any legal or constitutional obligation to

seek the assistance of his colleagues to work as administrative Judges except where the Constitution provides for consultation with the High Court.[3]

4.4 The other important limb of the administration of justice is the legal profession. In an adversorial system, the legal profession has a vital role to play in the administration of justice. And the administration of justice, to be effective, must be so organised as to cast a responsibility on both the limbs, namely, the Judges and the legal profession. In short, High Court management should be regarded as a joint responsibility. Administration of the court system is increasingly perceived as partnership between administrators which, in Indian condition, would be Judges and the legal profession.

4.5. In justification of the suggestion, some recent events may be noticed. There is a recurrent phenomenon of strike by the legal profession paralysing the court work, heaping insufferable hardship on the litigating public. It appears as if the two limbs concerned with the administration of justice in an adversorial system have not only ceased to be partners sharing any joint responsibility or a common concern but they have almost developed a confrontation. Something somewhere happens in this vast sub-continent and the lawyers resort to strike paralysing the work in the courts and the grievance for which the strike is resorted to is not remediable by the institution of court which necessarily includes Judges. There is no fora for joint deliberations for tackling problems arising in the administration of the court system where a dialogue may help in resolving the problems which would smoothen the working in the court. The institution of courts is neither for the Judges nor the legal profession but for the litigating public who seek resolution of their disputes through the court system. Judges and members of the legal profession are to assist in resolution of disputes for the orderly development of society. If these vital and inseparable limbs of administration of court system stand in confrontation with each other, the system comes to a standstill. It is conceded that where grey areas of disputes are likely to arise by partners working for the realisation of a common aim, a deliberative body must be set up for providing a fora for meeting, appreciating each other's point of view and arriving at consensus so as to avoid conflict and confrontation. This is vitally needed in India today when withdrawal by the members of the legal profession from court work by resorting to strike even without prior notice, picketing with a view to prohibiting dissenting

members from entering courts, obstructing secret ballot to decide whether to continue the boycott of courts or otherwise and a vocal minority imposing its decision on silent and suffering majority has become recurrent.

4.6. Very recently, in New Zealand, following a unanimous recommendation of the Judges of the High Court, there has recently been established a Courts Consultative Committee, chaired by the Chief Justice and comprising Judges, Law Society nominees, officers of the Justice Department, the Solicitor General and lay representation.

4.7. Accordingly, every High Court will set up Courts Consultative Committee to be chaired by the Chief Justice of the High Court and comprising three seniormost Judges where the Judge strength of the High Court exceeds ten and in other cases Chief Justice and the next seniormost Judge, Advocate General, the Minister of Justice by whatever name called of the State Government, the President and Secretary of the High Court Bar Association, a nominee of the Bar Council of the State from amongst the members of the State Bar Council and three representatives of litigating public to be nominated by the Chief Justice of the High Court. All problems save and except those concerned with the appointment of Judges and arising in the administration of court system may be brought before this Committee which would try to resolve the same.

4.8. The membership of the Committee should be for a period of three years. The meeting of the Committee may be convened by the Chief Justice; but on the request of any two members of the Committee, it shall be convened within a period of one week from the date of the receipt of the request.

4.9. Minutes of the deliberations of the Committee may be maintained by the Registrar of the High Court who will be the convenor of the Committee. All the decisions shall be taken by the democratic process, meaning thereby, by majority of the members present and voting but attempt should always be to arrive at a consensus.

4.10. Such a Committee should as well be appointed at the Supreme Court level with this difference that instead of nominee of the Bar Council of the State, there shall be a nominee of the Bar Council of India and, instead of the Minister of Justice of the State, the Minister of Justice of the Government of India, and instead of Advocate General of the State, the Attorney General would be the member.

4.11. The Law Commission is of the firm opinion that this partnership principle of sharing joint responsibility would be practicable and feasible and would have the inbuilt potentiality to avoid friction and confrontation.

4.12. One of ugliest features of the procedure for hearing of matters in the High Courts and the Supreme Court is a reverential regard for oral arguments. The Law Commission, after having recalled that the oral arguments in the Supreme Court of the United States are rigidly limited in duration, usually not extending beyond half an hour, a note was taken of the fact that even though no written briefs are presented before the House of Lords in advance, oral arguments hardly last an average of 3 days and occasionally up to 20 days and is a primary external influence on the court's conclusion. The Commission ultimately recommended that a system of a concise note of arguments be presented by the parties in advance before the commencement of oral arguments and oral arguments should, unless otherwise permitted by the court, be confined to the propositions that are set out in the note which note must be exchanged by the opposing counsel at least one week before the commencement of the oral arguments. The Commission expressed its aversion to putting a time limit on oral arguments.

4.13. The Seventy-ninth Report was published in 1979. To evaluate the effectiveness of the approach therein delineated, it would be advantageous to refer to two cases prior to 1979 and, thereafter to cull out the recommendation and evaluate its effect, to refer to two cases subsequent to 1979.

4.14. The Government of India issued an Ordinance, called The Banking Companies (Acquisition and Transfer of Undertakings) Ordinance, 1969, which was promulgated on July 19, 1969. The Ordinance was replaced by an Act, styled as The Banking Companies (Acquisition and Transfer of Undertakings) Act, 1969. One R.C. Cooper challenged the constitutional validity of the Ordinance and the Act before a Bench of 11 Judges. The hearing lasted for 37 days. The hearing commenced on July 22, 1969, and ended on January 7, 1970. At the relevant time, the Judge strength of the Supreme Court was 12, including the Chief Justice of India.

4.15. One Kesavananda Bharati challenged the constitutional validity of 24th, 25th and 29th Amendments of the Constitution. A Bench of 13 Judges, including the Chief Justice, heard the case. At the relevant time, the Judge strength of the Supreme Court was 14, including the Chief Justice, but two Justices, Mr. Justice C.A. Vaidialingam and Mr. Justice I.D. Dua, were appointed as ad hoc Judges. The hearing commenced on October 31, 1972, and ended on March 23, 1973. The hearing lasted for 68 days. The judgment was pronounced on April 24, 1973, and on the next day, Chief Justice Sikri retired.

4.16. Looking to the Judge strength, during the period the aforementioned two cases were heard, no other work save routine admissions could be taken by the court. At any rate, not a single final hearing matter could be attended to. These incontrovertible glaring facts were before the Commission when it opined that curtailment of oral arguments cannot be countenanced.

4.17. Subsequent to the report and after its obser- vations and recommendations were published which, among other things, included exchange of notes of arguments in advance and precise adherence to the points' raised in the notes, two more cases came to be argued before the Supreme Court of India. One A. K. Roy, a Marxist member of the Parliament, who was detained under National Security Ordinance of 1980, questioned the constitutional validity of the Ordinance as also the subsequent Act replacing the Ordinance.[19] The hearing in the case commenced before a Bench of five Judges on 9th December, 1980, and ended on 30th April, 1981. The Court was closed for summer vacation from the end of first week of May, 1981 to third week of July 1981. On the reopening of the court, a 7-Judge Bench commenced hearing in S. P. Gupta vs. Union of India questioning the constitutional validity of a circular letter issued by the then Minis- ter of Law and Justice on March 18, 1981.[31] Another batch of petitions involving the transfer of Mr. Justice K. B. N. Singh from Patna to Madras was heard along with this petition. A third petition by one Mr. S. N. Kumar, questioning the failure of the Government to renew his term as Additional Judge, was also heard along with this petition. Hearing of the batch of petitions commenced on 4th August, 1981, and lasted till about the 16th November, 1981, when the Judges composing the Bench had to stop sitting in the Court to prepare their judgments as one of the Judges composing the Bench was about to retire on the 1st Jan., 1982. Four Judges were com- mon to both the Benches. The net result is that the four Justices who participated in two cases spent the whole year in hearing two cases only and oral argu- ments in both the cases were unending. This is the aftermath of the view of the Law Commission for not curtailing oral arguments.

4.18. Every suggestion for curbing the tendency of long winding oral arguments has in fact produced the exactly opposite effect. Courts's failure to curb it acquired high visibility. Consequently, the Law Com- mission, examining the functioning of the Supreme Court, focussed its attention on the question of oral and written arguments in the higher courts. It issued a questionnaire and submitted a report on April 26, 1984.[12] *It posed to itself the following three questions:*

"Will it facilitate disposal of a greater number of cases if oral arguments are restricted to half an hour on each side ?

Will the procedural requirement making it obligatory on counsel to file written briefs, cut down oral arguments ?

Should some appeals be disposed of without hearing oral arguments ?"

In its recommendation, it was observed that 'the matter may be left to the good sense of the Judge who can, after consulting counsel, fix time before- hand keeping in mind the nature of the case and the issues to be argued'.[13] It also declined to recom- mend introducing 'a compulsory requirement of filing written arguments in all cases at least for the present'. The situation remained as it was prior to the report;

and the situation is going out of hand. Therefore, it is time to seriously review the primacy accorded to oral arguments in hearing of cases in Supreme Court and High Courts.

4.19. There is a second ugly feature of the unend- ing oral arguments. It is universally known that counsel charges daily fees for appearance in the court. The cost of litigation mounts in direct propor- tion to the length of oral arguments. It is not for a moment suggested that counsel deliberately indulges into long, winding, unending oral arguments for the graph of daily fees to rise. But it cannot be ignor- ed that oral arguments directly contribute to the mounting cost of litigation and the daily fees have reached astronomical figures evidenced from the whispers in the corridors of profession.

4.20. If one combines the fall out of oral argu- ments, namely, criminal waste of court's time and mounting cost of litigation, howsoever reverential an approach one may have to the oral arguments in Indian system of administration of justice, it is time to curb and control the length of oral arguments. It would be difficult to totally dispense with the same forthwith. A rational approach will permit effective curtailment of oral arguments. It will have the add- ed advantage of accuracy and precision in making submissions.

4.21. It is, therefore, recommended that written submissions, including the case law to be relied upon, must be submitted to the court within four weeks from the date the service is effected on the respon- dent and he has entered appearance. The respon- dent shall submit his written submissions within four weeks from the date of the receipt of the submissions of the appellant/petitioner. A rejoinder must also be filed within two weeks thereafter. The case will then be treated as ready for hearing. The written briefs must be circulated to the members constituting the Bench. They will specify the time allocated to each side in advance. No case should be heard maximum for full working hours in one day. This will effectively reduce the length of oral arguments and considerably save the time of the court so as to make it available for attending to larger number of cases.

4.22. There is a third limb of this fancy for oral arguments and that is citing of as many authorities as may possibly be available, applicability or other- wise notwithstanding. Article 141 of the Constitution provides that the law declared by the Supreme Court shall be binding on all courts within the territory of India. Consequently, every order of the Court even if not laying down any law is reported in the law re- ports. To illustrate, one K. Duraiswamy,[14] who was cconvicated by the trail court for having committed offences under sections 451, 380, 201 and 149 of the Indian Penal Code and was sentenced to suffer R. I. for one year on each count, which conviction and sentence were confirmed by the High Court, filed a petition for special leave to the Supreme Court under article 136 of the Constitution. It appears that spe- cial leave was granted confined to the question of sentence only. After hearing, the court noted in an order running into 14 lines that there is some room for reduction in the sentence of the appellant. After

noting the fact that 'the appellant was a Government servant who would lose his service on account of his conviction as also his pensionary benefits', the sentence was reduced to sentence undergone, which was about 3 months and imposed a fine of Rs. 500. Without meaning any disrespect to the court, no question of law was involved in the appeal. Sentence is a matter left to the discretion of the trial court. Discretionary order can be interfered with if found to be manifestly perverse. No such finding is recorded. It is not for a moment questioned whether the court had power to do it or not. But once the decision is reported—for what useful purpose, it is difficult to ascertain—the same will be relied upon in another case where the prayer is for reduction of sentence only. While discussing this aspect with a senior Judge of a High Court, it transpired that a sentence of R. I. for three years imposed by the trial court and confirmed by the High Court was reduced to two years and six months by the Supreme Court. The disposal of the case in this manner at any rate does not lay down any law. However, it is reported in the law reports. It permits multiplication of authorities at a later date. The more the institution grows older, there will be more and more decisions and the tendency to multiply them at the time of arguments would become irresistible. And in the oral arguments, when precedents are relied upon, the headnotes are read, the relevant paragraphs are read, and it becomes an unending process. Therefore, the second ugly feature of the oral arguments deserves to be circumscribed. It can be done by insisting upon the list of precedents being submitted, with the paragraphs relied upon, in advance to the court and any reference to it in the oral arguments must be wholly avoided. The court should not permit it.

4.23. The combined effect of the recommendations herein made with reference to oral arguments would considerably save the Court's time and would reduce the length of hearing to minimum sparing the Court's valuable time for handling more cases.

4.24. Scrupulously avoiding any repetition about any of the recommendations made in the past relevant to the topic of this report, it may be mentioned that certain suggestions recently examined by various professional bodies relevant to reducing the backlog have already been dealt with by the Law Commission since it started tackling the question of judicial reforms. A belief is gaining ground that some programme for skills development in decision-making process is desirable. Australia has set up Australian Institute of Judical Administration. New Zealand has been granted facility to take part in the activities of the Institute. The Judges of a generalist court like a High Court are constantly required to deal with issues arising out of subject matter of which they have had little past experience because it did not form part of their own spheres of practice or simply did not exist when they were at the Bar. The criticality of the situation will stare into the face when one recalls that specialisation in the Bar is an accepted reality. Such specialists, when selected from the Bar to man judicial assignments, would definitely need training in subject matter ouside their specialisation. This is, however, taken care of by recommending an academy for training of Judges

and refresher courses and any further discussion is accordingly avoided here.[15]

4.25. Ther law, as it stands today, does not confer power on the court to compel parties either to go for arbitration or mediation. It can only be done with the consent of parties. One of the two parties is always interested in delaying the matter. To further delay the matter, there is a tendency to examine withnesses who are hardly necessary. The court cannot stop it unless it is prepared to record a reasoned order that the party is guilty of vexatious approach. If the court can force parties to go to mediation or compulsory arbitration, one who is interested in delaying the matter by such tactics would be heaped with a heavy bill of costs. The wastage of court's time is not reflected in the bill of costs prepared in the courts. But if the matter is before a mediator or an arbitrator who will be paid according to his time, he will also assess who is responsible for prolixity in disposal of case and award costs accordingly. It is, therefore, necessary to arm High Courts and Supreme Court with power to compel parties to go for mediation or arbitration.

4.26 Order 41, rule 1, Code of Civil Procedure, 1908, makes it obligatory for a litigant preferring an appeal against the judgment adverse to him to annex a copy of the decree appealed from (unless appellate court dispenses therewith) and the judgment on which it is founded. The period of limitation within which the appeal is to be preferred gets extended to the extent of the time lag between the date the copy of the decree is applied for and is made ready. Occasionally the delay is of such a long duration that the time to prefer appeals gets multiplied twice, thrice or, in rare cases, even ten times. Experience shows that the copy of the decree is hardly relevant or necessary or even looked into for the purpose of deciding whether the appeal should or should not be admitted under Order 41, rule 11. In the past, the Commission and Committees dealing with the Code of Civil Procedure and the procedure for hearing appeals in the High Courts have not chosen to do away with the provision requiring annexing of copy of decree to memo of appeal which has become anachronistic and is of doubtful utility. The Law Commission is of the opinion that Order 41, rule 1, should be so amended to read that annexing a certified copy of the decree to memorandum of appeal is not at all obligatory and the appeal can be filed by producing the operative part of the judgment accompanying the memo of appeal.

4.27. In the olden times when the litigation proceeded at a leisurely pace, it was assumed that ordinarily the matter in the High Court should be heard by a Division Bench consisting of at least two Judges. This approach was dictated by the fact that till the Supreme Court of India was set up on the advent of the Constitution, appeal against the decision of the High Court lay to the Privy Council and that was beyond the reach of 90 per cent of litigants coming to the High Courts. To avoid, therefore, any possibility of human error, it was assumed that two minds are better that one. The situation has undergone a radical change. Now that the Supreme Court is

here, anyone feeling aggrieved by the judgment of High Court has an opportunity to approach the Supreme Court under article 136 of the Constitution. The Division Bench hearing is a luxury which can be ill-afforded for the reasons that follow. While on the civil side, district judge alone hears an appeal or a subordinate judge alone tries a suit of any pecuniary value, time of two judges of the High Court is spent in dealing with the same matter. The Calcutta High Court which is the second best in matters of arrears still enjoys the luxury of hearing civil revision application by a Division Bench. On the criminal side, the magistrate alone tries the criminal case, so also the Sessions Judge. But the moment conviction results in a sentence of three years and upwards in some High Courts or seven years and upwards in some other High Courts or ten years and upwards in still some other High Courts, the appeal is required to be heard by a Division Bench. It is now time to do away with this luxury. Having regard to the present situation, every matter in the High Court shall be heard by a single Judge except where the statute provides to the contrary. It is, therefore, recommended that the rules of the High Court with regard to strength of Benches relevant to the nature of the matter should be amended to provide for hearing by a single Judge every matter that comes to the High Court except where the statute provides to the contrary.

4.28. There was a suggestion for pre-trial procedures, an aspect which the Law Commission proposes to examine while dealing with urban litigation. To avoid duplication, it is not dealt with here.

4.29. To conclude, the Law Commission would merely take note of a new thinking but for experimentation. A question is being posed : 'Should the courts struggle, as it were, to retain civil work ?' Slowly a thinking is developing that private parties having civil disputes must choose their own forum for resolution of disputes outside State courts. The Court system must be available where public law is violated and the society is likely to suffer by the violation. Today, maximum private disputes have clogged the courts' dockets from the lowest to the highest. This is too radical an approach for which we have not attained maturity. One can rest content with the answer given to the question hereinabove posed by Mr. Justice Eichelbaum of the High Court of New Zealand. It may be extracted:

"Any democracy worthy of the name must provide adequate means of dispute resolution. And while we have all become accustomed to think of the Westminster model as the ideal form of machinery, as Lord Devlin said in **The Judge**, the obligation of the State is to provide as many modes of trial as are necessary to cover the variety of disputes that may commonly arise, so that for each type there is available a process that will offer a reasonable standard of justice at reasonable cost. The precept of equal justice under the law for all, cannot be taken literally. what then may be the preferred modes of the future ? One might develop small claims tribunals so as to enable them to deal with the majority of disputes between individuals; dispose of matrimonial litigation of most kinds administratively; recognise a good deal of work currently performed through the court system for the administrative regime it is, and extract it for processing elsewhere. Major commercial litigants could be encouraged to resort to arbitration, with wider use of court-appointed arbitrators : that suggestion seems in harmony with the recent establishment of specialised centres for dispute resolution in Victoria and New South Wales. The court system proper would be left with a smaller proportion of civil work, including, however, the still burgeoning field of administrative law.

Proposals of this kind have dangers as well as attractions. Speedy, inexpensive, informal adjudication does not always equate to justice. No doubt it will generally be fair, at least in the palm tree sense; but lay adjudicators may substitute idiosyncratic notions of fairness for justice according to law. Is that a bad thing ? One might argue that the result will equate with the law where the latter is fair; where the law does not meet current standards of fair play no harm is done by departing from it. But who then determines the law ? What of the judicial oath to do right after the law and usages of the particular counrty ?".

# CHAPTER V

## COMPUTER TECHNOLOGY

5.1 While the World and the country is fast moving to the 21 century, computers have invaded all fields of activity, modern technological advances have radically altered the working in offices and new gadgets are available for facilitating the mode and method of work, unfortunately the judiciary has remained far outside the mainstream of life. The High Courts, what to say of subordinate courts, have still typewriters of the Nineteenth Century vintage. Photocopiers are not known to most of the High Courts. Telex availability is nowhere near the scene. Computer has not even entered the Supreme Court. Only some word processors have recently been put into use. Electric and electronic typewriters are luxuries, still beyond the reach of judicial branch. Accounting is done by manual accounting process. Copies are prepared by beating away at typewriters, the product being more undecipherable than the original. Teleprinters with a court circuit is unknown to the judiciary. Even dicta phones have not made their appearance.

5.2. An institution which of necessity is required to be modern, abreast with thinking all over the world, to be in tune with winds of change can ill-afford to allow the technological revolution to pass by it and remain unaffected. The problem which the administration of justice today is facing and finding it difficult to cope with is the problem of backlog of arrears, delay in disposal of cases, over-worked Judges and tools of business of Nineteenth Century. All these again contribute to slow motion approach in hearing of causes, controversies and cases. Situation cannot be improved unless modern equipments are made available and advances in the organisation and methods of management are adopted by Courts.

5.3. The Law Commission is of the opinion that every High Court must have computerised system introduced in Registry for keeping a catalogue of pending cases so that the information is available at push button level.

5.4. Every High Court must have computerised library index of its decisions so that any decision on a given point is available forthwith to avoid any conflicting decision unless specifically required for the purpose of overruling it.

5.5. Every High Court must have number of word processors consistent with its institution, disposal and requirement of retaining records of judgements and all other documents. Each Judge must be provided at his residence a word processor. Every Judge must be provided with a dicta phone machine.

5.6 The record room should be modernised by a computerised micro-filming centre, both to save space, remove dirt and install new method of permanent retention of the important records. There must be sufficient electronic/electric typewriters both for the needs of the Judges at the residence and in the office.

5.7. Every High Court must have photo copier machines with such speed as is consistent with the turnout of the work in the High Court so that copies are made available within twentyfour hours after the judgement is signed or the document is ready for zeroxing. In a zerox copy, no time should be spent on comparison because it is an exact photo replica of the original. Copying charges must be computed to reimburse the cost and depreciation and expenditure on the machines over a long term period.

5.8. Every High Court must be connected by telex so that the Apex Court can communicate orders by telex. This would avoid the ugly incident that occurred in the Supreme Court where a bail order was forged in the name of the Supreme Court in favour of an accused. These are minimum requirements to modernise the working in the High Courts and any expenditure on it is a social overhead in a developing country which is founded on the doctrine of rule of law.

# CHAPTER VI

## CONCLUSION

6.1. The recommendations herein made are over and above those that have been made and set out in Appendix I. Where a departure has been made with reference to earlier recommendations, those made in this report may be implemented.

6.2. A notable departure of this report is where High Court jurisdiction is considerably curtailed by excluding from its jurisdiction subjects which deserve specialist treatment by specialist courts¦tribunals. After restructuring of the grassroot justice system recommended by the Law Commission,[1] the inflow of second appeal is going to be considerably reduced. The vacancies will be filled in expeditiously if the recommendations of the Law Commission are implemented.[2] If the retiring Judge is allowed to remain in position till the successor comes in as herein recommended, the High Courts and the Supreme Court will always be manned by full strength of its Judges. Further, if the services of retired judges are enlisted to clear the backlog of arrears and oral arguments can be curtailed, as herein recommended, one can legitimately say with confidence that the High Courts would be able to manage both its arrears and its inflow of work and the monster of backlog will disappear within a maximum period of two years. The hope is founded on effective implementation of the recommendations herein made.

Sd!-

(D.A. DESAI)

CHAIRMAN

Sd!-

(V.S. RAMA DEVI)

MEMBER SECRETARY

NEW DELHI:

February 29, 1988.

26

NOTES AND REFERENCES

CHAPTER I

1. LCI, *Report on Gram Nyayalaya* (1986).

2. LCI, *95th Report* (1984).

3. The Constitution of India, article 215.

4. Sources : Annual Report for the year 1986-87 of the Government of India, Ministry of Law and Justice, p. 35.

5. Source : Answer to Lok Sabha Unstarred Question No. 1793 dated November 18. 1987.

6. *Thirty-first Report of the Estimates Committee* (1985-86), p. 19.

7. *Report of the High Court Arrears Committee* 1949; LCI, *14th Report on Reform of Judicial Administration* (1958) ;
LCI, *27th Report on Code of Civil Procedure, 1908* (1964) ;
LCI, *41st Report on Code of Criminal Procedure, 1898* (1969) ;
LCI, *54th Report of Code of Civil Procedure, 1908* (1973);
LCI, *58th Report on Structure and Jurisdiction of the Higher Judiciary* (1974);
*Report of High Court Arrears Committee, 1972;*
LCI, *79th Report on Delay and Arrears in High Courts and other Appellate Courts* (1979);
LCI, *99th Report on Oral and Written Arguments in the Higher Courts* (1984);
*Satish Chandra's Committee Report* 1986.

8. LCI, *14th Report on Reform of Judicial Administration* (1958).

9. LCI, *27th Report on Code of Civil Procedure, 1908* (1964).

10. LCI, *54th Report on Code of Civil Procedure, 1908* (1973).

11. Report of High Court Arrears Committee (1972).

12. LCI, *58th Report on Structure and Jurisdiction of the Higher Judiciary* (1974) p.1.

13. LCI, *79th Report on Delay and Arrears in High Courts and Other Appellate Courts* (1979).

14. *Satish Chandra Committee* (1986) p. 192.

15. LCI, *99th Report on Oral and Written Arguments in the Higher Courts* (1984).

16. The Hon. Sir Francis Burt, Chief Justice of the Supreme Court of Western Australia, 'The Moving Finger or the Irremovable Digit', 61(9) *Aust. L.J.* (1987) p. 468.

17. See para 1.15 *supra.*

18. Speech by Hon'ble Justice P. N. Bhagwati, former C.J.I., on 26th November, 1986, at Law Day function in the Supreme Court of India.

19. The Constitution of India, article 214.

20. *Id.*, article 226.

21. *Id.*, article 227.

22. LCI, *116th Report on Formation of An All India Judicial Service*. (1986) Chapter III pp. 26-27.

23. LCI, *114th Report on Gram Nyayalaya* (1986).

24. (1985) 2 SCC 197.

26. LCI, *115th Report on Tax Courts* (1986) p. 16.

26. LCI, *122nd Report on Forum for National Uniformity in Labour Adjudication* (1987).

27. LCI, *123rd Report on Decentralisation of Administration of Justice : Disputes involving Centres of Higher Education* (1987).

28. See para 1.5 *supra.*

29. LCI, *121st Report* (1987).

CHAPTER II

1. LCI, *14th Report on Reform of Judicial Administration* (1958) p. 123.

2. Source : An Analysis of Institution, Disposal and Pendency of Cases in the High Courts for the year 1985, compiled by the Government of India, Ministry of Law and Justice, dated October 26, 1987.

3. LCI, *14th Report* (1958) Chapter 6.

4. LCI, *121st Report on New Forum for Judicial Appointments* (1987), p. 43.

CHAPTER III

1. LCI, *121st Report on New Forum for Judicial Appointments* (1987) p. 43.

27

2. Copy of the letter to the Chief Justice of India and the Chief Justice of each High Court (Appendices *II* and *III*).

3. The Constitution of India, article 130.

4. See para 3.1 *supra*.

CHAPTER IV

1. LCI, 79*th Report on Delay and Arrears in High Courts and Other Appellate Courts* (1979).

2. The Constitution of India, article 229.

3. *Id.*, articles 233 and 235.

4. 'Winds of Change in the Courthouse' by Hon. Mrs. Justice Eichelbaum, 61(9) (1987) *Aust. L. J.* p. 544.

5. LCI, 79*th Report* (1979) paras 6.6, 6.7 and 6.8 p. 35.

6. *Id.*, para 6.19, p. 38.

7. *Id.*, para 6.24.

8. *R. C. Cooper* Vs. *Union of India* (1970) 1 SCC 248.

9. *Kesavananda Bharati* Vs. *State of Kerala* (1973) 4 SCC 225.

10. *A. K. Roy* Vs. *Union of India and Others* (1982) 1 SCC 271.

11. *S.P. Gupta* Vs. *Union of India and Anr.* (1981) Suppl. SCC 87.

12 LCI, 99*th Report on Oral and Written Arguments in the High Courts* (1984).

13. *Id.*, p. 16.

14. *K. Duraiswamy* Vs. *State of Tamil Nadu*, AIR 1982 SC 51.

15. LCI, 117*the Report on Training of Judicial Officers* (1986).

16. 61(9) (1987) *Aust. L. J.* p. 456.

CHAPTER VI

1. *LCI*, 114*th Report on Gram Nyayalaya* (1986).

2. LCI, 121*st Report on A New Forum for Judicial Appointments* (1987).

APPENDIX

(Paras 1.6, 4.1 and 6.1)

LAW COMMISSION OF INDIA

| Sl. No. | Subject | Law Commission Report number and other Reports | Recommendations | Action, if any taken by Government |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |
| 1. | *Ordinary Original Jurisdiction of the High Court* | (a) 14th (1958) | Ordinary original jurisdiction of the High Courts should be allowed to continue (Para 23—page 127) | Nil |
| | | (b) 79th (1979) | Same recommendations as contained in 14th report. | |
| | | (c) Satish Chandra's Committee's (1986) | The original ordinary civil jurisdiction of the High Courts should be abolished forthwith (Chap. 13, para 8, page 192) | |
| 2. | *Original Jurisdiction Special Statute* | (a) High Court Arrears Committee, 1972 (1972) | The original jurisdiction of the High Court under the Indian Divorce Act, Parsi Marriages and Divorce Act, Patents and Designs Act, Succession Act, Divorce Act, Indian Lunacy Act, The Guardian and Wards Act, Indian Insolvency Act and matters like alteration of Memorandum of Association, excusing delay in filing returns or in registering charges under the Company's Act should be abolished and jurisdiction conferred on District Judges. | Nil |
| | | (b) 79th Report (1979) | The jurisdiction of the High Court under the Indian Divorce Act and Parsi Marriage Act should be abolished. | |
| | | (c) Satish Chandra's Committee (1986) | Same recommendations as in the High Court Arrears Committee, 1972. | |
| 3. | *Regular First Appeals* | (a) 14th Report (1958) | Appellate jurisdiction of the District Judge be raised to ten thousand and section 102 CPC to be amended so as to raise the non-appeallable limit to rupees two thousand. | Section 102 CPC amended in 1976 and limit of Rs. 1000/- raised to Rs. 3000/- |
| | | (b) High Court Arrears Committee, 1972 (1972) | Appellate jurisdiction of the District Judges should be fixed at rupees twenty thousand. | |
| | | (c) 79th Report (1979) | The appellate jurisdiction of the District Judges recommended to be raised, however, it was felt that it was not desirable to fix uniform figure for the entire country. The matter regarding fixing of pecuniary appellate jurisdiction of the District Judges left to the concerned authorities in each State. | |
| | | (d) Satish Chandra's Committee (1986) | First appeals of the High Court recommended to be abolished in accordance with the practice prevalent in the State of Haryana. In the alternative it was proposed that the pecuniary appellate jurisdiction of the District Judges should be fixed at rupees five lakhs as in the case of State of Punjab. | |

| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| | 4. *Civil Revision under Section 115 CPC* | (a) 14th Report (1958) | Right of revision recommended to be retained. | Section 114 CPC amended in 1976 |
| | | (b) High Court Arrears Committee, 1972 (1972). | Right of revision against inter-locutory orders should be abolished. | |
| | | (c) 27th Report (1964) | Same recommendations as in 14th Report. | |
| | | (d) 54th Report (1973) | Section 115 CPC recommended to be deleted on the ground that adequate remedy is available under Article 227 of the Constitution. | |
| | | (e) 79th Report (1979) | While recommending the retention of the revisions against inter-locutory orders it was proposed that records of the lower courts should not be sent for unless an express order is made for the purpose by the High Court and the petitioner should be called upon to file copies of the relevant documents to be relied upon at the time of hearing. | |
| | | (f) Satish Chandra's Committee (1986) | Right of revision against interlocutory orders should be taken away, enactment of a provision in the CPC identical to the provisions contained in Section 397(2) of CRPC. Enactment of provisions identical to order 41 rule 5 CPC with regard to grant of stay by revisional courts. | |
| | 5. *Revisions under Section 25 of the Provincial Small Causes Court Act* | (a) 14th Report of Law Commission (1958) | Revisional jurisdiction should remain with the High Court | Nil |
| | | (b) High Court Arrears Committee, 1972 (1972) | Revisional powers of the High Court should be taken away and these powers to be conferred on District Judges. | |
| | | (c) Satish Chandra's Committee (1986) | Same recommendations as in the case of High Court Arrears Committee, 1972 | |
| | 6. *Regular Second Appeals* | (a) 14th Report (1958) | No curtailment of the right of Second Appeals | Section 100 CPC amended in 1976 |
| | | (b) 27th Report (1964) | Same recommendations as in 14th Report. | |
| | | (c) High Court Arrears Committee, 1972 (1972) | Agreed with the recommendations made in 14th Report and recommended that the judge admitting a Second Appeal should state points of law arising for consideration therein. | |
| | | (d) 54th Report (1973) | Right of Second Appeal recommended to be confined to cases where as substantial question of law is involved | |
| | | (e) 79th Report (1974) | Agreed with the views expressed in 54th Report. | |
| | | (f) Satish Chandra's Committee | Second appeal should be totally abolished. | |
| | 7. *Letters Patent Appeal* | (a) 14th Report (1958) | No LPA against the decisions of a single judge on the appellate side. | LPA against in second appeals abolished by insertion of Section 100A CPC |
| | | (b) High Court Arrears Committee, 1972 | LPA should be abolished except in case of orders made in Writ Petitions, suits and proceedings under special jurisdiction tried on the original side of the High Court. | |
| | | (c) 79th Report (1979) | Abolition of L.P.A. | |
| | | (d) Satish Chandra's Committee (1986) | L.P.A. should be abolished as in the case of U. P, | |

Appendix II
(Paras 3.6 and 3.24)
D. O. N. 3|Chmn|88|LC
January 19, 1988

Dear Justice Pathak,

Government of India resolved to set up a Commission, to be styled as Judicial Reforms Commission, for indepth study of the present justice delivery system, its short-comings and infirmities and to recommend radical reforms in the same to make the system effective and resilient to meet the contemporary needs of the society. It had drawn up its terms of reference. In February 1986, the task of studying and recommending judicial reforms was assigned to the present Law Commission keeping in view the terms of reference drawn up by the Government of India, a copy of the same for convenience of reference is annexed to this letter. The Law Commission was requested to accord high priority to this new assignment. Accordingly, the Law Commission concentrated its attention on this assignment.

Since the reference, the Law Commission has submitted ten reports, the list of which is annexed to this letter for ready reference.

The Law Commission in its plan of work has reached the stage where it would undertake indepth examination of the problem of backlog in the High Courts and the Supreme Court of India, with particular reference to term No. 1(iii) and 2 of the terms of reference.

In the past, the Law Commission has examined the structure and jurisdiction of the High Court in its 14th, 58th and 79th Reports. 14th Report on Judicial Administration has a chapter on Supreme Court of India. There was a radical suggestion of setting up a Constitutional Division within the Supreme Court in the 95th Report. I can Justifiably assume that you are conversant with the recommendations in these reports. I must, however, state that the 95th Report is not as all implemented, not even printed till today.

The implementation of the recommendations of the Law Commission is tardy. In fact, more often the recommendation are ignored. Be that as it may, Government of India evinced a keen desire to introduce radical reforms in the justice delivery system of this country and, with that end in view, drew up the terms of reference.

I would like to inform you that the present Law Commission has submitted ten reports relevant to different terms of reference, three of them, i.e., 115th, 122nd and 12rd, directly deal with decentralisation of administration of justice by recommending Central Tax Court and eliminating the jurisdiction of the High Court in tax matters. Similar approach has informed the Law Commission in recommending Industrial Relations Commission at the State and Central level as also Central Educational Tribunal at the same two levels to deal with specialist topic simultaneously eliminating the jurisdiction of the High Court in these matters.

The problem of arrears is directly interlinked with the dismal failure on the front of filling in vacancies in the High Courts and the Supreme Court of India. I am not aware as to where the fault lies. Fact remains that there is inordinate delay in filling in vacancies. In this connection I am happy to inform you that the Law Commission has submitted a comprehensive report recommending setting up of National Judicial Service Commission.

The Law Commission would examine the problem of backlog intertwined with the failure to fill in vacancies in the Supreme Court in its planned and projected work schedule.

I feel happy to inform you about the tentative thinking of the Law Commission in this behalf with a view to eliciting from you critical response to the same.

In the report on National Judicial Service Commission, the Law Commission has proposed setting up of a Commission headed by the Chief Justice of India to deal with the problem of filling in vacancies expeditiously in the Supreme Court and the High Courts. If implemented, the Law Commission is of the opinion that it would retrieve the situation to a considerable extent. But one cannot stay put there. I, therefore, approach you with a request to consider one more suggestion in this behalf.

I was told that a convention has grown up three decades back that till all the vacancies are filled in, the Chief Justice cannot resort to article 128 of the Constitution. The convention was established in the background of the fact that vacancies were filled in very expeditiously. The situation today is depressingly different. If the convention is respected in the altered circumstances, it would render article 128 nugatory, which the framers of the Constitution could not have anticipated. Therefore, the problem can be approached from two independent angles.

The vacancy occurs on retirement or death of a Judge in position. Death is such an uncertain event that one cannot foresee it and rationally deal with it, but retirement is known in advance. Therefore, even if steps are taken considerably in advance to fill in the incoming vacancies, yet if the vacancy is not filled in, the outgoing Judge shall continue to be in position till the incumbent is appointed. One criticism voiced against this suggestion is that if Chief Justice has a good opinion about one Judge, he may not recommend the successor while someone, not such

31

a hot favourite, may be pushed out by bringing in a successor as early as possible. This apprehension is wholly unfounded in view of the fact that the vacancies are filled in according to the chronology it has occurred. The difference can be of a month or two. But by adopting this method, the Court would at no time be without its sanctioned strength.

The second tentative suggestion is that in the capital city of Delhi, some retired Judges of the Supreme Court have settled down after retirement. They have established own residence as well as their transport arrangement. Article 128 provides that the Chief Justice of India may at any time, with the previous consent of the President, request any person who has held the office of the Judge of the Supreme Court or has held the office of a Judge of a High Court and is duly qualified to be a Judge of the Supreme Court, to sit and act as a Judge of the Supreme Court. Service of Judges who have settled down in the capital city can be enlisted. No capital expenditure is involved in view of the fact that no separate building is required to be established. It is merely a question of adjusting the court time. The retired Judges may be requested to come at 8.30 in the morning and work up to 12 noon. By setting up four different Benches of there Judges each, two Benches dealing with old civil and two Benches dealing with old criminal appeals, say, those instituted prior to 1980, they can dispose of as fast as possible many matters and it would be good use of the underutilised installed capacity of the Supreme Court building. They have to be compensated by giving them full salary without deduction of pension and pension equivalent to gratuity. This would entail very little expenditure and would go a great way in disposing of old cases which has brought disrepute to the system. Simultaneously, it would be utilisation of a rich pool of experience of talented people, physically fit to render to the society which gave them the status. The convention hereinabove referred to may now be given a decent burial because it has lived its utility.

I am not at all referring to setting up one Judge Bench in some matters because the Supreme Court is already seized up with the matter. This remedy will to some extent help in retrieving the lost situation arising out of the delay in filling in the vacancies.

This approach can mutatis mutandis apply to High Courts also.

May I request you that as head of the judicial administration of this country and gravely concerned with the malaise in the system, to respond to these tentative suggestions as also to make on your own some new and original suggestions which may assist the Law Commission in its none-too-easy task.

My earlier experience of writing separate letters to all Judges has proved to be a futile exercise. I am, therefore, addressing this letter to you with a request to consult your valued colleagues and to let me have your considered views as early as possible.

With regards,

Yours sincerely,
(D. A. Desai)

Hon'ble Shri R. S. Pathak,
Chief Justice of India,
Supreme Court of India,
Tilak Marg,
New Delhi.

Encl. : As above.

## TERMS OF REFERENCE IN THE CONTEXT OF STUDYING JUDICIARY LAW

1. The need for decentralisation of the system of administration of justice by—

(i) establishing, extending and strengthening in rural areas the institution of Nyaya Panchayats or other other mechanisms for resolving disputes;

(ii) setting up of a system of participatory justice with defined jurisdiction and powers in suitable areas and centres;

(iii) establishing other tiers or systems within the judicial hierarchy to reduce the volume of work in the Supreme Court and the High Courts.

2. The matters for which Tribunals (excluding services Tribunals) as envisaged in Part XIV-A of the Constitution need to be established expeditiously and various aspects related to their establishment and working.

3. The procedural laws with a view generally to disposing of cases expeditiously, eliminating unnecessary litigation and delays in hearing of cases and reform in procedures and procedural laws and particularly to devising procedures appropriate to the terms envisaged in items 1(i) and 1(ii).

4. The method of appointments to subordinate courts/sub-ordinate judiciary.

5. The training of judicial officers.

6. The role of the legal profession in strengthening the system of administration of justice.

7. The desirability of formulation of the norms which the Government and the public sector undertakings should follow in the settlement of disputes including a review of the present system for conduct of litigation on behalf of the Government and such undertakings.

8. The cost of litigation with a view to lessening the burden on the litigants.

9. Formation of an All India Judicial Service; and

10. Such other matters as the Commission considers proper to necessary for the purposes aforesaid or as may be referred to it from time to time by the Government.

## ANNEXURE

| | | |
|---|---|---|
| 114. | Hundred & Fourteenth Report (12-8-1986) | 'Gram Nyayalaya'— Alternative Forum for Resolution of Disputes at Grass-Roots Level. |
| 115. | Hundred & Fifteenth Report (28-8-1986) | Tax Courts. |
| 116. | Hundred Sixteenth Report (27-11-1986) | Formation of an All India Judicial Service. |
| 117. | Hundred Seventeenth Report (28-11-1986) | Training of Judicial Officers. |
| 118. | Hundred Eighteenth Report (26-12-1986) | Method of Appointment to Subordinate Courts/Subordinate Judiciary. |
| 119. | Hundred and Nineteenth Report (19-2-1987). | Access to Exclusive Forum for Victims of Motor Accidents under Motor Vehicles Act, 1939. |
| 120. | Hundred Twentieth Report (31-7-1987) | Manpower Planning in Judiciary: A Blue Print. |
| 121. | Hundred Twenty First Report (31-7-1987) | A New Forum for Judicial Appointments. |
| 122. | One Hundred & Twenty-Second Report (9-12-87) | Forum for National Uniformity in Labour Adjudication. |
| 123. | One Hundred and Twenty-Third Report (15-1-1988) | Decentralisation of Administration of Justice: Disputes involving centres of Higher Education. |

D.O. No. 3|Chmn|88-L.C.

January 25, 1988.

Dear Justice Pathak,

In continuation of my letter No. D.O .3|Chmn|88-L.C. dated January 19, 1988, I encroach upon your busy schedule by this short letter only to correct an inadvertent error that has crept in my aforementioned letter. In the last line of para 4 of the letter, I stated that the 95th Report is not at all implemented, not even printed till today.' This sentence is likely to given an impression that the 95th Report is not placed on the table of the Lok Sabha and Rajya Sabha. The later information confirms that the Report was placed on the table of both the Houses which would permit a copy of it to be obtained by anyone interested in it. It may simultaneously be made clear that the Report is printed by the Ministry of Law and Justice. The letter may be read with this clarification.

I hope to get an early response from you with reference to the issues raised in that letter.

With regards,

Yours sincerely,

Sd|-

(D.A. Desai)

Hon'ble Shri R. S. Rathak,
Chief Justice of India,

5, Krishna Menon Marg,
NEW DELHI-110 011.

34

Appendix III

(Paras 3.6 and 3.24)

January 20, 1988

Dear Justice

Government of India resolved to set up a Commission, to be styled as Judicial Reforms Commission, for indepth study of the present justice delivery system, its shortcomings and infirmities and to recommend radical reforms in the same to make the system effective and resilient to meet the contemporary needs of the society. It had drawn up its terms of reference. In February 1986, the task of studying and recommending judicial reforms was assigned to the present Law Commission keeping in view the terms of reference drawn up by the Government of India, a copy of the same for convenience of reference is annexd to this letter. The Law Commission was requested to accord high priority to this new assignment. Accordingly, the Law Commission concentrated its attention on this assignment.

Since the reference, the Law Commission has submitted ten reports, the list of which is annexed to this letter for ready reference.

The Law Commission in its plan of work has reached the stage where it would undertake indepth examination of the problem of backlog in the High Courts and the Supreme Court of India, with particular reference to terms No. 1(iii) and 2 of the terms of reference.

In the past, the Law Commission has examined the structure and jurisdiction of the High Court in its 14th, 58th and 79th Reports. Over and above these reports, a Committee, called The High Court Arrears Committee, 1972, chaired by Shri Justice J. C. Shah, former Chief Justice of India, was set up. It was an informal Committee without any specific terms of reference. The Committee was charged with a duty to suggest ways and means for reducing the arrears of cases pending in the High Courts only. The Committee submitted its report making detailed recommendations for tackling the problem of backlog. The Committee highlighted the known fact, namely, inability of the High Court to cope with the inflow and disposal of rising number of causes instituted, which is largely attributable to the denial of the necessary Judge strength to the High Courts at the appropriate time, and strongly advocated that vacancies must be filled in as expeditiously as possible. The statistical table incorporated in the report shows that the delay in filling in the vacancies which attracted the attention of the Committee varied between 8 months 7 days to 1

month 18 days. Today, on an average, vacancies are not filled in for years. The situation has further considerably deteriorated.

The implementation of the recommendations of the Law Commission is tardy. In fact, more often the recommendations are ignored. Be that as it may, Government of India evinced a keen desire to introduce radical reforms in the justice delivery system of this country and, with that end in view, drew up the terms of reference.

I would like to inform you that the present Law Commission has submitted ten reports relevant to different terms of reference. three of them, i.e., 115th, 122nd and 123rd, directly deal with decentralisation of administration of justice by recommending Central Tax Court and eliminating the jurisdiction of the High Court in tax matters. Similar approach has informed the Law Commission in recommending Industrial Relations Commission at the State and Central level as also Central Educational Tribunal at the same two levels to deal with specialist topic simultaneously eliminating the jurisdiction of the High Court in these matters.

The problem of arrears is directly interlinked with the dismal failure on the front of filling in vacancies in the High Courts and the Supreme Court of India. I am not aware as to where the fault lies. Fact remains that there is inordinate delay in filling in vacancies. In this connection I am happy to inform you that the Law Commission has submitted a comprehensive report recommending setting up of National Judicial Service Commission.

The Law Commission would examine the problem of backlog interwined with the failure to fill in vacancies in the High Courts in its planned and projected work schedule.

I feel happy to inform you about the tentative thinking of the Law Commission in this behalf with a view to eliciting from you critical response to the same.

In the report on National Judicial Service Commission, the Law Commission has proposed setting up of a Commission headed by the Chief Justice of India to deal with the problem of filling in vacancies expeditiously in the Supreme Court and the High Courts. If implemented, the Law Commission is of the opinion that it would retrieve the situation to a considerable extent. But one cannot stay put there. I, therefore, approach you with a request to consider one more suggestion in this behalf.

35

I was told that a convention has grown up three decades back that till all the vacancies are filled in, the Chief Justice cannot resort to article 224A of the Constitution. The convention was established in the background of the fact that vacancies were filled in very expeditiously. The situation today is depressingly different. If the convention is respected in the altered circumstances, it would render article 224A nugatory, which the framers of the Constitution could not have anticipated. Therefore, the problem can be approached from two independent angles.

The vacancy occurs on retirement or death of a Judge in position. Death is such an uncertain event that one cannot foresee it and rationally deal with it, but retirement is known in advance. Therefore, even if steps are taken considerably in advance to fill in the incoming vacancies, yet if the vacancy is not filled in, the outgoing Judge shall continue to be in position till the incumbent is appointed. One criticism voiced against this suggestion is that if Chief Justice has a good opinion about one Judge, he may not recommend the successor while someone, not such a hot favourite, may be pushed out by bringing in a successor as early as possible. This apprehension is wholly unfounded in view of the fact that the vacancies are filled in according to the chronology of occurrence. The difference can be of a month or two. But by adopting this method, the Court would at no time be without its sanctioned strength.

The second tentative suggestion involves utilisation of the services of retired Judges. Usually, the High Court has its establishment in the capital of each State. In some States, Benches of the High Courts are set up in different cities in the same State. In the case of Punjab and Haryana, there is a common High Court for two States. Similarly in the case of Assam, the High Court at Guwahati has jurisdiction over several States. Now when Judges retire from the High Court, some of them settle down in the same city in which either the Principal Bench of the High Court is located or the city in which other Bench is established. These retired Judges, who have settled down in the same city, must have usually established their residence as well as their transport arrangement. Article 224A provides that the Chief Justice of a High Court for any State may at any time, with the previous consent of the President, request any person who has held the office of a Judge of that Court or of any other

High Court to sit and act as a Judge of the High Court for that State. Services of Judges who have settled down in the city can be enlisted without undergoing the question of finding residence and trasport arrangement for them. No capital expenditure is involved in view of the fact that no separate building is required to be constructed. It is merely a question of adjusting the court time. The retired Judge may be requested to come at 8.30 in the morning and work up to 12 noon. By setting up four different Benches of three Judges each, two Benches dealing with old civil and two Benches dealing with old criminal appeals, say, those instituted prior to 1984, there can be a massive effort to attack the backlog of cases. They should not be required to deal with admission work or any other work. Only matters listed for final hearing should be assigned to them. Even not ready matters may be brought to their notice to give direction for making them ready. This method would ensure use of the under-utilised installed capacity of the court buildings. It would also be good use of a rich pool of experience of talented people, physically fit to render to the society which gave them the status. They have to be compensated by giving them full salary wihtout deduction of pension and pension equivalent to gratuity. On the whole, this would entail marginal expenditure but would help in removing the curse on the system. In the light of this suggestion, the convention earlier referred to may now be given decent burial because it has outlived its utility.

May I request you as the head of the judicial administration of your State and gravely concerned with the malaise in the system to respond to these tentative suggestions as also to make on your own some new and original suggestions, which may assist the Law Commission in its none-too-easy task. I would request you to forward your considered opinion after consulting your colleagues to the Law Commission as early as possible.

With regards

Yours sincerely,

(D. A. DESAI)