UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS WEISEL PARTNERS LLC, and THOMAS WEISEL INTERNATIONAL PRIVATE LIMITED,<br><br>    Plaintiffs,<br><br>  v.<br><br>BNP PARIBAS, BNP PARIBAS SECURITIES (ASIA) LIMITED, and PRAVEEN CHAKRAVARTY,<br><br>    Defendants. | No. C 07-6198 MHP<br><br>**MEMORANDUM & ORDER**<br><br>**Re: Defendants' Motion to Dismiss for Lack of Standing, Personal Jurisdiction and** *Forum Non Conveniens* |

    Plaintiffs Thomas Weisel Partners LLC ("TWP LLC") and Thomas Weisel International Private Limited ("TWIPL") bring this action against defendants BNP Paribas, BNP Securities (Asia) Limited ("BNP Paribas Asia") and Praveen Chakravarty, alleging that defendants' efforts to solicit plaintiffs' employees in Mumbai, India, violated various California laws governing contracts and torts[1], as well as the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

    Now before the court are defendants' motions to dismiss. All three defendants move to dismiss on the basis of *forum non conveniens*. BNP Paribas Asia and Chakravarty move to dismiss for lack of personal jurisdiction. The third defendant, BNP Paribas, does not contest that it is subject to this court's jurisdiction. Only Chakravarty moves to dismiss plaintiff TWP LLC for lack of standing. Having considered the arguments of the parties and the papers submitted, the court enters the following memorandum and order.

BACKGROUND

Plaintiff TWP LLC is an investment bank and broker-dealer incorporated in Delaware and headquartered in San Francisco, California. Dhillon Dec. ¶ 2. From August 2003 to October 2005 TWP LLC employed Chakravarty as an Equity Research Associate in its San Francisco office. Sorani Dec. ¶¶ 2, 5. In October 2005 TWP LLC assigned Chakravarty to TWIPL—a subsidiary located in Mumbai, India and wholly owned by TWP LLC either directly or indirectly through a Mauritius holding company—as the Director of Discovery Research. Id. ¶ 5; Dillon Dec. ¶ 4.

TWIPL is incorporated and headquartered in India. Dhillon Dec. ¶ 3, Exh. A. TWIPL provided services to TWP LLC, including research reports on undercovered companies whose stocks traded on U.S. stock exchanges. Id. ¶¶ 5-6. A committee chaired by TWP LLC personnel decided the areas that Discovery Research would cover, and TWP LLC approved reports issued by Discovery Research before publication. Id. ¶¶ 11-12. The reports of the Discovery Research analysts were copyrighted by TWP LLC, used a TWP LLC stock rating system, and included contact information for the San Francisco office. Id. ¶ 13.

In mid-October 2007 Chakravarty met with Pierre Rousseau, BNP Paribas's Global Head of Equity Brokerage and a Director and Chief Executive Officer of BNP Paribas Asia, and Jonathan Harris, BNP Paribas Asia's Regional Head of Company Research. Id., Exh. E. At the meeting, which took place in Mumbai, India, Rosseau, Harris and Chakravarty planned to induce Discovery Research employees to "resign from Thomas Weisel enmass." Id. Rousseau and Harris asked Chakravarty to provide confidential information about the qualifications, expertise and compensation of targeted members of the Discovery Research team. Id.

Plaintiffs allege that the defendants used TWP LLC's confidential information to induce TWIPL employees to quit and join BNP Paribas Asia. Chakravarty's firm-issued laptop contained a spreadsheet with information requested by Harris, including 2007 base and bonus compensation and 2008 expected base compensation. Id. ¶ 18, Exh. F. The spreadsheet also contained salary and bonus information for Chakravarty as well as a list of interviews with Discovery Research analysts scheduled just days after the meeting between Rousseau, Harris and Chakravarty. Id., Exh. F.

2

Just a few days after the scheduled interviews, seventeen Discovery Research employees gave notice of their intent to quit. Id. ¶ 19. Of the four remaining research analysts at Discovery Research, three had only been licensed for a few months. Id. Plaintiffs assert that Chakravarty also would have resigned if he had not first been terminated for cause on November 7, 2007, after plaintiffs discovered the emails describing Chakravarty's plans to help defendants raid the Discovery Research staff. Id. In addition to the seventeen analysts who resigned, TWIPL's human resources generalist, Bijal Thakkar, who plaintiffs later discovered had assisted Chakravarty, quit on November 7. Id. On December 4, 2007 BNP Paribas announced that BNP Paribas Asia had created a 27-person securities research team in India under the leadership of Chakravarty.[2] Gallo Dec., Exh. L.

Due to the departure of most of its licensed analysts, Discovery Research could not produce timely research reports on many of the stocks it covered. Dhillon ¶ 20. Despite efforts to quickly recruit, train and license new research analysts, plaintiffs state that they were forced to shut down Discovery Research on December 6, 2007. Id. Plaintiffs allege that the closure of Discovery Research deprives TWP LLC of current and future revenues from the sale of subscriptions and from trading in stocks covered by Discovery Research. Id. They have filed this action, seeking monetary and punitive damages as well as attorneys' fees.

Defendant BNP Paribas is an international retail and investment bank organized under the laws of France with its global headquarters in Paris, France, its principal United States offices in New York City and a regional office in San Francisco, California. Complaint ¶ 9. BNP Paribas has a designated officer for service of process in California. Id.

BNP Paribas Asia is a brokerage operation organized under the laws of Hong Kong and headquartered in Hong Kong. Leung Dec. ¶ 2. BNP Paribas Asia is not licensed to do business in the United States, has no property here and has no employees based or working in the United States. Id. ¶¶ 5-8. It also does not have a California mailing address or telephone listing, does not maintain any corporate books or records in California, does not pay taxes in California and does not have any bank accounts in California. Id. ¶¶ 9-11.

3

1    Chakravarty is an Indian citizen and was employed by TWP LLC in San Francisco from
2 August 2003 until early October 2005, when he was assigned to TWIPL in Mumbai. Sorani Dec. ¶¶
3 3, 5. Until his termination in November 2007 Chakravarty remained an employee of TWP LLC,
4 whose employment terms he and TWP LLC agreed would be governed by the "laws of the U.S. and
5 [TWP LLC rules and regulations]." Id. ¶ 5, Exh. D at 4. As a condition of his employment,
6 Chakravarty agreed to protect TWP LLC's confidential information, to not solicit its employees, and
7 to not use his position or TWP LLC's confidential information for his personal gain or to compete
8 with TWP LLC. Id., Exh. C at 1-2. Using the shared TWP LLC/TWIPL computer system,
9 Chakravarty had access to most if not all of the confidential information about Discovery Research.
10 Dhillon Dec. ¶ 16.

12 DISCUSSION
13    Defendants' motions raise three issues which the court will address in turn: (1) standing of
14 plaintiff TWP LLC; (2) personal jurisdiction over defendants Chakravarty and BNP Paribas Asia;
15 and (3) dismissal on the basis of *forum non conveniens*.

17 I.    Standing
18    To have standing, a party must meet the constitutional requirements of Article III as well as
19 non-constitutional prudential considerations. Franchise Tax Bd. of California v. Alcan Aluminum
20 Ltd., 493 U.S. 331, 335 (1990). Article III requires TWP LLC to show that "[it] personally has
21 suffered some actual or threatened injury as a result of the putatively illegal conduct of the
22 defendant, and that the injury fairly can be traced to the challenged action and is likely to be
23 redressed by a favorable decision." Id. (internal citations omitted). One of the prudential
24 considerations states that "the plaintiff generally must assert his own legal rights and interests, and
25 cannot rest his claim to relief on the legal rights or interests of third parties." Id.
26    Chakravarty does not contest that TWP LLC has Article III standing. Rather, he asserts that
27 TWP LLC fails to satisfy the shareholder standing rule, a prudential requirement, because it does not
28 assert a direct and independent harm separate from the harm suffered by TWIPL.[3] The Supreme

4

1  Court has stated that the shareholder standing rule "generally prohibits shareholders from initiating
2  actions to enforce the rights of the corporation unless the corporation's management has refused to
3  pursue the same action for reasons other than good-faith business judgment" or the shareholder has
4  "a direct, personal interest in a cause of action." Id. at 336.  The Ninth Circuit further stated that
5  "[a] shareholder does have standing . . . when he or she has been 'injured directly and independently
6  from the corporation.'"  RK Ventures, Inc. v. City of Seattle, 307 F.3d 1045, 1057 (9th Cir. 2002).

7  The shareholder standing rule, however, is not applicable in this case because TWP LLC is
8  not bringing suit solely on behalf of TWIPL.  It has alleged direct harm to itself as a result of
9  defendants' conduct.  In the amended complaint, plaintiffs allege that Chakravarty directly harmed
10 TWP LLC when he misappropriated confidential information from a computer jointly owned by
11 TWP LLC and TWIPL in violation of the Computer Fraud and Abuse Act.  TWP LLC also states
12 that it suffered direct injury when the defendants misappropriated its trade secrets about employee
13 compensation and targeted raises.  As a result, TWP LLC suffered injuries including but not limited
14 to loss of present and future subscription revenue, profits and business reputation and goodwill.  The
15 court concludes that TWP LLC is a proper plaintiff with standing to sue.

17 II.      Rule 12(b)(2)---Lack of Personal Jurisdiction
18      Two defendants---Chakravarty and BNP Paribas Asia---move to dismiss for lack of personal
19 jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(2).  The general rule is that
20 personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the
21 exercise of that jurisdiction does not violate federal due process. Pebble Beach Co. v. Caddy, 453
22 F.3d 1151, 1154 (9th Cir. 2006).  Where there is no applicable federal statute governing personal
23 jurisdiction, courts apply the law of the state in which the district court sits. See Fed. R. Civ. Pro.
24 4(k)(1)(A); Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1320 (9th Cir. 1998).
25     Because California's long-arm jurisdictional statute is coextensive with federal due process
26 requirements, the jurisdictional analyses under state law and federal due process are the same.
27 Panavision, 141 F.3d at 1320; Cal. Civ. Proc. Code § 410.10 ("A court of this state may exercise
28 jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States").

5

A court may exercise personal jurisdiction over a defendant consistent with due process only if he or she has "certain minimum contacts" with the relevant forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

If a nonresident defendant has contacts with the forum state that are "substantial" or "continuous and systematic," then courts may exercise general personal jurisdiction over the defendant without regard to whether the action arises from the defendant's activities in the forum state. Perkins v. Benguet, 342 U.S. 437 (1952). If a nonresident defendant's activities within the forum state are less substantial, then courts may still exercise specific personal jurisdiction where the action arises out of or is related to the defendant's particular activities within the forum state. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8 (1984).

Specific jurisdiction exists if: (1) the defendant has performed some act or consummated some transaction within the forum or otherwise purposefully availed himself of the privileges of conducting activities in the forum; (2) the claim arises out of or results from the defendant's forum-related activities; and (3) the exercise of jurisdiction is reasonable. Bancroft & Masters, Inc. v. Augusta Nat. Inc., 223 F.3d 1082, 1086 (9th Cir. 2000). The first prong of this test requires that the defendant either purposefully avail itself of the privileges of conducting activities in the forum state or purposefully direct its activities toward the forum state. Schwarzenegger, 374 F.3d at 802. Typically, evidence of purposeful availment will include "action taking place in the forum that invokes the benefits and protections of the laws in the forum," while evidence of purposeful direction will include "action taking place outside the forum that is directed at the forum." Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1155 (9th Cir. 2006).

Purposefully directed activities are analyzed under the effects test enumerated by the Supreme Court in Calder v. Jones, 465 U.S. 783 (1984). The Ninth Circuit has interpreted Calder to impose three requirements. The defendant must have (1) committed an intentional act, (2) expressly aimed at the forum state, which (3) causes harm that the defendant knew was likely to be suffered in the forum state. Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme, 433 F.3d 1199, 1206 (9th Cir. 2006) (citing Schwarzenegger, 374 F.3d at 803). It is important to consider the

6

"extent of the defendant's contacts with the forum and the degree to which the plaintiff's suit is related to those contacts" because "[a] strong showing on one axis will permit a lesser showing on the other." Id. at 1210.

Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate. Schwarzenegger, 374 F.3d at 800. Where, as here, the motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts. Id. Moreover, in the context of specific jurisdiction, the plaintiff bears the burden of satisfying the first two prongs of the three-part test and if the plaintiff succeeds, the burden then shifts to the defendant to "'present a compelling case' that the exercise of jurisdiction would not be reasonable." Id. at 802. While the plaintiff cannot rely solely on the complaint to establish personal jurisdiction, the court must take uncontroverted allegations as true and resolve conflicts between the facts contained in the parties' affidavits in favor of the plaintiff. American Tel. & Tel. Co. v.Compagnie Bruxelles Lambert, 94 F.3d 586, 588 (9th Cir. 1996).

In the discussion on specific jurisdiction below, the court will discuss Chakravarty's and BNP Paribas Asia's actions individually in order to determine if either party purposefully directed their activities at the forum state. Since the analysis for whether plaintiffs' claims arise from defendant's forum-related activities and for whether the exercise of personal jurisdiction is reasonable are the same for both parties, the court will collapse the analysis for Chakravarty and BNP Paribas Asia in these two sections.

Although plaintiffs assert that the court has general jurisdiction over BNP Paribas Asia because BNP Paribas affiliates acted as its agent, the court declines to reach this issue because the court finds that there is specific jurisdiction over BNP Paribas Asia. BNP Paribas does not dispute that the court has general personal jurisdiction over it because BNP Paribas conducts substantial business in California and has an agent for service of process in the state. Gallo Dec., Exhs. B at 2, C.

7

### A. Purposeful Availment/Purposeful Direction

#### 1. Chakravarty

To show purposeful direction, the Calder effects test requires plaintiffs to prove that defendants: (1) committed an intentional act, (2) expressly aimed at the forum state, which (3) causes harm that the defendant knew was likely to be suffered in the forum state. Yahoo! Inc., 433 F.3d 1199 at 1206.

The first prong of the test requires plaintiffs to prove that Chakravarty committed an "intentional act." The Ninth Circuit has "construe[d] 'intent' in the context of the 'intentional act' test as referring to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." Schwarzenegger, 374 F.3d at 806 (finding defendant committed intentional act by placing advertisement in newspaper). Chakravarty committed an intentional act when he allegedly provided confidential information to help BNP Paribas and BNP Paribas Asia solicit employees from plaintiffs.

Plaintiffs must also demonstrate that Chakravarty "expressly aimed" his intentional act at California. The Ninth Circuit explained that "'express aiming' encompasses wrongful conduct individually targeting a known forum resident." Bancroft, 223 F.3d at 1087. While he was working in Mumbai, India, as Director of Discovery Research and until his dismissal in November 2007, Chakravarty was an employee of TWP LLC, whose employment terms he and TWP LLC agreed would be governed by the "laws of the U.S. and [TWP LLC rules and regulations]." Sorani Dec. ¶ 5, Exh. D at 4. As a condition of his employment, Chakravarty agreed to protect TWP LLC's confidential information, to not solicit its employees, and to not use his position or TWP LLC's confidential information for his personal gain or to compete with TWP LLC. Id., Exh. C at 1-2. By allegedly violating the terms of this contract, Chakravarty directed his wrongful conduct at California-based TWP LLC.

Furthermore, as an employee of TWP LLC assigned to head the Discovery Research group in Mumbai, Chakravarty possessed intimate knowledge that facilitating a raid on Discovery Research would necessarily target TWP LLC in San Francisco. The Mumbai office worked closely with TWP LLC. A seven-person committed chaired by Keith Gay, the San Francisco-based Head of Research

8

for TWP LLC, decided the areas that Discovery Research analysts would cover.  Dhillon Dec. ¶ 11. Reports written by Discovery Research analysts were approved by a Supervisory Analyst employed by TWP LLC in San Francisco before publication to ensure compliance with regulatory requirements, and the final reports listed a San Francisco phone number and an @tweisel.com email address under the author's contact information.  Id. ¶ 12, Exh. E.  In October 2005, the New York Stock Exchange ("NYSE") also approved of TWIPL's Mumbai office as a branch of TWP LLC. Gallo Dec., Exh. A at F-7.  Public filings listed TWIPL as a branch office of TWP LLC.  Id. Discovery Research analysts, including Chakravarty, were registered as associated persons of TWP LLC with U.S. regulatory authorities.  Id. ¶ 8.

Discovery Research operated for the benefit of TWP LLC.  Pursuant to the Intercompany Services Agreement ("ISA"), "TWP LLC owned all intellectual property generated by TWIPL, including trade secrets, confidential information and research reports."  Id. ¶ 6, Exh. C.  TWP LLC earned revenues by selling subscriptions to Discovery Research reports and creating a market in the stocks of the companies covered by Discovery Research.  Id. ¶ 9.  As an employee of TWP LLC and the Director of TWIPL's Discovery Research Group with intimate knowledge of the two entities' close function, this court finds that Chakravarty's actions were expressly aimed at TWP LLC in California.

The third and final prong of the Calder effects test requires plaintiffs to prove that the Chakravarty's intentional act caused harm that the he knew was likely to be suffered in the forum state.  As discussed above, Chakravarty, as Director of Discovery Research, understood the business relationship between TWP LLC and TWIPL and that his alleged conduct would directly harm TWP LLC.  Consequently, the court finds that Chakravarty purposefully directed his activities at TWP LLC in California.

### 2. BNP Paribas Asia

Applying the first prong of the Calder "effects" test, the court finds that BNP Paribas Asia committed an intentional act when Pierre Rousseau, BNP Paribas Asia's Chief Executive Officer, and Jonathan Harris, BNP Paribas Asia's Regional Head of Company Research, met with

9

Chakravarty to solicit his assistance and later used confidential information provided by Chakravarty to actively "raid" plaintiffs' employees.

The second prong requires plaintiffs to show that BNP Paribas Asia "expressly aimed" its intentional acts at California. Plaintiffs argue that BNP Paribas Asia knew that "raiding" the Mumbai office would result in harm to TWP LLC in California. Harris's October 15 email to Chakravarty, which envisioned resignation from "*Thomas Weisel* enmass," suggests that BNP Paribas Asia knew about TWIPL's California-based parent company and viewed the parent and subsidiary as one and the same. Dhillon Dec., Exh. E (emphasis added). Moreover, publicly available information already described above, including NYSE approval of TWIPL's Mumbai office as a branch of TWP LLC, provides a reasonable basis from which to infer that the officers of BNP Paribas Asia were aware that their alleged conduct would target not only TWIPL in Mumbai but also TWP LLC in California.

The final prong requires plaintiffs to establish that BNP Paribas Asia's intentional act caused harm that BNP Paribas Asia knew would likely be suffered in California. The evidence discussed above suggests that BNP Paribas Asia knew of the close connection between TWIPL and TWP LLC. Harris's October 15 email recognized that "raiding" the Discovery Group may force a "shutdown [of] the remainder of the office." Dhillon Dec., Exh. E. The court finds that BNP Paribas knew their action would harm the Mumbai branch, leading to harm that would be suffered in California. In sum, the court finds that BNP Paribas Asia purposefully directed their activities into California.

B. Relation between Claims and Contacts

To determine whether a claim arises out of forum-related activities, the Ninth Circuit has held that a "but for" test should be applied. Doe v. Unocal Corp., 248 F.3d 915, 924 (9th Cir. 2001). In this action, the court considers whether plaintiffs' claims would have arisen but for defendants' contacts with California. As an employee of TWP LLC, Chakravarty had ongoing contacts with California for over four and a half years, and his alleged conduct had the effect of harming TWP LLC in California. But for Chakravarty's alleged conduct, this injury would not have occurred. Similarly, but for BNP Paribas Asia's "raid" of the Discovery Group, TWP LLC would not have

been injured. The court is satisfied that plaintiffs' claims arise out of defendants' forum-related activities so that the exercise of specific jurisdiction is justified.

### C.  Reasonableness

Since the court has determined that Chakravarty and BNP Paribas Asia purposefully established minimum contacts with the forum state, the burden shifts to the defendant to "'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable' in order to defeat personal jurisdiction." Harris Rutsky, 328 F.3d at 1132 (quoting Burger King v. Rudzewicz, 471 U.S. 462, 477 (1985)). Courts consider seven factors in weighing reasonableness: (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendants of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. Id. The Ninth Circuit has held that no one factor is dispositive and that courts are to balance all seven. Id.

In balancing these factors, the court concludes that the exercise of personal jurisdiction over Chakravarty and BNP Paribas Asia is fair and reasonable. As discussed above, both defendants purposefully directed their activities at TWP LLC in California. This conduct is not minimal because the conduct led to the complete shutdown of the office in Mumbai, costing plaintiffs current and future revenue. Although both defendants are foreign entities, "the advent of 'modern transportation' certainly has made the burden of defending in a foreign forum more palatable." Ballard v. Savage, 65 F.3d 1495, 1501 (9th Cir. 1995). Chakravarty has in fact traveled to California, living and working in the state for over two years. While India may have some interest in adjudicating the dispute, the court finds that California has a strong interest in adjudicating the dispute because one plaintiff is a California entity asserting claims under California and federal law for injuries occurring in California. This is not a dispute unrelated to the forum. Finally, India would not provide for the most efficient resolution of the controversy given that inadequacy of the forum discussed below. Although some of the factors favor the defendants, on balance, defendants

11

1 have not met their burden of presenting a compelling case that exercise of jurisdiction does not
2 comport with fair play and substantial justice.

3 Since personal jurisdiction is established through specific jurisdiction, analysis under general
4 jurisdiction is unnecessary.

### III. *Forum Non Conveniens*

The common law principle of *forum non conveniens* allows a court to decline otherwise proper jurisdiction when the chosen forum is disproportionately inconvenient to the defendant or inappropriately burdensome on the court. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 (1981). The applicable standard is whether "defendants have made a clear showing of facts which . . . establish such oppression and vexation of a defendant as to be out of proportion to plaintiff's convenience, which may be shown to be slight or nonexistent . . . " Cheng v. Boeing Co., 708 F.2d 1406, 1410 (9th Cir. 1983). Consequently, dismissal for *forum non conveniens* is "an *exceptional tool* to be employed sparingly," and courts have declined to "perceive [of] it as a doctrine that compels plaintiffs to choose the optimal forum for their claim." Ravelo Monegro v. Rosa, 211 F.3d 509, 514 (9th Cir. 2000), cert. denied, 531 U.S. 1112 (2001) (emphasis added).

Dismissal for *forum non conveniens* by a court is appropriate where there is (1) an adequate alternate forum and (2) the balance of private and public interests clearly indicates that trial in the alternate forum would be more convenient for the parties. See Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 506–508 (1947); Lockman Foundation v. Evangelical Alliance Mission, 930 F.2d 764, 767 (9th Cir. 1991); Lueck v. Sundstrand Corp., 236 F.3d 1137, 1142–3 (9th Cir. 2001). While there is usually a "strong presumption in favor of honoring the plaintiff's choice of forum, a foreign plaintiff's choice is afforded less deference." Creative Technology, 61 F.3d at 703. See also Piper Aircraft, 454 U.S. at 255-56 ("When the home forum has been chosen, it is reasonable to assume that this choice is convenient. When the plaintiff is foreign, however, this assumption is much less reasonable. Because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference."). In adopting this "home forum" standard, the Supreme Court indicated that the appropriate distinction to draw was between a

12

"*resident* or *citizen* plaintiff . . . and [a] foreign plaintiff . . ." Id. (emphasis added).  Consequently, a plaintiff's choice of forum will not be disturbed unless the "private interest" and "public interest" factors strongly favor trial in the foreign country."  See Dole Food Co. v. Watts, 303 F.3d 1104, 1118 (9th Cir. 2002).

### A. Availability and Adequacy of India as an Alternative Forum

Chakravarty and BNP Paribas Asia "bear[] the burden of proving the existence of an adequate alternative forum." Lueck, 236 F.3d at 1143.  The Supreme Court has held that an alternative forum ordinarily exists when a defendant is amenable to service of process in the foreign forum. Piper Aircraft, 454 U.S. at 254 n. 22.  This threshold test is met here because Chakravarty is an Indian citizen residing in India, and BNP Paribas and BNP Paribas Asia have stated that they would be amenable to service of process in India.

To be adequate, an alternative forum must also provide "some remedy" for the wrong at issue. Id. at 1143 (quoting Piper Aircraft, 454 U.S. at 254 n. 22).  A forum will be inadequate only where the remedy provided is "so clearly inadequate or unsatisfactory, that it is no remedy at all." Piper Aircraft, 454 U.S. at 254.  The Ninth Circuit has held that "in a particular case, the evidence may well support the conclusion that a legal system is so fraught with corruption, delay and bias as to provide 'no remedy at all.'" Tuazon v. R.J. Reynolds Tobacco Co., 433 F.3d 1163, 1179 (9th Cir. 2006).  "A litigant asserting inadequacy or delay must make a powerful showing." Id.

India shares with the United States a common law tradition inherited from the British.  It may be the case that Indian courts could provide similar remedies for plaintiffs' contract and tort claims.  Nevertheless, plaintiff also asserts a federal cause of action under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  The court is not aware of and defendants have not identified any Indian law that would be analogous or comparable.

Moreover, plaintiffs contend that India is an inadequate forum due to extreme delays in the Mumbai Bench of the Bombay High Court, where this case would be litigated in India.  Desai Dec. ¶ 5.  According to Justice S. K. Desai, who served as Judge of the Bombay High Court from 1972 to 1990 and remains active as a legal consultant and Arbitrator in Mumbai, the average caseload per

13

1  judge exceeds 6,000. Id. ¶ 6. This is more than ten times the average caseload per judge for the
2  Northern District of California. See Gallo Decl, Exh. M. As a result of this long delay, more than
3  41% of the civil cases pending in the Bombay High Court are more than 10 years old. Id. ¶ 23. Exh.
4  L at 1. A civil case typically takes at least 15 years to reach original resolution and, due to appeals,
5  an additional 5 to 10 years to reach final resolution on appeal. Id. ¶ 7. Given the growing caseload
6  in the Bombay High Court, Desai estimates that resolution of this action from the Mumbai Bench
7  would likely take longer than 15 to 20 years, not including additional years spent on appeal. Id. ¶ 8.
8       Case law cited by defendants to argue that India is an adequate forum is distinguishable. In
9  Neo Sack, Ltd. v. Vinmar Impex, Inc., 810 F. Supp 829, 834 (S.D. Tex. 1993), the plaintiff argued
10 that delays in the Bombay court made that court an inadequate forum. Plaintiff's proof, however, did
11 not support his assertion because it only discussed delays in the Indore courts, a wholly separate
12 jurisdiction from the Bombay courts. In contrast, plaintiffs in this action have provided convincing
13 proof of delays in the applicable Indian court. In In re Union Carbide Corp. Gas Plant Disaster, 809
14 F.2d 195, 199 (2nd Cir. 1987), the claims involved injuries to Indian plaintiffs harmed by a
15 American-owned gas plant located in Bhopal, India. In order to handle the massive torts claims
16 arising from this incident, India passed special legislation so that cases could be "treated speedily,
17 effectively and to the best advantage of the claimants." Defendants in this action have not cited any
18 applicable statute that would accelerate the process, and the court knows of none. In PLM Intern.,
19 Inc. v. Nath, 1998 WL 514045 (N.D. Cal. Aug. 17, 1998) (Conti, J.), the court held that plaintiff
20 could not claim that India was an inadequate forum having previously filed suits on a number of
21 different occasions in India. Defendants in this case have offered no proof that TWP LLC or TWIPL
22 have previously filed suits in India. Finally, in Chhawchharia v. Boeing, Co., 657 F. Supp. 1157,
23 1160 (S.D.N.Y. 1987), the plaintiff only attached one newspaper article with "anecdotal references
24 to congestion in Indian courts."
25     Defendants also claim that recent developments have improved the Indian court system. By
26 raising the amount in controversy from approximately $11,000 USD to approximately $43,000 USD
27 for Indian High Court jurisdiction, defendants argue India has reduced the number of cases in these
28 courts. Unsha (India), Ltd. v. Honeywell Int'l Inc., 2004 WL 540441 at *4. India has also amended

14

its Code of Civil Procedure to reduce delays and streamline case management and increased the number of judges in the trial courts. Gopal Dec. ¶¶ 12-17. Defendants argue that these reforms have reduced the average trial time, so cases generally proceed to trial within 3-4 years. Id. ¶ 18. Although improvements have been made generally, defendants fail to explain how these changes have impacted the Mumbai Bench in particular. Plaintiffs have cited statistics from September 2007 that show the total number of cases pending in the Bombay High Court has increased. Desai Dec. ¶ 17. Since defendants have not presented evidence to rebut plaintiffs' convincing proof that delays in the Mumbai Bench would essentially provide "no remedy at all," the court concludes that India is an inadequate forum.

### B. Balancing of Private and Public Interest Factors

Ordinarily, a plaintiff's choice of forum will not be disturbed unless the "private interest" and the "public interest" factors strongly favor trial in a foreign country. Gulf Oil, 330 U.S. at 509. The Ninth Circuit has further held that "if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper." Lockman Found., 930 F.2d at 767 (quoting Piper Aircraft, 454 U.S. at 255 n.23).

Courts consider the following private interest factors: (1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) "all other practical problems that make trial of a case easy, expeditious and inexpensive." Piper Aircraft, 454 U.S. at 261 n.6. The Ninth Circuit has held that "district court should look to any or all of the above factors which are relevant to the case before it, giving appropriate weight to each. It should consider them together in arriving at a balanced conclusion." Lueck, 236 F.3d at 1145-46.

Courts consider the following public interest factors: (1) local interest of lawsuit; (2) the court's familiarity with governing law; (3) burden on local courts and juries; (4) congestion in the court; and (5) the costs of resolving a dispute unrelated to this forum. Lueck, 236 F.3d at 1147 (quoting Piper Aircraft, 454 U.S. at 261 n.6).

15

Plaintiffs and defendants each find a different forum to be more convenient because they disagree on where bulk of the witnesses and evidence are located. Defendants contend that most of the relevant evidence and witnesses are located in India, where the alleged tortious act occurred. They further assert that none of the relevant TWIPL employees or documents are in California. While conceding that a number of likely witnesses are in India, plaintiffs argue that there are a number of California-based witnesses that will be testifying about Chakravarty's role and duties at TWP LLC and TWIPL, the Discovery Research business model and the harm caused to plaintiffs by defendants' action. Furthermore, relevant BNP Paribas Asia employees with direct knowledge about the allege tortious act are based in Hong Kong, so flying these witnesses from Hong Kong to Mumbai would only be marginally more convenient than flying them from Hong Kong to San Francisco.

While some private interest factors weigh in favor of India, on balance they weigh more heavily in favor of California. The proper inquiry on the "number of witnesses or quantity of evidence in each locale" but rather on "materiality and importance of the anticipated [evidence and] witnesses' testimony." <u>Lueck</u>, 236 F.3d at 1146. Although Chakravarty is a key witness that currently resides in India, the burden of traveling to California is not unduly burdensome because he has previously lived and worked in the state. Rousseau and Harris are two other key witnesses, but they live in Hong Kong. As noted above, traveling from Hong Kong to India is only marginally more convenient than traveling from Hong Kong to San Francisco. Furthermore, other important witnesses are in California, so no forum is necessarily better. The relevant evidence and documents are also located in three different countries. To the extent that these documents are in Asia, the court does not find transporting them to San Francisco to be unduly burdensome since they appear to be mainly electronic documents.

The public interest factors favor maintenance of this action in California. There is a strong local interest in the lawsuit since one of the plaintiffs is a California corporation allegedly injured while in the course of conducting business in the state. California state law will govern nine out of ten causes of action and federal law will govern the final cause of action relating to computer fraud. Furthermore, as discussed above, the long delays expected in the Mumbai Bench renders that forum

16

1  inadequate. Finally, this is not a dispute unrelated to the forum as the court already discussed
2  regarding the relationship of defendants' contacts with the state and the claims asserted. Given the
3  strong interest that California has in this suit, the public interest factors favor plaintiffs.
4        Defendants also argue that a significant number of plaintiffs' claims are governed by Indian
5  law and subject to binding arbitration in India. As support, defendants cite to employment contracts
6  between TWIPL and its Discovery Group employees. Sorani Dec. ¶ 7. However, these employment
7  contracts are not at issue in this action, so this argument is without merit. The only Discovery Group
8  staff member that is a defendant in this case is Chakravarty, whose employment contract is with
9  TWP LLC, not TWIPL. Plaintiffs are seeking remedies for BNP Paribas, BNP Paribas Asia and
10 Chakravarty's allegedly illegal actions. All three defendants violated California law when they
11 allegedly stole trade secrets and committed business torts against TWP LLC and TWIPL.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss for lack of standing, lack of personal jurisdiction and on the basis of *forum non conveniens* is DENIED.

IT IS SO ORDERED.

Dated: August 25, 2008

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

17

**ENDNOTES**

1. Plaintiffs' state-law causes of action include: (1) misappropriation of trade secrets; (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; (4) intentional interference with employment relationships; (5) intentional interference with contract; (6) intentional interference with prospective economic advantage; (7) breach of fiduciary duty; (8) aiding and abetting breach of fiduciary duty; and (9) civil conspiracy.

2. Plaintiffs contend that BNP Paribas Asia's new India research venture is entirely comprised of former Discovery Research employees, though the exhibit that they cite to, Exhibit L of the Gallo Declaration, does not support this contention.

3. Chakravarty describes TWP LLC as a "minority shareholder" in TWIPL. The document that he cites explains that TWP LLC wholly owns TWIPL either directly or indirectly through a Mauritius holding company.