GILBERT R. SEROTA (No. 75305)
Email:  gserota@howardrice.com
CLARA J. SHIN (No. 214809)
Email:  cshin@howardrice.com
MICHAEL L. GALLO (No. 220552)
Email:  mgallo@howardrice.com
JOHN P. DUCHEMIN (No. 250501)
Email: jduchemin@howardrice.com
HOWARD RICE NEMEROVSKI CANADY
        FALK & RABKIN
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California  94111-4024
Telephone:   415/434-1600
Facsimile:    415/677-6262

Attorneys for Plaintiffs
THOMAS WEISEL PARTNERS LLC and
THOMAS WEISEL INTERNATIONAL
PRIVATE LIMITED

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THOMAS WEISEL PARTNERS LLC, a Delaware limited liability company, and THOMAS WEISEL INTERNATIONAL PRIVATE LIMITED, an Indian company,<br><br>Plaintiffs,<br><br>v.<br><br>BNP PARIBAS, a French corporation, BNP PARIBAS SECURITIES (ASIA) LIMITED, a Hong Kong company, and PRAVEEN CHAKRAVARTY, an individual,<br><br>Defendants. | No. C-07-06198 MHP<br><br>Action Filed:  December 6, 2007<br><br>PLAINTIFFS' NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE EIGHTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY AGAINST DEFENDANT PRAVEEN CHAKRAVARTY<br><br>Date:        February 22, 2010<br>Time:       2:00 p.m.<br>Place:       Courtroom 15<br>Judge:      Hon. Marilyn Hall Patel<br><br>Trial Date:  August 17, 2010 |

1

**TABLE OF CONTENTS**

2                                                                             **Page**

3   NOTICE OF MOTION AND MOTION                                               1

4   INTRODUCTION AND SUMMARY OF ARGUMENT                                      1

5   STATEMENT OF UNDISPUTED FACTS                                             3

6   A.   Praveen Chakravarty Was A Principal Of TWP, Director Of
7        TWIPL, And Had Primary Managerial Responsibility For
     Discovery Research.                                                      3

8   B.   While A Principal Of TWP, A Director Of TWIPL, And A
     Senior Manager Responsible For Discovery Research,
9        Chakravarty Helped BNPP Execute A Raid Of Key Discovery
     Research Employees.                                                      4

10
11       1.   Chakravarty Learns That BNPP Intends To Build A
          Research Operation In India And Recruit Employees.                  4

12       2.   Chakravarty And BNPP Meet In India, They Discuss
13        BNPP's India Plans, And Chakravarty Introduces BNPP
          To Discovery Research Analysts.                                     5

14       3.   BNPP Asks Chakravarty To Identify A "Core Group"
          Of Discovery Research Employees And To Provide
15        Compensation And Background Information In Order
          To Facilitate An *En Masse* Resignation From TWP.                   6

16
17       4.   Chakravarty Selects And Recruits Discovery Research
          Employees To Work For BNPP, And Arranges Their
18        Interviews With BNPP.                                               7

19       5.   Chakravarty Participates In The Contract Negotiations
          Between Discovery Research Employees And BNPP.                      11

20  C.   Chakravarty And Over 20 Discovery Research Employees
     Join BNPP In December 2007.                                             11

21
22  ARGUMENT                                                                  12

23  I.    CHAKRAVARTY OWED FIDUCIARY DUTIES TO TWP.                           13

24  II.   THE LAW PROHIBITS A FIDUCIARY FROM RECRUITING
     EMPLOYEES OF HIS COMPANY ON BEHALF OF A
25        THIRD PARTY.                                                        15

26  III.  THE UNDISPUTED FACTS PROVE THAT CHAKRAVARTY
     BREACHED HIS FIDUCIARY DUTY OF LOYALTY BY
27        RECRUITING DISCOVERY RESEARCH EMPLOYEES FOR
     BNPP.                                                                    18

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1

## TABLE OF CONTENTS

2

Page

3   A.   Charkravarty Violated His Fiduciary Duties As An Officer Of
4        TWP.                                                              18

5        1.   Chakravarty Provided BNPP With Key Information
             About Discovery Research Employees.                          18

6        2.   Chakravarty Helped BNPP Solicit Discovery Research
7             Employees.                                                   20

8   B.   Chakravarty Violated His Duty Of Loyalty As An Employee
         Of TWP By Withholding From Senior TWP Managers That
9        BNPP Was Recruiting Discovery Research Employees.                 20

CONCLUSION                                                                 22

10

11

12

13

14

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

Page(s)

### Cases

*American Republic Insurance Co. v. Union Fidelity Life Insurance Co.*, 470
F.2d 820 (9th Cir. 1972) .......................................................... 17, 18

*Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171 (Del.
1988) .......................................................... 13

*Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327 (1966) .......... 2, 15, 16, 17, 18, 19, 20

*Daniel Orifice Fitting Co. v. Whalen*, 198 Cal. App. 2d 791 (1962) .......... 13

*Fowler v. Varian Assocs., Inc.*, 196 Cal. App. 3d 34 (1987) .......... 13, 14, 20, 21

*GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.*, 83 Cal. App.
4th 409 (2000), *overruled on other grounds*, 33 Cal. 4th 1140 (2004) .... 13, 14, 15, 17

*Galen v. County of Los Angeles*, 477 F.3d 652 (9th Cir. 2007) .......... 12, 13

*Garner v. Pearson*, 374 F. Supp. 580 (M.D. Fla. 1973) .......... 13

*Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400 (2007) .......... 15

*In re Westec Corp.*, 434 F.2d 195 (5th Cir. 1970) .......... 13

*Richardson v. Reliance National Indemnity Co.*, No. C 99-2952 CRB, 2000
WL 284211 (N.D. Cal. Mar. 9, 2000) .......... 13

*Stokes v. Dole Nut Co.*, 41 Cal. App. 4th 285 (1995) .......... 14

*Wenzel v. Mathies*, 542 N.W.2d 634 (Minn. App. 1996) .......... 13

### Statutes

Fed. R. Civ. P.
56(a) .......... 1, 12
56(d)(2) .......... 1, 12

### Other Authorities

*Principles of Corporate Governance* §5.06 illus. e .......... 18

*Restatement (Second) of Agency*
§393 cmt. e .......... 18
§395 cmt. b .......... 16

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

TO ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on February 22, 2010, at 2:00 p.m., or as soon thereafter as this matter may be heard by the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs Thomas Weisel Partners LLC and Thomas Weisel International Private Limited will, and hereby do, move, pursuant to Federal Rules of Civil Procedure 56(a) and 56(d)(2), for an order granting Plaintiffs' Motion For Partial Summary Judgment On Plaintiffs' Eighth Cause Of Action For Breach Of Fiduciary Duty Against Defendant Praveen Chakravarty (the "Motion"). The Motion is based upon this Notice and Motion, the Memorandum of Points and Authorities below, the accompanying Declarations of Mark Fisher and Clara Shin with supporting exhibits, the [Proposed] Order submitted herewith, and such other and further papers and argument as may be submitted to the Court in connection with the Motion.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs Thomas Weisel Partners LLC ("TWP") and Thomas Weisel International Private Limited ("TWIPL") (collectively, "Plaintiffs") bring this Motion against Defendant Praveen Chakravarty ("Defendant" or "Chakravarty") for summary judgment on his liability for breach of fiduciary duty to TWP.[1] The Motion arises from Chakravarty's conduct in the fall of 2007, when Chakravarty, a TWP officer and employee, conspired with and assisted Defendants BNP Paribas Securities (Asia) Limited ("BNPP Asia") and BNP Paribas (collectively, "BNPP") in planning and executing an *en masse* defection of more than 20 of TWP's India research business employees to BNPP.

On December 4, 2007, BNPP publicly announced the launch of an "onshore research platform"; specifically, "a 27-people strong securities research team in India." BNPP described the research team as based in Mumbai, India, "under the leadership of Praveen Chakravarty, Chief Operating Officer and Acting Head of Equity Research for

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

---

[1] Plaintiffs' breach of fiduciary duty claim against Chakravarty is the Eighth Cause of Action in the Second Amended Complaint ("SAC"). Dkt. No. 159.

BNP Paribas Securities in India, newly appointed as of December 3, 2007." BNPP did not disclose that over 20 members of this new research team, including its leader, Chakravarty, had been hired away from Plaintiffs' India research business—Discovery Research. BNPP also failed to disclose that it could not have engineered this mass defection of TWP employees without the illegal cooperation of Chakravarty.

The undisputed facts set forth below prove that Chakravarty breached his fiduciary duty to TWP. While a Principal of TWP and a Director and Head of Research of TWP's India operations, Chakravarty facilitated BNPP's raid on Discovery Research by: selecting the Discovery Research employees BNPP recruited and ultimately hired; preparing and providing BNPP with a list of Discovery Research employees to target together with their compensation and background information; introducing BNPP to the Discovery Research analysts; assisting in arranging BNPP's interviews of Discovery Research employees; and otherwise coordinating the recruitment of these employees with BNPP and even presenting them with and obtaining their signatures on BNPP offer letters. Chakravarty gave BNPP all this assistance *while still on Plaintiffs' payroll.*

A fundamental fiduciary duty of officers, directors, and employees is the duty of loyalty. This duty prohibits an individual from putting the interests of third parties ahead of those of his employer. As shown below, there is no credible dispute that Chakravarty owed fiduciary duties to TWP. Part I, *infra*. There also is no dispute that the law prohibits a fiduciary from recruiting his fellow employees on behalf of a third party to leave the firm. Part II, *infra*. This has been black letter law for more than 40 years since the California Supreme Court's decision in *Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 345 (1966). Finally, the undisputed facts prove that Chakravarty breached his fiduciary duty of loyalty by helping BNPP recruit Discovery Research employees. Part III, *infra*. In the absence of any dispute about the material facts or law establishing Chakravarty's breach of fiduciary duty, summary judgment should be entered against Chakravarty on Plaintiff's eighth cause of action for breach of fiduciary duty.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

**STATEMENT OF UNDISPUTED FACTS**

**A.    Praveen Chakravarty Was A Principal Of TWP, Director Of TWIPL, And Had Primary Managerial Responsibility For Discovery Research.**

TWP is an investment bank and broker-dealer headquartered in San Francisco, California.   Declaration Of Mark Fisher In Support Of Plaintiffs' Motion For Partial Summary Judgment On The Eighth Cause Of Action For Breach Of Fiduciary Duty Against Defendant Praveen Chakravarty ("Fisher Decl.") ¶2.   In 2005, TWP established Discovery Research, a start-up business in Mumbai, India, that was intended to provide equity research to TWP's clients on a subscription and consulting basis.  *Id.* ¶3.  TWP established an Indian subsidiary, TWIPL, to hold its India operations, including Discovery Research. *Id.*

In October 2005, TWP relocated Chakravarty from San Francisco, to Mumbai.  *Id*. ¶4. Chakravarty remained an employee of TWP and was promoted to Principal of TWP in February 2007.  *Id*.  Principals are senior officers of TWP.  *Id*.  Chakravarty also held the position of Head of Research of TWIPL and served on its Board of Directors.  *Id*. ¶5.

In October 2007, Discovery Research employed approximately 14 research analysts and 24 research associates in India.  *Id*. ¶6.  Chakravarty had managerial responsibility for these employees and for TWP's India research operations.  *Id*.; Declaration Of Clara Shin In Support Of Plaintiffs' Motion For Partial Summary Judgment On The Eighth Cause Of Action For Breach Of Fiduciary Duty Against Defendant Praveen Chakravarty ("Shin Decl.") Ex. A at 6:6-9 (10/3/07 phone call transcript) ("I run the India office for the San Francisco based investment bank called Thomas Weisel Partners"); *see also* 7:9-10 ("And basically I run the India office right now").[2]  Chakravarty supervised the research

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

---

[2]Exhibit A to the Shin Declaration is a certified transcript of a telephone recording produced by BNPP in this litigation on August 6, 2009.  BNPP has verified that this telephone conversation between Rousseau and Chakravarty took place on October 3, 2007. Upon the Court's request, Plaintiffs will make a copy of the audio file available to the Court.

analysts and associates, including recruiting and training them.[3]   Only one person in India was senior to Chakravarty with respect to Discovery Research—KV Dhillon, Chief Executive Officer and Managing Director of TWIPL.  Fisher Decl. ¶5.

**B.   While A Principal Of TWP, A Director Of TWIPL, And A Senior Manager Responsible For Discovery Research, Chakravarty Helped BNPP Execute A Raid Of Key Discovery Research Employees.**

**1.   Chakravarty Learns That BNPP Intends To Build A Research Operation In India And Recruit Employees.**

In September 2007, an acquaintance of Chakravarty connected him to BNPP  by email sent to Chakravarty's personal gmail account (pchucky@gmail.com).   Shin Decl. Ex. C. Chakravarty and Pierre Rousseau ("Rousseau"), Chief Executive Officer of BNPP Asia and Global Head of Equity Brokerage for BNP Paribas, spoke by telephone on October 3, 2007. *Id*., Ex. A (10/3/07 phone call transcript).  At that time, BNPP had no research analysts in India but were looking to build an operation there:

> **Q. Did you tell [Chakravarty] in the conversation, this first telephone conversation, what you were looking for or what you wanted to do with respect to research in India?**
>
> **A. I did tell him broadly what we were doing and our intention to do in India.**
>
> **Q. What did you say?**
>
> **A. I don't recall the exact words, but it was to explain that we were building an operation in India, including research, a full setup, execution, etcetera, and we have an ambition plan to develop that activity, as part of a global, as part of a global expansion in Asia, and the development plan that we had, and that India was definitely the last piece missing on the Pan Asia operation.**
>
> **\* \* \* \***
>
> **Q. Okay.  Is it true that you had no analysts in India at the time?**

---

[3]Shin Decl. Exs. B at 35:2-6 (Chakravarty Dep.) ("Q. In India, to whom did the Discovery Research analysts report?  A. The Discovery Research analysts reported—the writing Discovery Research analysts reported in to me"), A at 14:12-16 ("I have very, I mean literally, you know, I kind of built from zero to 50 people and trained them and recruited them and all that.  So I think I've learned a lot of lessons on how the model works").

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

**A. That's true.**  (*id*., Ex. D at 50:10-51:8 (Rousseau Dep.))

Rousseau told Chakravarty that he was looking to recruit people "to develop the platform, especially on the research side." *Id*., Ex. A at 4:23-25 (10/3/07 phone call transcript).

Chakravarty introduced himself to Rousseau as "run[ning] the India office for the San Francisco based investment bank called Thomas Weisel Partners." *Id*. at 6:6-8.  He explained that his efforts had been devoted to building TWP's India research platform.[4] Chakravarty described TWP's Discovery Research team as "India's only SEC regulated entity" (*id*. at 8:4-9), that it was designed to "produce Wall Street quality research" (*id*. at 8:20-21), and that the "analysts have to go through all the licensing requirement, series 7, 63, 86, 87 of the SEC, to be able to start writing research".  *Id*. at 8:14-16.

Chakravarty and Rousseau also discussed whether "the platform" would be for sale:

> **MR. ROUSSEAU:  Today what do you have in mind as an opportunity is to come with your team or is to look for an opportunity with your team or by yourself or what is your view you have on that?**
>
> **MR. CHAKRAVARTY:  You know, obviously we created the platform, so again, I'm not saying I will come with all the 50 people.**
>
> **MR. ROUSSEAU:  Do you think this platform will be for sale or not?**
>
> **MR. CHAKRAVARTY:  Yes, we can.  We can—I can make that happen.**
> (*id*. at 13:4-14)

At the end of the conversation, Chakravarty and Rousseau agreed to meet in person in Mumbai. *Id*. at 14:22-17:24.

> **2.     Chakravarty And BNPP Meet In India, They Discuss BNPP's India Plans, And Chakravarty Introduces BNPP To Discovery Research Analysts.**

On or around October 11, 2007, Chakravarty met Rousseau and Jonathan Harris ("Harris"), BNPP Asia's Head of Regional Equity Research and Managing Director, in

---

[4]*Id*., Ex. A at 7:21-8:2 (10/3/07 phone call transcript) ("And all my effort has gone into building the equity research platform.  And the thinking was we will build a platform and then build revenue streams around it because building the research platform, building the content was—we thought was the first step that we needed to do")

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

Mumbai.[5]  Rousseau explained that BNPP wanted to establish operations in India[6] and they discussed the Discovery Research team.[7]  The following day, Chakravarty gave Rousseau and Harris a tour of TWP's office in Nariman Point, Mumbai.[8]   During this visit, Chakravarty introduced Rousseau and Harris to several senior Discovery Research analysts.[9]

### 3.   BNPP Asks Chakravarty To Identify A "Core Group" Of Discovery Research Employees And To Provide Compensation And Background Information In Order To Facilitate An *En Masse* Resignation From TWP.

After their meeting in Mumbai, Harris asked Chakravarty to identify a "core group" of the Discovery Research team and provide compensation and other background information about them.  *Id.*, Ex. F.  Harris proposed an "enmass" resignation by these employees and raised the possibility that TWP would then "move to shut down the remainder of the office":

---

[5]Chakravarty originally had planned to show Rousseau and Harris the Discovery Research offices before dinner but deferred the visit until the next day because a TWP visitor from the United States was going to be there:  "Pierre—unfortunately I have someone from our US office here tomorrow and Friday.  So I don't think its [sic] a good idea to meet at our office.  Can we meet for dinner and drinks directly and I will try and show you the office maybe after dinner?"  *Id.*, Ex. E.

[6]*Id.*, Ex. D at 59:7-13 (Rousseau Dep.) ("Q. What did you tell him about what you wanted to do in India?  A. It was to explain the fact that we wanted to open an operation which was a full broker in India and for that, we were looking, that we were looking for management people, execution people.  That we had at that time looking for research also").

[7]*Id.*, Ex. D at 60:10-20 (Rousseau Dep.) ("Q. [ ] Do you remember anything else that you told Mr. Chakravarty at the meeting in the Oberoi and the Intercontinental Hotel dinner?  A.  After a while, we asked questions about what's going on, what is the operation, what it is, what those people were doing.  Q.  What did he tell you?  A.  Broadly speaking, he explained that he build that team, that he came here to build this business, and that he brought all these people, put them together").

[8]*Id.*, Ex. D at 66:25-67:11 (Rousseau Dep.) ("Q. So the next day you had another meeting.  A. Yes.  Q. Face to face.  A. It was a meeting where we meet, of course, Praveen, and we went to the, we went to their offices and he showed us all his setup, buildings and video conference.  When you know the setup in India, it was very impressive to see the setup in place there, so.  Q. So he gave you a tour of the office?  A. Yes.  We came there, he give us a tour, explain what people were doing, etcetera")

[9]*Id.*, Exs. B at 177:21-23 (Chakravarty Dep.) ("I recall making an introduction of Mr. Rousseau and Mr. Harris to a few analysts in a conference room"), D at 70:4-9 (Rousseau Dep.) ("Q. And who did you meet during that trip to the offices?  A. So we did this tour.  Q. Right.  A. And after, we wanted to see the—we asked him, some of his, what he called senior analysts").

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   **Pierre and I both came away feeling we had some good discussions and that
2   there is a lot of complementary interest.  As we discussed, the way we'd like
    to take this forward is to first identify the core group of your team, I think
3   you said about 20-25 individuals.  We'd like to then work on preparing
    employment documents for all of them.  Once you have them and all is
4   satisfactory, we'd look to you to resign from Thomas Weisel enmass.  If their
    reaction is that they'd move to shut down the remainder of the office, we can
5   step in and offer to take over the remainder as a gesture to save them the
    office shutdown costs.**

6   **First step would be to get from you a list of all employees, their current comp
    and job descriptions.  Next I'd like you to highlight the 20 or 25 key
7   individuals, and a bit more info on their job descriptions and background.
    For this group, please include an indication of what comp levels you would
8   think about for their move to BNP Paribas.  Once I get this from you, you
    and I can arrange for a call to talk through the info.**  (*id.*)

9

10  *See id.*, Ex. G at BNP040760 (internal BNPP memo from Harris) ("Chakravarty and his

11  team will then approach Thomas Weisel USA to resign en-mass.  Based on our discussions

12  with Chakravarty, we would expect Thomas Weisel at this point to move to shut down the

13  India operations as its highest value employees will be leaving").

14              **4.    Chakravarty Selects And Recruits Discovery Research Employees To
                        Work For BNPP, And Arranges Their Interviews With BNPP.**
15

16          Chakravarty—*while still employed by TWP*—identified for BNPP the best research

17  analysts to recruit and provided BNPP with these employees' background information.  He

18  even told BNPP what level of compensation would be necessary to lure them away from

19  TWP.  According to BNPP, these were  essential steps in its recruitment process:

20  **Q. Now, Mr. Harris, in October 2007, did you ask Mr. Chakravarty to
    identify for BNP Paribas the key research analysts and associates in Thomas
21  Weisel's Mumbai office?**

22  **A. I did.**

23  **Q. And did he do that for you?**

24  **A. He did.**

25  **Q. And did that help BNP Paribas in the recruitment process?**

26  **A. It did.**

27  **Q. In October of 2007, did you ask Mr. Chakravarty to give you the job
    descriptions and backgrounds of the key research analysts and associates in
28  Thomas Weisel's Mumbai office?**

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    **A. I did.**

2    **Q. And did he do that?**

3    **A. He did.**

4    **Q. And did that assist BNP Paribas in the recruitment process?**

5    **A. It did.**

6    **Q. And in October 2007, did you ask Mr. Chakravarty to provide BNP Paribas with the current Thomas Weisel compensation of each of these key
7    people?**

8    **A. I asked for their current compensation.**

9    **Q. And did he give that to you?**

10   **A. Yes.**

11   **Q. And did that help you in the recruitment process for these individuals?**

12   **A. The recruitment process for these individuals was the same process that
13   we would follow elsewhere, and a starting point is to come up with their
     current compensation.**

14   **Q. So by having Mr. Chakravarty provide you with their current
     compensation, it helped you in the recruiting process?**

15   **A. Yes, you could say that.**

16   **Q. And did you, in October 2007, ask Mr. Chakravarty to give you an
17   indication of what compensation levels he thought would help facilitate their
     move to BNPP Asia?**

18   **A. I did.**

19   **Q. And did he give you that indication?**

20   **A. Yes, he did.**

21   **Q. And did that assist in the recruitment process?**

22   **A. That began the negotiation process.**  (*id.*, Ex. H at 47:12-49:8 (Harris Dep.))

23

24   Chakravarty emailed Harris and Rousseau a spreadsheet that he stated "contains 07

25   base, 07 bonus, expected 08 base and proposed BNP 08 base and bonus, # of years of work

26   experience and educational qualifications for each [Discovery Research employee]."  *Id.*,

27   Ex. I.  Chakravarty explained that he had included "ALL analysts and the ones highlighted

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

in green are the ones that will move with me" and noted "we have a total of 28 associates of which I propose to pick the 14 most experienced ones." *Id.*[10]

Chakravarty identified "next steps" in the recruitment process and made himself the point person for arranging interviews and meetings:

> **1:  Let me know who you want to talk to and i can arrange for it immediately.  You can call each on their cell phones.**
>
> **2:  You are not obliged to take the entire team.  The minimum we can go with is 8 analysts and the rest are available as needed.**
>
> **3:  If we close deal with 8 analysts, me and the HR/Prod Mgmt person quickly, then we can try to bid for the office space and others.**  (*id.*)

Harris thereafter suggested the following plan:

> **Praveen,**
>
> **\* \* \* \***
>
> **For later this week, I'd like to set up individual meetings with your 12 core analysts to meet with myself, Hugo Leung (Deputy CEO) and Theresa Ho (Senior Equities HR from Singapore).  I am OK to do these as a 3 on 1 to keep it to 6 meetings.  I'd propose that we book a room in the business center of the Oberoi in which to conduct the meetings.  If there are others from your team that you think we should meet with, please let us know—perhaps your Product Manager?  I believe that Angelo has requested resumes from your key people.  It would be good to have those to refer to during our meetings.**
>
> **We'll need to schedule at least an hour meeting with you to go through the details.  Perhaps we can do this on Thurs PM and then have dinner together.**
>
> **We are scheduled to arrive Wed night, and will fly out on the same flight back to HK as last visit on Friday PM.  We will be free to meet with you and your group whenever it suits during this period.**
>
> **Jon** (*id.*, Ex. K)

Chakravarty emailed Harris a "proposed schedule" with interview times on October 25 and 26 for ten Discovery Research analysts and their sector coverage, years of experience, and education.  *Id.*  Chakravarty also arranged to meet with the BNPP recruitment team during the interviews:

---

[10]Two days later, Chakravarty sent another spreadsheet containing "details with the sectors of each analyst".  *See id.*, Ex. J.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

**1:  I meet all of you for breakfast at 8:30am at the Oberoi on Thursday.**

**2:  We start analyst meetings (10 analysts) at 10am on Thursday – 6 on Thursday and 4 on Friday**

**3:  You will meet my HR/Prod mgmt on Friday after all analyst meetings.**

**4:  I will do a follow-up meeting on Thurday (sic) evening after all the analyst interviews and follow up with dinner**

**5:  We can do a final wrap on Friday before your flight Friday evening.**

**Praveen.**  (*id.* at BNP039388)

Around the time of these interviews, Chakravarty provided BNPP with additional information about the Discovery Research analysts.  Chakravarty emailed BNPP: 1) an "Excel sheet with numbers, names and the proposal" and 2) a "zip file with all analyst profiles."  *Id.*, Ex. L.  The first document identified the names and proposed BNPP salaries of each of the ten Discovery Research analysts interviewed on October 25 and 26 as well as of 13 associates; Chakravarty included details of his proposed "perks" in the spreadsheet. *Id.*  This document also contained a section entitled "Timelines" in which Chakravarty set out how he and BNPP would time the defections to inflict maximum damage on TWP:[11]

| Timelines | |
|---|---|
| **Contracts for Praveen and Analysts** | **1-Nov** |
| **Analyst Signing Bonus payment** | **8-Nov** |
| **Analysts Resign** | **10-Nov** |
| **Praveen Signing bonus payment** | **11-Nov** |
| **Praveen resigns** | **13-Nov** |
| **Contracts for Associates & Support** | **17-Nov** |
| **Associates & Support Signing Bonus** | **21-Nov** |
| **Associates Resign** | **23-Nov** |

---

[11]Chakravarty testified that he had a general discussion with Harris about the timelines and couldn't recall whether Harris or Harris's assistant also had "added any details to that box or not." *Id.*, Ex. B at 219:1-11 (Chakravarty Dep.).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

| Support Staff Resign | 23-Nov |
|---|---|
| TWP Decision on Real Estate | 8-Dec |
| Start Date | 9-Jan |

Chakravarty apprised Harris that he had "spoken to 8 of the 13 associates and all of them have agreed." *Id*. at BNP042582.

### 5. Chakravarty Participates In The Contract Negotiations Between Discovery Research Employees And BNPP.

Following the interviews of Discovery Research employees, Chakravarty wrote to Harris to let him know that he had "reviewed the [BNPP] contracts" and was "getting analysts to sign them later this afternoon." *Id*., Ex. M. Chakravarty also relayed information between Discovery Research employees and BNPP:

**Q. Did you play a role with respect to BNP making offers to Discovery Research employees?**

**A. What do you mean by "role"? Did I –**

**Q. Meaning did you participate in any way in passing contracts along, serving as a go-between between BNP and Discovery Research employees?**

**\* \* \* \***

**Q. The only recollection I have is being a—is one of being a messenger.**

**A. Tell me what you mean by "one of being a messenger."**

**Q. What I mean by being a messenger is conveying information, relaying information between some Discovery Research analysts and Mr. Harris and others at BNP.** (*id*., Ex. B at 226:17-227:7 (Chakravarty Dep.))

### C. Chakravarty And Over 20 Discovery Research Employees Join BNPP In December 2007.

Prior to the defecting Discovery Research employees' departure to BNPP, Chakravarty did not tell his supervisor—KV Dhillon—or any other TWP senior managers involved with Discovery Research that BNPP was recruiting Discovery Research employees:

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

**Q.  Did you tell Mr. Dhillon that BNP had interviewed Discovery Research analysts?**

**A.  I don't have a specific recollection of that.**

**Q.  Did you tell Mr. Dhillon that BNP had interviewed Discovery Research associates?**

**A.  I don't have a specific recollection of that.**

\* \* \* \*

**Q.   Did you tell Mr. Dhillon that you played a messenger role in the discussions between BNP and Discovery Research analysts and associates?**

\* \* \* \*

**THE WITNESS:  I don't recall [telling] Mr. Dhillon that I played the role of messenger between Discovery analysts and BNP.**

**Q.  What about research associates and BNP?**

\* \* \* \*

**THE WITNESS:  I don't recall telling Mr. Dhillon.**  (*id*. at 236:25-238:4 (Chakravarty Dep.))

On November 6, 2007, Chakravarty sent TWP an email stating that he would be unable to continue at the firm.  Fisher Decl. ¶7.  TWP terminated Chakravarty's employment the next day.  *Id*. ¶8.  A total of 23 former Discovery Research employees and Chakravarty became employees of a new BNPP research unit in India under Chakravarty's leadership.  Shin Decl. Ex. N

On December 4, 2007, BNPP announced the launch of an "onshore research platform"; specifically, "a 27-people strong securities research team in India."  *Id*., Ex. O.  BNPP explained that the research team would be based in Mumbai, India "under the leadership of Praveen Chakravarty, Chief Operating Officer and Acting Head of Equity Research for BNP Paribas Securities in India, newly appointed as of December 3, 2007."  *Id*.  Over twenty members of BNPP's new team had previously been Discovery Research employees.

### ARGUMENT

Plaintiffs seek summary judgment on Praveen Chakravarty's liability for breach of fiduciary duty to TWP pursuant to Federal Rules of Civil Procedure 56(a) and 56(d)(2).  A

-12-

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    party claiming relief may move "for summary judgment on all or part of the claim" (Fed. R.

2    Civ. P. 56(a)) and "[a]n interlocutory summary judgment may be rendered on liability alone,

3    even if there is a genuine issue on the amount of damages."  Fed. R. Civ. P. 56(d)(2).  To

4    defeat summary judgment the opposing parties "must make a showing sufficient to establish

5    a *genuine dispute* of material fact regarding the existence of the essential elements of [the]

6    case that [they] must prove at trial."  *Galen v. County of Los Angeles*, 477 F.3d 652, 658

7    (9th Cir. 2007) (emphasis added).  Summary judgment is appropriate here because there are

8    no disputes of law or fact regarding Chakravarty's liability on Plaintiffs' eighth cause of

9    action for breach of fiduciary duty.

## I.

## CHAKRAVARTY OWED FIDUCIARY DUTIES TO TWP.

12       Fiduciary duties are vested in any officer who "has *some* discretion in managing

13   corporate affairs"—top level control is unnecessary.  *GAB Bus. Servs., Inc. v. Lindsey &*

14   *Newsom Claim Servs., Inc.*, 83 Cal. App. 4th 409, 419-21 (2000), *overruled on other*

15   *grounds*, 33 Cal. 4th 1140 (2004) (regional vice president was fiduciary); *see also Daniel*

16   *Orifice Fitting Co. v. Whalen*, 198 Cal. App. 2d 791, 797 (1962) (corporate vice-president

17   and chief engineer was fiduciary because he "participated in management").[12]  Officers of

18   *subsidiaries* to a corporation also owe fiduciary duties to the *parent* corporation.   In

19   *Richardson v. Reliance National Indemnity Co.*, Judge Breyer held that, under California

20   law, a director of a corporate subsidiary owes a fiduciary duty to shareholders of the

21   corporate parent.  No. C 99-2952 CRB, 2000 WL 284211, at *12 (N.D. Cal. Mar. 9, 2000).[13]

22          [12]This Court has stated that "California state law will govern" all the claims in this case
23   aside from one federal statutory claim.  Dkt. No. 85 at 16.  On November 9, 2009,
      Chakravarty moved to dismiss Plaintiffs' breach of contract claims based on California law.
24   Dkt. No. 161.

25          [13]*See, e.g.*, *Wenzel v. Mathies*, 542 N.W.2d 634, 641 (Minn. App. 1996) (directors of
      closely held bank owed fiduciary duty to equitable shareholders of the bank's holding
26   company); *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del.
      1988) ("in a parent and wholly-owned subsidiary context, the directors of the subsidiary are
27   obligated only to manage the affairs of the subsidiary in the best interests of the parent and
      its shareholders"); *Garner v. Pearson*, 374 F. Supp. 580, 586 (M.D. Fla. 1973) ("This duty
28   would be a duty owed by directors [of subsidiary] to the shareholder . . . of its parent"); *In re*
                                                                                    (continued . . . )

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

California law further vests *all* corporate employees with a duty of loyalty that requires them to refrain from competing with their employer. "California law does not authorize an employee to transfer his loyalty to a competitor. During the term of employment, an employer is entitled to its employees' undivided loyalty." *Fowler v. Varian Assocs., Inc.*, 196 Cal. App. 3d 34, 41 (1987) (citation and internal quotation marks omitted). This duty is breached, "and may give rise to a cause of action in the employer, when the employee takes action which is inimical to the best interests of the employer." *Stokes v. Dole Nut Co.*, 41 Cal. App. 4th 285, 295 (1995). Among other things, an employee is "obligat[ed] to share with his employer" any "substantial information" about competitors' plans to compete with the corporation—and an employee who refuses to do so, particularly when the employee is planning to *join* the competitor, is in breach of his or her duty of loyalty. *Fowler*, 196 Cal. App. 3d at 41, 42. In *Fowler*—a wrongful termination case—the court granted summary judgment on an employer's affirmative defense that a disloyal employee had breached his fiduciary duty of loyalty by failing to disclose his knowledge of a competitor's plans and found that the corporation had good cause to discharge the employee.[14]

The undisputed facts show that Chakravarty owed fiduciary duties to TWP—both as an employee of TWP and as an officer. Chakravarty "participated in [the] management" of and exercised "some discretionary authority" over TWP in at least two ways. *GAB Bus. Servs.*, 83 Cal. App. 4th at 420-21. *First*, Chakravarty was a Principal of TWP, a senior officer position at the company, and helped to create and manage Discovery Research for TWP. *See* pp.2-3, *supra*; Shin Decl. Ex. A at 6:6-13 (10/3/07 phone call transcript) ("I run the India office for the San Francisco based investment bank called Thomas Weisel Partners"). *Second*, Chakravarty was a Director of a TWP subsidiary (TWIPL) and had direct

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

---

( . . . continued)

*Westec Corp.*, 434 F.2d 195, 202 (5th Cir. 1970) (under Texas law, fiduciary duties of subsidiary's manager "should be seen as running to the shareholders of [parent company]").

[14] In *Stokes*, the court noted that fiduciary breaches like those in *Fowler* could be the basis for a tort claim by the employer for breach of fiduciary duty. 41 Cal. App. 4th at 295.

-14-

1  managerial authority over Discovery Research analysts and associates as the Head of
2  Research.  *See* pp.3-4, *supra*.

**II.**

**THE LAW PROHIBITS A FIDUCIARY FROM RECRUITING
EMPLOYEES OF HIS COMPANY ON BEHALF OF A
THIRD PARTY.**

6  Officers breach their fiduciary duty of loyalty by engaging in a "course of conduct . . .
7  designed to obtain for a competitor those of plaintiff's employees whom the competitor
8  could afford to employ and would find useful."  *Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d
9  327, 347-48 (1966); *see also GAB Bus. Servs.*, 83 Cal. App. 4th at 424 (breach of fiduciary
10  duty for officer to "recruit valued employees away from the corporation to, and into jobs
11  with the corporation's competitor").[15]

12  In *Bancroft-Whitney*, defendant Glen was president of plaintiff Bancroft-Whitney, a
13  publisher of law books with its principal place of business in San Francisco.  64 Cal. 2d at
14  330.  While still an employee of Bancroft-Whitney, he entered into negotiations with a rival
15  publisher, Matthew Bender ("Bender"), to become the head of a new Bender regional office
16  in San Francisco and recruited employees from Bancroft-Whitney on Bender's behalf.  Glen
17  identified Bancroft-Whitney employees to be recruited by Bender (*id*. at 336, 340); compiled
18  a list of Bancroft-Whitney candidates along with salary information (*id*. at 340-41); and gave
19  this list to Bender (*id*. at 341)—*conduct nearly identical to Chakravarty's*.

20  The California Supreme Court held that Glen's conduct violated an officer's duties to
21  his corporation:

> It is beyond question that a corporate officer breaches his fiduciary duties when, with the purpose of facilitating the recruiting of the corporation's employees by a competitor, he supplies the competitor with a selective list of the corporation's employees who are, in his judgment, possessed of both ability and the personal characteristics desirable in an employee, together with the salary the corporation

---

[15] These duties exist as a matter of law and are independent of any contractual relationship.  *GAB Bus. Servs.*, 83 Cal. App. 4th at 416-21; *accord Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 412 (2007) ("an agent's duty of loyalty arises not from any contract but from the parties' relationship").

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

is paying the employee and a suggestion as to the salary the competitor should offer in order to be successful in recruitment. (*id*. at 350-51)

*Bancroft-Whitney*, taking an expansive view of the information that an officer of a corporation is prohibited from revealing to a competitor, held that an unpublished list of salaries paid by a corporation to its employees is "confidential information and that an officer of a corporation violates his trust if he reveals it to a competitor for the purpose of enabling the solicitation of the corporation's employees by the competitor." *Id*. at 351. The court relied on the Restatement of Agency to explain that the rule prohibiting the disclosure of confidential information by an agent applies "'not only to those communications which are stated to be confidential, but also to information which the agent should know his principal would not care to have revealed to others or used in competition with him.'" *Id*. (citing *Restatement (Second) of Agency* §395 cmt. b).

Like Chakravarty, Glen did not stop at providing a list of employees he thought should be recruited. Glen helped Bender solicit the target Bancroft-Whitney employees—assistance which the California Supreme Court "condemned as a breach of his fiduciary duty." *Id*. at 352. Glen suggested tactics to be followed in discussions with the Bancroft-Whitney employees, discussed these employees with Bender during the recruiting campaign, personally approached them to offer employment, and communicated with Bender about the progress they were making in recruiting employees. *Id*. Also like Chakravarty, Glen was hired by the company for whom he did the recruiting; the California Supreme Court opined that this made his misconduct even more problematic:

> If Glen while still president of plaintiff had performed these acts on behalf of Bender Co. without also obligating himself to join the company, there could be no doubt that he would have violated his duties to plaintiff. Surely his position in this regard cannot be improved by the fact that he was also to be employed by Bender Co. and was to share in the profits of the new western division. (*id*. at 348)

The Supreme Court determined that it "need not decide whether any of these acts would constitute a breach of fiduciary duty, taken alone, since there can be little doubt that, in

-16-

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    combination, they show a course of conduct which falls demonstrably short of 'the most

2    scrupulous observance' of an officer's duty to his corporation."  *Id*.

3        Following *Bancroft-Whitney*, the court in *GAB Business Services* decided that a

4    corporate officer is disloyal when he uses "his insider's knowledge of employee skills and

5    salaries to recruit valued employees away from the corporation he owed a fiduciary duty to,

6    and into jobs with the corporation's competitor."   83 Cal. App. 4th at 424.[16]   In

7    *GAB Business Services*, the disloyal fiduciary, Neal, was regional vice president of GAB—a

8    claim adjusting company.  A competitor, Lindsey, approached Neal and offered to make him

9    its western regional manager.  Neal invited two friends at GAB to "explore the Lindsey

10   opportunity with him" and together they recruited fourteen other GAB employees.  *Id*. at

11   414-15.  The three conspirators and fourteen other GAB employees resigned *en masse*,

12   leaving "big holes" at GAB.  *Id*. at 415.  The court held that such conduct was ample

13   evidence to support a verdict for breach of fiduciary duty.  *Id*. at 423-24.  "Easing this

14   analysis is the striking similarity between Neal and that of an officer in *Bancroft-Whitney*

15   *Co. v. Glen*, who was found to have breached his fiduciary duty as a matter of law."  *Id*. at

16   423-24 (internal citation omitted).   The court pointed out that the faithless fiduciary's

17   conduct in *GAB Business Services* was "slightly worse" than in *Bancroft-Whitney* because

18   "Neal accomplished the solicitation himself, rather than merely 'facilitating' it."  *Id*. at 424.

19        In *American Republic Insurance Co. v. Union Fidelity Life Insurance Co.*, the Ninth

20   Circuit relied on *Bancroft-Whitney* to uphold a trial court finding of unfair competition on

21   the ground that a corporate manager of an insurance company breached his duty of loyalty

22   by recruiting his fellow employees to work for a competitor.[17]   470 F.2d 820 (9th Cir. 1972).

23   ───────────────

24        [16]In *GAB Business Services*, the plaintiff appealed the trial court's refusal to instruct
     the jury that the corporate officer defendant owed a fiduciary duty to his company as a
25   matter of law.  83 Cal. App.4th at 415.  The court of appeal ruled that the trial court's refusal
     was prejudicial error and that there was ample evidence to support a jury verdict in the
26   plaintiff company's favor on its breach of fiduciary duty claim, and reversed the judgment.
     *Id*. at 423.

27        [17]*American Republic* was decided under Oregon law, but nothing about the decision
     suggests a different outcome under California law—thus the reliance on *Bancroft-Whitney*.
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   In that case, the manager, Lindgren, decided to work for a rival insurer. *Id.* at 823-25.

2   Before resigning, Lindgren "attempted to persuade his subordinates to leave [his employer]

3   and join him at [his employer's competitor]. He succeeded to the extent that seven salesmen

4   signed contracts with him prior to April 22 [the resignation date] and eight others followed

5   thereafter." *Id.* at 823. The Ninth Circuit concluded that Lindgren's conduct was an

6   actionable wrong in contravention of the usual duty of loyalty owed to his employer. *Id.* at

7   824-25.

8        These cases are in accord with fundamental common-law principles. The *Restatement*

9   *(Second) of Agency* Section 393 notes that "an employee is subject to liability if, before or

10  after leaving the employment, he causes fellow employees to break their contracts with the

11  employer." *Id.* at cmt. e. The American Law Institute's Principles of Corporate Governance

12  state that "[a]lthough a senior executive or director may advise other officers and employees

13  of an intention to enter a competing business while still employed by the corporation, his or

14  her duty under §5.06 would be violated if, while still in the corporation's employ, the

15  director or senior executive attempts to persuade an employee to join the competing

16  business." *Principles of Corporate Governance* §5.06 illus. e.

17                                      **III.**

18   **THE UNDISPUTED FACTS PROVE THAT CHAKRAVARTY**
     **BREACHED HIS FIDUCIARY DUTY OF LOYALTY BY**
19   **RECRUITING DISCOVERY RESEARCH EMPLOYEES FOR**
                            **BNPP.**
20

21       The undisputed facts show that, by helping BNPP identify, solicit, and hire TWP's key

22  India research employees, Chakravarty's actions fell demonstrably short of "the most

23  scrupulous observance" of an officer's duty to his corporation and, taken together, constitute

24  a breach of his fiduciary duty. *Bancroft-Whitney*, 64 Cal. 2d at 348.

25

26

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

**A.   Chakravarty Violated His Fiduciary Duties As An Officer Of TWP.**

**1.   Chakravarty Provided BNPP With Key Information About Discovery Research Employees.**

Chakravarty's undisputed conduct was nearly identical to that condemned by *Bancroft-Whitney* as being "beyond question" a breach of fiduciary duty.  Chakravarty supplied BNPP "with a selective list of the corporation's employees who are, in his judgment, possessed of both ability and the personal characteristics desirable in an employee, together with the salary the corporation is paying the employee and a suggestion as to the salary the competitor should offer in order to be successful in recruitment."  *Id*. at 350-51; *see* pp.6-11, *supra*.

BNPP asked Chakravarty to identify a "core group"[18] of employees and Chakravarty did so.  Like the faithless fiduciary in *Bancroft-Whitney*, Chakravarty betrayed TWP by providing BNPP with employee lists containing compensation information, including suggested compensation, work experience, educational qualifications, and industry expertise.  *See* pp.6-11, *supra*.  Specifically:

- On October 15, 2007, Chakravarty emailed to BNPP a spreadsheet that he explained "contains 07 base, 07 bonus, expected 08 base and proposed BNP 08 base and bonus, # of years of work experience and educational qualifications for each [targeted Discovery Research analyst]."  Shin Decl. Ex. I.  Chakravarty highlighted the analysts that would move with him and he proposed "pick[ing] the 14 most experienced" associates.  *Id.*

- On October 17, 2007, Chakravarty emailed to BNPP a spreadsheet, which included "the sectors of each analyst."  *Id*., Ex. J.

- On October 26 and 30, 2007, Chakravarty emailed to BNPP a "spreadsheet with proposed numbers and current base for all" along with a zip file "with all analyst profiles".  *Id*., Ex. L.

_____

[18]Shin Decl. Ex. F.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

The California Supreme Court has held that officers are prohibited from providing such information to a competitor and that an officer, by making such disclosures, "violates his trust if he reveals it to a competitor for the purpose of enabling the solicitation of the corporation's employees by the competitor." *Bancroft-Whitney*, 64 Cal. 2d at 351.

### 2. Chakravarty Helped BNPP Solicit Discovery Research Employees.

Like the faithless fiduciary in *Bancroft-Whitney*, Chakravarty also helped BNPP solicit the targeted employees. *See* pp.4-12, *supra*. The California Supreme Court has deemed such conduct to violate the duty of loyalty. *Bancroft-Whitney*, 64 Cal. 2d at 352.

Chakravarty helped to arrange BNPP's interviews of Discovery Research employees, including sending Harris a "proposed schedule" for ten Discovery Research analysts along with their sector coverage, years of experience, and education. Shin Decl. Ex. K. Chakravarty scheduled times to meet with BNPP before, during, and after these interviews. *Id*. Chakravarty helped to coordinate the Discovery Research employees' contract discussions and resignations. *See* pp.11-12, *supra*. He emailed BNPP a spreadsheet that contained a section entitled "Timelines" setting out dates for the analysts', associates', and his resignations; for the signing of bonus payments; and the start date at BNPP. Shin Decl. Ex. L. Chakravarty also relayed information between Discovery Research employees and BNPP during the contract discussions. *Id*., Ex. B at 226:17-227:7 (Chakravarty Dep.); *see* pp.11-12, *supra*.

The California Supreme Court has held that "assistance" such as that provided by Chakravarty to BNPP is "to be condemned as a breach of [ ] fiduciary duty." *Bancroft-Whitney*, 64 Cal. 2d at 352.

### B. Chakravarty Violated His Duty Of Loyalty As An Employee Of TWP By Withholding From Senior TWP Managers That BNPP Was Recruiting Discovery Research Employees.

Chakravarty did not tell Dhillon or any of the other senior TWP senior managers involved with Discovery Research that BNPP was recruiting Discovery Research employees. *See* pp.11-12, *supra*. Chakravarty's failure to disclose this information was a violation of his obligation as an employee "to share with his employer" any "substantial

-20-

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    information" about a competitor's plans to compete with the corporation—particularly when

2    he was planning to join the competitor.  *Fowler*, 196 Cal. App. 3d at 41-42.

3         In *Fowler*, Varian Associates fired a disloyal employee, Fowler, who then sued the

4    company for wrongful termination.  *Fowler v. Varian Assocs., Inc.*, 196 Cal. App. 3d 34

5    (1987).  As an affirmative defense, Varian argued that Fowler had breached his duty of

6    loyalty to Varian and the appellate court affirmed an award of summary judgment in

7    Varian's favor.  *Id*. at 37.  Fowler had been Varian's marketing manager when a potential

8    competitor to Varian began courting him and exchanging information with Fowler about

9    future plans.  *Id*. at 41-42.  Fowler withheld this information from Varian.  *Id*.  The appellate

10   court held that Fowler had "an acknowledged obligation to share with his employer

11   information about competitors' plans" and that his silence was "fundamentally inconsistent

12   with his duty of loyalty to Varian"—particularly because he was planning on joining the

13   competitor.  *Id*. at 42.

14        Like the disloyal employee in *Fowler*, Chakravarty violated his employee duty to

15   prefer TWP's interests over those of BNPP.  Chakravarty knew that BNPP was interested in

16   recruiting research employees and that BNPP was looking for Discovery Research

17   employees "to resign from Thomas Weisel enmass."  *See* pp.4-7, *supra*.  BNPP and

18   Chakravarty both understood and expected that this *en masse* resignation could result in

19   TWP shutting down its India operations: "we'd look to you to resign from Thomas Weise

20   enmass.  If their reaction is that they'd move to shut down the remainder of the office, we

21   can step in and offer to take over the remainder as a gesture to save them the office

22   shutdown costs."  Shin Decl. Ex. F; *see id*., Ex. G.  This certainly constituted the sort of

23   "substantial information" about a competitor's plans that Chakravarty was obligated to

24   disclose to TWP.

25        As a matter of law, Chakravarty transferred his allegiance to BNPP while still

26   employed by TWP, and, as a result, violated his fiduciary duty of loyalty to TWP.

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

-21-

1

**CONCLUSION**

2          For the foregoing reasons, Plaintiffs respectfully request that the Court enter judgment

3    for Plaintiffs on the eighth cause of action for breach of fiduciary duty against Defendant

4    Praveen Chakravarty.

5    DATED:  January 14, 2010              GILBERT R. SEROTA
                                          CLARA J. SHIN
6                                         MICHAEL L. GALLO
                                          JOHN P. DUCHEMIN
7                                         HOWARD RICE NEMEROVSKI CANADY
                                                FALK & RABKIN
8                                         A Professional Corporation

9
                                          By:_____*s/Clara J. Shin*_____
10                                                 CLARA J. SHIN

11                                        Attorneys for Plaintiffs THOMAS WEISEL
                                          PARTNERS LLC and THOMAS WEISEL
12                                        INTERNATIONAL PRIVATE LIMITED

13

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28