UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS WEISEL PARTNERS LLC and THOMAS WEISEL INTERNATIONAL PRIVATE LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>BNP PARIBAS, BNP PARIBAS SECURITIES (ASIA) LIMITED and PRAVEEN CHAKRAVARTY,<br><br>Defendants. | No. C 07-6198 MHP<br><br>**MEMORANDUM & ORDER**<br><br>**Re: Plaintiffs' Motion for Partial Summary Judgment on the Eighth Cause of Action for Breach of Fiduciary Duty against Defendant Praveen Chakravarty** |

Plaintiffs Thomas Weisel Partners LLC ("TWP") and Thomas Weisel International Private Limited ("TWIPL") (collectively "plaintiffs") filed this action against defendants BNP Paribas ("BNP Paribas"), BNP Paribas Securities (Asia) Limited ("BNP Paribas Asia") (collectively "BNPP") and Praveen Chakravarty ("Chakravarty") alleging several violations of law involving the en masse resignation of numerous employees of plaintiffs and their hiring by BNPP. Now before the court is plaintiffs' motion for partial summary judgment on liability on their eighth cause of action for breach of fiduciary duty against Chakravarty. Having considered the parties' arguments and submissions and for the reasons stated below, the court enters the following memorandum and order.

BACKGROUND

The relevant facts, taken in the light most favorable to Chakravarty, are as follows. TWP is an investment bank headquartered in San Francisco, California. Docket. No. 178-1 (Fisher Dec.) ¶ 2. In 2005, TWP founded Discovery Research in Mumbai, India, to provide lower cost equity research to TWP's clients. *Id.* ¶ 3. TWP also established TWIPL to hold its Indian operations, including Discovery Research. *Id.* Chakravarty joined TWP as an equity research associate in 2003 and was transferred to Mumbai in 2005. Docket No. 191 (Chakravarty Dec.) ¶¶ 2 & 3. Chakravarty was promoted to Principal at TWP in 2007. Fisher Dec. ¶ 4. He also held the title of Director of Discovery Research and was an appointed Director on TWIPL's Board of Directors. Docket No. 219 (Chakravarty Answer) ¶ 25. In India, Chakravarty reported directly to Karanveer Dhillon ("Dhillon"), the CEO of TWIPL and a senior partner at TWP, and had a "dotted line" or indirect reporting relationship with Steve Buell ("Buell"), the Head of Research at TWP. Chakravarty Dec. ¶ 5. Chakravarty had managerial responsibility for the research analysts working for Discovery Research in India. Fisher Dec. ¶ 6; Docket No. 178-2 (Shin Dec.), Exh. B (Chakravarty Depo.) at 35 ("the writing Discovery Research analysts reported in to me"). Plaintiffs state that Chakravarty informed TWP via email on November 6, 2007, that he "would be unable to continue at TWP" and that TWP terminated his employment for cause on November 7, 2007. Fisher Dec. ¶¶ 7 & 8. Chakravarty states that he resigned from TWIPL on November 6, 2007. Chakravarty Answer ¶ 15. Chakravarty received an offer of employment from BNPP on November 1, 2007, and began officially working for BNPP on December 3, 2007. Chakravarty Dec. ¶¶ 33 & 35.

In their eighth cause of action, plaintiffs allege that Chakravarty occupied a position of trust and confidence with TWP by virtue of his employment with TWP, his position as Director of Discovery Research and his position as a corporate director of TWIPL. Docket No. 159 (Second Amended Complaint ("SAC")) ¶ 107. As such, plaintiffs contend, Chakravarty owed TWP fiduciary duties of loyalty and confidentiality, which he ultimately breached by facilitating a raid on Discovery Research's employees by BNPP prior to Chakravarty's departure from plaintiffs' employ. *Id.* ¶¶ 3, 107 & 108. Chakravarty admits exploring employment opportunities at BNPP and that he

served as an "intermediary of information between [BNPP] and his coworkers in the hope that some of them might secure alternative employment." Chakravarty Answer ¶ 108.

Chakravarty initially contacted Pierre Rousseau ("Rousseau"), BNP Paribas's Global Head of Equity Brokerage and a Director and CEO of BNP Paribas Asia, via email in September 2007. Docket No. 160 (BNPP Answer) ¶¶ 27 & 29; Chakravarty Answer ¶ 29. In that email, Chakravarty expressed his interest in meeting with Rousseau in Mumbai to discuss BNPP's potential entry into India and stated that "we have an existing operation that may be of interest." Shin Dec., Exh. C (Nov. 21-24, 2007 Email Chain) at BNP040193. On October 3, 2007, Chakravarty and Rousseau first spoke by telephone. BNPP Answer ¶ 29; Chakravarty Dec. ¶ 26. During that conversation, Rousseau stated that he was recruiting people for a new operation in India and asked Chakravarty whether the Discovery Research "platform will be for sale." Shin Dec., Exh. A (Transcript of Telephone Conversation between Rousseau and Chakravarty) at 4, 13.[1] Chakravarty replied that he could "make that happen." *Id.* at 13. Chakravarty subsequently met with Rousseau and Jonathan Harris ("Harris"), BNP Paribas Asia's Regional Head of Company Research, in Mumbai on October 11, 2007. BNPP Answer ¶¶ 27 & 30; Chakravarty Answer ¶ 30. During this visit, Chakravarty introduced the two BNPP representatives to six Discovery Research analysts. Chakravarty Depo. at 177; Shin Dec., Exh. G (Memorandum) at BNP040758 (stating, in memorandum from Harris to BNPP executives describing the Discovery Research opportunity, that he met with six senior analysts in the office).

On October 15, Harris sent an email to Chakravarty's TWP email account, describing next steps. Shin Dec., Exh. F (Oct. 15, 2007 Email Chain). Harris wrote that:

> [a]s we discussed, the way we'd like to take this forward is to first identify the core group of your team, I think you said about 20-25 individuals. We'd like to then work on preparing employment documents for all of them. Once you have them and all is satisfactory, we'd look to you to resign from Thomas Weisel enmass [sic]. If their [TWP's] reaction is that they'd move to shut down the remainder of the office, we can step in and offer to take over the remainder as a gesture to save them the office shutdown costs.
>
> First step would be to get from you a list of all employees, their current comp and job descriptions. Next I'd like you to highlight the 20 or 25 key individuals, and a bit more info on their job descriptions and background. For this group, please include an

3

  indication of what comp levels you would think about for their move to BNP Paribas. Once I get this from you, you and I can arrange for a call to talk through the info.

*Id.* at BNP039416.

  That same day, Chakravarty sent a response email to Harris and Rousseau. Chakravarty wrote:

> As requested, [I] am attaching a spreadsheet that contains 07 base, 07 bonus, expected 08 base and proposed BNP 08 base and bonus, # of years of work exeprience [sic] and educational qualifications for each. Note: Sheet has ALL analysts and the ones highlighted in green are the ones that will move with me. For associates, we have total [sic] of 28 associates of which I propose to pick the 14 most experienced ones. . . . Let me know who you want to talk to and [I] can arrange for it immediately. You can call each on their cell phones. You are not obliged to take the entire team. The minimum we can go with is 8 analysts and the rest are available as needed. If we close the deal with 8 analysts, me and the HR/Prod Mgmt. person quickly, then we can try to bid for the office space and others.

Shin Dec., Exh. I (Oct. 15, 2007 Email from Chakravarty to Harris and Rousseau) at BNP040669. Attached to the email was the spreadsheet referenced by Chakravarty which listed the 2007 base salary, 2007 bonus, 2007 total compensation, expected 2008 base salary, the proposed base salary at BNPP, the proposed guaranteed bonus at BNPP, the proposed total compensation at BNPP, and number of years of work experience for 13 analysts and 14 research associates at TWP. Shin Dec., Exh. I (Spreadsheet). On the spreadsheet, Chakravarty highlighted, in green, the analysts that he thought would be most valuable to bring to BNPP. *See id.*

  Later that same day, October 15, 2007, Harris sent an email to a number of BNPP email addresses, including Rousseau's. Shin Dec., Exh. G (Oct. 15, 2007 Email from Harris). The email explained that during "my visit to India last week, we found a very interesting and cost effective possible solution to building equity research capabilities in India." *Id.* at BNP041580. Harris attached two documents to the email: (1) the spreadsheet that he had been provided by Chakravarty, *see* Shin Dec., Exh. G (Spreadsheet), and (2) a three-page, single-spaced memorandum regarding the opportunity "to acquire the team, and possibly total operation, of Discovery Research," *see id.* (Memorandum) at BNP040758.

4

On October 17, 2007, Chakravarty emailed a revised version of the spreadsheet to Harris which included an additional column indicating the sector coverage for each of the 13 analysts. Shin Dec., Exh. J (Revised Spreadsheet).

On October 22, 2007, Harris emailed Chakravarty, writing that "[f]or later this week, I'd like to set up individual meetings with your 12 core analysts . . . . I'd propose that we book a room in the business center of the Oberoi in which to conduct the meetings. If there are others from your team that you think we should meet with, please let us know. . . . We'll need to schedule at least an hour meeting with you to go through the details." Shin Dec., Exh. K (October 22-23, 2007 Email Chain) at BNP039388-89. Chakravarty subsequently emailed Harris with a "proposed schedule" for Harris and other BNPP representatives to meet with ten Discovery Research analysts and Chakravarty's "HR/Prod Mgmt" on October 25 and October 26, 2007. *Id.* at BNP039388. Chakravarty's email reveals that he intended to take an active role in the interview process: "I will meet all of you for breakfast . . . . We start analyst meetings (10 analysts) at 10am . . . . I will do a follow-up meeting [with you] . . . . We can do a final wrap on Friday before your flight Friday evening." *Id.*[2] Chakravarty has submitted sworn declaration testimony that he did not participate in the analyst interviews. Chakravarty Dec. ¶ 29.

On October 26 or 27, 2009, apparently after BNPP had completed its interview of the Discovery Research analysts, Chakravarty sent an email to Harris and attached two documents. The first was another spreadsheet, which included the names of 10 analysts and 13 associates, their TWP compensation and their proposed BNPP compensation. Shin Dec., Exh. L (Spreadsheet). The spreadsheet also included proposed compensation for Chakravarty of $500,000 ($250,000 base salary, $250,000 bonus), as well as perks he expected to receive (house, club membership and kid's school). *Id.* In addition, the spreadsheet set forth the following "timelines" for effectuating the new venture:

5

| Contracts for Praveen and Analysts | 1-Nov |
|---|---|
| Analysts Signing Bonus payment | 8-Nov |
| Analysts Resign | 10-Nov |
| Praveen Signing Bonus payment | 11-Nov |
| Praveen Resigns | 13-Nov |
| Contracts for Associates & Support | 17-Nov |
| Associates & Support Signing Bonus | 21-Nov |
| Associates Resign | 23-Nov |
| Support Staff Resign | 23-Nov |
| TWP Decision on Real Estate | 8-Dec |
| Start Date | 9-Jan |

On November 1, 2007, Harris emailed Chakravarty that "[w]e are on track on our side for delivery of contracts today. Shin Dec., Exh. M (Nov. 1, 2007 Email Chain) at BNP039983. Chakravarty later responded that he had "reviewed the contracts" and was "getting analysts to sign them." *Id.*[3] Chakravarty also suggested that Harris consider hiring an additional analyst and offered to "schedule a phone conversation for" Harris if Harris was interested. *Id.* At a minimum, Chakravarty served as a "messenger . . . conveying information, relaying information between some Discovery Research analysts and Mr. Harris and others at BNP." Chakravarty Depo. at 226-27.

At least eighteen TWIPL analysts resigned between approximately October 31 and November 6, 2007, *see* Docket No. 193-215 (Employee Declarations), and Chakravarty himself resigned from TWIPL on Nov. 6, 2007, Chakravarty Answer ¶ 15. At no point prior to his departure from plaintiffs' employ did Chakravarty inform Dhillon, his supervisor, that he was facilitating BNPP's recruitment of Discovery Research employees. Chakravarty Depo. at 236-37. Chakravarty has presented some evidence that on November 2, 2007, he approached both Dhillon and Buell to inform them that BNPP might be interested in a joint venture with TWIPL, which would include making a bid to take over TWIPL's offices and the remainder of TWIPL's employees. Chakravarty Dec. ¶ 34. TWP did not pursue the opportunity. BNPP ultimately hired over twenty Discovery

6

1 Research employees for its new India operations and appointed Chakravarty the Chief Executive
2 Officer and Acting Head of Equity Research in India. Shin Dec., Exh. N (BNPP Employees from
3 Thomas Weisel); *id.*, Exh. O (BNPP Announcement); BNPP Answer ¶ 49; Chakravarty Answer
4 ¶ 49. Unable to continuing operating the Mumbai office after the loss of these employees, plaintiffs
5 announced the closure of the office on December 6, 2007. SAC ¶ 10; *see* Docket No. 190 (Calabria
6 Dec.), Exh. 8 (Paul Slivon ("Slivon") Depo.) at 270.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), " [a] party claiming relief may move . . . for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(a). "An interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages." Fed. R. Civ. P. 56(d)(2). Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-55 (1986). A fact is "material" if it may affect the outcome of the proceedings, and an issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248. The court may not make credibility determinations. *Id.* at 255. The moving party bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Anderson*, 477 U.S. at 250.

## DISCUSSION

7

"To establish a cause of action for breach of fiduciary duty, a plaintiff must demonstrate the existence of a fiduciary relationship, breach of that duty and damages." *Charnay v. Cobert*, 145 Cal. App. 4th 170, 182 (2006). The court discusses each element in turn.

I. <u>Existence of Fiduciary Duty</u>

Corporate officers and directors stand in a fiduciary relation to the corporation and its stockholders and are not permitted to use their position of trust and confidence to further their private interests. *Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 345 (1966) (quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939)).[4] A rule established by public policy " 'demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty.' " *Id.* A company's fiduciaries are not limited solely to those individuals who exercise "top-level control"; rather, "an officer who participates in management of the corporation, exercising some discretionary authority, is a fiduciary of the corporation as a matter of law." *GAB Business Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.*, 83 Cal. App. 4th 409, 420-21 (2000), *overruled on other grounds by*, *Reeves v. Hanlon*, 33 Cal. 4th 1140 (2004); *see also Sequoia Vacuum Sys. v. Stransky*, 229 Cal. App. 2d 281, 287 (1967) (holding that a fiduciary duty existed where the defendant was a "managerial employee and director of the . . . corporation"). A fiduciary of a subsidiary also owes a fiduciary duty to the subsidiary's parent corporation. *See Richardson v. Reliance Nat'l Indem. Co.*, No. C-99-2952, 2000 WL 284211, at *12 (N.D. Cal. Mar. 9, 2000) (Breyer, J.) (concluding that California courts would hold that a director of a subsidiary owes fiduciary duties to the shareholders of the parent corporation); *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1174 (Del. 1988) ("[I]n a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders."). In addition, "an employer is entitled to its employees' 'undivided loyalty' " during the term of employment. *Fowler v. Varian Assocs., Inc.*, 196 Cal. App. 3d 34, 41 (1987) (quoting *Sequoia*, 229 Cal. App. 2d at 287). "The duty of loyalty is breached . . . when the employee takes action which is inimical to the best interests of the employer." *Stokes v. Dole Nut Co.*, 41 Cal. App. 4th 285, 295 (1995).

8

United States District Court
For the Northern District of California

The undisputed record in this case indicates that Chakravarty was an appointed Director on TWIPL's Board of Directors and was "Head of Research" for TWIPL, Chakravarty Answer ¶ 25; Fisher Dec. ¶ 5; that in February 2007, TWP promoted Chakravarty to "Principal," which is a senior officer position within TWP, Fisher Dec. ¶ 4; that only one individual located in India was superior to Chakravarty with respect to Discovery Research, *id.*; and that all of Discovery Research's analysts reported to Chakravarty, Chakravarty Depo. at 35 ("[T]he writing Discovery Research analysts reported in to me."). Evidence submitted by Chakravarty himself demonstrates that he was a member of the Discovery Research management team. Chakravarty Dec., Exh. F (Discovery Research Brochure) (listing Chakravarty in the "Our Team" section as a Director and member of the "Management Team"). In addition, Chakravarty stated to Rousseau during their initial conversation about Discovery Research (which was recorded) that he "r[an] the India office for" TWP and that he "literally . . . built [Discovery Research] from zero to 50 people and trained them and recruited them and all that." Shin Dec., Exh. A (Transcript of Telephone Conversation between Rousseau and Chakravarty) at 6, 14. Moreover, the record indicates that Chakravarty exercised some control over Discovery Research's budget and the bonuses awarded to Discovery Research employees. *See* Calabria Dec., Exh. 33 (Oct. 2, 2007 Email Chain) (emails from Slivon to Chakravarty exhorting Chakravarty to meet with Hans Buehlmann to "arrive[] at a new [budget] number" and chastising Chakravarty for "advancing personnel salary bonus [sic] too fast relative to experience").

Chakravarty argues in opposition that the titles bestowed upon him by TWP—Director, Principal, Head of Research—were meaningless, and that therefore, plaintiffs have failed to establish that he owed a fiduciary duty to TWP as a matter of law. In the alternative, Chakravarty complains that plaintiffs have refused to make a Rule 30(b)(6) witness available to testify regarding the import of Chakravarty's various titles and whether the TWIPL Board of Directors was a meaningful entity. Chakravarty also argues that he lacked the authority to hire or fire Discovery Research employees and thus did not exercise management authority. In so arguing, however, Chakravarty ignores the evidence of his actual duties at Discovery Research. The uncontroverted record establishes that Chakravarty ran Discovery Research and managed all of its approximately 50

9

1    employees. His own statements indicate that he exercised at least some control, if not direct
2    authority, over whom to hire and how much to pay them. In addition, hiring and firing authority is
3    not a required element of management authority. In *GAB*, for instance, the court rejected the
4    defendant's argument that his lack of unilateral authority over hiring and firing demonstrated his
5    lack of management authority; the court noted that "the test for fiduciary status is not control" but
6    rather "merely *participation* in management." *GAB*, 83 Cal. App. 4th at 422 (emphasis in original).
7    California courts have found the existence of a fiduciary duty in far less compelling circumstances
8    than those presented by Chakravarty. *See IDX Tech., Inc. v. Aspen Elecs., Inc.* No. G025520, 2001
9    WL 1382758, at *3 (Cal. Ct. App. Nov. 7, 2001) (holding that non-officer who supervised two
10   employees owed fiduciary duty to employer). Therefore, even if TWIPL's Board of Directors was a
11   "sham" and even if the titles of "Head of Research" and "Principal" were entirely devoid of
12   meaning, Chakravarty was "an officer who participate[d] in management of the corporation,
13   exercising some discretionary authority." *GAB*, 83 Cal. App. 4th at 420-21. Accordingly, the court
14   holds, as a matter of law, that Chakravarty owed a fiduciary duty to TWIPL and to TWIPL's parent
15   company, TWP.[5]

16   II.    <u>Breach of Fiduciary Duty</u>

17          A fiduciary breaches his fiduciary duty as a matter of law when "the undisputed evidence
18   shows a consistent course of conduct by him designed to obtain for a competitor those of plaintiff's
19   employees whom the competitor could afford to employ and would find useful." *Bancroft-Whitney*,
20   64 Cal. 2d at 347-48. The facts of the seminal case on this issue, *Bancroft-Whitney*, are eerily
21   similar to the undisputed record in the instant action. In *Bancroft-Whitney*, the president of
22   Bancroft-Whitney, Judson B. Glen ("Glen"), was contacted by a competitor, Matthew Bender & Co.
23   ("Bender"), to establish a West Coast office for Bender. Glen was interested, and, while still
24   employed by Bancroft, signed a contract to begin working for Bender a few months later. Before
25   resigning from Bancroft, Glen went about systematically raiding Bancroft's employees for Bender's
26   benefit. Initially, Glen arranged for meetings between Bender representatives and key, high-ranking
27   Bancroft personnel and, when they expressed interest in leaving Bancroft, drew up contracts for
28

10

those employees to officially join Bender. Glen and those employees then explicitly identified 14 other Bancroft employees to target, after discussing all 56 Bancroft employees' strengths and weaknesses, current salaries at Bancroft, and the compensation that might entice them to leave for Bender. The targeted employees were then contacted by representatives from Bender, who offered to have them join the new venture; in each instance, the salary offered by Bender was in excess of the employees' current salaries at Bancroft. Twelve of the lower-level employees ultimately accepted Bender's offer. A few days later, Glen, the high-ranking Bancroft executives, and the twelve employees all resigned en masse. *Id.* at 335-44.

In holding that Glen had breached his fiduciary duty to Bancroft-Whitney, the California Supreme Court focused on the information and assistance that Glen provided to Bender. With respect to the information, the court concluded that

> [i]t is beyond question that a corporate officer breaches his fiduciary duties when, with the purpose of facilitating the recruiting of the corporation's employees by a competitor, he supplies the competitor with a selective list of the corporation's employees who are, in his judgment, possessed of both ability and the personal characteristics desirable in an employee, together with the salary the corporation is paying the employee and a suggestion as to the salary the competitor should offer in order to be successful in recruitment.

*Id.* at 350-51. As for conduct, the court condemned the "assistance given by [the defendant] to the solicitation of the [employees] on the list . . . as a breach of his fiduciary duty." *Id.* at 352. This was so because "Glen not only provided the list on which the recruiting was based, but he suggested certain tactics to be followed in discussions with the [employees], . . . discussed the persons on the list with [a Bender representative] during the recruiting campaign, and, in Glen's own words" wanted to be kept in the loop so that " 'he . . . c[ould] cooperate to full advantage.' " *Id.* at 352. The court also relied upon the fact that Glen initially personally approached the high-ranking Bancroft employees and offered them employment contracts with Bender. *Id.* at 339-40, 352. The court found it particularly damning that the defendant was also to be employed by the competitor whose employee-raid he had facilitated. *Id.* at 348.

Even viewing the record in the light most favorable to Chakravarty, Chakravarty's conduct is materially indistinguishable from the breach of fiduciary duty in *Bancroft-Whitney*. The undisputed

11

facts establish that Chakravarty provided BNPP with detailed salary information for all analysts and associates employed by TWIPL. From that complete list, Chakravarty identified for BNPP the "key members" of his team who he believed would make the move with him and would make the best employees for the new BNPP venture. Chakravarty then proceeded to coordinate interviews between BNPP representatives and the Discovery Research analysts that he specifically targeted, set forth a schedule for when those moving to BNPP would enter into contracts and would resign from TWILP, and helped BNPP ensure that the contracts were, in fact, delivered and entered into. In so acting, Chakravarty provided BNPP with information and engaged in conduct that violated his fiduciary duty to TWP.

Chakravarty attempts to distinguish his conduct on a number of unpersuasive grounds. Firstly, he claims that the salary information he passed on to BNPP was not confidential because he obtained the information from the analysts themselves, who granted him permission to provide it to BNPP. In his declaration, Chakravarty explains that

> I did not pass along compensation information without first seeking permission and the information itself from the Discovery Research analysts; and I did not reveal any confidential information to BNP Paribas much less any trade secrets. I did not obtain analyst or associate compensation from TWIPL or TWP's computers or from anywhere within TWIPL or TWP. Instead the analysts gathered together during non-work hours and provided me their own base salary information, as well as the approximate base salary information of the associates with whom they worked. . . .
> [¶] The 2007 and 2008 bonus information that was provided to BNP Paribas did not reflect actual bonuses Discovery Research analyst [sic] and associates had received in 2007 or expected to receive in 2008. Rather, the analysts decided to provide desired bonuses rather than actual bonuses to BNP Paribas in an effort to negotiate a better compensation package for themselves and for their associates. Moreover, the educational qualifications and sector coverage for each of these analysts was information which was distributed outside of TWIPL.

Chakravarty Dec. ¶¶ 30-31. Although this statement *might* absolve Chakravarty for divulging the salary information for the analysts, it does not acquit him from providing BNPP with the salary information of the associates employed by Discovery Research. There is no evidence anywhere in the record that Chakravarty sought permission from any of the associates prior to turning their salary information over to BNPP. Even if the associate salary information were approximations derived by the analysts, Chakravarty was only privy to those approximations by reason of the position of trust

12

1   that he inhabited with TWP. Furthermore, the conclusion that Chakravarty breached his duty to
2   TWP would be no different even accepting the dubious proposition that none of the information that
3   Chakravarty turned over to BNPP was confidential. The *Bancroft-Whitney* court explicitly held that
4   its conclusion that Glen breached his fiduciary duty was "inescapable *even if the information*
5   *regarding salaries is not deemed to be confidential.*" *Id.* at 351 (emphasis added). And
6   Chakravarty's argument regarding the non-confidential nature of the information entirely ignores the
7   myriad other ways in which he facilitated the en masse exodus of Discovery Research employees to
8   BNPP, discussed more fully below.
9       Secondly, Chakravarty asserts that *Bancroft-Whitney* is inapposite because (1) Discovery
10  Research was about to be shut down and (2) Discovery Research employees were disgruntled and
11  looking for other employment opportunities, whereas the employees poached by Bender were not
12  otherwise predisposed to leave Bancroft-Whitney. However, an individual's fiduciary duty toward
13  his employer continues until either the corporation to which the duty is owed ceases to exist or the
14  fiduciary resigns. *See GAB*, 83 Cal. App. 4th at 421 (holding that a fiduciary must resign in order to
15  divest himself of fiduciary duties)*; Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914 (Del.
16  2003) (holding that fiduciary duties continued even after the corporation had completed a merger
17  agreement); *N. Am. Catholic Educ. Programming Found. v. Gheewalla*, 930 A.2d 92, 101 (Del.
18  2007) (holding that fiduciary duties continue even when a corporation is "navigating in the zone of
19  insolvency"). In addition, pre-existing employee dissatisfaction with an employer is relevant only to
20  the amount of damages, not to the breach of fiduciary duty itself. *See Am. Republic Ins. Co. v.*
21  *Union Fid. Life Ins. Co.*, 470 F.2d 820, 826 (1972) ("The existence of high turnover and employee
22  dissatisfaction is significant only in determining the extent of American's loss attributable to
23  Lindgren's actions," where Lindgren had solicited subordinate employees to move with him to a
24  competitor).[6]
25      Thirdly, Chakravarty contends that because Discovery Research and the new BNPP venture
26  were not direct competitors, there can be no finding of a breach of his fiduciary duty to TWP.
27  Chakravarty cites no authorities for the proposition that the fiduciary duty can be breached only by
28

13

facilitating the movement of employees to a competitor.[7] Assuming competition is a relevant factor and assuming that TWP and BNPP were not, in fact, competitors, the court would still reach the same conclusion. For there is absolutely no dispute that Discovery Research and BNPP were competitors in the labor market for skilled financial analysts and associates. Otherwise, BNPP would not have had any interest in acquiring a large number of Discovery Research's employees.

Fourthly, Chakravarty avers that his conduct does not amount to breach because, unlike the defendant in *Bancroft-Whitney*, Chakravarty never solicited Discovery Research employees on behalf of BNPP and did not "encourage or coerce" Discovery Research employees to leave for BNPP. Chakravarty Dec. ¶ 29. The record is far less clear on this issue than Chakravarty suggests; Chakravarty "solicited" Discovery Research analysts by conveying BNPP's interest in hiring those analysts. And, by setting up interviews, reviewing contracts and getting contracts signed by the analysts, it could be argued that he "encouraged" them to leave Discovery Research for BNPP by smoothing the transition process. Regardless, nothing in *Bancroft-Whitney* indicates that solicitation, encouragement or coercion are prima facie elements necessary for a finding of breach of fiduciary duty. Rather, *Bancroft-Whitney* explains that the fiduciary duty is breached when an employee who owes that duty engages in a "a consistent course of conduct . . . designed to obtain for a competitor those of plaintiff's employees whom the competitor could afford to employ and would find useful." *Bancroft-Whitney*, 64 Cal. 2d at 347-48. That is exactly what Chakravarty did. He initiated contact with BNPP and informed BNPP that the Discovery Research platform was for sale. He provided BNPP with at least some information regarding salaries to which he was only privy because of the position of trust that he held within TWP. He specifically suggested that BNPP target some, but not all, of Discovery Research's employees, because those employees were "key members" of his team, i.e., the employees best suited for the new BNPP venture. And he facilitated the movement of those targeted employees by coordinating interviews and serving as a conduit of information between BNPP and the employees. Thus, whether Chakravarty technically solicited, encouraged or coerced any of the employees is irrelevant. The sum of his conduct clearly meets the *Bancroft-Whitney* standard.

14

1     At the hearing on the motion, Chakravarty argued that declarations submitted by Discovery
2 Research employees all state that Chakravarty neither lured employees to BNPP nor encouraged or
3 coerced them to leave Discovery Research. While it is true that each employee declaration disavows
4 any coercion to resign from TWIPL or encouragement from Chakravarty to leave Discovery
5 Research, the declarations notably fail to mention how each individual learned of the BNPP
6 opportunity. None of the declarations contradicts the evidence showing that Chakravarty provided
7 useful information to BNPP about each employee, organized interviews of Discovery Research
8 employees by BNPP, reviewed the employment contracts offered by BNPP, and facilitated the
9 contract signing process for the Discovery Research employees who chose to join BNPP.
10 Ultimately, the employee declarations submitted in support of Chakravarty's opposition fail to
11 contradict that Chakravarty's actions, in breach of his fiduciary duty to plaintiffs, were the but-for
12 cause of the en masse resignation of several Discovery Research employees in the first week of
13 November 2007. Had Chakravarty not initiated contact with BNPP, provided employee information
14 to BNPP, introduced BNPP representatives to Discovery Research analysts, set up interviews
15 between BNPP and Discovery Research employees, and facilitated the signing of BNPP
16 employment contracts by Discovery Research employees, the Discovery Research employees would
17 not have left Discovery Research and joined BNPP in the manner and at the time they did.
18     Finally, Chakravarty argues that the business opportunity doctrine bars plaintiffs' breach of
19 fiduciary duty claim. The business opportunity doctrine provides that there is no breach of a
20 fiduciary duty where the beneficiary of the duty was aware of the opportunity and dismissed it as
21 undesirable. *See Applera Corp.-Applied Biosystems Group v. Illumina, Inc.*, No. C 07-2845 WHA,
22 2008 WL 170597, at *5 (N.D. Cal. Jan. 17, 2008) (Alsup, J.) (citing *Robinson, Leatham & Nelson,*
23 *Inc. v. Nelson*, 109 F.3d 1388 (9th Cir. 1997)). Chakravarty attempts to excuse his conduct by
24 asserting that he informed TWIPL of an opportunity to form a joint venture with BNPP on
25 November 2, 2007, and that plaintiffs rejected the opportunity. Opp. at 14-15, 21-22; Chakravarty
26 Dec. ¶ 34. However, by Chakravarty's own assertion, he did not inform Discovery Research of any
27 business opportunities involving BNPP until November 2, 2007, one day after he had received an
28

offer of employment from BNPP, five days after he helped organize and facilitate interviews between BNPP and a number of Discovery Research analysts, and more than two weeks after he sent the first spreadsheet to Harris and brought BNPP representatives to visit the Discovery Research facilities. Furthermore, it is undisputed that BNPP provided contracts to Discovery Research analysts on November 1, 2007. *Id.*, Exh. M (Nov. 1, 2007 Email Chain). Plaintiffs' breach of fiduciary duty claim is therefore not barred by the business opportunity doctrine, because Chakravarty had already breached his fiduciary duty to plaintiffs prior to bringing any opportunity to plaintiffs' attention.

In conclusion, the actions taken by Chakravarty to facilitate the en masse defection of 26 of Discovery Research's employee fall squarely within the test set forth in *Bancroft-Whitney*. Accordingly, the court holds that, as a matter of law, Chakravarty breached his fiduciary duty to TWIPL and TWP.

III.   Damages

Chakravarty argues that plaintiffs' motion should be denied because plaintiffs fail to adduce any evidence of proximate injury. Plaintiffs allege that they were forced to close Discovery Research in December 2007 due to the loss of so many employees to BNPP, SAC ¶ 10, and Chakravarty, in response to that allegation, has admitted learning that Discovery Research would be closed, Chakravarty Answer ¶ 10. Plaintiffs further allege that Discovery Research employed approximately 55 individuals in fall 2007, SAC ¶ 26, and Chakravarty has admitted as much, Chakravarty Answer ¶ 26. Chakravarty has also provided eighteen declarations by individuals who resigned from Discovery Research between October 31 and November 6, 2007, and began working at BNPP in December 2007. Docket No. 193 (Eleswarapu Dec.) ¶¶ 1 & 9; Docket No. 194 (Bhattacharya Dec.) ¶¶ 1 & 11; Docket No. 195 (Ganti Dec.) ¶¶ 1 & 10; Docket No. 196 (Mathew Dec.) ¶¶ 1 & 12; Docket No. 197 (Shaw Dec.) ¶¶ 1 & 13; Docket No. 200 (Sarathi Dec.) ¶¶ 1 & 9; Docket No. 201 (Sharma Dec.) ¶¶ 1 & 10; Docket No. 202 (Vora Dec.) ¶¶ 1 & 10; Docket No. 205 (A. Singh Dec.) ¶¶ 1 & 9; Docket No. 206 (Naringrekar Dec.) ¶¶ 1 & 10; Docket No. 207 (Dubey Dec.) ¶¶ 1 & 11; Docket No. 208 (Nair Dec.) ¶¶ 1 & 13; Docket No. 209 (C. Singh Dec.) ¶¶ 1 & 10;

Docket No. 210 (Abhisheik Dec.) ¶¶ 1 & 11; Docket No. 212 (M. Gupta Dec.) ¶¶ 1 & 11; Docket No. 213 (K. Gupta Dec.) ¶¶ 1 & 10; Docket No. 214 (Somayajula Dec.) ¶¶ 1 & 10; Docket No. 215 (George Dec.) ¶¶ 1 & 14. All of these declarations cite BNPP's offer of a higher salary than Discovery Research was paying as a factor leading to the change in employment. Eleswarapu Dec. ¶ 14; Bhattacharya Dec. ¶ 15; Ganti Dec. ¶ 14; Mathew Dec. ¶ 16; Shaw Dec. ¶ 18; Sarathi Dec. ¶ 13; Sharma Dec. ¶ 16; Vora Dec. ¶ 14; A. Singh Dec. ¶ 14; Naringrekar Dec. ¶ 16; Dubey Dec. ¶ 14; Nair Dec. ¶ 18; C. Singh Dec. ¶ 14; Abhisheik Dec. ¶ 16; M. Gupta Dec. ¶ 14; K. Gupta Dec. ¶ 13; Somayajula Dec. ¶ 14; George Dec. ¶ 19. Chakravarty has also introduced some evidence that, at some unspecified future date, TWP intended to close Discovery Research. Chakravarty Dec. ¶ 21 (stating that Buell told Chakravarty in late September 2007 that closure of Discovery Research was "imminent"); Calabria Dec., Exh. 30 (Buell Memorandum to Slivon) (stating that Buell would support Slivon if he recommended to the Executive Committee that "we move on from Discovery").

Chakravarty overlooks the undisputed evidence in the record that no final decision had yet been made to cease operating Discovery Research. Certainly, there was no decision to close Discovery Research as early as December 6, 2007, which is the date Discovery Research was forced to close the office because of the defection of employees to BNPP. Further, Chakravarty does not account for the undisputed evidence that Chakravarty and representatives of BNPP *expected and intended* that by raiding Discovery Research's employees, Discovery Research would be forced to close, providing BNPP with an opportunity to acquire the remaining Discovery Research assets at little or no cost. Harris, in the internal BNPP memorandum discussing the hiring of BNPP employees, wrote:

> Chakravarty estimates that the core of the team consists of about 25 individuals. We propose to agree [sic] employment terms and roles with approximately this number and issue contracts. Chakravarty and this team will then approach Thomas Weisel USA to resign en-mass [sic]. Based on our discussions with Chakravarty, we would expect Thomas Weisel at this point to move to shut down the India operations [sic]as its highest value employees will be leaving. We would then approach them and offer to take over the entire operations at no cost to BNPP, as we help them avoid related shutdown costs. Chakravarty is comfortable with this approach and believes it has a high chance of success.

17

Shin Dec., Exh. G (Memorandum) at BNP040760. The causal connection between Chakravarty's conduct and the premature closing of the Discovery Research office is indisputable and satisfies the proximate injury requirement for breach of fiduciary duty. *See Bancroft-Whitney*, 64 Cal. 2d at 355 (where the defendant provided a competitor with a list of employees including current compensation information and offer suggestions, "[t]he causal relationship between [the] violation of duty and [the defendant corporation's] persuasive inducement to the plaintiff's personnel is crystal clear").

Accordingly, the court holds that plaintiffs have established, as a matter of law, that Chakravarty's breach of the fiduciary duty he owed to plaintiffs proximately caused injury to plaintiffs.

*****

Having found that plaintiffs have established all of the elements for a breach of fiduciary duty claim against Chakravarty, the court holds, as a matter of law, that Chakravarty breached the fiduciary duty that he owed to plaintiffs.

CONCLUSION

Plaintiffs' motion for partial summary judgment on the eighth cause of action for breach of fiduciary duty against defendant Chakravarty is GRANTED.

IT IS SO ORDERED.

Dated: March 31, 2010

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

**ENDNOTES**

1. Chakravarty's objection to Exhibit A is overruled. Chakravarty does not dispute that the underlying recording is that of a telephone conversation between Chakravarty and Rousseau on October 3, 2007. Chakravarty objects only to the transcript, claiming it is inaccurate and incomplete. The court has listened to the audio recording and finds that the transcript provided in Exhibit A is materially accurate and complete. The court further notes that while an occasional "uh" may have been omitted over the course of the transcribed conversation, the statement to which Chakravarty specifically objects is clearly stated in the recording.

2. Chakravarty's objection to Exhibit K is overruled. The "From:" field of the email presented indicates that the message was sent from the email address pchucky@gmail.com, which Chakravarty has admitted is his own email address. Shin Dec., Exh. P (Chakravarty Depo.) at P3. In addition, the email was produced by BNPP in response to plaintiffs' discovery requests.

3. For the same reasons stated above in regards to Exhibit K, Chakravarty's objection to Exhibit M is overruled. Chakravarty's remaining objections, to Exhibits D and L1, are denied as moot.

4. Plaintiffs assert that California law governs this claim pursuant to an order of this court. Mot. at 13 n.13; *see* Docket No. 85 (Order) at 16 ("California state law will govern nine out of ten causes of action . . . ."). Defendants assert that "[t]he issue of choice of law remains in dispute" but do "not contend . . . that choice of law issue will impact the Court's [sic] resolution of the issues presented in this motion." Opp. at 16 n.85.

5. The court rejects Chakravarty's argument, relegated to its 105th footnote, that the court must apply Indian law to the breach of fiduciary duty claim because TWIPL was incorporated in India. It also may do well to keep in mind Gandhi's admonition that "[y]ou cannot neglect the nearer duty for the sake of a remote." 25 Mahatma Gandhi, *The Collected Works of Mahatma Gandhi* 160 (1967). TWP was incorporated in California, meaning California law will apply to the breach of fiduciary duty claim.

The court also denies Chakravarty's motion for additional discovery pursuant to Federal Rule of Civil Procedure 56(f). Even if Chakravarty were able to obtain deposition testimony from a Rule 30(b)(6) deponent from TWP that the TWIPL board of directors was a sham and that Chakravarty's title as a principal was meaningless, the court would reach the same conclusion based solely on Chakravarty's job duties.

6. Chakravarty cites to *Avocados Plus Inc. v. Freska Produce Int'l LLC*, No. CV06-896-RGK, 2007 WL 5091680, at *6 (C.D. Cal. Jan. 26, 2007), for the proposition that a fiduciary duty cannot be breached toward a business that plans to shut down. *Avocados*, however, does not reach nearly as far as Chakravarty suggests. In *Avocados*, the district court judge denied defendants' motion for summary judgment on the grounds that a genuine factual dispute existed over whether plaintiffs intended to continue operating their business. In the instant case, no such dispute exists. Although Chakravarty has presented evidence that TWP executives had engaged in discussions about whether to close Discovery Research, at the time the Chakravarty breached his fiduciary duty to TWP, no decision had yet been made.

7. The one case cited by Chakravarty, *Operations Research, Inc. v. Davidson & Tailbird, Inc.*, 217 A.2d 375, 383 (Md. 1966), does not speak at all for this proposition. Instead, as pointed out by plaintiffs, the court in *Davidson & Tailbird* simply rejected a presumption of a breached fiduciary duty where a group of employees asked for jobs from their former managers, who had already left their former company prior to being approached by their former charges.